Case 08-45664-mxm11 Doc 935 Filed 02/20/09 Entered 02/20/09 16:01:01 Page 1 of 15

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed February 20, 2009                          **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| et al., | § | Case No. 08-45664 (DML) |
| | § | |
| Debtors. | § | JOINTLY ADMINISTERED |

**MEMORANDUM OPINION**
[Related to Docket No. 427]

Before the court is Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code to Enter into Consulting Agreements with J. Clinton Rivers and Robert A. Wright (the "Motion")[1] filed by Debtors. The United States Trustee (the "UST") responded to the Motion by filing its Objection to Debtors' Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code to Enter into Consulting Agreements with J. Clinton Rivers and Robert A. Wright (the

---
[1] The Motion was filed at docket no. 427.

"Objection")². The court considered the Motion and Objection at a hearing on February 3, 2009 (the "Hearing"). During the Hearing Debtors and the UST presented argument and the court heard testimony from William Snyder ("Snyder"), Debtors' Chief Restructuring Officer. At the conclusion of the Hearing, for reasons discussed below, the court invited Debtors and the UST to submit additional briefs by February 12, 2009. Both Debtors and the UST have submitted additional briefs.³

This contested matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion embodies the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

Debtors commenced these chapter 11 cases on December 1, 2008, by the filing of voluntary chapter 11 petitions. Debtors, the nation's second largest producer of chicken for sale in the consumer market, remain in possession of their estates and continue to operate their business.

At the time of commencement of these cases J. Clinton Rivers ("Rivers") was employed by the parent Debtor, Pilgrim's Pride Corporation ("PPC") as its Chief Executive Officer and Robert A. Wright ("Wright") was employed as PPC's Chief Operating Officer. Following commencement of these cases, the board of directors of

---

² The Objection was filed at docket no. 607.

³ In his brief the UST raises the issue of whether parties were afforded due process respecting the Motion. The UST argues that the Motion mischaracterized the relief actually sought by Debtors (as discussed below) and, hence, parties did not have an opportunity to assess the true merits (or lack thereof) of the Motion. However, there is an active creditors' committee in these cases which monitored the Hearing and since then has commented orally on the Motion. Neither it nor the several major secured creditors in these cases – nor any other party in interest – that was present at the Hearing has claimed lack of sufficient opportunity to evaluate or oppose the Motion. Moreover, if the Motion's emphasis was misplaced, the principal relief actually sought by Debtors was disclosed. Finally, the UST has vigorously contested the Motion such that the court is confident it has been made privy to the arguments against it. Accordingly, the court concludes no purpose would be served by requiring further notice and hearing prior to ruling on the Motion.

PPC, based in part on Snyder's advice, determined that Debtors would be best served by a change in senior management. The board therefore entered into discussions with Don Jackson ("Jackson"), an individual who is knowledgeable and experienced in Debtors' industry. On December 16, 2008, PPC announced that Jackson would become Debtors' Chief Executive and Chief Operating Officer. By resignation agreements (the "Resignation Agreement") also dated December 16, 2008, Rivers and Wright resigned their respective offices.[4]

On January 2, 2009, Debtors filed the Motion. By the Motion Debtors seek, pursuant to section 363(b)(1) and/or section 503(c)(3) of the Bankruptcy Code (the "Code"),[5] to employ Rivers and Wright as consultants for four and three months respectively.[6] Under the proposed consulting agreements, Debtors will compensate Rivers and Wright at, essentially, their preresignation salaries. In the Objection, the UST argues that the proposed consulting agreements with Rivers and Wright violate Code § 503(c)(1) and (2). Even if the consulting agreements properly fall instead under section 503(c)(3), the UST insists Debtors have failed to justify them as required by that section.

At the Hearing, Snyder testified that, in fact, Debtors do not require consulting services from either Rivers or Wright.[7] Rather, Snyder testified, the consulting agreements are necessary to prevent Rivers and Wright from soliciting Debtors'

---

[4] Snyder testified at the Hearing that the resignations were in lieu of involuntary terminations.

