

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 22, 2009                                    **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **Chapter 11** |
| **PILGRIM'S PRIDE CORPORATION,** | § | |
| et al., | § | **Case No. 08-45664 (DML)** |
| | § | |
| Debtors. | § | **JOINTLY ADMINISTERED** |

**MEMORANDUM OPINION**

Before the court is *Debtors' Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014 Authorizing [sic] the Debtors to Reject Certain Executory Contracts and Certain Unexpired Leases of Nonresidential Real Property* (the "Motion"). Certain contract parties of Debtors (the "Growers")[1] responded

---

[1] R & C Farm, Moises Rodriguez, Loyce Roberts, Cullinane Farms, LLC, Abel T. Farm, David Hines, James Fountain, Trinder Farms, LLC, and Maybuck Farms, Inc., are named as proponents

with the *Live Oak Chicken Growers' Objection to Debtors' Motion to Reject Certain Executory Contracts and Certain Unexpired Leases of Nonresidential Real Property* (the "Objection"). On January 20, 2009, on the Growers' motion to continue the hearing on the Motion, the court conducted a telephonic hearing during which it determined that its consideration of the Motion and Objection should be bifurcated[2] between a hearing to determine what standard should be applied in deciding the Motion and an evidentiary hearing. The court then set February 24, 2009, to hear argument respecting the standard to be applied and March 10, 2009, for the evidentiary hearing.[3]

In anticipation of the February 24 hearing, the Growers, Debtors and the Official Unsecured Creditors' Committee (the "Committee") filed briefs in support of or opposed to application of the business judgment rule in deciding the Motion. At the February 24 hearing, the court received argument from those parties. Following that hearing, the court orally ruled as discussed below respecting the standard to be applied in deciding the Motion.

Prior to the March 10 hearing,[4] each of the parties filed a trial brief with the court, and subsequently, before the conclusion of the evidentiary hearing on the Motion, Debtors filed a brief addressing the Growers' allegations of discrimination. Following the evidentiary hearing, at the court's invitation, and in lieu of closing argument, each party filed a final brief with the court.

---

[ ] of the Objection (as defined below). As discussed at note 8 below, the court uses the defined term "Growers" for multiple purposes.

[2] *See* Fed. R. Bankr. P. 7042 which, together with Rule 9014(c), makes Fed. R. Civ. P. 42(b) applicable to the Motion.

[3] As described below, the evidentiary hearing actually consumed several days.

[4] Prior to the March 10 hearing, the parties conducted extensive discovery which required court intervention on one occasion.

**Memorandum Opinion 08-45664**

On March 10, March 13, March 31 and April 1, 2009, the court conducted an evidentiary hearing on the Motion. During that hearing the parties presented evidence in support of or opposed to the Motion. During the evidentiary hearing the court heard testimony from Dr. Donald Jackson, Debtors' chief executive officer ("Jackson"), Randy Stroud, Debtors' senior vice-president of live technical services ("Stroud"), Dr. Robert Taylor, the Growers' expert in agricultural economics ("Taylor"), Alberto Brito ("Brito"), Roman Vasallo ("Vasallo"), Moises Rodriguez ("Rodriguez"), Walter Starling ("Starling"), Loyce Roberts ("Roberts"), Jesus Martinez ("Martinez"), and Bruno Lazero Garcia ("Garcia") (the latter seven being owners or operators of chicken farms). In addition, Debtors, the Committee and the Growers designated and submitted portions of the depositions of Ramon Angeles ("Angeles"), Ofelia Angeles and Roland Buchanan. The court also received into evidence exhibits identified as necessary below.

On April 14, 2009, the Growers filed a motion seeking to reopen the record respecting this contested matter. The Growers contended that they had evidence that Stroud had testified incorrectly (as discussed below) during the evidentiary hearing. The Growers' motion was resolved by agreed order, pursuant to which the Growers submitted for inclusion in the record declarations under penalty of perjury made by three individuals engaged in the chicken growing business in the vicinity of Siler City, North Carolina: Gracie Freeman, Dwayne Parrish and Timothy Patterson (collectively the "Siler City Growers"). Pursuant to the same order, Debtors submitted for inclusion in the record declarations under penalty of perjury made by Dale Hulsey, Live Production Manager at one of the Debtors' North Carolina plants ("Hulsey"), and Stroud.

**Memorandum Opinion 08-45664**

Also, as permitted by the same agreed order, Debtors filed a letter brief on April 20, 2009. The Growers responded in kind the following day. Debtors' letter brief and the Growers' response were limited to addressing the significance of the declarations of the Siler City Growers, Hulsey, and Stroud.

The court exercises core jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014.

## I. Background

A.    General

Debtors are in the business of producing chicken and selling their product on the wholesale market (including, as mentioned below, the commodity market).[5] They are one of the largest producers of chicken products in the United States. Debtors operate 32 plants[6] for processing and packaging chicken products throughout the continental United States and Puerto Rico.

On December 1, 2008, Debtors commenced chapter 11 cases in this court. Debtors remain in possession of their property and continue to operate their business as debtors in possession. On December 7, 2008, the United States Trustee appointed the Committee;[7] no examiner or trustee has been appointed in Debtors' cases.

---

[5]    The industry term for a business such as Debtors' is "chicken integrator."

[6]    As a result of the other proceedings before it, the court is aware that Debtors expect to cease operations at several plants.

[7]    At this writing a motion seeking appointment of an equity committee is pending before the court.

**Memorandum Opinion 08-45664**

In connection with their business Debtors have entered into contracts with a number of entities (growers) including the Growers[8] by which such entities receive from Debtors baby chicks which those entities then care for until, at maturity, the chickens, ready for processing, are returned to Debtors.[9] At all times in the process the birds remain the property of Debtors. Debtors also provide to their contract counterparties the feed and any necessary medication for the chickens. Most of the counterparties, including the Growers, are compensated on a "tournament" basis,[10] by which their profit depends on the comparable, *vis-à-vis* other growers, quality and cost to Debtors of the mature chickens.

Debtors' counterparties, including the Growers, have had to invest substantial capital in facilities used to house and care for the chickens during their growth. Because, at least in the case of the Growers, Debtors' counterparties tend to be geographically concentrated in proximity to one of Debtors' plants, Debtors are often an important, if not critical, player in the local economy. In the case at bar, the Growers contend that their

---

[8] By the Motion, Debtors seek to reject 19 contracts with growers. Debtors have advised seven additional growers (including Brito and Starling) that their contracts are to be rejected as well; thus the total number of growers concerned with the disposition of the Motion is 26. The court uses the defined term "Growers" both to refer to those parties that filed the Objection and all counterparties to contracts that are the subject of the Motion or that have been notified their contracts will be rejected. Because the court ruled on March 10, 2009, that the Motion would be granted or denied as to all 19 (or 26) growers, as a practical matter the Growers filing the Objection are not distinguishable from those whose contracts are to be rejected but who did not join in the Objection.

[9] Debtors also enter into contracts for growers to maintain breeder hens and roosters and to produce eggs. The contracts with the Growers relate to raising broiler chickens (an industry generic for birds destined for the dinner table) for sale. Debtors have contracted with approximately 5500 growers nationally, of which 123 are located in the Growers' area and serve Debtors' Live Oak, Florida plant.

[10] The tournament methodology is discussed at greater length below.

**Memorandum Opinion 08-45664**

local economy is likely to suffer difficulties if the Growers' contracts with Debtors are rejected.

Aside from the dispute now before the court, other of Debtors' counterparties have sued Debtors in the United States District Court for the Eastern District of Texas, alleging that Debtors have discriminated against them in violation of the Packers and Stockyards Act (the "PSA"). *See White, et al. v. Pilgrim's Pride Corp., et al.*, 2:07-CV-522-TJW (E.D. Tex. 2007); 7 U.S.C. § 192(a) and (b). The Growers have intimated that they have (and have asserted) similar claims.

