U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 30, 2009                                                      United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| et al., | § | Case No. 08-45664 (DML) |
| | § | |
| Debtors. | § | JOINTLY ADMINISTERED |

**MEMORANDUM OPINION**

Before the court is *Motion of Ad Hoc Shareholders Group for Order Directing the Appointment of an Official Committee of Equity Security Holders Pursuant to 11 U.S.C. § 1102(a)* (the "Motion") filed by a group of shareholders[1] that style themselves as the *Ad Hoc* Shareholders Group (the "AHSG"). The Motion was opposed in that *Official*

---

[1] The shareholders filing the Motion were M&G Investment Management Ltd. ("M&G"), Pilgrim's Pride Corporation Retirement Savings Plan, James Schwertner and Michael Cooper.

**Memorandum Opinion 08-45664**
                                                                                 Page 1

*Committee of Unsecured Creditors' Objection (Including Memorandum of Law) to Motion for Order Directing Appointment of Equity Committee Pursuant to 11 U.S.C. § 1102(A)(2)* (the "UCC Objection") filed by the Official Committee of Unsecured Creditors (the "UCC") and in that *Objection of Bank of Montreal as DIP Agent for the DIP Lenders and Pre-Petition BMO Agent for the Pre-Petition BMO Lenders to the Motion of Ad Hoc Shareholders Group for Order Directing the Appointment of an Official Committee of Equity Security Holders Pursuant to 11 U.S.C. Section 1102(A)* (the "Bank Objection") filed by Bank of Montreal as "DIP Agent for the DIP Lenders and Pre-Petition BMO Agent for the Pre-Petition BMO Lenders" (the "Banks"). The AHSG additionally filed a supplemental brief in support of the Motion, and the Securities and Exchange Commission (the "SEC") and Lonnie "Bo" Pilgrim ("Pilgrim") and Pilgrim Interests, Ltd., filed memoranda in support of the Motion. Debtors filed a response which neither supported nor opposed the Motion. The United States Trustee (the "UST") initially opposed the Motion but did not file any pleadings in opposition to the Motion. At the 4/29 Hearing (as defined below) the UST announced that he concurred generally with the position of the UCC and the Banks but would not actively participate in trial of the Motion. CoBank, ACB ("CoBank"), lead bank with respect to Debtors' other principal prepetition credit facility, appeared and stated at the 4/29 Hearing that it concurred in the position taken by Debtors and was not opposed to formation of an equity committee, believing such a committee might make a positive contribution in these chapter 11 cases.

**Memorandum Opinion 08-45664**

**Page 2**

By the Motion, the AHSG asks that the court direct the UST pursuant to section 1102(a)(2) of the Bankruptcy Code (the "Code")[2] to appoint an official committee of equity holders in these chapter 11 cases. At the request of the AHSG the court held an initial status conference on the Motion on March 30, 2009. At that time the court instructed the parties to address whether the role of a committee appointed under Code § 1102(a)(2) could be limited by the court's authority. Debtors and the SEC complied with the court's request in their filings, and the AHSG, (as well as CoBank), during the 4/29 Hearing, commented on the question. At the March 30 status conference the court also asked that the AHSG propose a budget for an official committee of equity security holders, and the AHSG provided a proposed budget as an exhibit to its supplemental brief.

On April 29, 2009, the court held a hearing (the "4/29 Hearing") on the Motion. During the 4/29 Hearing, the court heard testimony from Joel Klein, Executive Vice President of PPM America, Inc., an affiliate of M&G ("Klein"), and William Snyder, Debtors' Chief Restructuring Officer ("Snyder") and received into evidence exhibits identified below as necessary. In addition, the parties designated for inclusion in the record portions of depositions of Don Jackson, Debtors' Chief Executive Officer ("Jackson"), Snyder, Michael Willingham ("Willingham"), Pilgrim, Klein, and Keith Hughes.

This contested matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014.

---

[2] 11 U.S.C. §§ 101 *et seq.*

**Memorandum Opinion 08-45664**

I.      Background

These cases were commenced on December 1, 2008. Debtors[3] are among the largest producers of chicken products in the world. They continue as debtors in possession, remaining in possession of their property and in operation of their business. *See* Code §§ 1107 and 1108. No trustee or examiner has been appointed in these cases.

