Martin A. Sosland (18855645)
Stephen A. Youngman (22226600)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

-and-

Gary T. Holtzer (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re** | § § § | **Chapter 11** |
| **PILGRIM'S PRIDE CORPORATION**, *et al.*, | § § | **Case No. 08-45664 (DML)** |
| Debtors. | § § § § | **JOINTLY ADMINISTERED** |

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363 AND 364 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO ENTER INTO A DIP SURETY FACILITY

TO THE HONORABLE D. MICHAEL LYNN,
UNITED STATES BANKRUPTCY JUDGE:

Pilgrim's Pride Corporation ("PPC") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"),[1] respectfully represent:

## Background

1. On December 1, 2008 (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Pilgrim's Pride's Businesses

3. PPC, together with its debtor and non-debtor subsidiaries (collectively, "Pilgrim's Pride"), has one of the best brand names in the chicken industry. It is one of the largest producers of chicken in the United States and the second-largest producer in Mexico. Pilgrim's Pride has operations throughout the continental United States, Puerto Rico, and Mexico. Based on the total annual chicken production in 2007 in the United States, the Debtors estimate that Pilgrim's Pride has the highest market share in the United States. Formed in 1946 as a retail feed store partnership between Lonnie A. "Bo" Pilgrim and his brother, Aubrey E. Pilgrim, PPC has been a publicly traded company since 1986.

---

[1] The Debtors in these cases are PPC; PFS Distribution Company; PPC Transportation Company; To-Ricos, Ltd.; To-Ricos Distribution, Ltd.; Pilgrim's Pride Corporation of West Virginia, Inc.; and PPC Marketing, Ltd.

4. Through vertical integration, Pilgrim's Pride manages the breeding, hatching and growing of chickens. Pilgrim's Pride also manages the processing, preparation, packaging, sale and distribution of its product lines, which Pilgrim's Pride believes has made it one of the highest quality, lowest-cost producers of chicken in North America. In the continental United States, Pilgrim's Pride produces both prepared chicken products and fresh chicken products. In Mexico and Puerto Rico, it produces exclusively fresh chicken products.

5. Although Pilgrim's Pride primarily produces chicken products, its operations also include, <u>inter alia</u>, operation of two captive insurance companies, through non-debtors. Pilgrim's Pride's products are sold to foodservice, retail and frozen entrée customers, distributed primarily through retailers, foodservice distributors and restaurants.

## Jurisdiction and Venue

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7. Pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code, the Debtors seek authorization and approval of a postpetition surety facility (the "<u>DIP Surety Facility</u>") with Liberty Mutual Insurance Company ("<u>Liberty</u>"), the principal terms of which are set forth in the term sheet attached hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>"), which will be executed by the parties substantially in the form attached hereto. The principal terms of the DIP Surety Facility include (i) the establishment of an $18 million DIP Surety Facility, (ii) assumption of the liabilities and obligations under the prepetition General Agreement of Indemnity dated December 24, 2002, a copy of which is attached as <u>Exhibit B</u> (the "<u>Prepetition</u>

Agreement"), and (iii) a posting of additional collateral in the approximate amount of $6.2 million to secure the Debtors' obligations under the DIP Surety Facility (the "Additional Collateral").

### Existing Bonds

8. To comply with various federal and state laws and regulations (and utility provider requirements) the Debtors must post, or have a surety post, bonds or other forms of security including, by way of example, bonds (i) to comply with workers' compensation insurance regulations, (ii) to comply with governmental licensing, tax and other regulations, and (iii) to maintain or establish utility accounts.

9. Prior to the Commencement Date, Liberty provided a surety facility for the Debtors. In that capacity, Liberty posted numerous bonds on the Debtors' behalf under the Prepetition Agreement by which the Debtors agreed to reimburse Liberty for any loss, damage or expense (including attorneys' fees) which it incurs by reason of any bonds issued on behalf of the Debtors.[2] As of the filing of this Motion, bonds in the approximate aggregate amount of $13 million remain outstanding (the "Existing Bonds"). The Debtors' reimbursement obligation to Liberty is currently backed by a letter of credit in the amount of $6,000,000 (the "Existing Letter of Credit"), of which only approximately $3.8 million remains available due to certain obligees drawing on some of the bonds postpetition.

---

[2] Paragraph 3 of the Prepetition Agreement provides that "[t]he Indemnitor [PPC] shall exonerate, indemnify and save harmless the Surety [Liberty] from and against any and all loss, damage or expense (including, but not limited to, interest, costs and attorney's fees) which the Surety shall at any time sustain or incur by reason of: the request to execute, procure, or deliver any Bonds; or the executing, procuring or delivering of any Bonds, whether already or hereafter executed; or the renewal or continuation thereof; or from making any investigation on account thereof; or any payment thereunder; or as a result of prosecuting or defending any action brought in connection therewith, obtaining a release therefrom, or recovering or attempting to recover any salvage in connection therewith; or by reason of the failure of the Indemnitor to perform or comply with the terms of this Agreement; or in the enforcement of the terms of this Agreement."

