

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**Signed September 16, 2009**                                        **United States Bankruptcy Judge**

---

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| ET AL., | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## Memorandum Opinion

Before the court is *Debtors' Omnibus Response To Section 503(b)(9) Claims* (the "Response") in which Debtors object to certain claims made under section 503(b)(9) of the Bankruptcy Code (the "Code") (11 U.S.C. §§ 101 *et seq.*) by trucking, electric, water, and gas companies.[1] In the Response, Debtors objected to the section 503(b)(9)[2] claims

---

[1] Subsequent to the Response, Debtors filed further pleadings in response to additional section 503(b)(9) claims. In these pleadings, Debtors objected to claims not addressed in this memorandum opinion, but some of the objections are on similar grounds to those here addressed.

by trucking companies Stanley Freight, LLC ("Stanley"), S. Easley Trucking, Inc., and Chuck's Transport, Inc. (collectively the "Trucking Companies"). Debtors also objected to the section 503(b)(9) claims of the City of Nacogdoches (the "City") a provider of, *inter alia*, water and Claiborne Electric Cooperative, Inc., an electricity provider (the "Electricity Provider"). Finally, Debtors objected to the section 503(b)(9) claims of gas utility companies CenterPoint Energy Services, Inc., Piedmont Natural Gas, Atmos Energy Corp., Atmos Energy Marketing, LLC, and Marshall County Gas District (collectively the "Gas Providers," and with the Trucking Companies, the City, and the Electricity Provider, the "503(b)(9) Claimants").

Stanley, the City, the Electricity Provider, Marshall County Gas District, Atmos Energy Corp., Atmos Energy Marketing, LLC, and CenterPoint Energy Services, Inc., all filed replies to the Response (each individually a "Reply," and collectively the "Replies"). Debtors then filed *Debtors' Omnibus Reply to Section 503(b)(9) Objections* (the "Debtors' Reply"). A hearing (the "Hearing") was held on July 21, 2009, during which the court heard argument from Debtors and various of the 503(b)(9) Claimants.

The court exercises core jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 AND 9014.

## I. Background

Debtors filed for relief under chapter 11 of the Code on December 1, 2008. Debtors remain in possession of their property and continue operation of their business as

---

[2] Section 503(b)(9) was added to the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005.

provided by sections 1107(a) and 1108 of the Code. Debtors, known within the industry as "chicken integrators," are among the largest producers and marketers of chicken products in the world. They operate numerous plants throughout the United States and employ more than 40,000 persons.

Contemporaneously with commencement of their bankruptcy cases, Debtors filed a motion to establish global procedures for the submission and payment of claims asserting entitlement to administrative priority under Code § 503(b)(9). The court entered an order granting that motion and establishing such procedures (the "Procedures Order") on December 31, 2008. In accordance with the Procedures Order, numerous creditors filed section 503(b)(9) claims, and Debtors filed the Response asking the court to allow some of the claims as presented and to disallow, at least as to priority treatment, all or part of other of the claims for various reasons, *inter alia*, that some of the claims were not for "goods." Several of the 503(b)(9) Claimants then filed Replies. The court considered the Response, the Replies, and the Debtors' Reply at the Hearing.

## II. Discussion

The dispute between Debtors and the 503(b)(9) Claimants concerns whether those claimants qualify for administrative priority treatment pursuant to section 503(b)(9) of the Code. Section 503(b)(9) states:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including…
> (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

Thus, to qualify for administrative priority treatment, a claim must be (1) for goods, (2) that are received by the debtor within the 20 days prior to case commencement, and (3) that are sold to the debtor in the ordinary course of its business. In the case at bar, there is no dispute that the claims of the 503(b)(9) Claimants were incurred by Debtors in the ordinary course of their business. Though Debtors have contested some claims made pursuant to section 503(b)(9) based on the 20 day limit or for other reasons, the court is presently concerned only with whether the claims of the 503(b)(9) Claimants are for "goods received by" Debtors.

