Expense Claims) were required to be filed in the Debtors' bankruptcy cases (the "<u>Bar Date</u>").  In accordance with instructions from the Bankruptcy Court, notices informing creditors of the last date to timely file proofs of claims, and a "customized" proof of claim form, reflecting the nature, amount, and status of each creditor's claim as reflected in the Schedules, were mailed to all creditors listed on the Schedules.  In addition, the Debtors caused to be published once in *The Wall Street Journal* (National Edition), the *USA Today*, *The Mount Pleasant Daily Tribune*, and the *El Nuevo Dia* a notice of the Bar Date.

2. *Section 503(b)(9) Claims Bar Date*

On December 31, 2008, the Bankruptcy Court entered the Order Pursuant to Section 503(b)(9) of the Bankruptcy Code to Establish and Implement Exclusive and Global Procedures for Submitting and Resolving Claims Relating to Goods Received Within Twenty Days Prior to the Commencement Date (the "<u>503(b)(9) Order</u>").  The 503(b)(9) Order fixed March 4, 2009 as the deadline for submitting requests for payment of claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "<u>Section 503(b)(9) Claims</u>").  The 503(b)(9) Order also established procedures for resolving any disputed Section 503(b)(9) Claims.  All Allowed Section 503(b)(9) claims will be paid in Cash in full on the Effective Date.

3. *Administrative Expense Claim Bar Date*

Pursuant to the Plan, the deadline for filing requests for payment of Administrative Expense Claims other than (i) claims of professionals retained in the Chapter 11 Cases, claims related to the debtor in possession financing and Section 503(b)(9) Claims, (ii) claims for liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iii) Administrative Expense Claims that have already been allowed on or before the Effective Date, is sixty (60) days after the Effective Date (the "<u>Administrative Claim Bar Date</u>").  All such Administrative Expense Claims must be filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors, as applicable, and the Office of the United States Trustee, on or prior to the Administrative Claim Bar Date.  Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim.

4. *Debtors' Procedures for Objecting to Proofs of Claims and Administrative Expense Claims and Notifying Claimants of Objection*

On July 21, 2009, the Bankruptcy Court entered an Order Approving Procedures for Objecting to Proofs of Claim and for Notifying the Claimants of Such Objections.  This Order authorizes the Debtors to object on an omnibus basis to proofs of claims comprised of: (i) duplicate and duplicate guarantee claims, (ii) amended and superseded claims, (iii) late-filed claims, (iv) claims inconsistent with the Debtors' books and records, (v) equity interest claims, (vi) claims under which the Debtors are not liable, (vii) claims that do not include sufficient information, (viii) misclassified claims, (ix) claims that have been satisfied, (x) claims that have been wrongfully filed in this case, (xi) claims that exceed the maximum amount under section 507 of the Bankruptcy Code and (xii) claims that objectionable pursuant to section 502(e)(1) of the Bankruptcy Code.

Pursuant to the Plan, unless extended by the Bankruptcy Court, the Debtors (upon certain notice to the Plan Sponsor as described in more detail in Section VI(C)(2)) and the Reorganized Debtors, as applicable, will have until one hundred and fifty (150) days after the Effective Date to object to prepetition general unsecured claims and approximately thirty (30) days after the Administrative Claim Bar Date to object to those Administrative Expense Claims that are subject to the Administrative Claim Bar Date.

Although the Debtors have already filed some omnibus claims objections, the Debtors are still conducting a comprehensive review and reconciliation of the claims filed against them, which includes identifying particular categories of proofs of claim that the Debtors should target for disallowance and expungement, reduction and allowance, or reclassification and allowance, and anticipate filing additional omnibus claims objections.

L.      **Establishment of Alternative Dispute Resolution Process**

In the course of conducting their businesses, the Debtors have become exposed to potential liability for claims relating to bodily injury or death arising from events that occurred prior to the Commencement Date (the "PI Claims").  These PI Claims have arisen primarily from traffic accidents involving trucks owned and driven by Debtors' employees, Texas work-related injuries, and products produced and sold by the Debtors. The Debtors estimate that prior to the Commencement Date approximately 200 lawsuits or other proceedings have been commenced against the Debtors and/or their employees and insurers related to such PI Claims. Additionally, the Debtors estimate that there may be more than 700 other PI Claims with respect to which no litigation, lawsuit or other proceedings have yet been commenced.

In order to streamline the process of resolving the PI Claims and to avoid piecemeal litigation by holders of PI Claims who have sought or will seek to lift the automatic stay, on April 9, 2009 the Bankruptcy Court approved certain alternative dispute resolution procedures that were proposed by the Debtors for attempting to resolve the PI Claims.  The alternative dispute resolution procedures (the "ADR Procedures") provide that, before obtaining relief from the automatic stay imposed by section 362 of the Bankruptcy Code, to pursue a PI Claim in a non-bankruptcy forum, each claimant (with certain exceptions) must in good faith participate with the Debtors in an offer exchange and mediation process. Any settlement that is reached through the offer exchange or mediation process, or any judgment that is awarded after the automatic stay is lifted, is granted an allowed general unsecured claim in the Chapter 11 Cases (to the extent not covered by Debtors' insurance) to be paid pursuant to the terms of the Plan.

As of September 4, 2009, 63 PI Claims have been resolved pursuant to the ADR Procedures.  The ADR Procedures will continue to apply after the Effective Date to any PI Claim not yet resolved.

M.      **Significant Material Litigation**

1.      *Donning and Doffing Litigation*

As of the Commencement Date, the Debtors were defendants in two collective actions brought by employees or former employees for unpaid wages, unpaid overtime wages, liquidated damages, costs and attorneys' fees, based on time spent donning uniforms and protective gear and then doffing such.  Those actions are *Randolph Benbow et al v. Gold Kist*, pending in the United States District Court for the District of South Carolina (the "Benbow Action") and *MDL 1832 Pilgrim's Pride Fair Labor Standards Act Litigation*, pending in the United States District Court for the Western District of Arkansas (the "MDL Action").  Post-petition, another similar suit was filed as an Adversary Proceeding in the Bankruptcy Court, entitled *Anna Atkinson, et al. v. Pilgrim's Pride Corporation, Gold Kist, Inc.* (the "Atkinson Action").  Collectively, these three actions include approximately 17,000 employees. Class proofs of claim were filed on behalf of the plaintiffs in the MDL Action for "at least $45 million" and for the plaintiffs in the Benbow Action for "at least $11 million."  PPC denies liability to the Plaintiffs under various theories, including without limitation, that the plaintiffs spend only a de minimus amount of time each day donning and doffing protective gear.  PPC and the plaintiffs have agreed to the entry of an order providing for an estimation of  the donning and doffing claims in these three cases and

related proofs of claim filed by employees or former employees who are not parties to these actions are to be estimated prior to confirmation of the Plan.

In addition, the Department of Labor (the "<u>DOL</u>") had pending at the Commencement Date a suit seeking approximately $6.1 million for workers in PPC's Dallas plant for time spent donning and doffing. This case involves approximately 500 employees and former employees and seeks essentially the same types of damages as are sought in the Benbow Action and the MDL Action. The DOL is also seeking injunctive relief to require PPC to pay for donning and doffing time in all of PPC's U.S. plants. PPC denies any liability to the DOL.

2.    *Securities Litigation*

On October 29, 2008, Ronald Acaldo filed a purported class action suit in the U.S. District Court for the Eastern District of Texas, Marshall Division, against PPC and individual defendants Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, J. Clinton Rivers, Richard A. Cogdill and Clifford E. Butler (the "<u>Acaldo Case</u>"). The complaint alleged that PPC and the individual defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder. The complaint sought unspecified injunctive relief and an unspecified amount of damages.

On November 13, 2008, Chad Howes filed suit in the U.S. District Court for the Eastern District of Texas, Marshall Division, against PPC and individual defendants Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, J. Clinton Rivers, Richard A. Cogdill and Clifford E. Butler (the "<u>Howes Case</u>"). The allegations in the Howes Case complaint are identical to those in the Acaldo Case complaint, as are the class allegations and relief sought. The defendants were never served with the Howes Case complaint.

On December 29, 2008, the Pennsylvania Public Fund Group filed a Motion to Consolidate the Howes Case into the Acaldo Case, and filed a Motion to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel. Also on that date, the Pilgrim's Investor Group (in which Mr. Acaldo is a part) filed a Motion to Consolidate the Howes Case into the Acaldo Case and a Motion to be Appointed Lead Plaintiff. The Pilgrim's Investor Group subsequently filed a Notice of Non-Opposition to the Pennsylvania Public Fund Group's Motion for Appointment of Lead Plaintiff. Mr. Howes did not seek to be appointed lead plaintiff.

On May 14, 2009, the court consolidated the Acaldo Case and the Howes Case and renamed the style of the case, "*In re: Pilgrim's Pride Corporation Securities Litigation.*" On May 21, 2009, the court granted the Pennsylvania Public Fund Group's Motion for Appointment of Lead Plaintiff. Thereafter, on June 26, 2009, lead plaintiff filed a consolidated (and amended) complaint. The consolidated complaint dismissed PPC and Clifford E. Butler as defendants. In addition, the consolidated complaint added the following directors as defendants:  Charles L. Black, S. Key Coker, Blake D. Lovette, Vance C. Miller, James G. Vetter, Jr., Donald L. Wass, Linda Chavez, and Keith W. Hughes. The directors are indemnified by PPC and have insurance to offset the defense costs and damages, which coverage is being provided by the carriers under a reservation of rights by the insurance carriers.

The consolidated complaint alleges four causes of action:  violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder, solely against Lonnie "Bo" Pilgrim, Clint Rivers, and Richard A. Cogdill (referred as the "<u>Officer Defendants</u>"). Those claims assert that, during the Class Period of May 5, 2008 through October 28, 2008, the defendants, through various financial statements, press releases and conference calls, made material misstatements of fact and/or omitted to disclose material facts by purportedly failing to completely impair the goodwill associated with the Gold Kist acquisition. The consolidated complaint also asserts claims under Section 11 of the Securities Act of 1933, as amended, against all defendants,

asserting that, statements made in the registration statement relating to the May 14, 2008 secondary offering of PPC common stock were materially false and misleading for their failure to completely impair the goodwill associated with the Gold Kist acquisition. Finally, the consolidated complaint asserts a violation of Section 15 of the Securities Act of 1933, as amended, against the Officer Defendants only, claiming that the Officer Defendants were controlling persons of PPC and the other defendants in connection with the Section 11 violation. By the consolidated complaint, the lead plaintiff seeks certification of the class, undisclosed damages, and costs and attorneys' fees.

On July 27, 2009, defendants filed a motion to dismiss the consolidated class action complaint. That motion is still pending.

3.    *Grower Litigation*

On July 1, 2002, three individuals, on behalf of themselves and a putative class of chicken growers, filed their original class action complaint against PPC in the United States District Court for the Eastern District of Texas, Texarkana Division, styled *Cody Wheeler, et al. v. Pilgrim's Pride Corporation*. In their lawsuit, the plaintiffs initially alleged (a) that PPC violated sections 192(a)-(b) of the Packers and Stockyards Act of 1921 (the "PSA") and breached grower contracts, and (b) various other extra-contractual and tort causes of action. The plaintiffs also brought individual actions for breach of contract, breach of fiduciary duties, and violations of the PSA. During the litigation, the district court dismissed certain claims and plaintiffs abandoned their class claims. However, on September 30, 2005, plaintiffs amended their lawsuit to join several entities owned and/or operated by Tyson Foods, Inc. as a co-defendants alleging that the Tyson Foods, Inc. entities and PPC conspired to depress grower pay in certain areas of Texas and Arkansas in violation of the Sherman Antitrust Act (1890). Plaintiffs also sought to certify a class based on the new Sherman Antitrust Act (1890) claim. Thereafter, the district court bifurcated the lawsuit into two separate cases, an antitrust case that includes the Tyson entities and the original PSA case. Later, the Court denied plaintiffs request to certify a class action based on the Sherman Antitrust Act (1890) claim. The plaintiffs' PSA case is pending before the United States Fifth Circuit Court of Appeals based on a certified legal issue as to whether plaintiffs must prove an anticompetitive effect in order to prevail under their PSA claims. PPC expresses no opinion as to the likelihood of an unfavorable outcome. PPC denies liability in both cases.

