- limit its ability to obtain additional financing to operate its business;

- require the Plan Sponsor to dedicate a substantial portion of cash flow to payments on debt, reducing its ability to use cash flow to fund working capital, capital expenditures and other general corporate requirements;

- limit its flexibility to plan for and react to changes in its business and the industry in which the Plan Sponsor operates;

- place the Plan Sponsor at a competitive disadvantage relative to some of its competitors that have less debt; and

- increase its vulnerability to general adverse economic and industry conditions, including changes in interest rates, lower cattle and hog prices or a downturn in its business or the economy.

In addition to the existing debt, the Plan Sponsor is not prohibited from incurring significantly more debt, which could intensify the risks described above. The terms of the indenture governing the 11.625% senior unsecured notes due 2014 permit the Plan Sponsor to incur significant additional indebtedness in the future, including secured debt. The Plan Sponsor may borrow additional funds to fund capital expenditures, working capital needs or other purposes, including future acquisitions.

## IX.

## CERTAIN FEDERAL TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, and to holders of Allowed Equity Interests in PPC. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document, and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other tax authority, and have not received an opinion of counsel with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a position different from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (such as, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, holders that are, or hold Equity Interests through, partnerships or other entities treated as partnerships for U.S. federal income tax purposes, traders that mark their securities to market, persons subject to the alternative minimum tax, and persons holding Equity Interests that are part of a straddle, hedging, constructive sale or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than

income taxes, nor does it apply to any person that acquires New PPC Common Stock in the secondary market.

This discussion assumes that New PPC Common Stock is held as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code. For U.S. federal income tax purposes, the Debtors intend to treat New PPC Common Stock and the other arrangements to which the Debtors are a party, in a manner consistent with their form.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only, and is not a substitute for careful tax planning and advice based upon your individual circumstances.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

A. **Consequences to Holders of Equity Interests in PPC**

Pursuant to the Plan, each holder of Equity Interests in PPC will receive, in exchange for such holder's existing PPC Common Stock, New PPC Common Stock, which will be subject to the Mandatory Exchange Transaction.

The exchange of existing PPC Common Stock for New PPC Common Stock should qualify as a recapitalization, and no gain or loss should be recognized by such Equity Interest holder. The holder's aggregate tax basis in the New PPC Common Stock received generally should equal the holder's aggregate tax basis in the existing PPC Common Stock exchanged therefor. In general, a holder's holding period in the New PPC Common Stock received will include the holder's holding period in the PPC Common Stock exchanged therefor.

In the event that the Plan Sponsor completes an initial public offering of its common stock, the Plan Sponsor has the right to cause the exchange of the outstanding New PPC Common Stock for JBS Common Stock pursuant to the Mandatory Exchange Transaction. PPC and the Plan Sponsor intend that this exchange not result in the recognition of gain or loss by the holders of New PPC Common Stock. The tax treatment of the exchange, however, will depend on the applicable facts and the law in effect at the time of the exchange, and there can be no assurance that the exchange will be tax-free to holders of New PPC Common Stock. If the exchange results in the recognition of gain, generally holders of New Common Stock will have gain or loss equal to the difference between (i) the fair market value of the JBS Common Stock received by such holder and (ii) such holder's tax basis in its New PPC Common Stock. Such gain or loss will generally constitute capital gain or loss. The deductibility of capital losses is subject to limitations. Holders of Equity Interests are urged to consult their own tax advisors regarding the tax treatment of the Mandatory Exchange Transaction to such holders.

Although the consequences to foreign taxpayers are not generally addressed in this summary, foreign taxpayers should be aware that PPC has not made a determination as to whether or not it is a "United States real property holding corporation" ("USRPHC") for U.S. federal income tax purposes. PPC believes that there is a risk that it is a USRPHC. PPC will be a USRPHC if the fair