[5] 11 U.S.C. §§ 101 *et seq.*

[6] The terms of the proposed consulting agreements are to run from the date of the order authorizing them.

[7] In their post-hearing brief, Debtors persist in the fiction that Rivers and Wright will, in fact, provide valuable assistance as consultants. It may be that Debtors are concerned about a provision of the Texas Business and Commerce Code cited by the UST and discussed below. However, the record before the court does not support the contention of Debtors that Rivers and Wright will perform meaningful consulting services for Debtors.

**Memorandum Opinion 08-45664** **Page 3 of 16**

customers on behalf of one of Debtors' competitors. Snyder testified that Jackson would need the period of the consulting agreements to establish his relationships with Debtors' customers.

Indeed, in response to a question from the court, Snyder affirmed that Debtors are not by the Motion trying to obtain the services of Rivers and Wright as consultants. Rather, Debtors seek court authority to purchase time-limited non-competition agreements from them.

Based on Snyder's testimony, the court was concerned that the issues – under section 503(c) – posed by the parties were not really the questions the court needed to address in deciding the Motion. The court thus asked Debtors and the UST to submit the additional briefs.

## II. Discussion

The court has recharacterized the Motion as one by which Debtors seek authority essentially to purchase non-competition agreements from Rivers and Wright. The court's first task, then, is to determine whether the purchase by a debtor of a non-competition agreement from an insider (or one who was an insider at case commencement) conflicts with any of the provisions of Code § 503(c). If the court determines section 503(c) not to be a bar to the agreements, it must then decide whether such a transaction outside the ordinary course of business[8] should be authorized.

---

[8] In the Motion Debtors suggest that entry into consulting agreements would be part of the ordinary course of their business. Assuming, without deciding, that this would be true absent the pendency of a chapter 11 case (and that retention of a consultant would not ordinarily require court approval under Code § 327), given the typical of the industry, creditor expectation test applied in determining ordinary course of business in chapter 11 (*see generally* 3 Collier on Bankruptcy ¶ 363.03[1] (15th ed. Rev. 2005)), the court would not consider a purchase of a non-competition agreement, even coupled with a consulting agreement, to be an ordinary course of business transaction, at least on these facts for these Debtors.

A. THE MOTION DOES NOT SEEK RELIEF INCONSISTENT WITH SECTION 503(C).

Section 503(c) of the Code states:

> **(c)** Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> **(1)** a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
>
> **(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
>
> **(B)** the services provided by the person are essential to the survival of the business; and
>
> **(C)** either—
>
> **(i)** The amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>
> **(ii)** if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;
>
> **(2)** a severance payment to an insider of the debtor, unless—
>
> **(A)** the payment is part of a program that is generally applicable to all full-time employees; and

**Memorandum Opinion 08-45664**      **Page 5 of 16**

    **(B)**    the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

    **(3)**    other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

Section 503(c) was added to the Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case. *See In re Airway Industries, Inc.*, 354 B.R. 82, 87 n.12 (Bankr. W.D. Pa. 2006) (citing a statement by Senator Edward Kennedy quoted in the July 24, 2005, edition of the KANSAS CITY STAR); H.R. Rep. No. 109-031, pt. 1 at 84 (2005); 4 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2008).

In determining whether the Motion falls within section 503(c), the court must accord the statute its plain meaning. *See, e.g., Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *United States v. Ron Pair Enters. Inc.*, 489 U.S. 236, 232 (1989); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. D. Del. 2007).

Section 503(c)(1) applies to "a transfer made to, or an obligation incurred for the benefit of, an insider . . . for the purpose of inducing such person to remain with the debtor's business . . . ." This provision is directed at so-called key employee retention programs. *See* 4 Collier on Bankruptcy ¶ 503.17[1] (15th ed. rev. 2005).