By the Motion, Debtors seek to reject their contracts with the Growers. In the Objection the Growers argue that Debtors selected their contracts for rejection in retaliation for pursuing claims like those raised in the litigation mentioned above.[11] The Growers also assert in the Objection that Debtors disproportionately selected for rejection contracts with Hispanics. Finally, in the Objection the Growers maintain that their geographic area was improperly singled out by Debtors and that rejection of their contracts should not be permitted because of the economic impact it will have on their community. The Growers contend that, for all these reasons, rejection of their contracts is inappropriate and contrary to the PSA.[12]

B.      Debtors' Rejection Methodology

---

[11]      Certain growers, including some of the Growers, organized a club, now defunct, for socializing and to communicate common concerns to Debtors. The Growers also assert that Debtors may have selected some contracts for rejection in retaliation for formation of that club.

[12]      The argument and evidence presented by the Growers did not wholly conform to the allegations in the Objection, as will be seen below.

**Memorandum Opinion 08-45664**

Debtors, however, presented uncontested evidence[13] that they used essentially the same tournament system that is used for calculating payment of growers to identify the least efficient growers serving the Live Oak, Florida plant, and it was the 26 least efficient growers[14] whose contracts were selected for rejection.

The tournament system essentially calculates for each grower supplying a production facility the cost per pound of produced chicken. Using standard costs for feed, medicine and other items supplied by Debtors, Debtors factor in the total chicks supplied to the grower, mature chickens delivered back to Debtors and the number of chickens lost through, e.g., condemnation. The result computed for each grower is ranked with the results for other growers serving the same facility and raising a time-comparable flock (a "flock" being the chicks delivered to a grower for raising at a particular time),[15] and a grower is then paid by Debtors based on its results relative to the other growers in its tournament.

---

[13]  The Growers, as discussed below, question the validity of the tournament system. They do not, however, dispute that it was the methodology used by Debtors in selecting contracts for rejection, though the Growers argue the method was applied to them inconsistently with how Debtors used it in terminating contracts related to their plant in Siler City, North Carolina.

[14]  As discussed below, Debtors determined that they needed to cut back production at their Live Oak, Florida plant by approximately 325,000 chickens per week. In order to reduce the supply of chickens to the plant by that number, Debtors computed that they would need to cut growers having a total of 2,000,000 square feet of growing space. Thus, the contracts selected for rejection by the Motion were those of the least efficient growers, determined using the tournament method, up to 2,000,000 square feet of growing space (actually a total reduction in growing space of 2,072,440 square feet will be effected by rejection of the Growers' contracts; rejection of the contracts of just the least efficient 25 growers would achieve a reduction of more than 2,000,000 square feet, and Stroud was unable to explain why 26, versus 25, growers had their contracts chosen for rejection); see Transcript of Proceedings, March 10, 2009 testimony of Stroud at page 150, line 25 through page 151, line 7.

The transcribed record of the evidentiary hearing will hereafter be cited as "TR (*name of witness*) *Date* at p. *page:line – line*".

[15]  In order to ensure a continuous supply of chickens, growers receive their flocks at different times. Thus a grower competes in a tournament with other growers receiving flocks at the same time as

**Memorandum Opinion 08-45664**

In determining which contracts they would reject, Debtors took the most recent five flocks raised by each of the growers serving the Live Oak plant (*see* Debtors' Exhibit 3, Growers' Exhibits R and S).[16] Debtors then calculated how, over those five flocks, each grower compared to an average determined for all growers serving the plant.[17] Those growers that were most below average for that five flock range were the ones whose contracts were chosen for rejection. While Debtors would make allowance for a grower that received a sick flock, Debtors did not adjust the calculations to allow for other aberrational results. Debtors insist, however, and that insistence is supported not only by the testimony of Jackson and Stroud, but also by that of Taylor, that their use of the tournament system over a five-flock range is standard in the industry for determining relative grower efficiency.[18]

---

that grower. Typically about five to ten growers compete in a given tournament. *See* Growers' Exhibit HH.

[16]    The testimony was that five flocks would cover approximately a year's production for a grower, each flock requiring approximately 49 days to raise, with flocks spaced about 14 days apart (the court recognizes this does not compute to a 365 day year, but it is consistent with the testimony of Stroud and Jackson) *See* TR (Jackson) March 10 at p. 32:23–25 and TR (Stroud) March 10 at p. 106:3–8. As discussed below, following rejection of the Growers' contracts, Debtors expect growers serving the Live Oak plant to process approximately 3.71 flocks per year.

[17]    As discussed above, growers do not all compete in a single tournament. For purposes of selecting contracts for rejection, Debtors pooled the results of different tournaments, which arguably could have distorted the rankings of growers. The court does not see how Debtors could have employed the tournament system for the purpose of ranking all growers serving the Live Oak plant without risking such distortion. Further, there is no evidence before the court that suggests there might be a more accurate way to measure the relative efficiency of the growers. Moreover, a number of variables result in growers not always being grouped with the same competitors from tournament to tournament.

[18]    *See* TR (Jackson) March 10 at p. 33:1–6; TR (Stroud) March 10 at p. 71:2–8; and TR (Taylor) March 13 at p. 102:3–5. In the course of his testimony, Stroud stated that the same methodology was used for culling growers at the Live Oak plant as had been used at Debtors' plant in Siler City, North Carolina. *See* TR (Stroud) March 10 at p. 70:8-10. The declarations of the Siler City Growers, however contradicted that testimony, and Stroud's declaration, submitted in response, acknowledged his original testimony was incorrect as a result of memory failure. Hulsey's declaration explained that he, charged with the task of selecting grower contracts for termination at the Siler City plant, did not use the most recent five flocks for judging efficiency due to extraordinary disease problems with some flocks.

**Memorandum Opinion 08-45664**

## II. Standard for Deciding the Motion

A.     The Issue

In the Objection the Growers urged that, rather than the normal business judgment rule, the court should test the Motion by the higher standard[19] suggested for determining whether to authorize rejection of certain executory contracts by *National Labor Relations Board v. Bildisco and Bildisco* (*In re Bildisco and Bildisco*), 465 U.S. 513 (1984) and *Mirant Corporation v. Potomac Electric Power Co.* (*In re Mirant Corporation*), 378 F.3d 511 (5th Cir. 2004). In *Bildisco* and *Mirant* it was held that certain executory contracts are so significant in terms of public policy that a court, in determining whether a chapter 11 debtor should be permitted to reject such a contract pursuant to section 365(a) of the Bankruptcy Code (the "Code"),[20] must take that policy into account.[21]

---

Though the declarations of Stroud and the Siler City Growers may raise questions about the accuracy of Stroud's memory, they do not cause the court to doubt either that the standard industry practice for assessing grower efficiency is the use of the five most recent flocks or that that was the method used by Debtors to select the Growers' contracts for rejection. Moreover, Hulsey's declaration clarified why Siler City presented a different situation. Accordingly, the court is not persuaded by the declarations of the Siler City Growers that it should reject Debtors' methodology for choosing the contracts of the Growers for rejection.

[19]     The court from time to time referred on the record to this higher standard as a "public interest standard" because its most recent enunciation was based on the public interest that was the focus of the appellate court's concern in *Mirant*, discussed below.