According to the schedules and statements of affairs filed by Debtors, their assets exceeded liabilities at filing by approximately $1 billion. Though consistently losing money through January of 2009, according to Snyder Debtors have managed operating profits in February and March of 2009. Their most recent filings with the SEC reflect that there is equity in the companies.[4] On the other hand, Debtors' most recent operating report filed with the UST suggests that Debtors' liabilities very likely exceed the value of their assets.[5]

The Parent Debtor's common stock is publicly traded.[6] The stock is held by approximately 29,000 entities and is currently actively traded. Of the approximate total of 74,000,000 shares, Pilgrim or family related entities own or control approximately

---

[3] Debtors are seven entities whose chapter 11 cases have been consolidated for administrative purposes. The court from time to time refers to Pilgrim's Pride Corporation as the "Parent Debtor." The Parent Debtor is the issuer of the common stock held by, *inter alia*, the members of the AHSG.

[4] Debtors' Form 10-Q filed on February 5, 2009 (AHSG Ex. 9) indicated approximately $120 million in shareholders' equity.

[5] *See* AHSG Ex. 6. Although the operating report reflects approximately $34 million in shareholders' equity, elimination of the intangible assets would reduce that amount below zero. On the other hand, the report also shows more than three quarters of a billion dollars in depreciation of fixed assets. Like all listings of assets and liabilities based on book value (including bankruptcy schedules and SEC filings), the operating report provides no more than a rough outline of value.

[6] Debtors also have issued publicly traded bonds. Several members of the UCC own such debt.

**Memorandum Opinion 08-45664**

46,000,000 shares and so have voting control over approximately 62% of the Parent Debtor's common stock.[7]

Pilgrim serves (along with another family member) on the board of directors of the Parent Debtor. Pilgrim has guaranteed much of the debt to the Banks[8] and is a party to one or more contracts with Debtors for the supply from farms owned by him to Debtors of live chickens for processing.

In addition to Pilgrim, and other insiders, the board of directors includes eight outside directors. Jackson, who was employed by Debtors early in these chapter 11 cases and who serves of the board, as part of his employment contract, is entitled to acquire up to 3,085,656 shares of the common stock of the Parent Debtor.[9]

## II. Discussion

A. Allegations of Wrongdoing

The UCC argues as one basis for denial of the Motion that shareholders were induced to seek appointment of an equity committee through the improper efforts of Willingham and one of the law firms representing the AHSG, Brown Rudnick, LLP ("Brown"). The UCC alleges (and the UCC Objection supports the allegations through

---

[7] As part of the shares he controls, indirectly, Pilgrim himself beneficially owns approximately 25 million shares. *See* UCC Ex. A, AHSG Ex. 8, and the Deposition of Pilgrim at page 10, lines 11 through 14.

Future reference to portions of the designated dispositions will hereafter be cited as "Depo. (*name of deponent*) at p. *page:line – line*".

[8] The parties do not agree whether Pilgrim is personally liable on the guaranties. UCC Ex. 18 reflects a guarantee by Pilgrim Interests, Ltd. in support of the Parent Debtor.

[9] *See* Depo. (Jackson) at pp. 11:22 – 12:3, *see also* UCC Ex. A. Jackson's entitlement to the stock depends on meeting certain operating goals. Snyder testified that it was likely the first goal would be met, entitling Jackson to half of the stock. Snyder testified it was unlikely that the second goal (to which the rest of the stock is tied) would be met unless plan confirmation is delayed at least into this year's fourth calendar quarter.

**Memorandum Opinion 08-45664**

cites to the depositions of Willingham, Snyder and Pilgrim) that Brown and Willingham solicited shareholder participation in the AHSG for their own profit and in contravention of laws respecting proxy solicitations and prohibiting barratry.

Taking the allegations of the UCC as true, the court does not consider them relevant to disposition of the Motion. Whether or not the facts warrant appointment of an equity committee under Code § 1102(a)(2) is dependent, as discussed below, on factors such as equity's existing representation, the likelihood that Debtors are solvent, the complexity of Debtors' cases, and the cost to Debtors' estates of the proposed committee. The motives of those who organized the AHSG – and the means they used – are not pertinent to the question of whether shareholders should have a representative committee to advocate their rights.