10. Certain of the Debtors' Existing Bonds are set to expire as early as end of June 2009 and need to be either re-extended or replaced. Extension on such bonds is crucial to the Debtors' ongoing business. Liberty has agreed to provide the Debtors the DIP Surety Facility during these Chapter 11 cases to allow the Debtors to renew the Existing Bonds and obtain additional bonds during these Chapter 11 cases. Accordingly, the Debtors and Liberty have entered into arms' length, good-faith negotiations and have reached an agreement on terms of the DIP Surety Facility that are the best terms available to the Debtors at this time.

### DIP Surety Facility

11. As described in more detail below, the Debtors and Liberty have agreed to enter into a DIP Surety Facility, the principal terms of which are as follows:

- Liberty shall provide an $18 million[3] DIP Surety Facility, which will expire on the effective date of a confirmed plan of reorganization (the "Plan").

- As support for the Debtors' reimbursement obligations to Liberty under the DIP Surety Facility, the Debtors will post the Additional Collateral for all bonded and indemnity obligations owed to Liberty by the Debtors, including those arranged under the Existing Bonds.

- Although Liberty will have the discretion whether to issue any bond under the DIP Surety Facility, Liberty has agreed to renew the Existing Bonds once during these Chapter 11 cases, if and when requested by the Debtors.

- The premium on the bonds issued or renewed under the DIP Surety Facility will be charged at a net rate[4] of $10.00 per $1,000 of the bond

---

[3] The aggregate amount of surety credit available under the DIP Surety Facility will be reduced by the aggregate value of the bonds outstanding and not released or partially released.

penal sum, provided that the minimum premium for the issuance of any single bond will be $100.

- The Debtors will assume the liabilities and obligations under the Prepetition Agreement. These liabilities and obligations are contingent in nature, and relate to the Debtors' ongoing operations.

**Approval of the DIP Surety Facility Is Warranted**

12. The Debtors seek authority to enter into the DIP Surety Facility, post the Additional Collateral and assume the liabilities and obligations under the Prepetition Agreement pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code.

*Entry Into DIP Surety Facility*

13. Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

14. In addition, section 363(b)(1) of the Bankruptcy Code permits the Debtors, after notice and a hearing, to use property of the estate outside the ordinary course of business. 11 U.S.C. §363(b)(1). Although the Debtors do not believe that approval of the Court is required to enter into the DIP Surety Facility because such practice is in the ordinary course of business,[5]

---

[4] For purposes of the Term Sheet, "net rate" means the amount of premium actually received by Liberty after reduction on account of any compensation (whether in the form of commission or otherwise) due to any broker or other paid intermediary.

[5] As provided in section 363(c) of the Bankruptcy Code,

[i]f the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c).

to the extent property of the Debtors estates is being used outside the ordinary course of business, out of abundance of caution, the Debtors request authority under section 363(b)(1) to enter into the DIP Surety Facility.

15. To the extent Court approval is required, ample justification exists for authority to enter into the DIP Surety Facility, post the Additional Collateral and assume the liabilities and obligations under the Prepetition Agreement. Because section 363 does not set forth a standard for determining what uses of estate property are appropriate, courts require evidence that the proposed use represents the exercise of the debtor's sound business judgment. See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that debtors may use estate assets when the evidence presented demonstrates good business judgment); In re Tropical Sportswear Int'l, 320 B.R. 15 (Bank. M.D. Fla. 2005) (sound business justification a factor in authorizing use of estate property); In re Southern Biotech, Inc., 37 B.R. 318 (Bankr. M.D. Fla. 1983) (debtors may purchase property if sound business judgment exists for use of estate property); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him a good business reason to grant the application"); accord In re Continental Air Lines, Inc., 780 F.2d 1223, 1225 (5th Cir. 1986). In this regard, courts have applied the business judgment rule. In re Integregated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); Matter of St. Petersburg Hotel Assoc. Ltd., 37 B.R. 341, 343 (Bankr. M.D. Fla. 1983). The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." Integregated Resources, Inc., 147 B.R. at 656 (internal citations

and quotations omitted). Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. Id.

16. Entry into the DIP Surety Facility is within the Debtors' sound business judgment. The Debtors require surety bonds in order to continue the operation of their business and, if the Debtors were unable to secure a surety facility, their business could be placed in jeopardy as the Debtors could lose significant business without certain surety bonds that are due to expire soon. The Debtors are not able to secure any other surety facility on terms better than those offered by Liberty. In addition, entry into the DIP Surety Facility will permit the Debtors to work with a surety familiar with the Debtors' operations and needs.