**A. Goods Delivered**

**1. Definition of Goods**

The word "goods," though used throughout the Code, is not defined anywhere within the Code. 4 COLLIER ON BANKRUPTCY ¶ 503.16(1) (15th ed. rev. 2008). Because the term is not defined in the Code, courts must look elsewhere to find a definition.[3] Many courts have looked to the Uniform Commercial Code's (the "UCC") Article 2 definition when determining what are "goods" for the purpose of section 503(b)(9). *See, e.g., In re Goody's Family Clothing, Inc.*, 401 B.R. 131, 134 (Bankr. D. Del. 2009); *In re Plastech Engineered Prods.*, 2008 Bankr. LEXIS 4082 (Bankr. E.D. Mich. Dec. 10, 2008); 4 COLLIER ON BANKRUPTCY ¶ 503.16(1) (15th ed. rev. 2008).[4]

---

[3] If, in other contexts Congress had established a consistent ambit for the term "goods," it would be useful. The court has found two places in the United States Code where Congress has defined "goods." In 49 U.S.C. § 80101(3), the word "goods" is defined as "merchandise or personal property that has been, is being, or will be transported." In contrast to this relatively narrow definition, 29 U.S.C. § 203(i) defines "goods" very broadly to include "goods…, wares, products, commodities, merchandise, or articles or subjects of commerce of any character…." Because these two definitions have such disparate effect, the court does not consider either helpful in discerning Congress's meaning in the use of the word in section 503(b)(9).

[4] It has been held in other contexts that when a term is not defined courts will give it its ordinary meaning. *See, e.g., Watson v. United States*, 522 U.S. 914, 942 (2000). If the court gave the term

Many of the 503(b)(9) Claimants have argued that, in defining goods for purposes of their claims, the court must apply choice of law provisions and look to the definition of goods found within the UCC version adopted by the state with the most significant relationship to a given claim. The court disagrees. Federal law governs the interpretation of federal statutes.[5] *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97 (1991); *In re Columbia Gas Sys.*, 997 F.2d 1039, 1056 (3d Cir. 1993). While it may find guidance in the UCC in deciding what are "goods,"[6] the court must also, in construing section 503(b)(9), take account of the need for uniform interpretation of the Code. As the Court of Appeals for the Fifth Circuit has stated, the court should not "apply state law when national uniformity is required." *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 890 (5th Cir. 2001).

Section 503(b)(9) is an extension of the scheme of priorities established by Congress in Code § 507. The constitutional grant of authority by which Congress enacted the Code is to "establish uniform Laws on the subject of Bankruptcies." U.S. Const. art. I § 8, cl. 4. One of the cardinal rules of bankruptcy law is that similarly situated claims should receive the same treatment. *See, e.g., Till v. SCS Credit Corp.*, 541 U.S. 465, 477 (2004); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) ("The Bankruptcy Code furthers the policy of 'equality of distribution among

---

"goods" its ordinary meaning for purposes of the claims addressed in this memorandum opinion, the outcome would remain the same.

[5] Section 503(b)(9) is not like those provisions of the Code (*e.g.*, section 522(b)) that specifically reference state law or provisions that turn on prepetition rights under other, including state, law (*e.g.*, section 541(a)). Differences in state law should not lead to different meanings for "goods" from state to state.

[6] The UCC is an appropriate source for determining federal common law. *See United States v. Conrad Pub. Co.*, 589 F.2d 949, 954 (8th Cir. 1978); *United States v. Hext*, 444 F.2d 804, 811 (5th Cir. 1971).

creditors' by requiring that a plan of reorganization provide similar treatment to similarly situated claims."). To apply differing state laws to determine entitlement to priority treatment under section 503(b)(9) would run contrary to the constitutional mandate for uniformity as well as violate this cardinal principle. Thus, while the court agrees that the UCC provides useful guidance in deciding what are "goods," it does not propose to give effect to any differences in local enactments of the UCC or the variances in its interpretation by the courts of the states. The court concludes that the appropriate definition of goods for the purpose of Code § 503(b)(9) is that found in the "model" UCC. Specifically, UCC § 2-105 states:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2-107).

**2. Mixed Goods and Services**

The definition of "goods" in Article 2 of the UCC is applicable to contracts for the sale of goods. Numerous courts have struggled with application of Article 2 to contracts where performance is a mixture of the supply of goods and the provision of services. *See, e.g., Princess Cruises v. GE*, 143 F.3d 828, 832-3 (4th Cir. 1998); *Triangle Underwriters, Inc. v. Honeywell*, Inc., 604 F.2d 737, 742 (2d Cir. 1979); *Plastech*, 2008 Bankr. LEXIS 4082 at *21-23. As a general rule, many courts have adopted as a test "whether the predominant factor, thrust, or purpose of the contract is the sale of goods or the provision of services." 77A C.J.S. *Sales* § 12 (2009); *see also Princess Cruises*, 143 F.3d at 832-3;

*Triangle Underwriters*, 604 F.2d at 742. If the contract is principally directed toward the sale of goods, Article 2 applies; if to the provision of services, it does not.

The court arguably could apply the same test and only find goods provided under a contract principally addressed to delivery of goods to fall within Code § 503(b)(9). This, however, would go beyond the extent to which the UCC may be utilized in construing the Code. Congress, in section 503(b)(9), did not provide any basis for excluding from the section's scope goods delivered pursuant to a contract the primary thrust of which is provision of services. Thus, while the court will look to UCC § 2-105 for the meaning of "goods," it will not limit section 503(b)(9) as do courts considering the term in construing Article 2.[7]

**B. Application to 503(b)(9) Claimants**

Having adopted a definition for "goods," the court next must test against it the claim to administrative priority of each of the categories of the 503(b)(9) Claimants. The court concludes that the Trucking Companies and the Electricity Provider provided no "goods" to Debtors, that the City provided some goods, and that the Gas Providers did provide goods to Debtors. As to the City and the Gas Providers, further inquiry is necessary to determine the extent of their entitlement to administrative priority treatment.

**1. Trucking Companies**

---

[7] As discussed below, claims arising from the provision of services do not fall within section 503(b)(9). To the extent that a claim, even if minimally, arises from delivery of goods, however, the claimant is entitled to administrative priority treatment.

In its Reply, Stanley argues that it is entitled to an administrative claim under section 503(b)(9) because it provided freight services to Debtors within 20 days of the commencement of Debtors' cases. At the Hearing, the Trucking Companies admitted that the Trucking Companies provided *services* to Debtors rather than *goods*. The Trucking Companies argued that claims based on the rendition of services should have been included within the ambit of section 503(b)(9) and that the exclusion of claims for services was the result of inartful drafting by Congress.

The court finds this argument unpersuasive. The court must assume Congress meant what it said. *See United States v. Goldenberg*, 168 U.S. 95, 102-3 (1897). If Congress had intended to include services within section 503(b)(9), it would have so specified. There are multiple instances in the Code in which Congress refers to both goods and services in a provision. *See, e.g.*, Code § 101(4A); Code § 101(49)(B)(vii); Code § 547(a)(2). Congress therefore knew quite well how to draft a provision covering services as well as goods. It elected not to so draft section 503(b)(9).

The court is not an architect of policy; that role is Congress's. Courts cannot read non-existent language into a statute. When construing statutes, courts must give force to their plain language unless to do so would lead to an absurd result. *Lamie v. United States Trustee,* 540 U.S. 526, 533 (2004). It cannot be contended that a Congressional election in designing the scheme of bankruptcy priorities to favor providers of goods over purveyors of services is absurd. Section 503(b)(9) simply does not provide for the payment on a priority basis for services rendered prepetition, and the court cannot read such meaning into the statute. The Trucking Companies' claim of entitlement to administrative priority under Code § 503(b)(9) must be denied.

**2. Electricity Provider**

The Electricity Provider has asserted a section 503(b)(9) claim based on the value of electric power provided to Debtors. In its Reply, the Electricity Provider argues that electricity should be treated as "goods" for the purpose of section 503(b)(9) of the Code.

In support of this position, the Electricity Provider points to a Supreme Court holding that "electric energy thus produced, constitute[s] property." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 330 (1936). In *Ashwander*, the Court addressed whether the United States had the authority to dispose of electricity generated by a government-owned dam. The Court held that Congress may, pursuant to Article 4, Section 3 of the Constitution, dispose of property, that electricity is property, and that the government therefore had the authority to dispose of it. *Id.* While electricity may be something in which one can have property rights, it does not necessarily follow that it falls within the term "goods." Not everything that is property falls under that heading. For example, one can have property rights in trademarks, patents, and copyrights, but no one would argue that intellectual property falls under the UCC definition of "goods."

The Electricity Provider also cites a number of cases in which courts determined that electricity is a product. *See, e.g., Monroe v. Savannah Elec. & Power Co.*, 471 S.E.2d 854, 855-56 (Ga. 1996); *People v. Menagas*, 11 N.E. 2d 403, 405 (Il. 1937); *Sixty-Seven S. Munn v. Board of Public Util. Comm'r*, 147 A. 735 (NJ 1929). Blacks' Law Dictionary defines "product" as "something that is distributed commercially for use or consumption." BLACK'S LAW DICTIONARY 1328 (9th ed. 2009). There are many things that are distributed commercially for use or consumption that would not qualify as "goods" under the UCC. For example, a television show that is broadcast commercially

and is consumed through viewing obviously does not fall within the meaning of "goods." The television show itself has no identifiable form; it is merely intellectual property. It can only be "moved" physically if it is encoded in a digital or analog form. The mere fact that something is a product does not mean that it falls within the term "goods" under the UCC or Code § 503(b)(9).

Finally, the Electricity Provider cites a number of cases in which courts have actually held that electricity does fit within the definition of "goods" under the UCC. *See, e.g.*, *In re Pac. Gas & Elec. Co.*, 271 B.R. 626, 638-40 (N.D. Cal. 2002); *C.G. Bryant v. Tri-County Elec. Member. Co.*, 844 F. Supp. 347, 349-52 (W.D. Ky. 1994). Generally, the courts that hold that electricity is such so conclude because, once it passes the customer's meter, it can be measured and is in the stream of commerce. *See, e.g.*, *In re Pac. Gas & Elec. Co.*, 271 B.R. at 638-40; *G&K Dairy v. Princeton Elec. Light Board*, 781 F. Supp. 347, 349-52 (E.D. Pa. 1991). None of these cases binds this court, and it respectfully disagrees with their holdings.

While it is true that electricity is metered, this does not mean that it is within the UCC definition of "goods." Telecom companies meter phone calls and internet bandwidth usage. However, the entities providing the medium for phone calls and the internet are clearly providing to their customers not "goods" but services. Further, the UCC requires that goods be movable at the time of identification. This is simply not true of electricity. Once electricity has been "identified" by measurement at the meter, it has already been consumed by the end user. It is impossible for the consumer to return electricity to the provider after it has passed the meter point. The mere fact that

electricity is sold in metered quantities does not bring it within UCC § 2-105 or Code § 503(b)(9).[8]

The court must look to the plain meaning of the UCC and the Code. UCC § 2-105 does not suggest that the provision's drafters had intended that "goods" would include things which cannot be packaged and handled. The reference to "specially manufactured goods" implies a reading too narrow to cover electricity, as does the specific inclusion in the definition of unborn animals and crops—things that, like manufactured goods, clearly occupy space and can be moved about; that UCC § 2-105 excludes specifically from the definition of "goods" money and investment securities — items that have extension and can be picked up and moved — but not most intangibles, despite the fact that intangibles are generally not considered goods, further persuades the court that the UCC's authors did not intend things like electricity, radio waves, or piped music to be within the scope of section 2-105.

Many courts have ruled that electricity does not fall within the term "goods." In *Samaritan Alliance* the bankruptcy court considered whether electricity providers sell goods or services and concluded that the sale of electricity is more akin to providing a service than selling goods. *In re Samaritan Alliance, LLC*, 2008 Bankr. LEXIS 1830, *9 (Bankr. E.D. Ky. June 20, 2008). Under New York law electricity is not considered to fall under the heading of "goods." *See United States v. Con. Edison Co.*, 590 F. Supp. 266, 269 (S.D.N.Y. 1984); *Farina v. Niagara Mohawk Power Corp.*, 81 A.D.2d 700

---

[8] The court's conclusion that electricity does not fall within the UCC's definition of goods is supported by Uniform Commercial Code Comment 1 to section 2-105, which states, "The definition of goods… is not intended to deal with things that are not fully identifiable as movables before the contract is performed." It is difficult to imagine how electricity to be delivered could be identified at all before transmission to the customer.

(N.Y. App. Div. 3d Dep't 1981). A number of other courts have held that electricity does not fall within the UCC's definition of "goods." *See generally New Balance Ath. Shoe v. Boston Edison Co.*, 1996 Mass. Super. LEXIS 496 (Mass. Super. Ct. 1996); *Williams v. Detroit Edison Co.*, 63 Mich. App. 559, 563 (Mich. Ct. App. 1975); *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.*, 196 N.W. 2d 316, 317 (Mich. Ct. App. 1972); *Cincinnati Gas & Elec. Co. v. Goebel*, 28 Ohio Misc. 2d 4, 5 (Ohio Mun. Ct. 1986).

Finally, section 503(b)(9) creates an exception to the general rule that claims arising prepetition are general unsecured claims. It allows for an administrative claim for goods delivered within the 20 days preceding a bankruptcy filing. Administrative claims are priority claims under Code § 507(a)(2). Priority claims are granted special treatment; therefore, provisions of the Code granting claims priority are to be narrowly construed.[9] 4 COLLIER ON BANKRUPTCY ¶ 507.01 (15th ed. rev. 2007). A party claiming priority must fit clearly within the priority statute in order to be granted a priority claim. *See Howard Delivery Serv. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 669 (2006); 4 COLLIER ON BANKRUPTCY ¶ 507.01 (15th ed. rev. 2007).

The Electricity Provider does not clearly fit within the requirements of section 503(b)(9). While some courts have accepted the argument that electricity is covered by the term "goods," other courts have rejected that position. Some courts have referred to electricity providers as simply service providers. *Samaritan Alliance*, 2008 Bankr. LEXIS 1830 at *9. This court is persuaded that these courts are correct or at least that a

---

[9] The Fifth Circuit has said that the words "actual" and "necessary," as found in section 503(b)(1)(A), should be narrowly construed. *See In re Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). Because sections 503(b)(1)(A) and (503)(b)(9) both allow for the treatment of claims as administrative expenses, the court concludes it should likewise narrowly construe the word "goods" for the purpose of section 503(b)(9).

narrower construction of UCC § 2-105 is preferable when determining the extent of the priority provided by section 503(b)(9). The Electricity Provider's section 503(b)(9) claim must therefore be denied administrative priority under section 503(b)(9).

**3. Gas Providers**

The UCC, as the Gas Providers argue, specifically includes natural gas within the definition of goods. Section 2-107(1) of the UCC states:

> A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the *sale of goods within this Article* if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

UCC § 2-107(1) (emphasis added).

While this provision is directed to minerals that are to be severed from realty, in its light it seems to the court absurd to exclude from the definition of goods minerals long since separated from the ground. Minerals, generally, are goods unless they remain part of the real estate of their origin.

Debtors maintain that gas does not fall within the term "goods" for the purpose of section 503(b)(9) because section 503(b)(9) must be read in conjunction with section 366 of the Code. Debtors note that section 366 was extensively amended by BAPCPA to the benefit of utilities. BAPCPA added section 503(b)(9) as well. From this, Debtors reason that Congress could not have intended that utilities should benefit from both changes to the Code.

The court, once again, is bound by the plain meaning rule. *Lamie,* 540 U.S. at 533. If the court adopts — as it does — the UCC definition of "goods," natural gas — whether provided by a utility or other vendor — falls within that definition. Congress

could have — but did not — except from section 503(b)(9) either providers that are acting as utilities or specific goods such as minerals.

That a gas provider may benefit from BAPCPA's amendments to both section 503(b)(9) and section 366 is not reason to ignore the plain meaning of the two sections. The Supreme Court has said that "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 619 (1980) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). The court cannot simply ignore the statute as it is written. While it questions whether Congress in fact realized that pursuant to section 503(b)(9) gas utilities would be entitled to administrative claims as well as receiving the protections offered by amended section 366, the court would be remiss to ignore the plain language of the statute simply because of any doubts it may have about Congress's intent.[10]

Because natural gas falls within the term "goods," the Gas Providers are entitled to an administrative claim for the *value* of the gas they delivered to Debtors in the 20 days prior to bankruptcy. The court notes, however, that the *value* of the gas is just that: Gas Providers are entitled to payment as an administrative expense for the value of gas

---

[10] This is not to say that Debtors' argument is without merit. The court would be unsurprised to learn that the drafters of section 503(b)(9) intended to benefit a debtor's prepetition vendors that supplied goods such as inventory, not utilities. Indeed, the addition to section 366 of subsection (c)(4), permitting a utility to offset a prepetition deposit against prepetition debt, suggests that Congress intended that provision, not section 503(b)(9), to favor satisfaction of a utility's prepetition obligations. However, a trial court is not, except in the most obvious case, an appropriate agency for divining where the intent of Congress is such that the apparent meaning of a statute should be ignored. Rather, such determinations should be left by trial courts to the appellate courts to avoid the risks of reprimand as well as reversal. *Compare BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (Scalia, J.) (disregarding apparent meaning of statute) *with Union Bank v. Wolas*, 502 U.S. 151 (1991) (Scalia, J., concurring) (rebuking lower court for disregarding plain meaning of statute).

delivered within 20 days of Debtors' filing, not to any recompense for the use of the utility's infrastructure in delivering the gas. The Gas Providers' claims to entitlement to administrative priority will be granted accordingly.

**4. The City**

The City provided sewage and garbage removal as well as water (the "Municipal Services") to Debtors and seeks payment for the Municipal Services under Code § 503(b)(9). In its Reply the City claims that the Municipal Services are "goods" for the purpose of section 503(b)(9) because they were defined as such in the Procedures Order. The City further argues that, should the court find that "goods" should be defined differently for the purpose of section 503(b)(9) than in the Procedures Order, water still falls within the section because it is within the term "goods" under the UCC. From its Reply, the City seems to concede that sewage and garbage removal are services, not goods, under the UCC, and the City is not entitled to a priority claim for such under section 503(b)(9) unless by the terms of the Procedures Order.

Even if the Procedures Order should be construed as the City urges, the court could not have expanded the scope of section 503(b)(9) by use of the Procedures Order. The Supreme Court has held that Congress, not the courts, determines general categories of claims. *See United States v. Noland*, 517 U.S. 535, 536 (1996); *United Sates v. Reorganized CF&I Fabricators*, 518 U.S. 213, 229 (1996). This court simply has no authority to establish a category of priority claims — here for prepetition services — not included in the Code.

Water supplied during the 20 days prior to Debtors' filing presents a different case. Section 2-107 of the UCC states that "a contract for the sale of minerals or the like

(including oil and gas)… is a contract for the sale of goods." Black's Law Dictionary defines "mineral" as "any natural inorganic matter that has a definite chemical composition and specific physical properties that give it value…." BLACK'S LAW DICTIONARY 1084 (9th ed. 2009).

It is clear that water is a natural inorganic substance with a definite chemical composition. Water has value — as evidenced by the price charged for bottled water. Because water meets the definition of "mineral," it fits within the definition of "goods" under the UCC. Therefore, the City is entitled to a claim under section 503(b)(9) for water delivered in the prebankruptcy period, but that claim is limited to the *value* of the water delivered. Otherwise, the City's claim to administrative treatment pursuant to section 503(b)(9) must be denied.

**C. Value of Goods**

Although not strictly necessary to the court's decision, the question of value merits some discussion. First, it is central to the necessary division of claims the bases of which are a mix of goods delivered and services performed. How to perform that division is thus a necessary corollary to application of the decision here reached. Second, it is beneficial to give the parties guidance respecting valuation both to facilitate their possible agreement respecting the extent of section 503(b)(9)'s coverage and to aid them, if necessary, in planning any evidentiary showing in a future hearing.

Section 503(b)(9) provides a prepetition creditor an administrative claim for "the *value* of any *goods* received" (emphasis added) by the debtor during the applicable prepetition period. Section 503(b)(9) does not provide for an administrative claim for services. Rather, Congress limited the scope of section 503(b)(9) to goods — and to the

*value* of the goods at that. Congress thus, pointedly, left to the courts determination of value to a debtor of goods received, rather than simply providing priority treatment for any claim arising from the delivery of goods.[11] Irrespective of whether services were rendered in conjunction with the delivery of goods, therefore, an administrative claim under section 503(b)(9) covers only the value of the goods themselves. *Plastech*, 2008 Bankr. LEXIS 4082.

The court, then, must consider how value should be measured. The word "value" appears numerous times throughout the Code and its meaning varies depending on context. Indeed, Congress, in section 506(a)(1), has recognized that the same property may be valued differently depending on the circumstances: "[V]alue shall be determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property." *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 960 (1997).

The definition of value found in the *Rash* case is suitable to guide the court in interpreting Code § 503(b)(9). It was crafted to address valuation of property a debtor intended to retain and use (as opposed to a valuation to determine a creditor's realization at foreclosure; *see generally, Winthrop Old Farm Nurseries v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries)*, 50 F.3d 72, 73-6 (1st Cir. 1995)). In *Rash*, the Court held that an undersecured creditor's collateral that was to be retained under the debtor's plan should be valued at replacement cost — *i.e.*, what the debtor would pay to

---

[11] The task facing the court in applying section 503(b)(9) is similar to determining the administrative claim of a debtor's counterparty to a rejected contract. A counterparty is entitled an administrative claim for performance rendered to a debtor during the period between the debtor's filing and its rejection of the executory contract. However, the administrative claim is limited to the reasonable value of that performance which will not necessarily be the price specified in the contract. *See, e.g., Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 42 (1st Cir. 2003) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)). At least one court has looked to the fair market value of the goods leased under a contract to determine the amount owed. *See In re ICS Cybernetics, Inc.*, 111 B.R. 32, 41 (Bankr. N.D.N.Y. 1989).

acquire similar property. *Rash*, 520 U.S. at 965.[12] Here, where the goods retained by Debtors will be used by Debtors, Debtors should also pay as an administrative expense under section 503(b)(9) what it would have cost Debtors to acquire similar goods.[13] Thus, each 503(b)(9) Claimant must prove the value of the goods for which it is entitled to an administrative expense claim.[14]

Natural gas is a commodity traded on the commodity markets. One method for valuing a commodity for the purpose of section 503(b)(9) claims might be to value the commodity based on the price at which it could be purchased during the relevant period on the commodity market.[15] Other goods sold to Debtors by a utility — *i.e.*, water — may not be so easily valued.

### III. Conclusion

Debtors' objections to priority status of the claims of the Trucking Companies and the Electricity Provider are sustained. To the extent the claim is based on garbage and sewage service, the objection to the City's claim is sustained. The Gas Providers and the City are entitled to administrative claims under section 503(b)(9) to the extent of the

---

[12] As *Rash* referred to acquisition of the property "for the same proposed… use" (*see Id.*), it might be argued that gas and water acquired from a utility should be valued at its cost from the utility. However, in *Rash*, the Court was dealing with and tracking the specific language of section 506(a). In construing section 503(b)(9), the court must also give effect to the statute's specific language, which limits the amount of the administrative claim to just the "value of [the] goods."

[13] If the contract provided a breakdown between goods delivered and services rendered, as was the case in *Plastec* (*Plastech*, 2008 Bankr. LEXIS 4082 at *25-26), the contract price for the goods delivered would provide a good starting place, as is the case with determination of value of post-petition performance of a rejected contract.

[14] The creditor bears the burden of showing entitlement to priority treatment. *See, e.g.*, *In re Terra Distrib. Inc.*, 148 B.R. 598 (Bankr. D. Idaho 1992); 4 COLLIER ON BANKRUPTCY ¶ 507.01 (15th ed. rev. 2007).

[15] In the case of natural gas, for example, an appropriate market would be the New York Mercantile Exchange (NYMEX).

value of gas and water, respectively, delivered to Debtors within 20 days prior to commencement of Debtors' chapter 11 cases, and to that extent Debtors' objections to such claims are overruled.

Counsel for Debtors is instructed to submit an order consistent with the foregoing.

### END OF MEMORANDUM OPINION ###