On the Bar Date, an adversary proceeding was filed on behalf of 555 claimants, predominantly growers or former growers, seeking, in general, unspecified damages under the PSA, the Texas Deceptive Trade Practices Act (the "DTPA"), common law fraud and fraudulent non-disclosure, promissory estoppel, and intentional infliction of emotional distress. This action is entitled *Adams, et al. v. Pilgrim's Pride Corporation*. In response to the adversary proceeding, which had the reference withdrawn from the bankruptcy court to the federal district court, PPC filed a motion to dismiss. The motion to dismiss was granted in part, dismissing all the plaintiffs' claims except for claims brought under the PSA and claims brought by Texas growers under the DTPA, subject to the plaintiffs' right to file a motion for leave to file an amended complaint. PPC denies liability and expresses no opinion as to the likelihood of an unfavorable outcome.

Prior to the Commencement Date, a lawsuit was also filed by Ricky Arnold and others against PPC and two of its employees, Danny Boone and Jamie Statler, in the Circuit Court of Van Buren County, Arkansas. The case is styled *Ricky Arnold, et al. v Pilgrim's Pride Corporation, et al.* (the "Arnold Suit"). The plaintiffs in the Arnold Suit include independent contract broiler growers from 74 separate poultry farms. In the Arnold Suit, the plaintiffs allege that PPC and its employees made various false representations to induce the plaintiffs into building poultry farms and entering into poultry growing agreements with PPC. The plaintiffs allege that they discovered the representations were false when PPC idled its Clinton, Arkansas processing plant on or around August 11, 2008. The plaintiffs assert claims

for: (a) fraud and deceit; (b) promissory estoppel; and (c) violations of the Arkansas Livestock and Poultry Contract Protection Act.  The damages (if any) are not liquidated.  PPC denies any liability to the Arnold plaintiffs and expresses no opinion as to the likelihood of an unfavorable outcome.

4.    _ERISA Litigation_

_In re Pilgrim's Pride Stock Investment Plan ERISA Litigation_, No. 2:08-cv-472-TJW, is pending in the United States District Court for the Eastern District of Texas, Marshall Division, against defendants Lonnie "Bo" Pilgrim, Lonnie "Ken" Pilgrim, Clifford E. Butler, J. Clinton Rivers, Richard A. Cogdill, Renee N. DeBar, the Compensation Committee, PPC's board of directors and other unnamed defendants.

This case is the consolidation of two putative class actions filed by Kenneth Patterson and Denise Smalls, respectively, pursuant to section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (the "Patterson Case").  During the Chapter 11 Cases, the Debtors sought to extend the bankruptcy stay to the Patterson Case.  The Debtors' motion was denied by the Bankruptcy Court without prejudice.

Plaintiffs allege generally that the individual defendants breached fiduciary duties of prudence and loyalty owed to participants and beneficiaries of the PPC Retirement Savings Plan and the To-Ricos, Inc. Employee Savings and Retirement Plan (together, the "Savings Plan") due to the Savings Plan's allegedly imprudent investment in the PPC common stock, and the defendants' alleged failure to provide accurate information to participants and beneficiaries.

An amended complaint is due to be filed by plaintiffs on September 25, 2009.  It is anticipated that plaintiffs will seek certification of a class of all persons or entities who were participants in or beneficiaries of the Savings Plan at any time between May 5, 2008 through the present and whose accounts held PPC common stock or units in PPC common stock, and will seek actual damages in the amount of any losses the Savings Plan suffered, to be allocated among the participants' individual accounts as benefits due in proportion to the accounts' diminution in value, attorneys' fees, an order for equitable restitution and the imposition of constructive trust, and a declaration that each of the defendants have breached their fiduciary duties to the Savings Plan participants. The court has ordered discovery to proceed on expert and non-expert issues. The parties have commenced discovery.  The court has also ordered briefing on class certification, with a hearing to be held on March 30, 2010.

The likelihood of an unfavorable outcome or the amount or range of any possible loss to the Debtors cannot be determined at this time. PPC has a liability insurance policy in place that is potentially available to offset the defense costs and damages in both of the ERISA suits, which coverage is being provided under a reservation of rights.

5.    _Environmental Litigation_

Drexel Chemical Company ("Drexel") has filed suit in the United States District Court for the Middle District of Georgia, seeking to recover remediation costs in connection with a plant Drexel purchased from Gold Kist.  Drexel filed a proof of claim in the amount of $1.9 million plus any remediation costs incurred during the Chapter 11 Cases.  PPC denies liability to Drexel.

6.    _City of Clinton, Arkansas_

The City of Clinton, Arkansas (the "City") filed an adversary proceeding against PPC on June 1, 2009 seeking to establish a claim pursuant to the PSA, fraud and fraudulent non-disclosure, and

for promissory estoppel related to the idling of PPC's Clinton, Arkansas plant. The City is seeking approximately $28 million in damages relating to construction of and/or improvements to a wastewater facility to purify water discharged from the PPC's processing plant. This action is entitled *The City of Clinton v. Pilgrim's Pride Corporation.* In response to the adversary proceeding, which had the reference withdrawn from the bankruptcy court to the federal district court, PPC filed a motion to dismiss, which was granted by the federal district court on September 15, 2009. The City has until September 30, 2009 to file a motion for leave to file an amended complaint. Unless such a motion is filed and granted, the dismissal will be with prejudice. PPC denies any liability to the City and expresses no opinion as to the likelihood of an unfavorable outcome.

## N.    Rejection and Assumption of Contracts

During the Chapter 11 Cases, the Debtors exercised their right under section 365 of the Bankruptcy Code to reject or assume certain executory contracts and unexpired leases of the Debtors. Notably, as a result of the idling of several facilities discussed above, the Debtors no longer needed the services of certain chicken growers and rejected those contracts. With respect to rejection of certain grower contracts in Live Oak, Fla, the Debtors and such growers were engaged in extensive litigation before the Bankruptcy Court on the merit of rejection of such growers' contracts. On April 30, 2009, the Bankruptcy Court entered the first of the orders authorizing rejection of grower contracts.

## O.    PBGC Matters

The Debtors are contributing sponsors or members of a contributing sponsor's controlled group, as defined in 29 U.S.C. § 1301(a)(14), with respect to three defined benefit pension plans, which are single employer plans covered by Title IV of ERISA. Under ERISA, the contributing sponsor of a pension plan covered by Title IV of ERISA and each member of its "controlled group" are jointly and severally liable for certain obligations relating to such plan. The Pension Benefit Guaranty Corporation ("PBGC") is a wholly owned United States Government corporation which administers the federal pension insurance programs under Title IV. PBGC has filed estimated proofs of claim against the Debtors for unfunded benefit liabilities (in the aggregate amount of approximately $100,152,000), statutorily required and unpaid minimum funding contributions and past due and future insurance premiums to PBGC, which, in part, are contingent upon termination of such single employer plans. The reorganized Debtors will assume, and the Plan specifically provides for the assumption of, all single employer plans of the Debtors and their controlled group covered by Title IV of ERISA. Nothing in the Plan, this Disclosure Statement, any Order Confirming the Plan, or section 1141 of the Bankruptcy Code, is to be construed as discharging, releasing, or relieving any person or entity (other than the Debtors) from any liability with respect to such single employer plans by reason of a breach of any of Sections 404 through 409 of ERISA, if any. The Debtors, PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability against any person or entity as a result of the Plan of Reorganization's provisions for satisfaction, release, and discharge of claims.

## V.

## STOCK PURCHASE AGREEMENT[2]

### A.    Purchase of New PPC Common Stock

The Plan is premised on a transaction with the Plan Sponsor whereby the Plan Sponsor will purchase 64% of the New PPC Common Stock on the Effective Date in exchange for $800 million in Cash, to be used by the Reorganized Debtors to, among other things, fund distributions to holders of Allowed Claims (the "Plan Sponsor Transaction").  The terms of the Plan Sponsor Transaction are set forth in the Stock Purchase Agreement (the "SPA"), which is attached to the Plan as Exhibit B.  The salient terms of the SPA are as follows, which summary is qualified in its entirety by the SPA:[3]

- Upon the Effective Date, stockholders of PPC will become entitled to receive, for each share of PPC Stock held by them (other than treasury shares and unvested restricted shares), one share of New PPC Common Stock.  The former PPC stockholders will collectively own an aggregate of 36% of the New PPC Common Stock.

- Until the Effective Date, subject to certain exceptions, PPC must conduct its business in a reasonable manner consistent with past practice and must obtain the consent of the Plan Sponsor for certain enumerated actions.

- PPC and the Plan Sponsor will work together to determine the contracts to be assumed by the Reorganized Debtors on the Effective Date and to resolve objections, if any, to certain cure amounts for assumed contracts.

- For a period of six years after the Effective Date, Reorganized PPC will indemnify the present and former directors and officers of PPC and its subsidiaries from all liabilities arising in connection with their service as directors and officers.

- The Plan Sponsor will, or will cause Reorganized PPC, after the Effective Date to honor certain severance, change in control and other employment agreements.

- PPC and the Plan Sponsor will work together to obtain all authorizations, consents and approvals of governmental authorities, including under antitrust laws, necessary to consummate the Plan Sponsor Transaction.

- Prior to the entry of the Plan Sponsor Order (as defined below), PPC may not solicit alternative transaction proposals from third parties but may provide information to and engage in discussions with third parties and take certain other actions with respect to any such unsolicited proposals that PPC's board of directors determines are reasonably likely to result in a Superior Proposal (as defined in the SPA).  If,

---

[2] The information contained in this Article V regarding JBS (as defined below), its operations, its financials, and the synergies to be created by the Plan Sponsor Transaction  have been generated by, and are the views of, the Plan Sponsor and have not been independently verified by the Debtors or their advisors.

[3] The description of the SPA herein is for summary purposes only and in case of any conflict between the SPA and this Disclosure Statement, the SPA will govern.

prior to the entry of the Plan Sponsor Order, PPC decides to enter into negotiations or approve signing an agreement with a third party with respect to an alternative transaction, it must notify the Plan Sponsor and give the Plan Sponsor the opportunity to match the third party offer.

- The SPA contains certain conditions to each of PPC's and the Plan Sponsor's obligations to consummate the Plan Sponsor Transaction, which include (i) the absence of a breach of the representations, warranties and covenants contained in the SPA, which, in the case of PPC, would or would be reasonably expected to cause a Material Adverse Effect (without giving effect to any exception relating to materiality or a Material Adverse Effect (as defined in the SPA)), or in the case of the Plan Sponsor, would be a material breach, (ii) entry of a Confirmation Order approving the Plan Sponsor Transaction, (iii) expiration or termination of waiting periods for antitrust laws or satisfaction of any related requirements, (iv) absence of an enacted order or law prohibiting the consummation of the Plan Sponsor Transaction, and (v) absence of a threatened order or law prohibiting the consummation of the Plan Sponsor Transaction that is reasonably likely to cause a Material Adverse Effect.   In addition to the conditions specified above, the conditions to the obligations of the Plan Sponsor to consummate the Plan Sponsor Transaction include (i) absence of a Material Adverse Effect and (ii) the satisfaction or waiver of the conditions precedent in respect of a credit facility among Reorganized PPC and certain of its Subsidiaries, as borrowers, for a commitment of not less than $1,650 million and Reorganized PPC's access to funding thereunder.

- The SPA may be terminated prior to the Effective Date upon the following events: (i) by either party if the other party has breached and is unable to cure certain of its representations, warranties and covenants contained in the SPA, (ii) by the Plan Sponsor if certain milestones are not met with respect to the filing of the Plan and Disclosure Statement with the Bankruptcy Court or the entry of the Plan Sponsor Order, (iii) by either party if certain milestones are not met with respect to the entry of the Disclosure Statement Order or the Confirmation Order, (iv) by either party if the Plan Sponsor Transaction is not consummated prior to March 31, 2010 (or May 1, 2010 if the parties are awaiting antitrust approvals), (v) by the Company, if it determines to enter into an agreement with respect to a Superior Proposal, (vi) by either party upon the issuance of an order prohibiting the consummation of the Plan Sponsor Transaction or (vii) by mutual written consent of the parties.

- If PPC terminates the SPA due to its receipt of a Superior Proposal, then PPC will be required to pay a $45 million termination fee to the Plan Sponsor along with an additional $5 million as reimbursement of expenses (the "Termination Fee").

On September 17, 2009, the Debtors filed a motion with the Bankruptcy Court seeking entry of an order (the "Plan Sponsor Order") approving certain provisions of the SPA, including, among other things, the Termination Fee.   The Bankruptcy Court is expected to hear the motion on October 20, 2009.   The Debtors will seek the Bankruptcy Court's authorization and approval with respect to the consummation of the Plan Sponsor Transactions contemplated by the SPA in connection with the confirmation of the Plan.

B.    **The Plan Sponsor**

1.    *General Background*

JBS USA Holdings, Inc. ("JBS USA"), the Plan Sponsor, is a wholly-owned direct subsidiary of JBS Hungary Holdings Kft. ("JBS Hungary"), and a wholly-owned indirect subsidiary of JBS S.A. ("JBS Brazil", and together with JBS USA and JBS Hungary, "JBS"), a Brazilian-based meat producer with operations across two major business segments:  beef and pork.  In terms of slaughtering capacity, JBS USA is among the leading beef and pork processors in the U.S. and has been the number one processor of beef in Australia for the past 15 years.  As a standalone company, JBS USA would be the largest beef processor in the world.  JBS USA also owns and operates the largest feedlot business in the U.S.

JBS USA processes, prepares, packages and delivers fresh, processed and value-added beef and pork products for sale to customers in over 60 countries on six continents.  Its operations consist of supplying fresh meat products, processed meat products and value-added meat products.  Fresh meat products include refrigerated beef and pork processed to standard industry specifications and sold primarily in boxed form.  JBS USA's processed meat offerings, which include beef and pork products, are cut, ground and packaged in a customized manner for specific orders.  Additionally, JBS USA processes lamb and mutton products.  JBS USA's value-added products include moisture-enhanced, seasoned, marinated and consumer ready products.  JBS USA also provides services to its customers designed to help them develop more comprehensive and profitable sales programs.  JBS USA customers are in the food service, international, further processor and retail distribution channels.  JBS USA also produces and sells by-products that are derived from its meat processing operations, such as hides and variety meats, to customers in the clothing, pet food and automotive industries, among others.

JBS Brazil has been listed on the São Paolo Stock Exchange since 2007.  As of August 25, 2009, it had a total market capitalization of approximately $3.7 billion.  In the fiscal quarter ended March 29, 2009, JBS USA represented approximately 78% of JBS Brazil's gross revenues.  In July, 2009, JBS USA filed a Form S-1 (the "Registration Statement") with the SEC to initiate an initial public offering (the "Offering") of its common stock.  More information regarding JBS USA can be found in the Registration Statement, which is attached hereto as Exhibit E[4].  More information regarding JBS Brazil, including its public filings, can be found on its website, www.jbs.com.br/ir.

2.    *Business Segments*

(a)    Beef

JBS USA has a slaughtering capacity of 37,290 heads per day in beef.  The beef segment is comprised of JBS USA's domestic and international beef processing business, including the beef operations that it gained through its successful acquisitions of Smithfield Beef Group, Inc. and Tasman Group Service, Pty. Ltd. in 2008, and its Australian lamb and mutton plant.  JBS's beef segment is primarily operated in the U.S. and Australia by JBS USA and its subsidiaries.  The majority of revenue from the beef segment is generated from United States and Australian sales of fresh meat including chuck cuts, loin cuts, round cuts, thin meats, ground beef, as well as value-added beef items and other products.  In addition, JBS USA sells beef by-products to the variety meat, feed processing, fertilizer, automotive, clothing and pet food industries.

---

[4]    The information provided in the Registration Statement is current as of July 22, 2009 and may have changed since that time.

(b)    Pork

JBS USA is the third largest pork producer in the United States, with a slaughtering capacity of 48,500 heads per day.  The pork segment includes JBS USA's domestic pork, lamb and sheep processing businesses.  The pork segment is operated in the U.S.  The majority of revenue from the pork segment is generated from the sale of fresh pork products including loins, roasts, chops, butts, picnics, and ribs, as well as hams, bellies and trimmings.  In addition, the pork segment includes the sale of lamb products which account for less than 1% of JBS' total net sales.

3.    *Plants*

JBS USA and its affiliates currently own and operate:

- eight beef processing plants in Colorado, Utah, Texas, Nebraska, Wisconsin, Pennsylvania, Michigan, and Arizona;

- three pork processing plants in Minnesota, Iowa, and Kentucky;

- one case-ready beef plant in California;

- one lamb plant in Colorado;

- one Wet Blue leather producing plant in Texas;

- two beef jerky plants located in Minnesota and Texas;

- one transportation center headquartered in Greeley, Colorado, with satellites in Utah and Texas;

- eleven feedlots located in Idaho, Kansas, Texas, Oklahoma, Colorado, Wisconsin, and Ohio;

- nine beef processing plants located in the Australian provinces of Queensland, New South Wales, Victoria, and Tasmania;

- four lamb and mutton plants located in the Australian provinces of New South Wales, Victoria, and Tasmania; and

- five feedlots located in the Australian provinces of Queensland and New South Wales.

4.    *Financial Performance*

JBS USA had consolidated net sales of $15.4 billion on a pro forma basis in the fiscal year ended December 28, 2008.  JBS USA's consolidated net sales for the fiscal quarter ended March 29, 2009 were $3.2 billion.  In the same periods, JBS USA had gross profit of $608 million on a pro forma basis and $73 million, respectively, and adjusted EBITDA of $531.8 million on a pro forma basis and $66.1 million, respectively.  JBS USA's net income for the fiscal year ended December 28, 2008 was $192.1 million on a pro forma basis and $2.3 million for the fiscal quarter ended March 29, 2009.  JBS USA's beef and pork segments represented 84% and 16%, respectively, of the consolidated net sales during both the fiscal year ended December 28, 2008 and the fiscal quarter ended March 29, 2009.  More

information regarding JBS USA's financial performance including the definition of adjusted EBITDA, can be found in the Registration Statement, which is attached hereto as <u>Exhibit E</u>.

**C.        Anticipated Initial Public Offering**

Under the Offering, JBS USA would be the issuer and JBS Hungary would be the selling stockholder of shares of JBS USA common stock (the "<u>JBS USA Common Stock</u>") offered internationally in the United States and other countries outside Brazil, with a concurrent offering in the form of Brazilian depositary receipts ("<u>BDRs</u>") in Brazil.  JBS USA will not receive any of the proceeds from the shares of common stock sold by JBS Hungary.  JBS USA expects to apply for listing of its common stock on the New York Stock Exchange ("<u>NYSE</u>") under the symbol "JBS."  JBS USA will also apply to list the BDRs on the São Paulo Stock Exchange.  Neither the SEC nor any state securities commission has approved or disapproved these securities or passed on the adequacy or accuracy of the related prospectus.  The Offering is currently postponed pending JBS USA's acquisition of the New PPC Common Stock.

JBS Hungary is currently the sole record holder of JBS USA common stock.  The holders of JBS USA's common stock are entitled to one vote for each outstanding share of common stock owned by that stockholder on every matter properly submitted to the stockholders for their vote.  Stockholders are not entitled to vote cumulatively for the election of directors.  Subject to the dividend rights of the holders of any outstanding series of preferred stock, holders of JBS USA's common stock are entitled to receive ratably such dividends and other distributions of cash or any other right or property as may be declared by its board of directors out of its assets or funds legally available for such dividends or distributions.

In the event of any voluntary or involuntary liquidation, dissolution or winding up of JBS USA's affairs, holders of its common stock are entitled to share ratably in its assets that are legally available for distribution to stockholders after payment of liabilities.  If JBS USA has any preferred stock outstanding at such time, holders of the preferred stock may be entitled to distribution and/or liquidation preferences.  In either such case, JBS USA must pay the applicable distribution to the holders of its preferred stock before it may pay distributions to the holders of its common stock.

JBS USA's amended and restated certificate of incorporation will authorize its board of directors, subject to limitations prescribed by law, to issue a certain number of shares of undesignated preferred stock in one or more series without further stockholder approval.  The board will have discretion to determine the rights, preferences, privileges and restrictions of, including, without limitation, voting rights, dividend rights, conversion rights, redemption privileges and liquidation preferences of, and to fix the number of shares of, each series of its preferred stock.

Upon the completion of the Offering, JBS USA will be subject to Section 203 of the Delaware General Corporation Law ("<u>Section 203</u>").  In general, Section 203 prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that the stockholder became an interested stockholder, unless:

- prior to that date, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for

purposes of determining the number of shares outstanding those shares owned by persons who are directors and also officers and by excluding employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

- on or subsequent to that date, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔% of the outstanding voting stock that is not owned by the interested stockholder.

In general, Section 203 defines an "interested stockholder" as any entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by such entity or person.  Section 203 defines "business combination" to include:  (1) any merger or consolidation involving the corporation and the interested stockholder; (2) any sale, transfer, pledge or other disposition of 10% or more of the assets of the corporation involving the interested stockholder; (3) subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder; (4) any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or (5) the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

A Delaware corporation may opt out of Section 203 either by an express provision in its original certificate of incorporation or in an amendment to its certificate of incorporation or bylaws approved by its stockholders.  JBS USA has not opted out, and does not currently intend to opt out, of this provision.  The statute could prohibit or delay mergers or other takeover or change of control attempts and, accordingly, may discourage attempts to acquire JBS USA.

Additionally, JBS USA's amended and restated certificate of incorporation and amended and restated bylaws will, upon the closing of the Offering, contain some provisions that may be deemed to have an anti-takeover effect and may delay, defer or prevent a tender offer or takeover attempt that a stockholder might deem to be in the stockholder's best interest.  The existence of these provisions could limit the price that investors might be willing to pay in the future for shares of JBS USA's common stock.  These provisions include:

- JBS USA will have a classified board of directors.  Accordingly, it will take at least two annual meetings of stockholders to elect a majority of the board of directors given JBS USA's classified board.  As a result, it may discourage third-party proxy contests, tender offers or attempts to obtain control of JBS USA.

- JBS USA's amended and restated bylaws will provide that, subject to the rights, if any, of holders of preferred stock, directors may be removed only for cause by the affirmative vote of the holders of a majority of the voting power of JBS USA's outstanding shares of common stock entitled to vote.  Furthermore, any vacancy on JBS USA's board of directors, however occurring, including a vacancy resulting from an increase in the size of its board, may only be filled by the affirmative vote of a majority of JBS USA's directors then in office, even if less than a quorum.

- JBS USA's amended and restated certificate of incorporation and amended and restated bylaws will provide that a special meeting of stockholders may be called only by the chairman of the board of directors or pursuant to a resolution adopted by the affirmative

vote of the majority of the total number of directors then in office.  Notwithstanding the foregoing, for so long as JBS S.A. or any of its subsidiaries owns at least 50% of JBS USA's outstanding shares of common stock, JBS S.A. or such subsidiary shall have the right to call a special meeting of stockholders.

• In order to effect certain amendments to JBS USA's amended and restated certificate of incorporation, its amended and restated certificate of incorporation will require first the approval of a majority of its board of directors pursuant to a resolution adopted by the directors then in office, in accordance with the amended and restated bylaws, and thereafter the approval by the holders of at least 66 ⅔% of its then outstanding shares of common stock.  Subject to the provisions of JBS USA's amended and restated certificate of incorporation, its amended and restated bylaws will expressly authorize its board of directors to make, alter or repeal its bylaws without further stockholder action.  JBS USA's amended and restated bylaws may also be amended by the holders of 66 ⅔% of its then outstanding shares of common stock.

• JBS USA's amended and restated certificate of incorporation and amended and restated bylaws will provide that an action required or permitted to be taken at any annual or special meeting of its stockholders may only be taken at a duly called annual or special meeting of stockholders.  This provision prevents stockholders from initiating or effecting any action by written consent, and thereby taking actions opposed by the board.  Notwithstanding the foregoing, for so long as JBS S.A. or any of its subsidiaries owns at least 50% of JBS USA's outstanding shares of common stock, JBS USA's stockholders will be permitted to take action by written consent.

• JBS USA's amended and restated bylaws will contain advance notice procedures with respect to stockholder proposals and the nomination of candidates for election as directors.

• The authorization of undesignated preferred stock will make it possible for JBS USA's board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to change control of the company.

The foregoing provisions of JBS USA's amended and restated certificate of incorporation and its amended and restated bylaws could discourage potential acquisition proposals and could delay or prevent a change in control.  These provisions are intended to enhance the likelihood of continuity and stability in the composition of the board of directors and in the policies formulated by the board of directors and to discourage certain types of transactions that may involve an actual or threatened change of control.  These provisions are designed to reduce JBS  USA's vulnerability to an unsolicited acquisition proposal.  The provisions also are intended to discourage certain tactics that may be used in proxy fights.  However, such provisions could have the effect of discouraging others from making tender offers for JBS USA shares and, as a consequence, they also may inhibit fluctuations in the market price of JBS USA's common stock that could result from actual or rumored takeover attempts.  Such provisions also may have the effect of preventing changes in JBS USA management.

Prior to the Offering, there will not have been any public market for JBS USA's common stock, and JBS USA makes no prediction as to the effect, if any, that market sales of shares of common stock or the availability of shares of common stock for sale will have on the market price of its common stock prevailing from time to time.  Nevertheless, sales of substantial amounts of common stock in the public market, or the perception that these sales could occur, could adversely affect the market price of

common stock and could impair JBS USA's future ability to raise capital through the sale of equity securities.

**D.      Other Offerings**

In addition, on April 27, 2009 JBS USA, LLC and JBS USA Finance, Inc. issued $700.0 million in senior unsecured notes due May 2014 bearing interest at 11.625%, which, after deducting initial purchaser discounts, commissions and expenses in respect of the notes offering, generated net proceeds of approximately $650.8 million.  The notes have semi-annual interest payment dates in May and November, commencing November 2009.  The proceeds of the notes issuance were used to pay $100.0 million under JBS USA, LLC's secured revolving facility and $550.8 million of outstanding principal and accrued interest on intercompany loans incurred by JBS USA.

**E.      Conversion of New PPC Common Stock to JBS USA Common Stock**

In the event JBS USA completes the Offering, or any other initial public offering of the JBS USA Common Stock and the offered shares are listed on a national securities exchange, then, at any time during an Exchange Window (as defined below) falling within the period commencing on the date of the closing of the Offering or such other offering and ending two years and 30 days from the Effective Date, JBS USA will have the right to deliver written notice of the mandatory exchange of the New PPC Common Stock (the "Mandatory Exchange Transaction") to Reorganized PPC at its principal place of business.  Upon delivery to Reorganized PPC of notice of the Mandatory Exchange Transaction each share of New PPC Common Stock held by stockholders other than JBS USA (the "Exchanged Holders") will automatically, without any further action on behalf of Reorganized PPC or any of the Exchanged Holders, be transferred to JBS USA in exchange for a number of duly authorized, validly issued, fully paid and non-assessable shares of JBS USA Common Stock equal to the Exchange Offer Ratio (as defined below).  The Mandatory Exchange Transaction will be effected in compliance with all applicable laws.  An "Exchange Window" is a period of time beginning on the 6th trading day after the first day on which both Reorganized PPC and JBS USA will have each made their respective annual or quarterly reports or earnings releases relating to the immediately preceding fiscal quarter or year, as applicable, and ending on the last day of the fiscal quarter during which the first day of the Exchange Window fell.

The Exchange Offer Ratio is a fraction, the numerator of which is the average volume-weighted daily trading price per share on the principal Exchange for the New PPC Common Stock and the denominator of which is the average volume-weighted daily trading price per share on the principal exchange for the JBS USA Common Stock, in each case for the Measurement Period. The "Measurement Period" is a number of consecutive trading days which is equal to twice the number of consecutive trading days between (i) the first date on which both JBS USA and Reorganized PPC shall have both made their respective annual or quarterly reports or earnings releases and (ii) the date on which JBS USA delivers to Reorganized PPC the notice of the Mandatory Exchange Transaction.

JBS USA believes that the potential exchange of New PPC Common Stock for JBS USA Common Stock under the circumstances provided in the Plan and summarized above will satisfy the requirements of section 1145(a) of the Bankruptcy Code.  Under the terms of the SPA, the Debtors and the Plan Sponsor have agreed to seek a finding of the Bankruptcy Court in the Confirmation Order that this potential exchange of New PPC Common Stock will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

F.      **Corporate Governance**

        JBS USA has adopted a code of conduct applicable to all employees and, in 2002, it adopted a code of ethics specifically applying to its chief executive officer, chief financial officer, chief accounting officer and controller.  JBS USA's board is currently comprised of three members.  Following a successful completion of the Offering, JBS USA's board will be comprised of seven members, including at least one independent director.   In addition, following a successful completion of the Offering, JBS USA's board will have both an audit committee and a compensation committee.

        JBS Brazil has adopted a code of ethics which it strives to apply to its business.  JBS Brazil's board is comprised of six members: one president, three permanent directors without a specific title and two permanent independent directors.  The board must meet at least four times per year.

        Upon completion of the Offering, JBS Brazil will own more than 50% of the total voting power of JBS USA's common shares and JBS USA will be a "controlled company" under the NYSE corporate governance standards.  As a controlled company, exemptions under the NYSE standards will free JBS USA from the obligation to comply with certain NYSE corporate governance requirements, including the requirements:

 - that a majority of its board of directors consists of "independent directors" as defined under the rules of the NYSE;

 - that it have a corporate governance and nominating committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

 - that it have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

 - for an annual performance evaluation of the nominating and governance committee and compensation committee.

        Accordingly, for so long as JBS USA is a controlled company, holders of its common stock will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

G.      **Financing**

        JBS has represented to PPC that it has sufficient immediately available funds or has access to such funds without any restrictions or conditions on use thereon or access thereto and without the need to incur short term indebtedness to pay, in cash, the Purchase Price (as defined in the Stock Purchase Agreement).  As of June 30, 2009, JBS and its affiliates had approximately $1.2 billion in cash and cash equivalents, and had access to approximately $560 million under undrawn and committed facilities.

H.      **Synergies Created as a Result of the Plan Sponsor Transaction**

        JBS believes that PPC is well-suited to a successful integration with JBS USA's North American operations.  JBS believes that such an integration will produce substantial cost-savings for both companies through synergies.  JBS believes that potential synergies include streamlining administrative structures and sales networks, consolidating distribution networks, optimizing freight and storage costs,

capturing shared purchasing opportunities, consolidating treasury and risk management systems and implementing best practices throughout the business.  In addition, opportunities for revenue enhancement through a combination of the companies include leveraging JBS USA's international sales force to improve PPC's penetration of key export markets, including Russia and Japan.  JBS believes that aggregate synergies from cost savings and revenue enhancement opportunities could amount to $200 million or more per year.

JBS USA's management has substantial experience in acquiring and successfully integrating companies.  Since July 2007, JBS USA has acquired:

- Swift Foods Company, a leading beef and pork processor in the United States;

- substantially all of the assets of Tasman Group Services, Pty. Ltd., a major beef and small animals processor in Australia; and

- Smithfield Beef Group, Inc., a major beef processor in the United States.

JBS USA's integration efforts and cost savings initiatives resulted in a 20.7% reduction in annual selling, general and administrative expenses for the fiscal year ended December 28, 2008.  In 2008, JBS USA had the lowest ratio of selling, general and administrative expenses to net sales compared to publicly traded protein companies in the U.S.

JBS USA also benefits from the experience of JBS Brazil's management team in acquiring and successfully integrating companies.  JBS Brazil has made over thirty acquisitions in the last fifteen years.

## I.     Stockholders Agreement

On the Effective Date, the Plan Sponsor and Reorganized PPC will enter into a Stockholders Agreement (the "Stockholders Agreement"), which sets forth certain rights with respect to the New PPC Common Stock, corporate governance and other related corporate matters.  The Stockholders Agreement is attached to the Stock Purchase Agreement as Exhibit A.  The salient terms of the Stockholders Agreement are as follows:[5]

- Until the expiration of the Standstill Period on the date that is two years and 30 days after the Effective Date, the Plan Sponsor and its Affiliates will be prohibited from acquiring, directly or indirectly, any shares of New PPC Common Stock, except (i) by way of stock splits, stock dividends, reclassifications, recapitalizations, or other distributions by Reorganized PPC to all holders of New PPC Common Stock on a pro rata basis, or (ii) pursuant to the Mandatory Exchange Transaction.

- In accordance with the Plan, the Stockholders Agreement provides that the initial Board of Directors of Reorganized PPC will consist of nine directors: (i) six directors designated by the Plan Sponsor (the "JBS Directors"), (ii) two directors designated by the Equity Committee (the "Equity Directors") and (iii) the Founder Director (as defined in the Stockholders Agreement).  The Stockholders Agreement contains terms regarding the appointment and removal of directors, the requirement

---

[5] The description of the Stockholders Agreement herein is for summary purposes only and in case of any conflict between the Stockholders Agreement and this Disclosure Statement, the Stockholders Agreement will govern.

for certain directors to be "independent" for purposes of applicable SEC rules and exchange listing requirements and the change in the size of the Board of Directors or relative numbers of JBS Directors and Equity Directors in the event that the respective parties' ownership percentages change or changes in applicable law or exchange listing requirements.

- The Stockholders Agreement requires the approval of at least a majority of the Equity Directors and any Founder Director, as a group, for certain actions, including the amendment or repeal of certain provisions of the Restated Certificate of Incorporation or the Restated Bylaws or amendments that would or could reasonably be expected to adversely affect, in any material respect, the rights of the stockholders other than the Plan Sponsor and its affiliates (the "<u>Minority Investors</u>").

- The Stockholders Agreement provides that the Plan Sponsor will cause all shares of New PPC Common Stock beneficially owned by it or its Affiliates to (i) be voted in the same proportion as the shares of New PPC Common Stock held by the Minority Investors are voted with respect to (A) the election or removal of Equity Directors and (B) proposals to amend the Bylaws that would adversely affect, or could reasonably be expected to adversely affect, in any material respect, the rights of the Minority Investors, as a class, and (ii) be voted for the election, or against the removal, of the Founding Director until the Founding Director is no longer on the Board of Directors.  With respect to all other matters submitted to a vote of holders of New PPC Common Stock, the Plan Sponsor may vote, or abstain from voting, in its sole and absolute discretion.

- The Stockholders Agreement contains certain covenants designed to cause the Mandatory Exchange Transaction to be consummated as a tax-free transaction.

- The Stockholders Agreement permits Reorganized PPC to make repurchases of New PPC Common Stock from Minority Investors if certain conditions are met.

- The Stockholders Agreement requires the Plan Sponsor and Reorganized PPC to use their respective commercially reasonable efforts to maintain the listing of the New PPC Common Stock on a national securities exchange.  However, neither the Plan Sponsor and its Affiliates nor Reorganized PPC will be obligated to ensure that the share price or market value of the New PPC Common Stock is sufficient to maintain such listing.

- The Stockholders Agreement may be terminated (i) by written agreement of the parties, (ii) on the consummation of the Mandatory Exchange Transaction or (iii) in the event that the Plan Sponsor owns 100% of the New PPC Common Stock, subject to the survival of certain covenants related to the preservation of tax-free treatment for the Mandatory Exchange Transaction.

- The Equity Directors will have the exclusive authority to exercise Reorganized PPC's rights under the Stockholders Agreement.

**J.      Plan Support Agreement**

On September 16, 2009, the Plan Sponsor and Mr. Lonnie A. "Bo" Pilgrim (the "Stockholder") entered into a Plan Support Agreement (the "PSA").  Under the PSA, the Stockholder agreed, among other things, to: [6]

- support the Plan and the SPA;

- not support any action, agreement or proposal that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of PPC under the SPA that could result in any of the conditions to PPC's obligations under the SPA not being fulfilled; and

- support any other matter necessary to the consummation of the Transactions (as defined in the PSA).

Nothing in the PSA limits or affects any actions taken by the Stockholder in his capacity as a director or officer of PPC or Reorganized PPC or any of its subsidiaries.

**VI.**

**THE CHAPTER 11 PLAN**

**A.      Summary and Treatment of Unclassified and Classified Claims and Equity Interests**

Unless otherwise indicated, the characteristics and amount of the claims or interests in the following classes are based on the books and records of the Debtors.  The estimated amounts of Claims and Equity Interests are calculated as of November 21, 2009, unless otherwise noted.[7]

| Class | Description | Treatment[8] | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Unclassified | Administrative Expenses Claims (other than ordinary course claims and those claims set forth below) | Paid in full in Cash | No | $20,000,000[9] | 100% |

---

[6] The description of the Plan Support Agreement herein is for summary purposes only and in case of any conflict between the Plan Support Agreement and this Disclosure Statement, the Plan Support Agreement will govern.

[7] If the Plan is approved by the Bankruptcy Court, the Debtors anticipate to  emerge from chapter 11 by end of December 2009.  The Debtors do not expect the estimated amount of Claims and Equity Interests to change between November 21, 2009 and the end of December 2009.

[8] Unless otherwise stated, all payments under the Plan will be made on (a) the later of (i) the Effective Date and (ii) when the applicable Claim or Equity Interest is Allowed, or (b) as otherwise agreed by the Debtors/Reorganized Debtors and the holder of such Claim or Equity Interests.

| **Class** | **Description** | **Treatment**[8] | **Entitled to Vote** | **Estimated Amount of Claims or Equity Interests in Class** | **Estimated Recovery** |
|---|---|---|---|---|---|
| Unclassified | Professional Compensation and Reimbursement Claims | Paid in Cash, in full at the time specified in the order of the Bankruptcy Court approving final fee applications of professionals | No | Undetermined | 100% |
| Unclassified | Indenture Trustee Fee Claims | Paid in full in Cash | No | De minimus | 100% |
| Unclassified | DIP Claims | Paid in full in Cash | No | $0 | 100% |
| Unclassified | Priority Tax Claims | Either (a) paid in full in Cash on Effective Date, (b) paid in full in Cash semi-annually over a period of up to 5 years, or (c) as otherwise provided by the Bankruptcy Court to provide payment in full | No | $15,000,000 | 100% |
| Class 1(a) | Priority Non-Tax Claims against PPC | Paid in full in Cash | No | $35,000,000 | 100% |
| Class 1(b) | Priority Non-Tax Claims against PFS Distribution Company | | | De minimus | 100% |
| Class 1(c) | Priority Non-Tax Claims against PPC Transportation Company | | | De minimus | 100% |
| Class 1(d) | Priority Non-Tax Claims against To-Ricos, Ltd. | | | De minimus | 100% |
| Class 1(e) | Priority Non-Tax Claims against To-Ricos Distribution, Ltd. | | | De minimus | 100% |
| Class 1(f) | Priority Non-Tax Claims against Pilgrim's Pride Corporation of West Virginia, Inc. | | | De minimus | 100% |
| Class 1(g) | Priority Non-Tax Claims against PPC Marketing, Ltd. | | | De minimus | 100% |
| Class 2(a) | BMO Secured | Paid in full in Cash; letters of | No | $217,000,000 in | 100% |

[9] Exclusive of ordinary course Administrative Expense Claims.

| Class | Description | Treatment[8] | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | Claims against PPC | credit will be cancelled or replacement letters of credit will be issued under the Exit Facility; upon satisfaction of the BMO Secured Claims as set forth in the Plan, the obligations set forth in the BMO Guarantee Agreement will be cancelled | | principal plus $5,000,000 in accrued and default interest on loans and $39,000,000 in letters of credit | |
| Class 2(b) | BMO Secured Claims against To-Ricos, Ltd. | | | | 100% |
| Class 2(c) | BMO Secured Claims against To-Ricos Distribution, Ltd. | | | | 100% |
| Class 3 | CoBank Secured Claims against PPC | Either (i) paid in full in Cash in an amount equal to such Allowed CoBank Secured Claim, (ii) reinstated pursuant to amended terms and conditions to be negotiated, or (iii) reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.  Accrued and unpaid postpetition interest on account of Allowed CoBank Secured Claims will be (i) paid either Cash in an amount equal to such accrued and unpaid postpetition default interest, or (ii) satisfied on such other terms as may be negotiated between Reorganized PPC and CoBank. | No | $1,126,000,000 in principal plus $29,000,000 in accrued and default interest | 100% |
| Class 4(a) | Secured Tax Claims against PPC | Either (a) paid in full in Cash on Effective Date, (b) paid in full in Cash semi-annually over a period of up to 5 years, or (c) as otherwise provided by the Bankruptcy Court to provide payment in full | No | (included in total for priority tax above) | 100% |
| Class 4(b) | Secured Tax Claims against PFS Distribution Company | | | (included in total for priority tax above) | 100% |
| Class 4(c) | Secured Tax Claims against PPC Transportation Company | | | (included in total for priority tax above) | 100% |
| Class 4(d) | Secured Tax Claims against To-Ricos, Ltd. | | | (included in total for priority tax above) | 100% |
| Class 4(e) | Secured Tax Claims against To-Ricos Distribution, Ltd. | | | (included in total for priority tax above) | 100% |
| Class 4(f) | Secured Tax Claims against | | | (included in total for priority tax | 100% |

| Class | Description | Treatment[8] | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | Pilgrim's Pride Corporation of West Virginia, Inc. | | | above) | |
| Class 4(g) | Secured Tax Claims against PPC Marketing, Ltd. | | | (included in total for priority tax above) | 100% |
| Class 5(a) | Other Secured Claims | Will (i) be reinstated, (ii) receive Cash in full plus interest required by section 506(b) of the Bankruptcy Code, (iii) receive proceeds of the sale of collateral to the extent of the value of the holder's secured interest in the collateral, (iv) receive the collateral plus any interest required under 506(b), or (v) receive such other distributions as necessary to satisfy section 1124 of the Bankruptcy Code | No | $27,000,000 in the aggregate for all Debtors | 100% |
| Class 5(b) | Other Secured Claims against PFS Distribution Company | | | | 100% |
| Class 5(c) | Other Secured Claims against PPC Transportation Company | | | | 100% |
| Class 5(d) | Other Secured Claims against To-Ricos, Ltd. | | | | 100% |
| Class 5(e) | Other Secured Claims against To-Ricos Distribution, Ltd. | | | | 100% |
| Class 5(f) | Other Secured Claims against Pilgrim's Pride Corporation of West Virginia, Inc. | | | | 100% |
| Class 5(g) | Other Secured Claims against PPC Marketing, Ltd. | | | | 100% |
| Class 6(a) | Senior Note Claims against PPC | Paid in full in Cash in an amount equal to (i) the principal amount of such Allowed Note Claim and (ii) accrued and unpaid postpetition interest at the non-default, contract rate | No | $400,000,000 in principal plus $48,000,000 in accrued interest | 100% |
| Class 6(b) | Senior Subordinated Note Claims against PPC | | | $250,000,000 in principal plus $33,000,000 in accrued interest | 100% |
| Class 6(c) | Subordinated Note Claims against PPC | | | $7,000,000 in principal plus $1,000,000 in accrued interest | 100% |

| Class | Description | Treatment[8] | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|-------|-------------|--------------|------------------|--------------------------------------------------------|--------------------|
| Class 7(a) | General Unsecured Claims against PPC | Paid in full in Cash with postpetition interest at the federal judgment rate as of the date of entry of the Confirmation Order | No | $180,000,000 | 100% |
| Class 7(b) | General Unsecured Claims against PFS Distribution Company | | | | 100% |
| Class 7(c) | General Unsecured Claims against PPC Transportation Company | | | | 100% |
| Class 7(d) | General Unsecured Claims against To-Ricos, Ltd. | | | | 100% |
| Class 7(e) | General Unsecured Claims against To-Ricos Distribution, Ltd. | | | | 100% |
| Class 7(f) | General Unsecured Claims against Pilgrim's Pride Corporation of West Virginia, Inc. | | | | 100% |
| Class 7(g) | General Unsecured Claims against PPC Marketing, Ltd. | | | | 100% |
| Class 8 | Intercompany Claims | Will be reinstated | No | $38,000,000[10] | 100% |
| Class 9 | Flow Through Claims | Will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Avoidance Actions and defenses with | No | $77,000,000 | 100% |

---

[10] As of August 22, 2009.

| Class | Description | Treatment[8] | Entitled to Vote | Estimated Amount of Claims or Equity Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | respect thereto, which will be fully preserved). | | | |
| Class 10(a) | Equity Interests in PPC | All existing PPC Common Stock will be cancelled, and each holder will receive a certain amount of common stock of the Reorganized PPC (which will be subject to the Mandatory Exchange Transaction) | Yes | 77,141,389 shares of common stock outstanding[11] | N/A |
| Class 10(b) | Equity Interests in PFS Distribution Company | Will be reinstated | No | 100 shares of common stock outstanding. 100 shares of preferred stock outstanding. | N/A |
| Class 10(c) | Equity Interests in PPC Transportation Company | | | 100 shares of common stock outstanding. 100 shares of preferred stock outstanding. | N/A |
| Class 10(d) | Equity Interests in To-Ricos, Ltd. | | | 12,001 shares outstanding | N/A |
| Class 10(e) | Equity Interests in To-Ricos Distribution, Ltd. | | | 12,000 shares outstanding | N/A |
| Class 10(f) | Equity Interests in Pilgrim's Pride Corporation of West Virginia, Inc. | | | 1,000 shares outstanding | N/A |
| Class 10(g) | Equity Interests in PPC Marketing, Ltd. | | | N/A | N/A |

[11] As of December 28, 2009, prior to any additional amounts that will be issued to Mr. Pilgrim upon approval by the Bankruptcy Court of the incentive plan described in Section IV(H) of this Disclosure Statement.

**B.      Description and Treatment of Classified Claims and Equity Interests**

1.      *Priority Non-Tax Claims against PPC, PFS Distribution Company, PPC Transportation Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd. (Classes 1(a)-(g))*

The claims in Classes 1(a)-(g) are of the types identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims). For the Debtors, these claims relate primarily to prepetition wages and employee benefit plan contributions to the extent such claims had not yet been paid as of the Commencement Date. Most of these claims have already been paid by the Debtors pursuant to an order entered by the Bankruptcy Court on the Commencement Date. The Debtors estimate that the aggregate allowed amount of the claims in these classes will be $35 million.

Classes 1(a) through (g) are unimpaired by the Plan. Each holder of an allowed Priority Non-Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an allowed Priority Non-Tax Claim agrees to a less favorable treatment, each such holder will receive, in full satisfaction of such claim, cash in an amount equal to such claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such claim becomes allowed.

2.      *Bank of Montreal Secured Claims Against PPC, To-Ricos and To-Ricos Distribution (Classes 2(a)-(c))*

The claims in Class 2(a)-(g) consist of all Secured Claims arising under the BMO Credit Agreement. The BMO Credit Agreement provided for a revolving credit facility in the maximum aggregate amount of $300 million, including letters of credit. As of November 21, 2009, approximately $261 million, inclusive of the outstanding letters of credit and accrued interest, is estimated to be outstanding under the BMO Credit Agreement.

Classes 2(a) through 2(c) are unimpaired by the Plan. Each holder of an allowed BMO Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an allowed BMO Secured Claim agrees to a less favorable treatment, each such holder will receive, in full satisfaction of such claim, cash in an amount equal to such claim on the Effective Date. Letters of credit issued by BMO and outstanding as of the Effective Date will be cancelled and returned to the issuing bank with notice to BMO or cash in an amount of 105% of the face amount of the letter of credit will be placed with the letter of credit bank or replacement letters of credit will be issued under the Exit Facility. Upon satisfaction of the BMO Secured Claims as set forth herein, the obligations set forth in the BMO Guarantee Agreement will be cancelled.

3.      *CoBank Secured Claims against PPC (Class 3)*

The claims in Class 3 consists of all secured claims arising under the CoBank Credit Agreement with CoBank as lender, collateral agent, and administrative agent, as lender, the CoBank Lending Group (together with the BMO Lending Group, the ("Prepetition Secured Lenders"). The CoBank Credit Agreement provides for a revolving credit facility of $550 million and a term loan of $750

million. As of November 21, 2009, approximately $1,155 million in principal and accrued interest is estimated to be outstanding under the CoBank Credit Agreement.

Class 3 is unimpaired by the Plan. Each holder of an Allowed CoBank Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed CoBank Secured Claim agrees to a less favorable treatment, each Allowed CoBank Secured Claim shall be, at the sole option of the Reorganized PPC, (i) satisfied in full in Cash in an amount equal to such Allowed CoBank Secured Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date such Claim becomes Allowed, (ii) reinstated pursuant to amended terms and conditions to be negotiated, or (iii) reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed CoBank Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of default. To the extent that any holder of an Allowed CoBank Secured Claim is entitled to accrued and unpaid postpetition interest on account of such Claim, such holder will receive, at the sole option of the Reorganized PPC, either (i) Cash in an amount equal to such accrued and unpaid postpetition default interest, or (ii) satisfaction of such accrued and unpaid postpetition interest on such other terms as may be negotiated between Reorganized PPC and CoBank.

4.   *Secured Tax Claims against PPC, PFS Distribution Company, PPC Transportation Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd.  (Classes 4(a)-(g))*

The claims in Class 4 are the types of claims which, absent their status as a secured claim, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that the aggregate amount of claims in this class (inclusive of the tax claims entitled to priority of payment under section 507(a)(8)) is approximately $15 million. If a secured tax claim accrues interest under applicable local law and the value of the collateral exceeds the amount of the allowed claim, such secured claim will include interest.

Classes 4(a) through (g) are unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, each such holder will receive, in full satisfaction of such claim, at the sole option of the Reorganized Debtors, either (a) cash in an amount equal to such allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, (b) equal semi-annual cash payments in an aggregate amount equal to such allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period ending no later than five (5) years after the Commencement Date, or (c) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

5.      *Other Secured Claims against PPC, PFS Distribution Company, PPC Transportation
Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia,
Inc., and PPC Marketing, Ltd. (Classes 5(a)-(g))*

The claims in Classes 5(a)-(g) consist of all Secured Claims other than Secured Tax Claims in Classes 4(a)-(g).  Based upon the Debtors' Schedules and the proofs of claim filed in the Chapter 11 Cases, Class 5(a)-(g) claims include those creditors who hold mechanic liens or certain IRBs against the Debtors.  The Debtors estimate that the aggregate amount of Other Secured Claims is $27 million.

Classes 5(a) through (g) are unimpaired by the Plan.  Each holder of an allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an allowed Other Secured Claim agrees to a less favorable treatment, at the sole option of the relevant Reorganized Debtor, (i) each Allowed Other Secured Claim will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such claim prior to the stated maturity of such claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim will receive, in full satisfaction of such Allowed Other Secured Claim, either (a) cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's interest in such Collateral, (c) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors or Reorganized Debtors elect to treat a Claim under clause (a) or (b) of this Section, the liens securing such Other Secured Claim will be deemed released.

6.      *Note Claims against PPC (Classes 6(a)-(c))*

The claims in Classes 6(a)-(c) are claims arising under the Senior Notes, the Subordinated Notes, and the Senior Subordinated Notes, respectively.  The Debtors estimate that the aggregate amount of the Note Claims is $739 million as of November 21, 2009.

Classes 6(a) through (c) are unimpaired by the Plan.  Each holder of an allowed Note Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan

Except to the extent that a holder of an allowed Note Claim agrees to a less favorable treatment, each holder of an Allowed Note Claim will receive Cash in an amount equal to (i) the principal amount of such Allowed Note Claim plus (ii) accrued and unpaid postpetition interest at the non-default, contract rate as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date the Note Claim becomes allowed.

7.   *General Unsecured Claims against PPC, PFS Distribution Company, PPC Transportation Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd (Classes 7(a)-(g)*

The Debtors estimate that, following completion of the claims reconciliation process, the aggregate amount of allowed claims in Classes 7(a)-(g) will be approximately $180 million, after deducting duplicate claims, claims not supported by the Debtors' books and records, claims that have already been reduced by agreement of the parties or order of the Bankruptcy Court and claims that are subject to other objections. The claims in Classes 7(a)-(g) consist of unsecured claims, including trade claims, claims based on rejection of leases or executory contracts, prepetition personal injury and prepetition litigation, and other general unsecured claims.

Classes 7(a) through (g) are unimpaired by the Plan. Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction of such claim, cash equal to (i) the full amount of such Allowed General Unsecured Claim plus (ii) postpetition interest at the federal judgment rate as of the date of entry of the Confirmation Order as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date the General Unsecured Claims become allowed.

8.   *Intercompany Claims (Class 8)*

The claims in Class 8 consist of claims that each of the Debtors may have against each other.

Class 8 is not impaired by the Plan. Each holder of an Intercompany Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Intercompany Claim accepts less favorable treatment, each Intercompany Claim will be reinstated and carried forward for financial reporting and tax purposes, as may be further determined by the Debtors in consultation with the Debtors' auditors and tax accountants.

9.   *Flow Through Claims against PPC, PFS Distribution Company, PPC Transportation Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd (Classes 9(a)-(g))*

The claims in Classes 9(a)-(g) consist of (a) claims arising from obligations to Debtors' customers incurred in the ordinary course of business, and (ii) claims of present or former employees, officers or directors of any of the Debtors in his or her capacity as such, (i) for current or future wages, salary, commissions, or benefits, or (ii) with respect to any employment, severance or workers' compensation program that has not been rejected or otherwise terminated under the Plan or pursuant to another order of the Bankruptcy Court.

Classes 9(a) through (g) are unimpaired by the Plan. Each holder of a Flow-Through Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, will be unaltered by the Plan and will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-through of all Avoidance Actions and defenses with respect thereto, which will be fully preserved).

10.  *Equity Interests in PPC (Class 10(a))*

Class 10(a) is impaired by the Plan.  Each holder of an Allowed Equity Interest in Class 10(a) is entitled to vote to accept or reject the Plan.

On and as of the Effective Date, each share of PPC Common Stock issued and outstanding immediately prior to the Effective Date (other than any shares of PPC Common Stock held in the treasury of the PPC or any subsidiary thereof immediately prior to the Effective Date and each share of restricted stock of PPC as to which any conditions to vesting shall not have lapsed or shall not have been satisfied at or immediately prior to the Effective Date, which will be canceled without any conversion thereof and no distribution will be made with respect thereto) (the "Existing Shares") will be cancelled and converted automatically into the right to receive, on the Effective Date or as soon as reasonably practical thereafter, a number of fully paid and nonassessable shares of New PPC Common Stock equal to the Share Conversion Factor.

For purposes of the Plan, "Share Conversion Factor" means the number determined by application of the following formula:

| SCF | = | (0.36 x NNS) / NES |
|-----|---|--------------------|

where:

| NNS | = | The number of shares necessary to cause SCF to be 1, or such other number of shares agreed in writing by the parties. It is currently anticipated that 214,281,636 shares of New PPC Common Stock will be issued on the Effective Date, although the Debtors may revise this number prior to the Effective Date. |
|-----|---|--------------------|
| NES | = | The total number of Existing Shares |
| SCF | = | Share Conversion Factor |

11.  *Equity Interests in PFS Distribution Company, PPC Transportation Company, To-Ricos, To-Ricos Distribution, Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd Class 10(b)-(g)*

Classes 10(b) through (g) are unimpaired by the Plan.  Each holder of an Allowed Equity Interest in Classes 10(b) through (g) is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

The Equity Interests in Classes 10(b) through (g) will be reinstated in their entirety pursuant to the Plan.

## C.    Claim Resolution Process

### 1.    *Allowance of Claims and Equity Interests*

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the Debtors agree, or if there is a dispute, that the Bankruptcy Court determines, that the claim or interest, and the amount thereof, is in fact a valid obligation of the Debtors.

Any claim that is not a disputed claim and for which a proof of claim has been filed is an allowed claim.  Any claim that has been listed by the Debtors in the Debtors' Schedules, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an allowed claim in the amount listed in the Schedules unless an objection to such claim has been filed.  Any claim that has been listed in the Debtors' Schedules as disputed, contingent or not liquidated and for which a proof of claim has been filed is a disputed claim.  Any claim for which an objection has been timely interposed is a disputed claim.  Any Claim that has been listed in the Debtors' Schedules as disputed, contingent or not liquidated and for which no proof of claim has been filed will be disallowed and discharged on the Effective Date of the Plan.

### 2.    *Claim Objections*

Except as otherwise provided with respect to Administrative Expense Claims, an objection to any Claim may be interposed by the Debtors or the Reorganized Debtors within one hundred and fifty (150) days after the Effective Date or such later date as may be fixed by the Bankruptcy Court.  Any Claim for which an objection has been interposed will be an Allowed Claim if the objection is determined in favor of the holder of the Claim pursuant to a final order of the Bankruptcy Court or as otherwise agreed to by the parties.

Prior to the Effective Date, except for objections that in the reasonable determination of the Debtors need to be filed on an emergency basis, the Debtors will provide three (3) calendar days prior notice to the Plan Sponsor of their intent to file an objection to Claims and if timely requested by the Plan Sponsor, will work with the Plan Sponsor in interposing such an objection.

### 3.    *Resolution of Disputed Claims*

Notwithstanding any prior order of the Bankruptcy Court, on and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve, or withdraw any objections to disputed Claims and to compromise, settle, or otherwise resolve any disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals.

### 4.    *Estimation of Claims*

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the

Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Prior to the Effective Date, except for estimation requests that in the reasonable determination of the Debtors need to be made on an emergency basis, the Debtors will provide three (3) calendar days prior notice to the Plan Sponsor of their intent to request estimation of any Claim and if timely requested by the Plan Sponsor, will work with the Plan Sponsor in interposing such a request.

In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. The objection, estimation and resolution procedures set forth in Article VII of the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

5. *No Interest Pending Allowance*

To the extent that a disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim will not be entitled to any interest thereon from the Effective Date to the date such Claim becomes Allowed.

**D.      Timing and Manner of Distributions**

1. *Timing of Distributions*

Except as otherwise provided for in the Plan, distributions on account of Allowed Claims will be made by the applicable Disbursing Agent on the Effective Date or as soon thereafter as practicable. If any portion of a Claim is disputed, no payment or distribution provided under the Plan will be made on account of any portion of such Claim unless and until the disputed portion of such Claim is resolved.

After the Effective Date, if a disputed Claim becomes allowed, the applicable Disbursing Agent will pay the holder of that claim 20 days after the order allowing the disputed Claim becomes a final order, or as soon thereafter as practicable, or such earlier date as agreed to by the Reorganized Debtors, in accordance with the provisions of the Plan.

Distributions made under the Plan in respect of Claims for which the Debtors have insurance will be made in accordance with the provisions of any applicable insurance policy. To the extent any portion of an Allowed Claim is not covered by any of the Debtors' insurance policies, whether or not because of deductible or self-insured retention obligations of the Debtors or Reorganized Debtor, such uninsured portion will be paid by the Debtors or Reorganized Debtor pursuant to the plan. Nothing contained in the Plan constitutes a waiver of any cause of action that the Debtors or the Reorganized Debtors may hold against any other entity, including insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

Notwithstanding anything set forth in the Plan to the contrary, no distributions of Cash less than $25 is required to be made under the Plan to any holder of a Claim unless a request for such payment is made in writing to the Disbursing Agent.

2.   *Delivery of Distributions*

(a)   General.   Subject to Bankruptcy Rule 9010, all distributions to a holder of an Allowed Claim or Allowed Equity Interest will be made to the address of the holder thereof as set forth (i) on the Schedules filed with the Bankruptcy Court or (ii) on the books and records of the Debtors or their agents, or (iii) in a letter of transmittal by such holders, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected on the foregoing listed documents.

(b)   Distributions to holders of Allowed Note Claims.   Reorganized PPC will deliver all distributions in respect of Allowed Note Claims to the applicable Indenture Trustee or such other entity or entities designated by the Debtors as the Disbursing Agent under the Notes.  Upon delivery of the foregoing distributions to the applicable Indenture Trustee or such designee(s), Reorganized PPC will be released of all liability with respect to the delivery of such distributions.  The applicable Indenture Trustee or such designee(s) will transmit the distributions to the holders of the Allowed Note Claims. Reorganized PPC will provide whatever reasonable assistance may be required by the applicable Indenture Trustee or such designee(s) with respect to such distributions.

(c)   Distributions to holders of Allowed BMO Secured Claims and DIP Claims. BMO will deliver all distributions in respect of Allowed BMO Secured Claims and DIP Claims pursuant to the terms of the relevant credit agreement to those lenders who are lenders under the terms of the relevant credit agreements as of the date of distributions to BMO on account of the Allowed BMO Secured Claims and DIP Claims.

(d)   Withholding and Reporting Requirements.   In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

3.   *Unclaimed Distributions*

In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors will use reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution will be made to such holder without interest from the original distribution date through the new distribution date; *provided* that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property (including any stock) will revert to the applicable Reorganized Debtor, and the Claim of any other Entity to such property or interest in property will be discharged and forever barred.

4.    *Manner of Payment*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

5.    *Fractional Shares*

No fractional shares of New PPC Common Stock will be distributed under the Plan. When any distribution pursuant to the Plan on account of an Allowed Equity Interest would otherwise result in the issuance of a number of shares of New PPC Common Stock that is not a whole number, the actual distribution of shares of New PPC Common Stock will be rounded as follows:  (i) fractions of one-half (½) or greater will be rounded to the next higher whole number and (ii) fractions of less than one-half (½) will be rounded to the next lower whole number with no further payment or other distribution therefor.  The total number of authorized shares of New PPC Common Stock to be distributed to holders of Allowed Equity Interests will be adjusted as necessary to account for the rounding provided herein.

6.    *Setoffs and Recoupment*

The Debtors may, but will not be required to, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim.

E.    **Treatment of Executory Contracts and Unexpired Leases**

1.    *Contracts to be Assumed or Rejected*

The Plan provides for the Debtors to assume those executory contracts and unexpired leases specifically designated as a contract or lease to be assumed on Schedule 8.1 to the Plan. The Plan also provides that the following types of executory contracts will be assumed, unless specifically listed on Schedules 8.7 or 8.9 as being a rejected contract or previously rejected pursuant to order of the Bankruptcy Court: (a) insurance policies; (b) change in control agreements, severance agreements and similar agreements, as may have been amended during the Chapter 11 Cases; (c) employee agreements, as may have been executed or amended during the Chapter 11 Cases; (d) contracts with growers; (e) contracts with catchers and haulers; (f) contracts with customers of one or more of the Debtors; (g) contracts with vendors who have entered into a contract with one or more of the Debtors entitled "Pilgrim's Pride Corporation Construction Agreement and General Conditions"; (h) Contracts with vendors who have entered into a contract with one or more of the Debtors entitled "Master Vendor Agreement"; and (i) Compensation and Benefit Programs.  All other executory contracts and unexpired leases will be rejected unless (y) already assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, (z) there is a motion for approval of the assumption, assumption and assignment, or rejection of such contract or lease that has been filed and served prior to the Confirmation Date.

The Debtors will file Schedules 8.1, 8.7, and 8.9 in a supplement to the Plan no later than ten (10) days prior to the Confirmation Hearing to approve the Plan.  Any time prior to the Confirmation Date, the Debtors may amend, in consultation with the Plan Sponsor, Schedules 8.1, 8.7 and 8.9.  The Debtors will provide notice of such amendment to the Equity Committee, the Creditors' Committee, the Postpetition Lenders and parties affected by any amendment to Schedules 8.1, 8.7 and 8.9.  Any executory contract or unexpired lease that has already been assumed or rejected pursuant to a final order

of the Bankruptcy Court or by procedures authorized by the Bankruptcy Court will not be rejected or assumed again pursuant to the Plan.  Executory contracts and unexpired leases that are listed on Schedules 8.1 and 8.9 relating to the use or occupancy of real property are broadly defined to include related agreements or supplements and executory contracts or unexpired leases appurtenant to the premises.  The treatment of these other agreements will be the same as for the underlying agreement (i.e., both will be assumed or both will be rejected) unless the Debtors specifically treat the other agreements separately in accordance with the provisions of the Plan.

2.   *Payment of Cure Amounts*

Generally, if there has been a default (other than a default specified in section 365(b)(2) of the Bankruptcy Code) under an executory contract or unexpired lease, the debtor can assume the contract or lease only if the debtor cures the default.  A condition to the assumption of an executory contract or unexpired lease is that any default under an executory contract or unexpired lease that is to be assumed pursuant to the Plan will be cured in a manner consistent with the Bankruptcy Code and as set forth in the Plan.  Accordingly, except as may otherwise be agreed to by the parties, within 30 days after the Effective Date, the Reorganized Debtors will pay all undisputed cure claims.  All disputed defaults that are required to be cured will be cured either within 30 days of the entry of a final order determining the amount, if any, of the Debtors' liability with respect to such cure claim, or as may otherwise be agreed to by the parties.

To the extent any non-Debtor party to an executory contract or an unexpired lease files an objection to the Debtors' proposed cure amounts and the alleged cure amount exceeds $300,000, the Debtors will provide notice thereof to the Plan Sponsor as provided in Section 5.02(d) of the SPA.

3.   *Rejection Damage Claims*

If an entity with a Claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan has not filed a proof of claim for such damages, and served upon counsel for the Reorganized Debtors within 30 days after the later of (i) notice of entry of the Confirmation Order and (ii) notice of an amendment to Schedules 8.1, 8.7, 8.9, 8.9(a) and 8.9(b), that Claim will be barred and will not be enforceable against the Debtors or Reorganized Debtors.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, the Reorganized Debtors, their respective property and their respective successors or assigns.

4.   *Indemnification Obligations*

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or before the Effective Date, against any claims or causes of action, as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents or applicable law, will be assumed by the Debtors on the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed under section 365 of the Bankruptcy Code, and all such obligations will survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.  The prosecution of any indemnified cause of action against the Debtors or any non-debtor will upon the Effective Date be enjoined and prohibited, except solely for the purpose of obtaining a recovery from any available insurance policy proceeds.  The Plan is intended to effect the assumption of the indemnification obligations of the Debtors as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents and applicable law, and the Plan will not, in and of

itself, be deemed to create any new indemnification obligations on the part of the Debtors to directors, officers or employees of the Debtors who were directors, officers or employees of the Debtors on or before the Effective Date.

    5.   *Change in Control Agreements*[12]

        PPC entered into change in control agreements with (i) each of Lonnie Ken Pilgrim, Chairman, Richard A. Cogdill, the Chief Financial Officer, and certain other key officers in October 2008 and (ii) each of Don Jackson and certain other key officers in September 2009, to be effective on the Effective Date (collectively, the "Change in Control Agreements"). The Change in Control Agreements have an initial term of three years. The Change in Control Agreements are being assumed by the Reorganized Debtors. The Change in Control Agreements have two triggers: (1) a change in control (the "Change in Control") and (2) separation from Pilgrim's Pride. The change of ownership of PPC pursuant to the Plan will qualify as the first trigger for the first two years following the Effective Date.

        Generally, the Change in Control Agreements provide that, except in the case of Dr. Jackson, any stock options and other equity awards held by the executives will become fully vested and exercisable upon a Change in Control (however, no such awards will be outstanding as of the Change in Control) and that, if PPC terminates an executive's employment for reasons other than "cause" or if the executive resigns for "good reason" (as these terms are defined in the Change in Control Agreements) within a specified time period following a Change in Control then the executive will be entitled to certain severance benefits. The employment period is 24 months in the case of Mr. Pilgrim and Dr. Jackson and 18 months in the case of Mr. Cogdill. Upon the termination of an executive's employment during the employment period, the Change in Control Agreements provide:

-   For a lump sum severance payment that includes the executive's target annual bonus for the fiscal year in which the termination occurs, prorated through the date of termination, and an amount based on the sum of the executive's annual base salary and target annual bonus, multiplied by 3.0 in the case of Mr. Pilgrim and Dr. Jackson and by 2.5 in the case of Mr. Cogdill.

-   That the executives may be entitled to receive a tax gross-up payment to compensate them for specified excise taxes, if any, imposed on the severance payment.

-   Up to 18 months of PPC-paid COBRA premiums.

-   In the case of Dr. Jackson, any stock option and other equity awards held by him will become fully vested and exercisable.

        In addition, the Change in Control Agreements provide that, for a period of 24 months in the case of Mr. Pilgrim and Dr. Jackson and 18 months in the case of Mr. Cogdill, from the date of any termination of the executive's employment that results in a severance payment under the executive's Change in Control Agreement, the executive will not (a) divulge confidential information regarding the Company, (b) solicit or induce employees of the Company to terminate their employment with the Company, or (c) seek or obtain any employment or consulting relationship with any specified competitor of the Company.

---

[12] The description of the Change in Control Agreements herein is for summary purposes only and in case of any conflict between a Change in Control Agreement and this Disclosure Statement, the Change in Control Agreement will govern.

In addition to the Change in Control Agreements described above, on the Effective Date, the Reorganized Debtors will enter into change in control or severance agreements with certain employees, as agreed with the Plan Sponsor.

6.   *Employment Agreements with Don Jackson and Jerry Wilson*

The Reorganized Debtors will assume the employment agreements that PPC entered into with Don Jackson ("Dr. Jackson") as Chief Executive Officer and President on January 27, 2009 and Jerry Wilson ("Mr. Wilson") as Executive Vice President, Sales on March 11, 2009.  The employment agreements have a term of three years, but they may be extended with the mutual written consent of the parties.  The material terms of the employment agreements with Dr. Jackson and Mr. Wilson are as follows:[13]

- The annual base salary for Dr. Jackson will not be less than $1,500,000 and for Mr. Wilson will be $500,000 during the term of the agreements.

- Dr. Jackson and Mr. Wilson received sign-on bonuses that are subject to repayment on a pro-rata basis over a three year period:  Dr. Jackson in the amount of $3,000,000 and Mr. Wilson in the amount of $500,000 (collectively, the "Sign-on Bonus").

- Upon confirmation of the Plan and the attainment of certain performance targets, an equity award of up to 3,085,656 shares of PPC's common stock (the "Stock Grant"), which was received by Dr. Jackson as a sign-on bonus, will vest and Dr. Jackson will be entitled to receive up to $2,000,000 as a reorganization bonus ("Reorganization Bonus").

- If either of the employment agreements are terminated other than for "cause" by PPC or its successor or with "good reason" by Dr. Jackson or Mr. Wilson during their term, any remaining unforgiven amount of the Sign-on Bonus will be immediately forgiven.  In addition, Mr. Wilson will receive a *pro rata* portion of his annual performance bonus.

- If either Dr. Jackson or Mr. Wilson terminates his employment without "good reason" (as such term is defined in the employment agreements) during the term of his respective employment agreement, such executive will be required to repay PPC any remaining unforgiven amount of the Sign-on Bonus, and, in the case of Dr. Jackson, the unvested portion of his Stock Grant will forfeit.

- If PPC or its successor terminates the executive's employment for "cause" (as such term is defined in the employment agreements) during the term, Dr. Jackson will have any remaining unforgiven amount of the Sign-on Bonus immediately forgiven and the unvested portion of his Stock Grant will forfeit and Mr. Wilson will be required to repay PPC any remaining unforgiven amount of the Sign-on Bonus.

- After the date of the termination of Dr. Jackson or Mr. Wilson, such executive may not solicit or induce employees of PPC to terminate their employment with PPC

---

[13] The description of the employment agreements herein is for summary purposes only and in case of any conflict between an employment agreement and this Disclosure Statement, the employment agreements will govern.

DS-63

during the 12-month period, in the case of Mr. Wilson, and 24 months, in the case of Don Jackson, following the date of employment termination or seek or obtain any employment or consulting relationship with any specified competitor of PPC during the restricted period.

7.  *Retiree Benefits*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits as that term is defined in section 1114 of the Bankruptcy Code) of the Debtors, except with respect to any retiree benefits of the Debtors (i) that were terminated or rejected prior to the Confirmation Date (to the extent such termination or rejection did not violate section 1114 of the Bankruptcy Code) or (ii) are subject to a motion to reject as of the Confirmation Date or have been specifically waived by the beneficiaries of such retiree benefits, for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

**F.      Conditions Precedent to Confirmation of Plan and Occurrence of the Effective Date of Plan**

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a)      The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, and, in so far as the Confirmation Order relates to or concerns the SPA or any matter contemplated therein, reasonably satisfactory to the Plan Sponsor, will have been entered and shall not be subject to any stay or injunction;

(b)      All actions, documents, and agreements necessary to implement the Plan will have been effected or executed; and

(e)      Other than those conditions that by their nature can only be satisfied at the closing of the transactions contemplated by the SPA, the conditions precedent to the SPA will have been satisfied or waived by the parties thereto and the Reorganized Debtors will have access to the Cash contributed by the Plan Sponsor.

**G.      Waiver of Conditions**

Each of the conditions precedent listed above and in Section 11.1 of the Plan (other than entry of the Confirmation Order) may be waived in whole or in part, as applicable, by the Debtors or the Plan Sponsor.  Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

**H.      Effects of Failure of Conditions to Effective Date**

In the event the conditions precedent specified in Section 11.1 of the Plan  have not been satisfied or waived pursuant to Section 11.2 of the Plan on or prior to the date to be specified in the Confirmation Order, then (i) the Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained herein will be deemed to constitute a waiver or release of any

claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors, and (v) nothing contained herein will prejudice in any manner the rights of the Debtors, including, without limitation, the right to seek a further extension of the exclusive periods under section 1121(d) of the Bankruptcy Code.

## I.   Effects of Confirmation on Claims and Equity Interests

### 1.   *Vesting of Asset*

Upon the Effective Date, all property of the Debtors' estates will vest in the Reorganized Debtors free and clear all claims, liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### 2.   *Discharge of Claims and Termination of Equity Interests*

The rights afforded to claimants and equity holders in the Plan, and the payments and distributions made thereby, will be in exchange for and in complete satisfaction, discharge and release of all existing debts and claims of any kind, nature or description whatsoever against the Debtors.  All holders of existing claims against the Debtors will be enjoined from asserting against the Debtors, or any of their assets or properties, any other or further claim based upon any act or omission, transaction or other activity that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim.  In addition, on the Effective Date, each holder of a claim against the Debtors will be forever precluded and enjoined from prosecuting or asserting any discharged claim against the Debtors.

### 3.   *Discharge of Debtors*

**Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim and any affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Effective Date.  As provided in section 524 of the Bankruptcy Code, such discharge will void any judgment against the Debtors, their estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged.  Upon the Effective Date, all persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtors, the estates, or any successor thereto.**

### 4.   *Injunction or Stay*

**Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims against or Equity Interests in and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, will be permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors, the Reorganized Debtors, their respective estates, any debtor who is indemnifiable by the Debtors or Reorganized Debtors, and their respective property, (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order, (iii)**

**creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind, (iv) asserting any right of setoff, subrogation or recoupment of any kind with respect to any such Claim or Equity Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan. Such injunction will extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.**

5.   *Term of Injunction or Stays*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

6.   *Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests, and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

7.   *Exculpation*

**Notwithstanding anything herein or in the Plan to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Committees, the Chief Restructuring Officer, the agents and lenders under the Prepetition BMO Credit Agreement and the Prepetition CoBank Credit Agreement, the agents and lenders party to the DIP Credit Agreement, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; <u>provided</u>, <u>however</u>, that the foregoing will not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

8.   *Releases by Holders of Claims and Equity Interests*

**Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of the Debtors, the Chief Restructuring Officer, (b) the Committees, (c) the agents and lenders under the Prepetition BMO Credit Agreement, (d) the agents and lenders under to the Prepetition CoBank Credit Agreement, (e) the agents and lenders under the DIP Credit Agreement, (f) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), and (g) the Debtors and the Reorganized Debtors, each holder of a Claim or an Equity Interest that votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the**

**Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, will release unconditionally and forever each of (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of the Debtors, the Chief Restructuring Officer, (b) the Committees, (c) the agents and lenders under the Prepetition BMO Credit Agreement, (d) the agents and lenders under to the Prepetition CoBank Credit Agreement, and (e) the agents and lenders under the DIP Credit Agreement, (f) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), and (g) the Debtors and the Reorganized Debtors, from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Equity Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Equity Interest prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; *provided*, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.**

        9.    *Releases by Debtors and Reorganized Debtors*

        **Effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of the Debtors (including the Chief Restructuring Officer), (b) the Committees, (c) the agents and lenders under the Prepetition BMO Credit Agreement, (d) the agents and lenders under to the Prepetition CoBank Credit Agreement, (e) the agents and lenders under the DIP Credit Agreement, and (f) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), each Debtor and Reorganized Debtor will release unconditionally and forever each of (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of the Debtors (including the Chief Restructuring Officer), (b) the Committees, (c) the agents and lenders under the Prepetition BMO Credit Agreement, (d) the agents and lenders under to the Prepetition CoBank Credit Agreement, (e) the agents and lenders under the DIP Credit Agreement, and (f) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the business or contractual arrangements between any Debtor and any such person or entity, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; *provided*, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.**

        10.  *Avoidance Actions*

        From and after the Effective Date, the Reorganized Debtors will have the sole right to prosecute any and all Avoidance Actions, equitable subordination actions or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or

Debtors in Possession, other than with respect to any cause of action or Avoidance Action released in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court.

11.    _Retention of Causes of Action/Reservation of Rights_

Except as provided in Sections 10.7 and 10.9 of the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or cause of action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Entity, to the extent such Entity asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' estates.

Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim.  The Reorganized Debtors will have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Commencement Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

12.    _Limitation on Exculpation and Releases of Professionals_

Nothing in Sections 10.7, 10.8 or 10.9 of the Plan is intended to (i) be construed to release or exculpate any entity from fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or _ultra vires_ acts, or (ii) limit the liability of the professionals of the Debtors, the Reorganized Debtors, and the Committees to their respective clients pursuant to the relevant provisions of the Code of Professional Responsibility.

**J.    Dissolution of Statutory Committees and Fee Review Committee**

On the Effective Date, the Committees will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.  On the Effective Date, the retention or employment of all attorneys, financial advisors, accountants and other agents of the Creditors' Committee and Equity Committee will terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.   To the extent not discharged and released on or prior to the Confirmation Date, on the eleventh (11th) day following the entry of an order in respect of the last of any outstanding fee applications, the Fee Review Committee will be released and discharged from its obligations pursuant to the Order Granting Motion for (I) Appointment of a Fee Review Committee and (II) Amendment of the Interim Compensation Order [Docket No. 1624 in the Chapter 11 Cases].