market value of its "United States real property interests" equal or exceed 50% of the sum of the fair market values of (a) its worldwide real property interests and (b) its other assets used or held for use in a trade or business. If PPC is, or has been, a USRPHC, foreign taxpayers could generally be subject to U.S. federal income tax on any gain realized on the sale or exchange of PPC Common Stock or New PPC Common Stock on a net income basis at regular graduated U.S. federal income tax rates. Gain that is not otherwise required to be recognized for U.S. tax purposes may nevertheless be required to be recognized by foreign taxpayers for these purposes unless the foreign taxpayer (i) receives a United States real property interest in exchange for a United States real property interest; (ii) the United States real property received would be subject immediately after the exchange to U.S. tax on its disposition; and (iii) the foreign taxpayer complies with any applicable filing requirements with respect to the exchange. The tax relating to the disposition of stock in a USRPHC does not apply to a foreign taxpayer whose holdings, actual and constructive, amount to 5% or less of PPC's common stock at all times as long as PPC has been a USRPHC and for 5 years thereafter, provided that PPC's common stock is regularly traded on an established securities market (which PPC currently believes is so traded, but there can be no assurances that it continue to be so traded). Foreign taxpayers holding Equity Interests are urged to consult their tax advisors to determine the application of these rules to their disposition of PPC common stock (including the exchange of PPC Common Stock for New PPC Common Stock and any exchange of New PPC Common Stock for JBS Common Stock) and to determine any applicable filing requirements.

1. *Information Reporting and Backup Withholding*

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

**B.     Consequences to the Debtors**

Reorganized PPC expects to have NOL carryforwards and operating losses for the current year for U.S. federal income tax purposes in excess of $700 million as of the Effective Date of the Plan. The amount of any such losses remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the Plan, the amount of Reorganized PPC's NOL carryforwards may be reduced or eliminated.

1. *Cancellation of Debt*

In general, the Tax Code provides that a debtor in a bankruptcy case is not required to include cancellation of indebtedness ("COD") income in its gross income, but must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any COD income incurred pursuant to a confirmed chapter 11

plan. The amount of COD income incurred is generally the amount by which the adjusted issue price of the indebtedness discharged exceeds the value of any consideration given in exchange therefor (issue price rather than value in the case of any debt instrument received). Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. In the case of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced. Any reduction in tax attributes in respect of COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD is incurred. The Debtors do not expect to incur any material amount of COD income as a result of the implementation of the Plan.

2. *Potential Limitations on NOL Carryforwards and Other Tax Attributes*

Following the Effective Date, the remaining NOL carryforwards and certain other tax attributes (including current year NOLs, if any) allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be subject to limitation under Section 382 of the Tax Code since the Plan will cause an "ownership change" to occur with respect to PPC.

Under Section 382 of the Tax Code, if a corporation (or group of affiliated corporations filing a consolidated tax return) undergoes an ownership change, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. An ownership change occurs where the percentage of a company's equity held by one or more "5% shareholders" (as such term is defined in Section 382) increases by more than 50 percentage points over the lowest percentage of stock owned by those shareholders at any time during a three-year rolling testing period.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 4.48% for ownership changes occurring in September, 2009). Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire after 20 years.

The ownership change occurring on the Effective Date will qualify for a special bankruptcy rule that liberalizes the foregoing rules for valuing the stock of a corporation for purposes of determining the amount of the annual limitation under Section 382. Specifically, Section 382(l)(6) permits a debtor corporation that undergoes an ownership change to value the equity of the corporation, for purposes of determining the amount of the annual limitation, by using the value immediately after the ownership change (by increasing the value of the corporation to reflect any surrender or cancellation of creditors' claims) instead of the value immediately before the ownership change.

In the event that the Plan Sponsor completes an initial public offering of its common stock and exercises its option under the Mandatory Exchange Transaction to cause the exchange of outstanding New PPC Common Stock for JBS Common Stock, a second ownership change may occur with respect to Reorganized PPC. If this second ownership change occurs, the pre-change losses may be

subject to further limitation under Section 382 of the Tax Code (based on the long-term tax rate in effect on such date and the equity value of the corporation immediately before the second ownership change).

Section 382 of the Tax Code also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless the actual value is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

PPC believes that it has not already had an "ownership change" within the meaning of Section 382 of the Tax Code that would limit the use of PPC's NOL carryforwards. Moreover, PPC has obtained an injunction to restrain trading in equity claims in an attempt to avoid the occurrence of an ownership change prior to the implementation of the Plan. It is possible, however, that such an ownership change has nonetheless occurred; in which case, the Section 382 limitation would likely be zero.

3. *Alternative Minimum Tax*

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT. An AMT credit cannot be carried back but carried forward indefinitely.

# X.

# CERTAIN SECURITIES LAW MATTERS

A.   **Issuance and Resale of New PPC Common Stock**

In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of the New PPC Common Stock to the holders of Allowed Equity Interests in PPC in Class 12(a) will be exempt from the registration requirements of the Securities Act and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor, or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property. The Debtors believe that the exchange of the New PPC Common Stock against Allowed Equity Interests against PPC under the circumstances provided in the Plan will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The New PPC Common Stock to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code, or a Statutory Underwriter (described below). In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities offered or sold under a plan for the holders of such securities, (iii) offers to buy securities offered or sold under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

An entity that is not an issuer is not deemed to be an "underwriter" under section 2(a)(11) of the Securities Act with respect to securities received under section 1145(a)(1) which are transferred in "ordinary trading transactions" made on a national securities exchange. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a Plan, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, or (iii) payment of special compensation to brokers or dealers in connection with the sale, other than the compensation that would be paid pursuant to an arms-length negotiation between a seller and a broker or dealer, each acting

unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer.

However, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as Statutory Underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a Statutory Underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

Resales of the shares of New PPC Common Stock by persons deemed to be Statutory Underwriters would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New PPC Common Stock deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. While the Debtors intend to seek a listing of the New PPC Common Stock on a national securities exchange, they cannot assure, however, that adequate current public information will exist with respect to any issuer of the New PPC Common Stock and, therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.

Pursuant to the Plan, certificates evidencing the New PPC Common Stock received by restricted holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

> **THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Any person or entity entitled to receive shares of New PPC Common Stock who the issuer of such securities determines to be a Statutory Underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing securities without such legend if, prior to the distribution of such securities, such person or entity delivers to such issuer, (i) an opinion of

counsel reasonably satisfactory to such issuer to the effect that the securities to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing the shares of New PPC Common Stock bearing such legend may present such certificate to the transfer agent for such securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the issuer of such securities an opinion of counsel reasonably satisfactory to the issuer to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the issuer an opinion of counsel reasonably satisfactory to such issuer to the effect that (x) such securities are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

**B.      Issuance and Resale of JBS USA Common Stock**

JBS USA and the Debtors believe that the potential exchange of Reorganized PPC common stock for JBS USA Common Stock under the circumstances provided in the Plan and summarized above will satisfy the requirements of section 1145(a) of the Bankruptcy Code. Under the terms of the SPA, the Debtors and the Plan Sponsor have agreed to seek a finding of the Bankruptcy Court in the Confirmation Order that this potential exchange of New PPC Common Stock will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

**C.      Listing**

PPC intends to apply to have the New PPC Common Stock listed on a national securities exchange, such as The New York Stock Exchange or The Nasdaq Stock Market. In order to cause the New PPC Common Stock to be so-listed, each of PPC and the Plan Sponsor will use their reasonable best efforts to obtain approval for such listing on The New York Stock Exchange or, if such approval is not reasonably likely to be obtained by the Effective Date, such other national securities exchange as PPC reasonably determines. Following any such listing, PPC and the Plan Sponsor will use their respective commercially reasonable efforts to cause Reorganized PPC to comply with all applicable continued listing standards of the applicable exchange so that the New PPC Common Stock will continue to be listed and traded thereon, except that the Plan Sponsor will have no obligation to ensure the share price or market value of New PPC Common Stock is sufficient to maintain the listing of such shares.

## XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.  **Liquidation Under Chapter 7**

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in the liquidation analysis in Exhibit G hereof, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to holders of general unsecured claims than those provided for in the Plan and no distributions to equity holders because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

B.  **Alternative Plan**

If the Plan is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a plan of reorganization has expired) could attempt to formulate a different plan of reorganization. Such a plan might involve a reorganization and continuation of the Debtors' business on a standalone basis (i.e., without participation of a Plan Sponsor), a sale of the Debtors as a going concern, or an orderly liquidation of the Debtors' assets under chapter 11. The Debtors have examined these various alternatives in connection with the process involved in the formulation and development of the Plan, and have concluded that the Plan enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors would still incur the expenses associated with winding down the estates and selling assets. The process would be carried out in a more orderly fashion over a greater period of time than a chapter 7 liquidation, and if a trustee were not appointed, because such appointment in not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe, however, that liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

C.  **Staying in Chapter 11**

In addition, instead of formulating a different plan of reorganization, the Debtors could remain in chapter 11. If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could survive as a going concern in protracted Chapter 11 Cases. In particular, the current DIP Credit Agreement expires on December 1, 2009. The Debtors could have difficulty obtaining extending the DIP Credit Agreement or obtaining new financing to sustain the day-to-day operational requirements of their businesses, including the increased restructuring costs resulting from protracted chapter 11 cases.

## XII.

## VOTING PROCEDURES AND REQUIREMENTS

A.  **Solicitation Package**

Accompanying this Disclosure Statement are, among other things, copies of (i) the Plan (Exhibit A); (ii) the notice of, among other things, the deadline for submitting ballots to accept or reject the Plan (the "Ballots"); the date, time and place of the hearing considering confirmation of the Plan and matters related thereto; and the deadline for filing objections to the confirmation of the Plan; and (iii) for those entitled to vote, one or more Ballots to be used in voting to accept or reject the Plan.

B.  **Voting Procedures**

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. Under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no property under the Plan. All Classes of Claims are unimpaired under the Plan and are not entitled to vote. Only Class 10(a) (Equity Interests in PPC) is entitled to vote to accept or reject the Plan.

If your Equity Interest is not in this class, you are not entitled to vote and you will not receive a Ballot with this Disclosure Statement. If your Equity Interest is in this class and is Allowed, you are entitled to vote and should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

If (1) you have any questions about (a) the procedures for voting your Equity Interest, (b) the packet of materials you received, or (c) the amount of your Claim or Equity Interest holding, or (2) you wish to obtain an additional copy of the Plan, Disclosure Statement or any exhibits/schedules thereto, please contact Kurtzman Carson Consultants LLC, the Debtors' solicitation and balloting agent, at (888) 830-4659.

C.  **Voting/Election Deadline**

After carefully reviewing the Plan, this Disclosure Statement and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box in the enclosed Ballot. Please note that the Ballot for Equity Interests in PPC also contains a separate vote to accept or reject the STIP and the LTIP, both of which are described in more detail in Section VII(D)(4). Please complete and sign your Ballot (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in disqualification of your vote on such Ballot. Each Ballot has been coded to reflect the class of Equity Interests it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, your Ballot (or the Master Ballot cast on your behalf) must be actually *received* by the voting agents at the following address before the Voting Deadline of [ ], on [ ]:

> Pilgrim's Pride Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245

If a Ballot is damaged or lost, you may contact the Debtors' voting agents at the numbers set forth above. Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted. Any Ballot received after the voting deadline will not be counted. If the return envelope included with your Solicitation Package is addressed to your Nominee, please allow enough time for your Nominee to submit your vote on a Master Ballot. Ballots or copies of Ballots should <u>not</u> be delivered to the Debtors or the Committees or their respective counsel.

**D.     Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of Equity Interests is determined by calculating the amount of the Allowed Equity Interests voting to accept, based on the actual total Allowed Equity Interests voting. Acceptance requires an affirmative vote of at least two-thirds in dollar amount of the Allowed Equity Interests voting.

## XIII.

## CONFIRMATION OF THE PLAN

**A.     Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The Confirmation Hearing is scheduled for [ ], on [ ], before the Honorable D. Michael Lynn, 501 West Tenth Street, Fort Worth, TX 76102-3643. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

**B.     Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon and received no later than [ ] by: (i) Pilgrim's Pride Corporation, 4585 US Highway 271 North, Pittsburg, Texas 75868-0093 (William K. Snyder, CRO); (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Victoria Vron, Esq.); (iii) Weil, Gotshal & Manges LLP, 200 Crescent Court, Suite 300, Dallas, TX 75201 (Attn: Stephen A. Youngman, Esq.); (iv) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976 Dallas, TX 75242 (Attn: Lisa Lambert, Esq. and Erin Schmidt, Esq); (v) Andrews Kurth LLP, 1717 Mainstreet, Suite 3700, Dallas, Texas 75201 (Attn: Jason S. Brookner, Esq. and Jonathan I. Levine, Esq.), and (vi) Brown Rudnick LLP, Seven Times Square, New York, New York 10036 (Attn: Steven D. Pohl, Esq. and Jeremy Coffee, Esq.).

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served by [ ], Prevailing Central Time, on [_____], 2009, in the manner described in the Disclosure Statement Order attached hereto as <u>Exhibit B</u>.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.     Requirements for Confirmation—Consensual Plan**

1.   <u>Elements of 1129(a) of the Bankruptcy Code</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied, including the following requirements:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means prohibited by law;

- Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, affiliates of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider;

- With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below;

- Unless the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan;

- Unless the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that allowed undisputed Administrative Expense and

- Allowed Other Priority Claims will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such claims deferred Cash payments, over a period not exceeding six (6) years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims;

- At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further of financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below;

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

**D.      Best Interests Tests/Liquidation Analysis**

As described above, section 1129(a)(7)(A) of the Bankruptcy Code requires that each holder of an impaired claim or equity interests either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

As stated in Section VI above, the Debtors will pay all creditors in full with interest. Since the Plan provides for full payment to creditors and a certain recovery to holders of Allowed Equity Interests, the amount proposed to be paid is not less than the amount creditors and stakeholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  In fact, as reflected in the Liquidation Analysis attached hereto as <u>Exhibit G</u>, holders of impaired Claims and Equity Interests would receive less in a chapter 7 liquidation than under the Plan.

**E.      Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections described in section IV above.  Based upon such projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

F.  **Requirements for Confirmation—Non-Consensual Plan**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1. *No Unfair Discrimination*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Equity Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

2. *Fair and Equitable Test*

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- *Secured Creditors*. With respect to a class of secured claims, the plan provides: (i) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property, or (ii) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this paragraph, or (iii) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

- *Unsecured Creditors*. With respect to a class of unsecured claims: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of section 1129.

- *Holders of Equity Interests*. With respect to a class of equity interests: (i) the plan provides that each holder of an equity interest receive or retain on account of

such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the plan on account of such junior interest any property.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement.

**G.     Reservation of "Cram Down" Rights**

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors each reserve the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by Class 10(a) (Equity Interests in PPC).

## XIV.

## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all creditors and equity holders and urge the holders of impaired claims in Class 10(a) (Equity Interests in PPC) to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: September 17, 2009
Fort Worth, Texas

Respectfully submitted,

PILGRIM'S PRIDE CORPORATION

By: /s/ Richard A. Cogdill
Name: Richard A. Cogdill
Title: Chief Financial Officer

PFS DISTRIBUTION COMPANY

By: /s/ Richard A. Cogdill
Name: Richard A. Cogdill
Title: Chief Financial Officer

PPC TRANSPORTATION COMPANY

By: /s/ Richard A. Cogdill
Name: Richard A. Cogdill
Title: Chief Financial Officer

TO-RICOS, LTD.

By: /s/ Richard A. Cogdill
Name: Richard A. Cogdill
Title: Chief Financial Officer

                TO-RICOS DISTRIBUTION, LTD.

                By:   /s/ Richard A. Cogdill
                       Name: Richard A. Cogdill
                       Title:   Chief Financial Officer

                PILGRIM'S PRIDE CORPORATION OF WEST VIRGINIA, INC.

                By:   /s/ Richard A. Cogdill
                       Name: Richard A. Cogdill
                       Title:   Chief Financial Officer

                PPC MARKETING, LTD.

                By:   Pilgrim's Pride Corporation
                       Its General Partner

                       /s/ Richard A. Cogdill
                       Name: Richard A. Cogdill
                       Title:   Chief Financial Officer

Counsel:

Martin A. Sosland, Esq. (18855645)
Stephen A. Youngman, Esq. (22226600)
Gary T. Holtzer, Esq. (*pro hac vice*)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746 7700
Facsimile: (214) 746 7777


Attorneys for Debtors and
   Debtors in Possession