Clearly, the purpose of the Motions – and the payments to Rivers and Wright contemplated by it – is not to cause Rivers and Wright "to remain with the [Debtors]

business." As Snyder testified, Debtors do not expect, as a result of the consulting agreements, that Rivers or Wright will have any meaningful role in Debtors' business. The purpose of the relief sought by the Motion is not to induce Rivers or Wright to remain with Debtors; it is simply to induce them *not* to work for a competitor of Debtors for a limited period of time. Indeed, the proposed consulting agreements include provisions both protecting against contact by Rivers and Wright with Debtors' customers and prohibiting Rivers and Wright during the agreements' terms from working for any of Debtors' competitors. *See* Rivers' *Consulting Agreement* at ¶ 6(b) & (c) and Wright's *Consulting Agreement* at ¶ 6(b) & (c). Because the proposed consulting agreements are not for the purpose of retaining Rivers and Wright, section 503(c)(1) has no application here.

Section 503(c)(2) bars "a severance payment to an insider of the debtor . . ." unless the payment is in accordance with the tests set out in that section. The evidence before the court is that both Rivers and Wright have been paid severance as permitted by section 503(c)(2).[9] The payments proposed by the Motion are not intended as severance, nor do they have more than a tangential relationship to the termination of Rivers and Wright. The court does recognize that, if a debtor may pay a terminated insider not to compete, the result may be that debtors will seek to evade section 503(c)(2)'s limit on severance pay through negotiation of a noncompetition agreement.[10] However, any such

---

[9] The UST argues that Debtors overpaid severance to Rivers and Wright. The difference between Debtors' and the UST's calculation of the permitted severance depends on how "a calendar year" is determined for purposes of section 503(c)(2)(B). *See* 4 Collier on Bankruptcy ¶ 503.17[2] (15th ed. rev. 2005). The court need not address this issue at this time.

[10] It is not uncommon to see an employment agreement with an insider that includes, in connection with specified severance payments, a noncompetition provision. Of course, such an agreement is only enforceable in a chapter 11 context by the insider as permitted by section 503(c). The court questions (though in the instant case it need not decide) whether a noncompetition provision in an

agreement will still require court approval under (as discussed below) section 503(c)(3), and an agreement which is clearly improvident or a subterfuge will not receive such approval.

The UST, however, points to *In re Dana Corporation*, 351 B.R. 96, 102-3 (Bankr. S.D.N.Y. 2006), in which the bankruptcy court ruled that payments ostensibly in exchange for a non-competition agreement were in fact tied to the employee's severance and so were barred by section 503(c)(2). *Dana* is distinguishable in that it involved a pre-termination agreement, unlike the post-severance agreement in the case at bar. The covenant not to compete part of the agreement in *Dana* was included with the severance terms. This resulted in a clear interrelationship between the proposed payments and the potential of the employee's severance. Moreover, the ruling of the *Dana* court was based on the failure of the debtors "to meet their burden of demonstrating that the payments in exchange for signing a non-compete agreement . . . [did] not constitute 'severance' for purposes of section 503(c)(2) . . . ." *Id.* The court here would find Debtors have met any burden they may have to prove the payments to Rivers and Wright are not for severance. The court thus holds that the proposed consulting agreements do not violate section 503(c)(2).

Section 503(c)(3) on its face applies to the relief sought by the Motion. The provision is not plainly limited in its scope even to transactions with insider employees, though its final clause ("including transfers made to . . . officers, managers, or consultants hired after" case commencement) together with the balance of section 503(c) suggest that was its intended focus. However, the court need not at this juncture decide whether

---

employment agreement would be enforceable by a debtor if the severance provisions of the agreement are otherwise not enforceable against the debtor.

section 503(c)(3) was intended to reach beyond transactions with insiders. Whether or not section 503(c)(3) is of broader scope, it clearly would apply to any "transfer[ ] or obligation[ ] [to an insider] that [is] outside the ordinary course of business." As the Motion proposes transfers and obligations to insiders[11] that are outside the ordinary course of business, section 503(c)(3) applies to the Motion.

Section 503(c)(3), however, does not prohibit such a transfer or obligation. Rather, it conditions approval of a proposed transfer or obligation upon such being "justified by the facts and circumstances of the case." Thus, if Debtors have made a showing that the payments to Rivers and Wright proposed in the Motion are so justified, the relief sought by the Motion is not inconsistent with section 503(c).

B.   THE STANDARD FOR GRANTING RELIEF.

Debtors argue that the test for granting the Motion should be that of the business judgment rule as applied under Code § 363(b)(1). They cite several cases,[12] including *Dana,* in support of the proposition that section 503(c)(3) requires no different standard than that applied under the former provision. Motion, ¶¶ 10-11. On the other hand, some courts have held that section 503(c)(3) sets a higher bar than the simple business judgment test. *See In re CEP Holdings, LLC*, 2006 Bankr. LEXIS 3305 *8-9 (Bankr. N.D. Ohio 2006); *In re Dura Auto Sys, Inc.*, Case No. 06-11202, Docket No. 1369

---

[11]  An insider is defined as including directors and officers of a corporate debtor. 11 U.S.C. Code § 101(31B) (2009). As their employment by Debtors has been terminated, and Rivers and Wright are thus no longer officers (though the court is unclear whether either is still a director of any of Debtors), they arguably are not insiders. Such a reading of the statute would surely frustrate Congress's intent in BAPCPA in enacting at least section 503(c)(2). As the definition of insider is inclusive, the court therefore holds that, for purposes of section 503(c), anyone who was an officer or director of a debtor as of commencement of the debtor's bankruptcy case is an insider.

[12]  *See In re Nobex*, Case No. 05-20050, Docket No. 194 (pp. 86-87) (Bankr. D. Del. Jan. 12, 2006); *see also In re Riverstone Networks, Inc.*, Case No. 06-10110 (Bankr. D. Del. Mar. 28, 2006); *In re Pliant Corp.*, Case No. 06-10001 (Bankr. D. Del. Mar. 14, 2006).

(Bankr. D. Del. June 29, 2007); *In re Supplements LT, Inc.*, Case No. 08-10446 (KJC), Docket No. 227 (Bankr. D. Del. Apr. 14, 2008).

The court agrees with the conclusion reached in this latter group of cases that the test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1). First, to do so would mean that section 503(c)(3) is redundant. A transfer made or an obligation incurred outside the ordinary course of a debtor's business would fall within section 363(b)(1) in the absence of section 503(c)(3), and, thus, the latter provision would add nothing to the Code. Congress is presumed to intend that independent sections of the Code will have independent, differing impacts. *See, e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994). To read section 503(c)(3) as requiring nothing not already required by section 363(b)(1) would violate this principle of construction.

Second, the conditioning of approval of covered transfers and obligations upon their being "justified by the facts and circumstances of the case" suggests to the court that Congress intended the court to play a more critical role in assessing transactions, at least those with insiders, that fall within the ambit of section 503(c)(3). In applying the simple business judgment test, courts are adjured to defer to the debtor in possession or trustee; if a valid business reason is shown for a transaction, the transaction is to be presumed appropriate. *See* 7 Collier on Bankruptcy ¶ 1108.06 (15th ed. rev. 2006).

The court concludes that section 503(c)(3) is intended to give the judge a greater role: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it. The court reads this requirement as meaning that the court must make its own

determination that the transaction will serve the interests of creditors and the debtor's estate. Put another way, when a transaction is proposed between a debtor and its insiders, the court cannot simply rely on the debtor's business judgment to ensure creditors and the debtor's estate are being properly cared for. Given the obvious conflict of interest between a debtor's estate and insiders – who may themselves have been responsible in whole or part for devising and internally approving the proposed transaction – the argument underlying application of the business judgment rule (that officers and directors will fulfill their fiduciary responsibilities) lacks its usual weight. Reading of section 503(c)(3) as does the court therefore clearly comports with the other two subdivisions of section 503(c) and suits the evident purpose of Congress in enacting the provision.[13]

C.  APPLICATION TO THE MOTION.

The court concludes that on the record before it, Debtors have carried their burden of showing that the proposed agreement is justified by the facts and circumstances of the case. Not only does Snyder's testimony underwrite a valid business reason for the agreements with Rivers and Wright, his testimony also demonstrates that entry into the agreements is in the best interests of creditors and Debtors' estates.[14]

---

[13] That the court should assess the value to the debtor of a post-petition transaction covered by section 503(c)(3) is also consistent with another provision added by BAPCPA and directed toward the incestuous relationship between a debtor and its insiders, section 548(a)(1)(B)(ii)(IV), providing that prepetition transactions with insiders will be subject to avoidance if the debtor did not receive reasonably equivalent value.

[14] The court does not here address whether Debtors might have struck a better deal with Rivers and Wright. The court, like the UST, is troubled by the cost of what amounts to agreements not to compete which will be effective for only a brief period of time. However, the court need only determine that Debtors have provided a sound business reason for the agreements and that, even at their projected cost, the benefit to creditors and Debtors' estates is of commensurate value. Moreover, there is no evidence in the record (other than the tenuously circumstantial suggestion of the correspondence between the proposed payments to Rivers and Wright and their prior salaries) that negotiation of the proposed consulting agreements was not arms length. In fact, the record suggests Snyder, who, as discussed below, has a degree of independence, was an active participant in the negotiations.

Without the agreements proposed in the Motion, Debtors will be subject to potential competition engineered by Rivers and Wright. Debtors assert they have no right to prevent that competition as things stand.[15] Snyder's testimony, which the court finds credible,[16] was that Rivers and Wright were knowledgeable about Debtors' customers and had contacts with those customers, and that either might use such knowledge and contacts to divert those customers to one of Debtors' competitors. According to Snyder, diversion of even one of Debtors' largest customers could cost Debtors hundreds of millions of dollars. While the payments to Rivers and Wright will be substantial – totaling almost $500,000 – the cost of the agreements with these individuals is miniscule in comparison with the extent of Debtors' business[17] and the harm that might be done to Debtors' reorganization prospects and estates if the Motion is not granted and Debtors' fears respecting competition through Rivers and Wright are realized.

---

[15] The UST argues that Rivers and Wright are, in any event, effectively barred by the Resignation Agreements from stealing Debtors' customers. The court addresses this argument below.

[16] Though technically Debtors' employee, Snyder serves as Debtors' Chief Restructuring Officer and so is more like an independent advisor. In fact, Snyder was retained by order of the court. *See Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to (A) Employ and Retain CRG Partners Group LLC to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and (B) to Designate William Snyder as the Chief Restructuring Officer for the Debtors Nunc Pro Tunc to the Commencement Date* entered in this case on January 9, 2009 at Docket no. 825. The court has had considerable experience with Snyder in prior cases (*see, e.g., In re Mirant Corp.*, 354 B.R. 113. 120 (Bankr. N.D. Tex. 2006)). Taking that experience into account, the court is confident that Snyder testified truthfully about the proposed agreements and the reasons motivating them. The court additionally is prepared to infer, as it does below, that Snyder ensured Debtors and their counsel engaged in appropriate due diligence in evaluating the agreements.

[17] Debtors' annual revenues exceed $8.5 billion. Debtors Form 10-K for the fiscal year ending Sept. 27, 2008, filed Dec. 11, 2008, at p. 55.

Courts in the past have authorized debtors to pay former insiders not to compete with them. *See, e.g., In re Werner Holding Co, Inc., et al.*, Case No. 06-10578 (Bankr. D. Del. 2006); *In re Footstar, et al.*, Case No. 04-22350 (Bankr. S.D.N.Y. Dec. 20, 2004). Thus there is no categorical prohibition on payments by a debtor to an insider to prevent competition.

The UST, however, makes two arguments for why the court should deny the Motion notwithstanding Snyder's testimony. First, the UST argues that the agreements will not be enforceable by reason of section 15.50(a) of the Texas Business and Commerce Code. Second, the UST insists that, in any event, Rivers and Wright may not solicit Debtors' customers on behalf of a competitor because of the provisions of their Resignation Agreements.

> TEX. BUS & COMM. CODE § 15.50(a) states (in pertinent part):
>
> (a)   Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS & COMM. CODE § 15.50(a). From this statute the UST argues that, since the agreements with Rivers and Wright are intended only to protect Debtors from competition, the noncompetition portions of the agreements are not "ancillary to or part of . . . otherwise enforceable agreement[s]."

This argument fails for two reasons. First, while Debtors may not intend to enforce the consulting portions of the agreements, that does not mean they could not do

so. Section 15.50(a) requires only that the agreement be enforceable, not that it be – or, from the promissee's perspective, that it be intended to be – actually enforced.

Second, section 15.50(a) is intended primarily to protect the promissor – i.e., the party promising not to compete – not the beneficiary of the covenant not to compete – here the Debtors. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 650-51 (Tex. 2006) (requiring performance by the employer for a non-compete agreement to be enforceable). Thus, the fact that the agreements will be enforceable against Debtors (the agreements will be entered pursuant to this court's order,[18] so they will be enforceable), means they satisfy section 15.50(a).

The UST next argues that Debtors do not need the covenants not to compete from Rivers and Wright as embodied in the proposed agreements. Leaving aside the UST's assertion that the record does not support Debtors' contention that Wright could divert any of Debtors' customers,[19] the court is not prepared at this point and in this context to construe the obligations of Rivers and Wright under the Resignation Agreements. In the first place, the court's construction of those agreements in the context of the Motion might not be binding on Rivers and Wright. Second, the court infers from Snyder's testimony that he – and Debtors – considered whether the Resignation Agreements sufficiently protected Debtors. The court is confident that counsel to Debtors would not

---

[18] The court is also not persuaded that a Texas statute precludes entry by a debtor into an agreement blessed by order of a federal court. But, as the state statute here is in any event satisfied, the court need not look to the Constitution's supremacy clause as warrant for approval of the proposed agreements. Cf. U.S. Const. art. VI, cl. 2; *New York v. United States*, 505 U.S. 144, 112 (1992); *In re Ferguson*, 112 B.R. 820 (Bankr. N.D. Tex. 1990).

[19] Even if the court were not satisfied that Snyder's testimony regarding Wright was sufficient, it is improbable that Wright, Debtors' chief operating officer, would not be well-acquainted with Debtors' principal customers and have frequent communication with those customers.

have presented the Motion to the court without analyzing its legal justification.[20] Consideration of the legal effect of the severance agreements would be an essential part of the due diligence that would be a necessary prerequisite to filing the Motion.[21] That Debtors *might* be protected adequately by the terms of the Resignation Agreements is not alone sufficient to warrant the court's second guessing of Debtors' decision to purchase the additional and iron-clad assurance against competition afforded by the agreements proposed in the Motion[22]. Nevertheless, the court cautions Debtors and their counsel that it will take submission of an order granting the Motion as constituting verification of the court's assumption that counsel has assessed fully the legal necessity to the protection of Debtors' business of the proposed consulting agreements.

### III. Conclusion

For the foregoing reasons, the Objection is overruled and the Motion will be GRANTED. Counsel to Debtors may present an order to such effect.

### # # # END OF MEMORANDUM OPINION # # #

---

[20] The Resignation Agreements do provide considerable protection for Debtors' confidential information, including a provision barring each of Rivers and Wright from "disclos[ing] . . . directly or indirectly" "customer contacts and information." Resignation Agreements, ¶ 6. While the court agrees with the UST that this provision, at least, may give Debtors protection against the conduct the Motion is intended to prevent, the court can also justify a construction that would not prevent Rivers and Wright from using their knowledge of Debtors' customers to Debtors' detriment. Given the potential consequences of competition from Rivers or Wright, the court cannot conclude Debtors are wrong in seeking absolute certainty that such competition will not occur. The court nevertheless notes that in granting the Motion, it does not intend to in any way limit or reduce the obligations of Rivers and Wright under their Resignation Agreements.

[21] The court cannot believe Debtors' counsel and Snyder would risk their respective reputations – to say nothing of their fees – in order to rubber-stamp the gift of funds to Rivers and Wright.

[22] On a different record, especially given the court's role under section 503(c)(3), it might be appropriate to deny relief in a case like that at bar on the basis that the debtor's decision-making process or due diligence was flawed.