[20]     11 U.S.C. §§ 101 *et. seq.*

[21]     Arguably, there is no warrant in the Code for distinguishing among different types of contract. *See Bildisco*, 465 U.S. at 521-22. Indeed, although section 365 does not distinguish (at least on the basis of public policy) between kinds of agreement in terms of rejectability (*but see* section 365(o)), Congress provided specifically in section 1169(b) for consideration of the public interest in approval of rejection of railway track leases. *See also,* section 1165, directing that the court consider the public interest in applying several provisions of subchapter IV of chapter 11. From Congress's specific reference to the public interest in the part of the Code dealing with railroad reorganizations it could be inferred that Congress did not intend to account for public policy in other parts of the Code, including, generally, section 365. That said, this court is, of course, bound by *Bildisco* and *Mirant* and so recognizes that public policy must be taken into account in appropriate cases in deciding whether to allow rejection. Nevertheless, the statutory construction arguments against applying a different test for rejection to some contracts support the court's view that the public policy exception to the ordinary business judgment rule is a very narrow one.

**Memorandum Opinion 08-45664**

The Growers contend that Debtors' contracts with them are of the type the rejection of which the *Bildisco* and *Mirant* Courts would hold subject to the higher level of scrutiny necessitated by implication of public policy. The Growers argue that (1) rejection of their contracts is improper in that it effects discrimination of the kind barred by the PSA; and (2) the economic impact of rejection on their community is contrary to the public interest. Thus, the Growers insist, rejection of their contracts should only be permitted upon satisfaction of the more rigorous test for rejection of contracts formulated in *Bildisco* and *Mirant*. The essence of the Growers' argument is that, when issues under another federal statute, here the PSA, arise in connection with rejection of a contract under Code § 365(a), the court must look to the guidance provided by *Bildisco* and *Mirant* before approving the contract's rejection.

Debtors and the Committee, on the other hand, argue that the test of *Bildisco* and *Mirant* should only be used in areas where federal law provides a regulatory framework intended to serve a public policy. They maintain that, at least with respect to chicken producers,[22] Congress did not intend in the PSA to impose as public policy a regulatory regime such as that created by the National Labor Relations Act (*Bildisco*) and the Federal Power Act (*Mirant*). Therefore, the contracts with the Growers that Debtors seek to reject do not fall within the narrow exception to the general rule that rejection of a contract pursuant to section 365(a) should be judged under the business judgment rule.

---

[22]   As argued by the Committee, when Congress added chicken producers to the PSA in 1987, it did not make applicable to them many of the regulatory provisions applicable to other meat producers. *See* H.R. Rep. No. 100-397, at 6-7 (1987), *reprinted in* 1987 U.S.C.C.A.N. 855, 856-57, as cited in *Memorandum of Official Committee of Unsecured Creditors Regarding Legal Standard for Rejection of Live Oak Chicken Growers* [sic] *Contracts* at page 8.

**Memorandum Opinion 08-45664**

The Motion and Objection thus posed for the court the question of whether, in assessing potential rejection by Debtors of their contracts with the Growers, disposition of the Motion should turn on Debtors meeting the higher *Bildisco/Mirant* standard. For the reasons stated below, the court, at the conclusion of the February 24 hearing, ruled that the business judgment test, as opposed to the higher bar the application of which was directed in *Bildisco* and *Mirant*, would govern its decision on the Motion. However, in formulating the manner in which it would apply the business judgment rule, the court, as discussed below, concluded it would be able to account for any concerns of the Growers that have merit.

B.    Public Policy Does Not Require Application of a Higher Standard for Rejection of the Growers' Contracts

The general rule is that the decision to reject a given contract should be left to the trustee's (or debtor in possession's) sound business judgment. *See Richmond Leasing Co. v. Capital Bank, N.A.* (*In re Richmond Leasing Co.*), 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that the question [of] whether a lease should be rejected . . . is one of business judgment.") (quoting *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.(In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.)*, 318 U.S. 523 (1943)) (omissions in original, alteration added); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision [based on its business judgment] to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") *citing Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987). That use of the business judgment rule is the norm was

recognized by the *Bildisco* and *Mirant* Courts. *Bildisco*, 465 U.S. at 523-24 (petitioner

sought a more strict standard for rejection than the "traditional 'business judgment'

standard applied by the courts to authorize rejection of the ordinary executory contract.");

*Mirant*, 378 F.3d at 525.

In *Bildisco*, however, the Supreme Court also concluded that for some contracts

the court should set a higher bar for rejection. Noting "the special nature of a collective

bargaining contract" (*Bildisco*, 465 U.S. at 524), the Court held that "national labor

policies of avoiding labor strife and encouraging collective bargaining" dictated that

rejection be approved only after the parties attempted but failed to negotiate an

alternative solution to rejection (*id*. at 526), and then that rejection would only be proper

(1) if the contract was clearly burdensome; and (2) after a balancing of the equities (*id*. at

527).

Similarly, in *Mirant* the Court of Appeals determined that rejection of the contract

at issue on the basis of "the business judgment standard would be inappropriate." *Mirant*,

378 F.3d at 525. In *Mirant* the contract was one subject to the jurisdiction of the Federal

Energy Regulatory Commission ("FERC"). Noting that, under the Federal Power Act,

FERC, consistent with its "fixed rate doctrine," was to consider the public interest before

allowing a change in economic arrangements that would affect the availability of power

and the utility rates charged to the public, the Court of Appeals directed that, in deciding

whether to permit rejection, the lower court should employ a test like that enunciated in

*Bildisco* by which the contract might be rejected only (1) if the contract was determined

to be burdensome; and (2) after a balancing of the equities. *Id*.[23]

---

[23]     In subsequent proceedings the District Court stated the test to be applied for rejection of the
         contract at issue in *Mirant* as follows:

**Memorandum Opinion 08-45664**

While *Bildisco* and *Mirant* clearly establish that, in some exceptional cases, a court considering a motion to reject should apply a standard more rigorous than the ordinary business judgment rule, the two opinions offer little guidance as to how to identify those "exceptional cases." The reasons for applying a more rigorous standard were different in *Mirant* from those in *Bildisco*. In the latter case, a higher standard was appropriate because of "the special nature of a collective bargaining contract and the consequent 'law of the shop' which it creates." *Bildisco,* 465 U.S. at 524. In *Mirant* the higher standard was appropriate because of the public interest in availability and cost to the public of electric power. *Bildisco* thus focused on the type of contract while *Mirant* turned on the effect of rejection on the public.

In each case there was a potential conflict between the power to reject contracts under the Code and the role of a regulatory agency – FERC or the National Labor Relations Board (the "NLRB"). But the role of the regulators was very different in the two cases. The NLRB (at least in the context of *Bildisco*) is positioned to mediate and ensure a smooth relationship between two negotiating parties, labor and management. FERC's role, on the other hand, is to protect the supply of power and the rates charged for power to the public. Thus, in *Mirant*, FERC was not seeking to encourage agreement

---

"To be entitled to an order authorizing rejection of the Back-to-Back Agreement, Debtors must prove that it burdens the bankrupt estates, that, after careful scrutiny and giving significant weight to comments and findings of the FERC relative to the effect such a rejection would have on the public interest inherent in the transmission and sale of electricity in interstate commerce, the equities balance in favor of rejecting the Back-to-Back Agreement, and that rejection of the Back-to-Back Agreement would further the Chapter 11 goal of permitting the successful rehabilitation of Debtors."

*In re Mirant Corp.*, 318 B.R. 100, 108 (N.D. Tex. 2004). The United States District Court for the Southern District of New York has adopted the position that the bankruptcy court lacks the ability even to authorize rejection of a power contract under FERC's jurisdiction. *California Dep't. of Water Res. v. Calpine Corp. (In re Calpine Corp.),* 337 B.R. 27 (S.D.N.Y. 2006).

**Memorandum Opinion 08-45664**

between the contract parties (the debtor and Potomac Electric Power Co.)[24] and in *Bildisco* the role of the NLRB was not to protect supply of a necessity to the public and the cost to the public of that necessity.

Both *Bildisco* and *Mirant* involved federal statutes. But the purposes and structure of the two laws are not sufficiently congruent to suggest some rule for when it is appropriate to apply the higher standard for contract rejection under the Code. Certainly this court is unwilling to hold that a higher standard for rejection must be met any time another federal law is implicated by the contract to be rejected. Not every act of Congress that may touch a debtor's contract will require the court to consider public policy or other extraneous requirements of federal law in determining whether that contract may be rejected.

Likewise, the court doubts that it would make sense to limit application of a higher standard for rejection to just those cases where unfettered rejection is inconsistent with a federal statute or would encroach on the turf of a federal regulator. The court can easily conceive of a case where rejection of a contract could have a significant impact upon, say, public health, such that its rejection should be allowed only after a more critical review by the court than is contemplated under the ordinary business judgment rule, pursuant to which a court might feel constrained to accept the debtor's judgment absent the debtor's "bad faith, or whim or caprice" (*Wheeling-Pittsburgh Steel*, 72 B.R. at 849-50).[25] Limiting the higher standard to instances where a federal statute is involved

---

[24] In *Bildisco* the Court emphasized that an effort at negotiation between the debtor and the union should precede rejection. *Bildisco*, 465 U.S. at 526. The *Mirant* court, not unreasonably given the context and the thrust of the Federal Power Act, set no such requirement.

[25] The court does not consider the "whim or caprice" limitation the established standard setting the limits of the business judgment rule, but it is illustrative of the problem in testing rejection of some contracts by the business judgment rule.

**Memorandum Opinion 08-45664**

would mean the rejection power of Code § 365(a) would always trump local laws intended to protect the public.[26]

Certainly the contracts in the case at bar do not much resemble those at issue in *Bildisco* and *Mirant*. Congress has not in the PSA evinced the sort of concern for bargaining that led the Court in *Bildisco* to conclude that the collective bargaining agreement there at issue fell into a special category of contract. While the Secretary of Agriculture exercises some regulatory power over the relationship between chicken integrators like Debtors and their counterparties like the Growers, the Secretary has no part in overseeing the process of bargaining between the two; nor do the agreements between Debtors and the Growers create anything like the "law of the shop." Nor is there a national policy respecting chicken growers comparable to the national policy that labor strife be avoided cited by the Court in *Bildisco*.

As for the public interest, unlike the case of *Mirant* and the Federal Power Act, Congress did not make the PSA applicable to the chicken industry to assure the public a supply of chicken or to establish anything like the "fixed rate doctrine" that was of concern to FERC. While, as argued by the Growers, rejection of their contracts may lead

---

[26] During argument on February 24, the Committee, most aptly, called the court's attention to *Midlantic Nat'l Bank. v. New Jersey Dep't of Environmental Protection (In re Quanta Resources Corp.)*, 474 U.S. 494 (1986), in which the Supreme Court denied a trustee's motion to abandon burdensome property in contravention of local laws designed to protect public health and safety. As contract rejection is closely related to abandonment (*see* 3 Collier on Bankruptcy ¶ 365.LH (15th ed. rev. 2004); 4A Collier on Bankruptcy ¶ 70.42[2] (14th ed. 1978)**;** John C. Creedon and Robert M. Zinman, *Landlord's Bankruptcy: Laissez Les Lessees*, 26 Bus. Law 1391, 1395 (1971)), *Midlantic Nat'l Bank* would support a stricter test for rejection of any contract where rejection would effect a circumvention of local laws protecting the public.

to a rise in the price of chicken for consumers, unlike the cost of power, that is not an evident concern of Congress or any statutorily established regulator.[27]

As for other possible reasons for applying a higher standard to rejection of the Growers' contracts, the court can identify none. The health and safety of the public are not threatened by rejection, and so the rationale of *Midlantic Nat'l Bank* does not assist the Growers. While the impact of rejection on the Growers' community may be significant, that is not an uncommon result of the cut-backs that typically accompany a restructuring in chapter 11.[28] Whether through contract rejections or plant closings, contraction of a debtor's business will often have a harmful effect for one or more local economies. If the bankruptcy court must second-guess every choice by a trustee or debtor in possession that may economically harm any given locale, the business judgment rule applicable to contract rejection and many other decisions in the chapter 11 process will be swallowed by a public policy exception.[29]

---

[27]     The PSA does evince concern for improper trade practices by poultry integrators. *See* 7 U.S.C. § 192(e). However, the Growers have not alleged that Debtors are violating those provisions of the PSA, and there is no support in the record for finding that the Motion was motivated by a plan to effect the restraint of trade.

[28]     The court does not take lightly the harm that rejection will cause the Growers. From the evidence the court has seen, it is clear that the effect of rejection of the Growers' contracts will be significant, perhaps catastrophic, for the Growers and possibly even for their community. However, Congress intended that the damage claim to which the counterparty to a debtor's rejected contract is entitled would serve as the principal remedy for rejection (or breach). *See* 11 U.S.C. § 365(g); *Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.),* 208 F.3d 498, 505 (5th Cir. 2000). In the case at bar, Debtors' schedules indicate Debtors are solvent. If that indeed is true, the Growers will be entitled to full satisfaction of their damage claims, if any, or of any other claims the Growers may file in Debtors' cases that are allowed. The amount of any claims will be determined under applicable state law. *See In re Brady Mun. Gas Corp.*, 936 F.2d 212 (5th Cir. 1991). Thus, the Growers will be no worse off than if Debtors had breached their contracts prepetition. While this is small solace for persons who have devoted their lives to the growing business and whose livelihoods are now at risk by reason of the Motion, it is the result mandated by Congress in the Code.

[29]     The court is especially wary of expansion of such an exception given what happened in construing section 70b of the former Bankruptcy Act (the "Act") in the context of rehabilitative proceedings. Section 70b of the Act allowed enforcement of an express covenant in a lease which provided for

---

**Memorandum Opinion 08-45664**

For the foregoing reasons, the court thus concludes that the more rigorous test for rejection propounded in *Bildisco* and *Mirant* is not applicable in the case at bar. If it remains unclear to the court what factors or test would dictate use of that more stringent standard,[30] the court is satisfied that its use is not justified in the instant matter.

C.    Application of the Business Judgment Rule

That said, contrary to contentions of Debtors, the business judgment rule does not provide them unfettered freedom to use the power given by Code § 365(a) however they will. Congress did not intend the Code to be a shield behind which a debtor in possession

---

termination of the lease upon the lessee entering bankruptcy (an *ipso facto* clause). The harsh result of lease termination for a rehabilitating debtor was upheld by the Supreme Court in *Finn v. Meighan*, 325 U.S. 300 (1945). In *Finn* the Supreme Court stated, "Thus we must read § 70 (b) [sic] as providing that an express covenant is enforceable which allows the lessor to terminate the lease if a petition to reorganize the lessee under Ch. X is approved. [citation omitted]. That being the policy adopted by Congress, our duty is to enforce it." *Id.* at 303.

However, the Supreme Court revisited the issue the following year in *Smith v. Hoboken R.R., Warehouse and S.S. Connecting Co (In re Hoboken R.R., Warehouse and S.S. Connecting Co.)*, 328 U.S. 123 (1946). In *Hoboken Railroad* the Supreme Court was dealing with the reorganization of railroad under chapter VIII of the Act. In that case the Supreme Court considered the public interest in deciding whether to allow a lessor to enforce an *ipso facto* clause and terminate a lease of track. As is true under the Code, the Act specifically required consideration of the public interest when dealing with track leases. *See* section 77o of the Act. The Court thus ruled in *Hoboken Railroad* that enforcement of a bankruptcy termination clause was inconsistent with the public interest test imposed in the Act in railroad reorganizations (as opposed to corporate reorganizations under chapter X).

Taking the Court's reference to the public interest out of context, despite *Finn*, courts thereafter developed a "public interest" exception to the application of section 70b in chapter X cases where a lease termination would have disastrous consequences for holders of public debt. *See In re Fleetwood Motel Corp.*, 335 F.2d 857 (3d Cir. 1964); *Weaver v. Hutson*, 459 F. 2d 741 (4th Cir. 1972), *cert. denied* 409 U.S. 957 (1972). This line of reasoning continued down its slippery slope to *Queens Boulevard Wine & Liquor Corp. v. Blum (In re Queens Boulevard Wine & Liquor Corp.)*, 503 F.2d 202 (2d Cir. 1974). In *Queens Boulevard*, a chapter XI case, the court found that the unsecured creditors were members of the public and therefore their interests should be considered before applying the strict language of section 70b to allow enforcement of an *ipso facto* clause upon bankruptcy, so swallowing the general rule of *Finn* in a public interest exception.

[30]    As noted above, the more stringent *Bildisco/Mirant* test will be rarely applied. Recognizing that *Bildisco* and *Mirant* (and *Midlantic Nat'l Bank*) may be raised by parties in the future, the court anticipates that it would not likely consider applicable the public policy exception to the business judgment rule in future cases absent a threshold showing that rejection of the subject contract (1) is facially inconsistent with a statutory mandate or effects the bypass of a regulatory authority; or (2) will potentially adversely affect the general public interest or may endanger public health or safety.

**Memorandum Opinion 08-45664**

might engage in conduct that would be improper in a non-bankruptcy context. Indeed, as a fiduciary holding its estate in trust and responsible to the court, a debtor in possession must administer its case and conduct its business in a fashion amenable to the scrutiny to be expected from creditor and court oversight.

In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper deference to the business judgment of the debtor's management.[31] *See Richmond Leasing*, 762 F.2d 1303, 1309 (5th Cir. 1985). In *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993), the Court of Appeals, discussing its prior holding in *Central Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38 (2d Cir. 1979)[32] stated:

> In reviewing a trustee's or debtor-in-possession's decision to assume [or reject] an executory contract . . ., a bankruptcy court sits as an overseer of

---

[31] Not only does the Code specifically require the court's approval of assumption or rejection of an executory contract (Code § 365(a)) but case law makes clear that a trustee's or debtor in possession's decision to assume or reject is ineffective without court approval. *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 400 (5th Cir. 2001). This court is unwilling to presume Congress, by providing that authority to bankruptcy courts, intended a bankruptcy court, as opposed to exercising actual oversight of determinations of how to deal with contracts, to serve as no more than a rubber stamp for the trustee or debtor in possession. While there may be legislators who consider the judiciary under-employed, it is hardly likely that even they would seek to rectify the situation through assigning judges make-work tasks that would accomplish no more than an increase of attorneys' fees in bankruptcy cases.

[32] *Minges*, unlike *Orion*, involved rejection of a contract. In *Minges*, the Court, declining to adopt a test for rejection of a contract that turned on a showing that the contract was burdensome, ruled that rejection should be tested by a flexible standard. *Minges,* as parsed by the *Orion* court, held "a bankruptcy court reviewing a . . . decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances, and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Orion*, 4 F.3d at 1099.

The court understands *Minges,* as interpreted in *Orion*, to require it to place itself in the shoes of the estate's decision-maker and, accepting the decision-maker's assumptions and projections, test that decision-maker's exercise of business judgment. *See* 3 Collier on Bankruptcy ¶ 365-03[2] (15th ed. rev. 2008).

**Memorandum Opinion 08-45664**

the wisdom with which the bankruptcy estate's property is being managed
by the trustee or debtor-in-possession . . . .

In *Richmond Leasing* the Court of Appeals for the Fifth Circuit, having cited *Minges* with
approval (762 F.2d at 1309), discussed the standard to be applied in testing a trustee or
debtor in possession's decision to assume or reject under Code § 365(a).  The Court of
Appeals stated that the bankruptcy court should consider "the risks of the proposed
transaction, the available alternatives, and the danger of prejudice to the objecting parties
. . . ."  *Richmond Leasing*, 762 F.2d at 1312, n. 11.  *See also,* 3 Collier on Bankruptcy
¶ 365.03[2] (15th ed. rev. 2008).

In the exercise of its business judgment, a debtor in possession may be expected
to make its decisions rationally in exercising the rejection option.[33] If, for example, a
debtor made rejection and other business decisions through use of an Ouija Board, the
court might quite properly question those decisions.  The court must ensure the decision-
making process used by a debtor in possession in exercising its powers under the Code is
a sensible one.[34]  *See Minges* 602 F.2d at 43.

---

[33]    As already noted, courts have held a decision to reject may not be the result of whim, caprice or
bad faith.  *See In re Trans World Airlines*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).  By holding
Debtors to a requirement that rejection decisions be made rationally, the court precludes reliance
on whim or caprice or decisions undertaken in bad faith but also intends that Debtors not use, *e.g.*,
prayer (which could not easily be regarded as whimsical, capricious or lacking in good faith) as a
method for its business decisions.  Requiring rationality of a fiduciary managing a bankruptcy
estate means that logic, whether deductive or inductive, will be applied to the facts facing the
decision maker to reach a sound business decision.  In the absence of a party objecting to a trustee
or debtor in possession's decision, rationality may be assumed by the court, but once questions
regarding the decision-making process have been raised the court's role as an "overseer of the
wisdom" of the decision-maker requires it to review that process.

[34]    The Growers have also argued that, in deciding whether to permit rejection, the court should
balance the harm to Debtors of being required to perform against the harm caused the Growers by
rejection.  While there is some support in the case law for such an approach (*see, e.g., In re
MidWest Polychem, Ltd.*, 61 B.R. 559, 562 (Bankr. N.D. Ill. 1986)), the Court of Appeals for the
Fifth Circuit has generally approved use of a business judgment rule not so limited.  *See Richmond
Leasing*, 762 F.2d at 1309.  The court is not prepared to rule out ever considering harm to a
debtor's counterparty in deciding whether to authorize rejection (indeed, as noted above, the Court
in *Richmond Leasing* cited at least prejudice to objecting parties as a concern for the Court, though

**Memorandum Opinion 08-45664**

In the case at bar the Growers have alleged that Debtors selected their contracts for rejection as retaliation for their claims that Debtors violated the PSA, or for starting a growers' club, or out of a motive to discriminate against Hispanics or the Growers' geographical area. If Debtors have better or approximately equal economic options and selected the Growers' contracts for rejection on a discriminatory or retaliatory basis, their decision-making process was not rational. If, therefore, the evidence would support the Growers' allegations, the Motion should be denied.

Following argument of the parties on February 24 the court ruled that the business judgment test would apply in disposing of the Motion. However, once Debtors had shown a valid business reason for rejecting their contracts with the Growers,[35] if the Growers were able to show that Debtors had other, better or approximately equally economically attractive options (*e.g.*, other contracts the rejection of which would provide like benefit), then, if the Growers could further present facts showing apparent choice of their contracts on a discriminatory basis or facts establishing a pattern from which the court could reasonably infer that Debtors had chosen the Growers' contracts for rejection on irrational bases, including to further racial or other discrimination or for retaliation in frustration of, *inter alia*, the PSA, Debtors would have the additional burden of proving they selected the Growers' contracts for rejection in a rational manner. If the Growers should be unable to show either (1) that Debtors have equal or better options; or

---

the court does not understand that the *Richmond Leasing* Court meant harm to a counterparty), but if there is a case where such consideration would be appropriate, it is not the case at bar. Since the court considers Debtors properly decided to reject some contracts, balancing of the harm is not a logical measure for deciding which contracts should be rejected.

[35] The court did not understand, based on the Objection, that the Growers dispute that Debtors must take some action such as rejection of some contracts with growers to improve the economics of the Live Oak plant. Rather the Growers argue in the Objection that their contracts were wrongfully selected for rejection.

**Memorandum Opinion 08-45664**

(2) that Debtors appear to have selected the Growers' contracts for rejection on an irrational basis; or if Debtors can show the contracts were, in fact, properly selected, the Motion should be granted. If, on the other hand, the Growers should make the requisite showing and Debtors be unable to rebut it, then the Motion should be denied.

### III. Application to the Facts

A.    Business Purpose

The Growers all service Debtors' Live Oak plant in Live Oak, Florida. The Live Oak plant was acquired by Debtors in early 2007 as part of their acquisition of Gold Kist, Inc. Prior to the acquisition, the plant had been renovated, but, at least during Debtors' ownership, the plant has lost money. At the commencement of Debtors' chapter 11 cases, the Live Oak plant was losing between $1,000,000 and $1,100,000 per week.[36]

The Live Oak plant has two production lines. At the commencement of Debtors' cases, one line was being operated on a single shift and the other on a double shift. Each line/shift processes approximately 325,000 chickens per week.

Debtors' management determined that limiting both production lines to a single shift would save approximately $800,000 per week. In order to achieve this savings – and to suit the plant's reduced capacity – Debtors concluded that they would need to reduce their weekly supply of chickens to the Live Oak plant by approximately 325,000 chickens. As discussed above, Debtors elected to accomplish the reduction in supply by rejection of their contracts with the Growers.

---

[36]    According to the testimony, the Live Oak plant's operations are that unprofitable because a substantial portion of the plant's production is sold into the open commodity market rather than being dedicated to one of Debtors' contract customers. TR (Stroud) March 10 at p. 67:18–22. The court understands sale of chicken into the commodity market is not profitable for Debtors at this time.

There can be no question but that stemming of losses at the Live Oak plant is a valid business purpose.  Because the result of rejection of the Growers' contracts is an improvement – according to Jackson – of about $800,000 per week in Debtors' earnings before interest and taxes ("EBIT") (*see* TR (Jackson) March 10 at p. 29:17–24), it is clear that rejection of the contracts was also for a valid business purpose.  Thus, Debtors have met their initial burden that rejection of the Growers' contracts is an exercise of their sound business judgment.

B.    Debtors' Options

When the court set the standard for deciding the Motion at the conclusion of the February 24 hearing it ruled that, to rebut Debtors' valid exercise of business judgment, the Growers would first have to show that Debtors had equally attractive alternatives to rejection of their contracts.  In so ruling the court had in mind alternative rejection options or similar steps Debtors might take to improve their EBIT.[37]  While the court's ruling could be read more broadly, the argument that preceded the ruling – including questions posed by the court – could have left little doubt that it was not intended to open for review the broader strategies chosen by Debtors to address problem of the Live Oak plant's unprofitability.

Nevertheless, the principal alternative pressed by the Growers is that, rather than rejecting their contracts, Debtors should spread the pain among all growers serving the Live Oak plant.  Thus, Taylor testified that, while retaining the Growers, Debtors could achieve the necessary reduction in the supply of chickens by reducing flock density or

---

[37]    Although the record is not entirely clear on the point, the court understands that maintaining the current production at the Live Oak plant while cutting back production elsewhere is not, as a practical matter, an option for Debtors.  At least none of the evidence adduced by the Growers suggested the use of such an option.

**Memorandum Opinion 08-45664**

extending the time between flocks such that each grower would have 3.25 flocks per year as opposed to the 3.71 flocks a grower would have under Debtors' projections following rejection of the Growers' contracts.[38]

      This is not the sort of option the court intended would be considered by reason of its ruling. Undertaking the route suggested by Taylor would involve adopting an entirely different strategy for addressing the problems at the Live Oak plant. Pursuing that alternative would likely require Debtors to negotiate with all growers serving the Live Oak plant and the mortgagees for all the growers. So spreading the pain could, according to the testimony of Jackson, result in the failure of many of the growers, since the reduced number of flocks might leave a grower unable to survive economically.[39] Even assuming a "spread-the-pain" strategy could be formulated, the court questions whether it could be implemented as quickly or efficiently as the rejection route Debtors have chosen.

      It is clear that, whatever authority a bankruptcy court has to question the business judgment of a debtor in possession, the court may not go so far as to second guess a choice of business strategy. *See* 7 Collier on Bankruptcy ¶ 1108.07 (15th ed. rev. 2008). The court thus concludes that the Growers' proposal that, rather than rejecting their contracts, Debtors simply reduce across the board flocks allotted to all growers, is not an

---

[38]    *See* TR (Taylor) March 10 at p. 39:8–12; Growers' Exhibit I, which summarizes Taylor's calculations. Taylor, however, based his calculations on retention of Debtors' contracts only with those of the Growers who joined in the Objection. As the court has concluded it must grant or deny rejection as to all 26 of the Growers, Taylor's solution of spreading the pain would leave each grower with fewer than 3.25 flocks per year.

[39]    *See* TR (Jackson) March 10 at p. 45:2–8. The Growers presented evidence that the pressure on growers could be relieved by concessions from growers' lenders. *See, e.g.,* Growers' Exhibit P and Growers' Exhibit Q; TR (Brito) March 31 at p. 33:1-8; TR (Rodriguez) at p. 110:1-8; TR (Starling) March 31 at p. 173:6-23; and TR (Roberts) March 31 at p. 210:11-14. This would of course result in Debtors having to become involved in a web of negotiations – a process much more complex and uncertain of result than the more simple strategy effected by the Motion.

**Memorandum Opinion 08-45664**

option that is economically or practicably equivalent to the one Debtors seek to implement through the Motion.

A second alternative suggested by Taylor would be to choose contracts for rejection based on an expanded number of flocks considered in assessing grower efficiency. The court does not consider this alternative a functional equivalent to the methodology selected by Debtors. Considering more than five flocks would involve going back further in time, so skewing the determination of efficiency away from current performance. While it might make some sense to adjust tournament results to exclude aberrational flocks or to measure improvement or worsening of performance,[40] the court does not consider reliance on the more distant past an alternative to Debtors' methodology that would be more fair; certainly Taylor offered no reason – other than that

---

[40]     Several of the Growers were improving in efficiency over the five flocks used by Debtors. *See* Debtors' Exhibit 3, grower #103. Other growers' performance trends the other way. *See, e.g.,* Debtors' Exhibit 3, grower #211. Also, a number of growers appear to have been hurt or helped unduly by a single, aberrational flock. *See, e.g.,* Debtors' Exhibit 3, growers #401 (third flock far below average) and #345 (fifth flock well above average). During the evidentiary hearing testimony was offered (from, *e.g.,* Martinez and Garcia) that Debtors' employees or the chicks or feed supplied by Debtors was reason for a bad result for a given flock. *See* TR (Martinez) April 1 at pp. 8:23–9:3 and TR (Garcia) April 1 at p. 15:1-5. The court is concerned about aberrational results in part due to such testimony. The court is also troubled by the fact that Debtors used a pool of tournaments in judging the growers: if a grower happened to compete in several tournaments with other particularly efficient growers, that grower might be unfairly assessed as inefficient, but if the grower were paired with poorly performing peers, that grower's results might be skewed favorably. That said, defects in the tournament system do not make its use irrational, and there is no evidence whatsoever that those making decisions respecting contract rejection did anything to skew results for any growers. Moreover, Debtors are surely aware of the patent deficiencies in the tournament system and, if it were deemed necessary, might have made allowances for those deficiencies (indeed, Martinez, for example, had a flock excluded from tournament upon his complaint his birds were sick; *see* TR (Martinez) April 1 at pp. 24:5- 25:7) (*see* TR (Stroud) March 10 at pp. 88:1–89:9). Such defects in the system at most make imperfect a methodology which nevertheless is accepted throughout the industry. Finally, Debtors presented evidence that GIPSA (the Grain Inspection, Packers and Stockyard Administration) had reviewed Debtors' use of the tournament system in selecting the Growers' contracts for rejection and did not fault the methodology. *See* TR (Stroud) March 10 at p. 74:2–19.

**Memorandum Opinion 08-45664**

the rankings might change for some growers – for so altering the method of selecting contracts for rejection.[41]

     Somewhat more compelling is Taylor's suggestion that Debtors should have selected contracts for rejection based in part at least on the quality of growing facilities. Debtors categorize grower farms technologically into five categories from most up-to-date to least up-to-date. The farms of most of the Growers are in the second or third most up-to-date category. Although Taylor's testimony was not uncontested (and that of Jackson and Stroud was not perfectly consistent with Taylor's on the point), the court finds credible Taylor's assertion that rejection of the Growers' contracts is likely to result in loss to Debtors of the potential future benefit of the Growers' farms.[42] To the extent that those farms are technically superior to the farms of growers whose contracts are not rejected, Debtors are at least arguably disadvantaged.[43]

     On the other hand, culling growers on the basis of the technology of their farms would mean losing some of Debtors' most efficient growers.[44] Furthermore, a farm's

---

[41] While Hulsey indicated in his declaration that he went back further in time in selecting contracts for termination at the Siler City plant, he also gave a number of reasons for doing so. Those reasons do not obtain as to the Live Oak plant.

The court recognizes that Hulsey's decision in culling growers was apparently more thoughtfully subjective that the more mechanical method employed in selecting the Growers' contracts for rejection. Nevertheless, the methodology used at the Live Oak plant was rational; that the court might prefer Hulsey's approach as seemingly better ameliorating some of the harsh contours of the tournament system is insufficient to warrant overturning Debtors' rational exercise of their business judgment.

[42] *See* TR (Taylor) March 13 at p. 46:17–25; *compare* TR (Jackson) March 10 at p. 40:11–15; TR (Stroud) March 10 at p. 80:3–5.

[43] During cross examination of Taylor Debtors intimated that selecting contracts for rejection based on how up-to-date the growers' farms were would be improper under the PSA. The court, however, does not have before it evidence from which it could so conclude.

[44] *See, e.g.,* Growers' Exhibit S, reflecting grower #138, the second most efficient of all the growers over the five-flock period, as having only conventional (the least advanced) facilities.

**Memorandum Opinion 08-45664**

technological classification is not necessarily the surest measure of its quality; a poorly maintained, technologically advanced farm may be a better candidate from Debtors' perspective for termination than a less advanced but more carefully maintained, well managed facility. Moreover, farms may be updated. Indeed, Martinez testified he could not initially purchase the farms he operated due to Debtors' requirement that they be updated. TR (Martinez) April 1 at p. 28:16–20.

Without more evidence, based on the record before it, the court cannot hold that by advancing consideration of technological status as an option for selecting contracts for rejection, the Growers have satisfied the requirement that Debtors have as good or better alternatives to rejection of the Growers' contracts. Although the court is not prepared to find that this alternative for selecting contracts for rejection -- based on technology of the farms -- meets the test it intended for Debtors' options, it will proceed to assess whether Debtors used the tournament method of selection as they did in order to effect improper discrimination or retaliation or as a shield to conduct that might otherwise conflict with, *inter alia*, the PSA.

C.      Debtors Did Not Select Irrationally

In its ruling at the February 24 hearing, the court indicated that, if the Growers showed Debtors had options at least equally attractive economically to rejection of the Growers' contracts, the court would consider evidence showing Debtors instead chose to reject the Growers' contracts on an irrational basis. As the court indicated, it was principally concerned with selection of the Growers' contracts for rejection as a way to effect discrimination based on race or on some basis prohibited by the PSA or as retaliation. Even if the Growers have succeeded in posing an option meeting the first part

of the court's ruling, (and the court concludes they have not), the Growers have failed to show improper motivation in Debtors' choice of their contracts for rejection.

Counsel for the Growers stated several times during the evidentiary hearing that the Growers did not contend that anti-Hispanic bias motivated those who made the decision to reject and selected the tournament method for identifying the growers whose contracts would be rejected. Nor does the evidence support any inference that bias or a desire to evade the PSA or to retaliate against the Growers for making claims against Debtors[45] based on the PSA or for starting a growers' club[46] played a role in the decision making process. The testimony of Jackson and Stroud stands contrary to any such inference,[47] and none of the testimony by any of Brito, Vasallo, Rodriguez, Starling, Roberts, Martinez or Garcia would support a finding or inference by the court that Debtors' managers' decision to reject the Growers' contracts was based on any such consideration.

The court believes the inquiry should end there. Those who decided which contracts with growers should be rejected and who chose the tournament method for selecting which contracts would be rejected not only had a valid business reason for their decisions but exercised their business judgment in a rational, appropriate fashion. The

---

[45] Indeed the Growers presented no evidence whatsoever that supports a claim that rejection of their contracts was retaliation for asserting claims under the PSA against Debtors.

[46] Rodriguez testified during the evidentiary hearing and Angeles testified in his deposition that Debtors were predisposed against them because of the growers' club. *See* TR (Rodriguez) March 31 at pp. 90:23 - 92:15; Deposition of Ramon Angeles taken February 27, 2009 at pp. 48:20 – 49:7. Martinez testified that Debtors' employees warned him against joining the club. See TR (Martinez) March 31 at p. 224:17–24. None of these witnesses, however, connected the organization of, or membership in, the club to the process by which contracts were selected for rejection. Moreover, the testimony of all three was insufficient for the court to find or even reasonably infer a conscious bias against the club as a motive for contract rejection on the part of Debtors or any of Debtors' employees.

[47] *See* TR (Jackson) March 10 at pp. 35:22-36:3 and TR (Stroud) March 10 at p. 77:12–16.

**Memorandum Opinion 08-45664**

court need not go further in reviewing their conduct or in determining the merits of the Motion.

The Growers, nevertheless, in an effort to meet the second requirement of their case set by the court's February 24 ruling, have presented some evidence to show that one of Debtors' supervisors,[48] who was responsible for overseeing 11 of the 26 Growers (Debtors' Exhibit 5, Growers' Exhibit U), was biased against persons of Hispanic (Cuban) descent.  The Growers admit that this supervisor had no part in deciding that some growers' contracts should be rejected or which growers' contracts would be rejected or that the tournament methodology, using the five most recent flocks, would be used to determine which contracts would be rejected.  However, the Growers argue that the supervisor in question could act to cause growers under his supervision to perform less well in the tournament system.

---

[48]     Supervisors are sometimes referred to as "representatives."  *See, e.g.,* Growers' Exhibit U.  *Cf.* Debtors' Exhibit 5, referring to them as "supervisors".   According to the testimony of Stroud and Taylor, a supervisor's role is significant in his growers' operations.  TR (Stroud) March 10 at p. 87:23–25; and TR (Taylor) March 13 at p. 57:12–16.  The supervisor not only visits his growers' facilities frequently; the supervisor may direct a grower respecting various aspects of care of the chickens in the grower's custody – *e.g.*, temperature settings for the chicken house.  The testimony of several of the Growers suggests that the supervisor in question was intrusive but not necessarily helpful.  *See* TR (Brito) March 31 at p. 17:2–5 (issues with proper ventilation); TR (Brito) March 31 at p. 47:24– 25 (discussing frequency of visits); TR (Vasallo) March 31 at pp. 68:17- 69:2 (issues with the chicken house computer); TR (Garcia) April 1 at p. 36:14-18 (issues with the chicken house computer).

Debtors were not required to defend this supervisor's conduct.  There may well be evidence that might have been offered to rebut the Growers' contentions regarding the supervisor.  Also, there was testimony suggesting other supervisors turned in similar performances – for example, Martinez had several complaints about his supervisor.  *See* TR (Martinez) April 1 at pp. 10:21-23; 11:7-13; and 11:24-12:2.  The court in any case assumes, given the complaints aired during trial on the Motion and the disproportionate number of "inefficient" growers assigned to the supervisor in question, that Debtors will conduct whatever review is appropriate of the performance of the supervisors at the Live Oak plant.

The Growers have not presented evidence sufficient[49] for the court to infer that the supervisor in question was, in fact, biased against Hispanics (Cubans)[50] or that he took any action that hurt the tournament ranking of his growers.[51] Even had the Growers been able to show either bias or a conscious effort to hurt his growers, the supervisor had no idea that tournament rankings for a grower's five most recent flocks could lead to the rejection of the grower's contract. At most, a showing that the supervisor was biased or sought to harm his growers would do no more than suggest that the data provided to decision makers by the tournament system was somewhat distorted. Stroud, having been made aware of the Growers' concerns about the supervisor in question, made inquiry of the supervisor's superiors concerning him. Based on that inquiry, Stroud testified he concluded that the supervisor was a satisfactory performer.[52] The court is not prepared to

---

[49]    The court was liberal, to say the least, in allowing the Growers to make their case, permitting, over objection, the introduction of evidence of even questionable probative value. Even with that latitude, the evidence provided by the Growers at most offers vague hints of bias on the part of the supervisor in question.

[50]    Brito testified that he sensed bias against him based on his ethnicity. *See* TR (Brito) March 13 at p. 25:11-14. Garcia similarly testified that the supervisor's attitude toward him changed after the supervisor heard Garcia speaking Spanish. *See* TR (Garcia) April 1 at 37:16-19. The only testimony of overt statements by any of Debtors' employees (not the supervisor in question) was given by Martinez. *See* TR (Martinez) March 31 at p. 225:18-22. This evidence is clearly inadequate to support a finding of anti-Hispanic (Cuban) bias on the part of any of Debtors' employees, let alone Debtors themselves. A feeling one is the subject of bias is obviously not enough. The statements testified to by Martinez may have been made in jest (*see* TR (Martinez) April 1 at p.31:18-25). In any event the statements clearly qualify as "stray remarks." Such stray remarks would not support a finding of discrimination in a civil rights action. *See Krystek v. University of S. Mississippi*, 164 F.3d 251, 256 (5th Cir. 1999). While the court is not here applying the civil rights laws, conduct that would not support a claim under those laws is also insufficient to show discrimination in the context of the Motion.

[51]    Although a disproportionate number of the Growers were assigned to the supervisor in question, (no other supervisor oversaw more than four of the Growers; see Debtors' Exhibit 5), the court has insufficient evidence to suggest any correlation between this fact and a bias against Hispanics.

[52]    *See* TR (Stroud) March 10 at p. 120:14–25. The Growers had means for raising questions about the supervisor. Though some complaints were, in fact, made, there is no evidence of a pattern of complaints respecting the supervisor in question, and, absent an obvious pattern, the court considers Stroud's inquiry sufficient to validate the tournament results as free of serious taint.

**Memorandum Opinion 08-45664**

so critique a debtor's exercise of business judgment that its inquiry would extend to the adequacy of management's investigation of that debtor's employees. Even were the connection between the supervisor's conduct and the selection of the Growers' contracts for rejection less tenuous than is the case, the court could not find it a basis for second-guessing management's reliance on the tournament system or the data used in its decision making process.

The Growers also presented evidence they claimed showed contracts with Hispanic owned (or, in Martinez's case, operated) farms were disproportionally selected for rejection. Garcia testified that he had canvassed all growers to determine which were Hispanic and concluded that 33.2% of the square footage[53] serving the Live Oak plant was Hispanic owned (or operated)[54] prior to the effects of the Motion (*see* Growers' Exhibit U). Garcia further testified that 41.6% of the square footage covered by rejected contracts was Hispanic owned (or operated) (*see id.*). Garcia finally calculated that 23.6% of Hispanic owned (or operated) square feet were subject to the Motion, while of contracts with non-Hispanic owned (or operated) farms, Debtors were rejecting only 16.5% (*see id.*).

Even accepting Garcia's figures without further inquiry, the court cannot find sufficient evidence of a pattern of selecting Hispanic over non-Hispanic contracts for rejection. Moreover, if the unit of calculation used is farms rather than square feet, only 27% of the contracts selected for rejection were with Hispanics. As Hispanics account

---

[53]    Garcia testified he calculated his percentages using square footage as his metric because Debtors used total square feet in determining how many contracts to reject. *See* TR (Garcia) April 1 at p.44:20-25.

[54]    During the evidentiary hearing the court held that one grower (whose contract is not to be rejected pursuant to the Motion) not counted as Hispanic by Garcia should be considered Hispanic. Garcia's figures consequently are off slightly, though not materially.

**Memorandum Opinion 08-45664**

for 27.6% of the total of farms, there was no disproportionate rejection of contracts with Hispanics. Moreover, the average size of a Hispanic owned (or operated) farm is much larger than the average size of all farms, thus accounting for the larger square feet held by Hispanics and subject to rejection. For all these reasons, the court cannot find or infer disproportionate selection of contracts with Hispanics for rejection.

The Growers have not presented evidence in support of the contention in the Objection that Debtors sought to avoid the anti-discriminatory provisions of the PSA through rejection of their contracts. As noted above, no or inadequate evidence has been offered in support of the claim that Debtors were retaliating in the Motion against the Growers. As they have also failed to demonstrate anti-Hispanic bias, the Growers have not met the second (as well as the first) part of the test established by the court to rebut the Debtors' showing that the Motion represents an exercise of sound business judgment.

## IV. Conclusion

The court is mindful of the tragic effect for the Growers of rejection of their contracts. Those of the Growers who testified before the court were impressive for their candor and obvious competence. Were the court possessed of magical powers such that it could make the Live Oak plant profitable and, so, rejection of the Growers' contracts contrary to Debtors' interests, it would do so. Unfortunately the Live Oak plant loses money; the best way to stem that loss is to reduce operations at the plant; and in order to reduce operations, the supply of chickens to the plant must be reduced. Clearly one logical way to accomplish that reduction is through use of the rejection power provided by Code § 365(a) to dispose of some contracts with growers. Debtors used a rational method accepted throughout the industry for measuring the efficiency of the growers

**Memorandum Opinion 08-45664**

supplying the Live Oak plant and chose for rejection the contracts of the least efficient growers ascertained through that method. There is no evidence that the selection of contracts for rejection was at all influenced by any questionable motive. On the contrary, the entire process was rational, sensible and a clear exercise by Debtors of their sound business judgment.

For these reasons the Objection must be OVERRULED. The Motion will be GRANTED.

It is so ORDERED.

# # # # END OF MEMORANDUM OPINION # # # #