This is not to say the court is not troubled by the UCC's allegations. Rather, the proper context for consideration in these chapter 11 cases of the behavior of Brown and Willingham is, with regard to the latter, the actual formation of an equity committee and, respecting the former, any effort to employ Brown on behalf of that committee.[10] If equity owners deserve an estate-compensated representative at the table, they ought not to be denied such representation because those initiating the Motion are arguably tarnished because of their questionable conduct.

Upon the court's direction to appoint an equity committee, the UST will canvas equity owners to determine who are willing participants. If the evidence available to the UST suggests a potential committee member – say Willingham – is so tainted by his behavior in connection with the case as to leave him unqualified to serve, that individual

---

10     Obviously other fora would also have jurisdiction to address wrongful conduct of the sort alleged in non-bankruptcy contexts.

**Memorandum Opinion 08-45664**

                                                                                                                   **Page 6**

may be denied a seat on the committee. To the extent the UST's decision may be subject to question, the matter may be brought before the court. *See* Code § 1102(a)(4); 7 Collier on Bankruptcy ¶ 1102.07[2] (15th ed. rev. 2009).[11]

As to employment of Brown, that is subject to court approval. *See* Code § 1103(a) and Fed. R. Bankr. P. 2014(a). Any party in interest – including the UCC – may object to Brown's employment should it be proposed. *See* Code § 1109(b). Indeed, if Brown's conduct truly was as wrongful as the UCC insists, the court anticipates the firm's employment would be questioned not only by the UCC but by the UST and perhaps other parties as well. Certainly the court's action on the Motion will have no effect respecting the propriety of Brown's employment.[12]

B.   An Equity Committee is Warranted

Disposition of the Motion turns on interpretation of section 1102(a)(2). That section states:

> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

11 U.S.C. § 1102(a)(2).

---

[11] Prior to passage of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") which added section 1102(a)(4) to the Code, bankruptcy courts exercised similar control over committee membership. Courts looked to Code § 105 to justify directing changes in committee membership "…if the United States Trustee acted arbitrarily and capriciously" in selecting the committee or failing to remove a committee member. *In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003).

[12] The court's decision also does not address the question of whether the conduct of Brown (or Willingham) warrants sanction, whether civil, disciplinary or even criminal. Because the court does not consider the evidence of wrongdoing alluded to by the UCC, it cannot conclude that any sanction is or is not in order; nor does the court intend in this memorandum opinion to suggest that it finds the UCC's position or allegations respecting Brown's (or Willingham's) conduct supported by the evidence.

**Memorandum Opinion 08-45664**

Courts have applied the following factors in determining whether to appoint an equity committee under section 1102(a)(2): (i) whether Debtors are likely to prove solvent; (ii) whether equity is adequately represented by stakeholders already at the table; (iii) the complexity of the Debtors' cases; and (iv) the likely cost to Debtors' estates of an equity committee.[13] *See In re Williams Commc'ns. Group, Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002); *Albero v. Johns-Manville Corp., (In re Johns-Manville Corp.)*, 68 B.R. 155 (S.D.N.Y. 1986), *appeal dismissed* 824 F.2d 176 (2d Cir. 1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996; *In re Wang Labs, Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992). Upon consideration of those factors, the court concludes that an equity committee should be appointed in these cases.

1.  Solvency

The value of Debtors will ultimately be determined based on their ability to generate cash flow. *See Protective Comm. v. Anderson*, 390 U.S. 414, 442, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) ("The commercial value of property consists in the expectation of income from it") (*quoting Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526, 61 S. Ct. 675, 85 L. Ed. 982 (1941). As Debtors are even now in the process of preparing their business plan for the next five years, the data from which the court might determine Debtors' going concern value is not available.[14]

---

[13] Another factor courts have considered in determining whether to appoint an equity committee is the extent the debtor's shares are widely held and actively traded. *See In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 696 (Bankr. C.D. Cal. 2008). The court does not understand that the UCC and the Banks argue that the Parent Debtor's stock is not widely held and actively traded.

[14] Nor at this juncture and in the context of the Motion would the court be disposed to conduct a valuation of Debtors on a going concern basis. Such a valuation process would be too complex and time-consuming to undertake in connection with the Motion, even if the necessary data were available to the court.

The court does have available to it values provided in Debtors' schedules and in Debtors' public filings with the SEC and may deduce a value for Debtors from the operating reports filed with the UST. While these values may prove illusory, except for Debtors' most recent operating report they all indicate that Debtors are solvent. Also Snyder testified during the 4/29 Hearing that he believed that Debtors' condition was not even close to "hopeless insolvency." Based upon this evidence, for purposes of the Motion, the court finds that the AHSG has met its burden of showing that Debtors are, in fact, solvent or nearly solvent.[15] Given that, in this circuit, professionals representing an equity committee may not be entitled to compensation if the subject case ultimately provides no return to equity,[16] the risk that the court's finding respecting solvency is wrong is not wholly borne by creditors. The court thus concludes that this factor – Debtors' actual or near solvency – favors granting the Motion.

2. Adequate Representation

The UCC and the Banks contend equity is already adequately represented by Pilgrim, the Parent Debtor's board of directors, Snyder and Jackson.[17] They insist that all

---

[15] Much of the authority suggests – and the court agrees – that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency; in cases like the one at bar, the court should not disfavor equity. *See In re Williams Commc'ns. Group, Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002); *In re Wang Labs, Inc.*, 149 B.R. 1, 7 (Bankr. D. Mass. 1992).

[16] *See Kaye v. Hughes & Luce, LLP (In re Gadzooks, Inc.)*, 2007 U.S. Dist. LEXIS 50929 (N.D. Tex. July 13, 2007) *appeal dismissed Kaye v. Hughes & Luce, LLP (In re Gadzooks, Inc.)*, 291 Fed. Appx. 652 (5th Cir. 2008). In *Gadzooks*, the District Court concluded that the Fifth Circuit's decision in *Andrews & Kurth, L.L.P. v. Family Snacks (In re Pro-Snax Distribs.)*, 157 F.3d 414, 426 (5th Cir. 1998) required that professionals representing equity would have to show a contribution in a chapter 11 case to be compensated by the estate. *Kaye v. Hughes & Luce, LLP (In re Gadzooks, Inc.)*, 2007 U.S. Dist. LEXIS 50929, *19-20 (N.D. Tex. July 13, 2007).

[17] The Banks also suggest, the court assumes facetiously, that the UCC will serve as an adequate protector of the interests of equity owners. While it is true, as discussed below, that shareholders and unsecured creditors often have common interests, as also discussed below, when it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds.

of these have a sufficient stake in a recovery by equity owners such that equity needs no official committee to protect its interests. Both the UCC and the Banks also suggest that an unofficial committee, such as the AHSG, should be sufficient to protect the rights of equity owners.

The AHSG, the SEC and Pilgrim all insist otherwise. They argue that Pilgrim wears too many hats – as creditor, as guarantor of Debtors' bank debt and as Debtors' contractual counterparty – to serve adequately the interests of shareholders.[18] As to the balance of the board of directors and Jackson, the ASHG argues that their fiduciary duties to creditors (*see Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 355 (U.S. 1985); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 114 (Bankr. D. Del. 2001)) are such that requiring them to serve as the representatives of equity would create for them an inherent conflict.[19]

The court agrees. While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors (*see Weintraub*, 471 U.S. at 355; *In re Nat'l R.V. Holdings, Inc.*, 390 B.R. 690, 698 (Bankr. C.D. Cal. 2008)), the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management. The principal concern of Debtors and their managers (including Snyder) must be

---

[18] As noted by the AHSG, three actions have been filed in the United States District Court for the Eastern District of Texas naming, *inter alia*, Pilgrim, Lonnie Ken Pilgrim, Richard A. Cogdill, and Debtors in class action lawsuits the subject matter of which deals with the equity securities of Debtors. These cases are styled: *Smalls v. Pilgrim*, Case No. 2:09-cv-011-TJW-CE (E.D. Tex.); *Acaldo v. Pilgrim's Pride Corp.*, Case No. 2:08-cv-419-TJW (E.D. Tex.); and *Patterson v. Pilgrim*, Case No. 2:08-cv-472-TJW (E.D. Tex.).

[19] The court was presented with evidence of Pilgrim's various business interests at the 4/29 Hearing which potentially could give rise to a conflict. Among others, Pilgrim is the counterparty to various grower and chicken contracts, real estate leasing agreements (through a separate entity), a guarantee arrangement, and at one point an airplane rental agreement. *See* Depo. (Snyder) at pp. 58:4 – 59:19; AHSG Ex. 9 at p. 31; AHSG Ex. 19.

**Memorandum Opinion 08-45664**

**Page 10**

preservation of Debtors' going concern value and their successful emergence from chapter 11. That will occur through confirmation of a plan of reorganization. Confirmation of a plan, in turn, is heavily dependent upon Debtors reaching an accord with the UCC and the Banks. Given Code § 1129(a)(10), confirmation of a plan will likely require the support of the unsecured creditors, the Banks or CoBank.[20]

As this court has had occasion to note, based on a case involving some of the same professionals, it is hardly likely that the UCC or the Banks will be disposed to value Debtors so liberally that equity may be sure to receive its due. *See In re Mirant Corp.*, 334 B.R. 800, 814-15 (Bankr. N.D. Tex. 2005).[21] Indeed, in *Mirant*, the debtors concurred with the creditors' committees in valuing the debtors at 75% or less of what the market, following plan confirmation, concluded they were really worth. This concern of the court was echoed by Klein during the 4/29 Hearing based upon his experience in other chapter 11 cases.[22]

The dynamics of chapter 11 are such that Debtors – and their management – are likely to be constrained to accept and advocate to the court a conservative value for their business in order to obtain creditor assent to a reorganization plan. If Pilgrim or Jackson is faced with the choice of holding out for the benefit of equity and risking a failure of the reorganization or accepting a restructuring that values Debtors excessively conservatively, despite their interest in maximizing stock value, they may have little

---

[20] Shareholder acceptance of a plan does not satisfy section 1129(a)(10).

[21] The court, of course, recognizes that these cases are different from *Mirant*. However, many courts have recognized different parties' "incentive to…overvalue or undervalue" a debtor. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004); *see also In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).

[22] Snyder's testimony that management would protect shareholders was counterbalanced by his expressed concern about Pilgrim or Jackson or any other board member having the time and expertise to adequately represent equity owners in the valuation and plan process.

**Memorandum Opinion 08-45664**

choice but to adopt the latter alternative. Indeed, given the limitations on a debtor's ability to extend the exclusive period afforded a debtor to propose a plan that were added to Code § 1121(d) by BAPCPA, the pressure on Debtors to reach agreement with the UCC and the Banks is far greater in these cases than was true in *Mirant*.

The UCC confuses management's duty to maximize estate value with the adequate representation of equity. The former function, as Snyder testified, during the 4/29 Hearing, does not equate to valuation for purposes of determining entitlement to treatment under a plan. Indeed, management, as a theoretical neutral *vis-à-vis* a company's various stakeholders, should not counter-balance the pessimism respecting value that may be expected of creditors. By way of example, if the claims in Debtors' cases total $2.7 billion and Debtors' value might reasonably be estimated between $2.5 billion and $3 billion, creditors may reasonably be expected to adopt the low end value; Debtors' management, as fiduciaries, might reasonably split the difference at $2.75 billion. If these are the only parties offering opinions of value, it is not unlikely that the court would find a value of Debtors of between $2.5 billion and $2.75 billion – so excluding equity participation under a plan. An equity committee would provide a counterweight by, presumably, being as optimistic in valuing Debtors as creditors are pessimistic. This is a role that the court believes management, including Snyder, Pilgrim and Jackson, cannot be expected to fill.[23]

Moreover – and regarding the argument that an informal committee is sufficient to protect equity – the cost of disputing value and capital structure with the UCC and the

---

[23] Snyder testified that the Debtors' 2009 business plan has been reviewed by financial advisors employed by the UCC, the Banks and CoBank. He further testified that their criticisms of Debtors' assumptions tended to depress value. This testimony strengthens the court's conviction that a voice for equity would help ensure a fairer valuation of Debtors.

Banks is likely to be too great to be borne other than by a statutory fiduciary paid by the estate. In *Mirant*, the valuation process costs millions of dollars. It is unreasonable to ask Pilgrim, Jackson, other board members or the members of the AHSG to go out-of-pocket to cover those costs.[24] Further, while some of the costs of an informal committee might be compensable under Code § 503(b)(3)(D) and (4), as this court has previously held, the cost of a financial advisor, whose role in the valuation process is indispensible, would not be payable under those provisions. *See In re Mirant Corp.*, 354 B.R. 113, 138-39 (Bankr. N.D. Tex. 2006).

The UCC and the Banks also urge the court to defer appointment of an equity committee until a later date, when it is clearer such a committee is necessary. However, Debtors expect to complete their business plan for the next five years in the next few weeks. As is clear from the valuation process in *Mirant*, a debtor's business plan, which projects future cash flows, is a critical element in the valuation equation. *See Mirant*, 334 B.R. at 823. Snyder's testimony at the 4/29 Hearing supports this view.[25] Denying equity owners the means to analyze and critique Debtors' projections in their business plan is likely to hinder if not hopelessly cripple any later effort to show that Debtors' value is sufficient to justify equity participation. Rather than presenting a basis for delaying appointment of an equity committee, the state of Debtors' cases is such that establishment of an advocate for shareholders is urgent.

It is the view of the court that the evidence demonstrates that equity is not adequately represented by Pilgrim (who himself argues he cannot represent

---

[24] As Klein testified, it is doubtful that an informal group would be prepared to underwrite such an effort on behalf of all shareholders.

[25] Snyder's deposition also alluded to the importance of the business plan. *See* Depo. (Snyder) at pp. 35:9 – 36:19.

shareholders), Snyder, Jackson or the rest of Debtors' officers and directors; they simply are not in a position to press equity's case very hard. Additionally, the court believes the reorganization process will be benefited by equity having its own, independent representative. It is imperative that that representative have adequate opportunity to participate in the critical stages of the valuation of Debtors on a going concern basis. Accordingly, the court concludes that the need for adequate representation favors granting the Motion.

    3.    Case Complexity

The UCC would define case complexity solely in terms of capital structure. The UCC thus argues that Debtors' capital structure is so simple as not to favor creation of an equity committee. The court is not confident that Debtors' capital structure is not sufficiently complex to support the need for independent equity representation, but the court in any case considers the issue of complexity to be one that involves more than capital structure.

While there are a number of complications faced in these cases, the court is most concerned with the many variables that affect Debtors' projected cash flow and so Debtors' enterprise value. Debtors' ability to generate cash flow is dependent upon numerous commodity prices that vary in volatility, including corn, soy meal and Debtors' own products. As Snyder testified during the 4/29 Hearing, questions of capacity are also pertinent to projecting Debtors' cash flow. Finally, Debtors' decisions respecting the timing of idling or reactivation of its plants may affect value.

As the court understands the relationship between the complexity of a case and the need for equity representation by a statutory fiduciary, appointment of such a

representative is more appropriate where the complexities of the case make it more difficult for another – here management – to protect equity interests as well as those of creditors.[26] In these cases, the difficulties of valuing Debtors would, in the court's view, severely complicate for any single fiduciary performance of the two tasks of determining fair treatment of creditors and advocating the entitlement of equity to participate in a reorganized enterprise. The court thus concludes the complexity factor also favors granting the Motion.

    4.    Cost

Not unreasonably, the UCC has expressed concern about the cost to Debtors' estates of an equity committee.[27] The court, too, is concerned about the cost of an equity committee. To that end, the court asked the parties to address whether it had authority to limit the functions an equity committee might perform and asked that the AHSG propose a budget for an equity committee.

The court concludes that through the use of one of these devices it can control the cost of an equity committee. Given the court's conclusion that there is a need for equity representation and its ability to control the cost of that representation, the court concludes that the cost of a committee of shareholders is outweighed by the benefits it will bring to the reorganization process.

---

[26] Courts have found that a case is sufficiently complex for a number of reasons. In *Johns-Manville* the court found that when shareholders will need to "actively participate in the case" then the case is complex for the purposes of appointment of an equity committee. *See Johns-Manville*, 68 B.R. at 12-13; *see also Wang Labs*, 149 B.R. at 5 (finding that the factor was met based on the volume of pleadings filed and the number of binders dedicated to the case in that court clerk's office.).

[27] The Banks also expressed concern about the cost of an equity committee. Indeed, the Banks Objection could be read to be threatening to cease the funding they provide to Debtors should the court grant the Motion or an equity committee be authorized which will be paid from the estate before payment in full of the Banks. The court chooses to assume that the threatening tone of the Bank Objection was inadvertent.

**Memorandum Opinion 08-45664**

                                      **Page 15**

The AHSG, the SEC and Debtors responded to the court's request for input on its authority to limit an equity committee's role. Debtors and the AHSG take the position the court may, and Debtors (and CoBank) argue it should, limit the functions to be performed by the equity committee. The SEC takes the opposite view.

While the court believes it could limit the scope of the equity committee's work, it will not do so. In a number of areas, equity owners and creditors have common interests. For example, requests by Debtors to act outside the ordinary course of business to improve cash flow or realize on unproductive assets usually will be viewed the same way by representatives of debt and equity. The court might limit an equity committee's participation in proceedings on such requests to those instances where the equity committee can show that its interests in fact diverge from those of the UCC. However, many requests in these cases have been set for hearing on a short fuse; there may not be time in future proceedings for court consideration of whether equity should be allowed to act for itself. The court concludes it is preferable to leave it to the equity committee to police itself.

That said, professionals representing the equity committee should expect reduction or even elimination by the court of fees sought for work duplicative of that performed by those acting for the UCC. Outside of valuation, negotiation of a plan and the plan confirmation process (and communicating with equity owners), the court expects the equity committee will limit its involvement in these cases to matters where its interests are at odds with those of the UCC.[28] Until the court concludes the equity

---

[28] In the exhibit to its supplemental brief, the AHSG provides (at ¶ 8) a listing of categories into which it anticipates the work of its professionals will fall. Several of these appear to the court to entail work on matters where equity and debt have common interests. Such categories include estate causes of action, asset sales and other litigation. Other areas – executory contracts, other

**Memorandum Opinion 08-45664**

Page 16

committee cannot be trusted to be prudent in choosing its battles, however, the court declines to place formal limitations on its role.

On the other hand, the court does believe it is appropriate to hold the equity committee to a budget. The AHSG proposes a monthly budget of $400,000 for counsel and $150,000 for a financial advisor. Given that most of the work of an equity committee should be concerned with valuation, negotiation and the confirmation process, this is too much. Moreover, the equity committee will have to have local counsel. As reflected in the AHSG's budget, its local counsel – an excellent firm – is considerably less expensive than Brown. By assigning more work to local counsel, costs may be held down.

The court concludes that the equity committee should be limited to expending estate funds up to $425,000 per calendar month, not to exceed $1,150,000 per calendar quarter,[29] for all purposes, including its counsel and a financial advisor. For its financial advisor the equity committee also may seek provision for a restructuring fee in the application for the advisor's retention, provided that any restructuring fee will be subject to court review for reasonableness on the same basis as the advisors for Debtors and the UCC.

The court recognizes the budget it has set may prove inadequate. The equity committee may seek reconsideration of the budget should future events warrant, and professionals employed by the committee will not be barred from seeking fees in excess of the budget in final fee applications (though payment of fees in excess of the budget

---

    motion practice and claim resolution – will often not be appropriate for equity committee involvement as well.

[29] Calendar quarters begin on January, April, July and October 1. Amounts provided herein shall be prorated to the extent a professional is retained or terminated during a calendar month or quarter.

will likely be largely dependant on treatment of equity owners under a plan). Likewise, should it become clear that equity is not entitled to participate in Debtors' reorganization, the court may reconsider the budget here set or may, upon appropriate motion, or *sua sponte*, direct that the equity committee be dissolved.

### III. Conclusion

For the reasons stated, the UCC Objection and the Bank Objection will be overruled. The Motion will be granted, upon the terms provided herein. The UST is directed, as soon as practicable, to take steps to form an official committee of equity security holders (which shall not, absent court approval, include Pilgrim, Jackson or an insider, as defined in Code § 101(31), of either) in accordance with this memorandum opinion.[30] Nothing in this opinion is intended to serve as a determination that the AHSG has or has not made a "substantial contribution" within the meaning of Code § 503(b)(3)(D) in these cases.

It is so ORDERED.

# # # # END OF MEMORANDUM OPINION # # # #

---

[30] The UCC has asserted that stockholders do not truly want an equity committee. The UST, pursuant to this memorandum opinion, will test that allegation. If the UST is unable to form an equity committee for lack of interest on the part of equity owners he considers not disqualified from serving, he shall so report to the court.

**Memorandum Opinion 08-45664**

**Page 18**