17. Therefore, the ability to renew existing bonds and obtain new bonds will further the Debtor's business and thus is, in the Debtors' business judgment, in the best interests of the Debtors, their estates and creditors.

*Posting the Additional Collateral*

18. In addition, approval of posting the Additional Collateral is warranted under section 364(c) of the Bankruptcy Code.

19. Section 364(c) of the Bankruptcy Code permits a debtor that is unable to obtain unsecured credit allowable in the ordinary course under section 364(a), to obtain credit (1) with priority over any or all administrative expenses specified in sections 503(b) or 507(b); (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien. To the extent the issuance, renewal or replacement of any surety bond or entry into the DIP Surety Facility is deemed a secured extension of credit, the Debtors request authority to do so under section 364(c) of the Bankruptcy Code. The Debtors do not believe they can obtain surety bonding except on a secured basis. In

addition, Liberty's is the best surety bond proposal which the Debtors have received to date. The Debtors' postpetition lenders have consented to the Debtors' entry into the DIP Surety Facility.[6]

*Assumption of Liabilities*

20. Liberty has conditioned its agreement to provide the DIP Surety Facility on the Debtors' assumption of the liabilities and obligations under the Prepetition Agreement. A debtor may assume prepetition liabilities if sound business judgment exists for such assumption. See In re Tropical Sportswear Int'l Corp., 320 B.R. 15 (Bankr. M.D. Fla. 2005); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord In re Continental Air Lines, Inc., 780 F.2d 1223, 1225 (5th Cir. 1986). In the exercise of their business judgment, the Debtors believe that the assumption of the liabilities and obligations under the Prepetition Agreement is reasonable. The business judgment rule shields a debtor's management from judicial second-guessing. See Westship, Inc. v. Trident Shipworks, Inc., 247 RR. 856, 866 (M.D. Fla. 2000) (under the business judgment rule, once the debtors demonstrate that an action will benefit the estate, "it is unnecessary to inquire whether another alternative will yield a greater gain"); see also In re Integrated Resources, Inc., 147 RR. 650, 656 (S.D.N.Y. 1992) ("[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'") (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985). Thus, this Court should approve the assumption of the liabilities and obligations under the Prepetition Agreement if the Debtors demonstrate sound business justification. The Debtors assert that such justification exists.

---

[6] Contemporaneously herewith, the Debtor has filed a motion to approve certain amendments to the postpetition credit agreement, including for approval of the DIP Surety Facility.

21. First, as noted above, the Debtors' liabilities under the Prepetition Agreement are contingent in nature, and relate to the Debtors ongoing operations. Second, such assumption is a condition precedent to the issuance of any new bonds by Liberty, and, for the reasons set forth above, the Debtors believe that absent new bonding capacity, the value of these estates will be negatively impacted.

22. The proposed DIP Surety Facility will provide the Debtors increased options, based on liquidity, collateral requirements and other business and financial considerations, in determining how to comply with applicable laws and third-party deposit requirements. The premium on bonds offered by Liberty under the DIP Surety Facility is even lower than the rates applicable to the Existing bonds. Additionally, Liberty's collateral requirement is less than 100% of the total amount of the DIP Surety Facility. The Debtors were not able to secure any other surety provider who would have provided the Debtors a surety facility on better terms. In addition, entry into the DIP Surety Facility will permit the Debtors to work with a surety familiar with the Debtors' operations and needs. For all of the foregoing reasons, entry into the DIP Surety Facility constitutes sound business judgment.

23. If the Court does not approve the Debtors' entry into the DIP Surety Facility, the Debtors will incur additional costs to find a new surety or alternative credit enhancements and, if unable to secure such alternative facility, will put its business in jeopardy because the Debtor will lose significant business without certain surety bonds that are soon expiring.

24. The DIP Surety Facility will benefit the Debtors during the course of these cases by enabling the Debtor to continue bonding its various business operations. Based on the benefits to be realized from entering into the DIP Surety Facility, together with the potential

NY2:\1987870\09\16L%M09!.DOC\67466.0003

10

harm and injury to the Debtors' estates if the relief requested is not granted, the Debtors submit that entry into the DIP Surety Facility is in the best interests of the Debtors, their estate and their creditors.

## Notice

25.  Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the statutory committee of unsecured creditors; (iii) counsel to the Debtors' prepetition secured lenders; (iv) counsel to the Agent to the Debtors' postpetition lenders; (v) counsel for Liberty; and (vi) all parties on the Master Service List filed with this Court (collectively, the "Notice Parties"). The Debtors submit that no other or further notice need be provided.

## No Previous Request

26.  No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 5, 2009
      Fort Worth, Texas

    /s/ Stephen A. Youngman
Martin A. Sosland (18855645)
Stephen A. Youngman (22226600)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

-and-

Gary T. Holtzer (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession