6. *Employment Agreements with Don Jackson and Jerry Wilson*

The Reorganized Debtors will assume the employment agreements that PPC entered into with Don Jackson ("Dr. Jackson") as Chief Executive Officer and President on January 27, 2009 and Jerry Wilson ("Mr. Wilson") as Executive Vice President, Sales on March 11, 2009. The employment agreements have a term of three years, but they may be extended with the mutual written consent of the parties. The material terms of the employment agreements with Dr. Jackson and Mr. Wilson are as follows:[14]

- The annual base salary for Dr. Jackson will not be less than $1,500,000 and for Mr. Wilson will be $500,000 during the term of the agreements.

- Dr. Jackson and Mr. Wilson received sign-on bonuses that are subject to repayment on a pro-rata basis over a three year period: Dr. Jackson in the amount of $3,000,000 and Mr. Wilson in the amount of $500,000 (collectively, the "Sign-on Bonus").

- Upon confirmation of the Plan and the attainment of certain performance targets, an equity award of up to 3,085,656 shares of PPC's common stock (the "Stock Grant"), which was received by Dr. Jackson as a sign-on bonus, will vest and Dr. Jackson will be entitled to receive up to $2,000,000 as a reorganization bonus ("Reorganization Bonus").

- If either of the employment agreements are terminated other than for "cause" by PPC or its successor or with "good reason" by Dr. Jackson or Mr. Wilson during their term, any remaining unforgiven amount of the Sign-on Bonus will be immediately forgiven. In addition, Mr. Wilson will receive a *pro rata* portion of his annual performance bonus.

- If either Dr. Jackson or Mr. Wilson terminates his employment without "good reason" (as such term is defined in the employment agreements) during the term of his respective employment agreement, such executive will be required to repay PPC any remaining unforgiven amount of the Sign-on Bonus, and, in the case of Dr. Jackson, the unvested portion of his Stock Grant will forfeit.

- If PPC or its successor terminates the executive's employment for "cause" (as such term is defined in the employment agreements) during the term, Dr. Jackson will have any remaining unforgiven amount of the Sign-on Bonus immediately forgiven and the unvested portion of his Stock Grant will forfeit and Mr. Wilson will be required to repay PPC any remaining unforgiven amount of the Sign-on Bonus.

- After the date of the termination of Dr. Jackson or Mr. Wilson, such executive may not solicit or induce employees of PPC to terminate their employment with PPC during the 12-month period, in the case of Mr. Wilson, and 24 months, in the case of Don Jackson, following the date of employment termination or seek or obtain any employment or consulting relationship with any specified competitor of PPC during the restricted period.

---

[14] The description of the employment agreements herein is for summary purposes only and in case of any conflict between an employment agreement and this Disclosure Statement, the employment agreements will govern.

7. *Retiree Benefits*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits as that term is defined in section 1114 of the Bankruptcy Code) of the Debtors, except with respect to any retiree benefits of the Debtors (i) that were terminated or rejected prior to the Confirmation Date (to the extent such termination or rejection did not violate section 1114 of the Bankruptcy Code) or (ii) are subject to a motion to reject as of the Confirmation Date or have been specifically waived by the beneficiaries of such retiree benefits, for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

**F.      Conditions Precedent to Confirmation of Plan and Occurrence of the Effective Date of Plan**

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a)      The Confirmation Order, in form and substance reasonably satisfactory to the Debtors, and, in so far as the Confirmation Order relates to or concerns the SPA or any matter contemplated therein, reasonably satisfactory to the Plan Sponsor, will have been entered and shall not be subject to any stay or injunction;

(b)      All actions, documents, and agreements necessary to implement the Plan will have been effected or executed;

(c)      Other than those conditions that by their nature can only be satisfied at the closing of the transactions contemplated by the SPA, the conditions precedent to the SPA will have been satisfied or waived by the parties thereto and the Reorganized Debtors will have access to the Cash contributed by the Plan Sponsor; and

(d)      The Allowed BMO Secured Claims, the Allowed CoBank Secured Claims, and the DIP Claims will have been paid in full pursuant to Sections 4.2, 4.3 and 2.4 hereof, respectively; *provided, however*, that payment in full of such Claims and effectiveness of the Plan may occur simultaneously.

**G.      Waiver of Conditions**

Each of the conditions precedent listed above and in Section 11.1 of the Plan (other than entry of the Confirmation Order) may be waived in whole or in part, as applicable, by the Debtors or the Plan Sponsor; *provided, however*, that the condition precedent in Section 11.1(d) of the Plan may only be waived by the Debtors with the consent of, as applicable, BMO or CoBank, as agents for the lenders from time to time party to the Prepetition BMO Credit Agreement, the DIP Credit Agreement, and the Prepetition CoBank Credit Agreement, respectively.  Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

**H.      Effects of Failure of Conditions to Effective Date**

In the event the conditions precedent specified in Section 11.1 of the Plan  have not been satisfied or waived pursuant to Section 11.2 of the Plan on or prior to the date to be specified in the Confirmation Order, then (i) the Confirmation Order will be vacated, (ii) no distributions under the Plan will be made, (iii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status*

*quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (iv) all of the Debtors' obligations with respect to the Claims and Equity Interests will remain unchanged and nothing contained herein will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors, and (v) nothing contained herein will prejudice in any manner the rights of the Debtors, including, without limitation, the right to seek a further extension of the exclusive periods under section 1121(d) of the Bankruptcy Code.

**I.      Effects of Confirmation on Claims and Equity Interests**

1.      *Vesting of Asset*

Upon the Effective Date, all property of the Debtors' estates will vest in the Reorganized Debtors free and clears all claims, liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

2.      *Discharge of Claims and Termination of Equity Interests*

The rights afforded to claimants and equity holders in the Plan, and the payments and distributions made thereby, will be in exchange for and in complete satisfaction, discharge and release of all existing debts and claims of any kind, nature or description whatsoever against the Debtors.  A Disputed Claim will not be discharged until it is disallowed or allowed by the Bankruptcy Court or another court of competent jurisdiction, and if allowed, until a distribution to the holder of such allowed claim is made pursuant to the Plan. All holders of existing claims against the Debtors will be enjoined from asserting against the Debtors, or any of their assets or properties, any other or further claim based upon any act or omission, transaction or other activity that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim.  In addition, on and after the Effective Date, each holder of a claim against the Debtors will be forever precluded and enjoined from prosecuting or asserting any discharged claim against the Debtors.

3.      *Discharge of Debtors*

**Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim and any affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Effective Date; *provided, however*, that a Disputed Claim will not be discharged until it is disallowed or allowed by the Bankruptcy Court or another court of competent jurisdiction, and if allowed, until a distribution to the holder of such allowed claim is made pursuant to the Plan.  As provided in section 524 of the Bankruptcy Code, such discharge will void any judgment against the Debtors, their estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged.  Upon the Effective Date, all persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against the Debtors, the estates, or any successor thereto.**

4. *Injunction or Stay*

**Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims against or Equity Interests in the Debtors and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates, will be permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors, the Reorganized Debtors, their respective estates, any debtor who is indemnifiable by the Debtors or Reorganized Debtors, and their respective property, (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (ii) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order, (iii) creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind, (iv) asserting any right of setoff, subrogation or recoupment of any kind with respect to any such Claim or Equity Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan.  Such injunction will extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.**

5. *Term of Injunction or Stays*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

6. *Injunction Against Interference with Plan*

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests, and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

7. *Exculpation*

**Notwithstanding anything herein or in the Plan to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Committees, the Chief Restructuring Officer, the agents and lenders under the Prepetition BMO Credit Agreement and the Prepetition CoBank Credit Agreement, the agents and lenders party to the DIP Credit Agreement, the Settling Unions, the Plan Sponsor, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; <u>provided</u>, <u>however</u>, that the foregoing will not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

8. _Releases by Holders of Claims and Equity Interests_

      **Except as otherwise expressly provided in the Plan, on the Effective Date, and in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan, each holder of a Claim or an Equity Interest that votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan, will release and discharge unconditionally and forever each of (a) the Debtors and the Reorganized Debtors, (b) the Chief Restructuring Officer, (c) the Committees, (d) the agents and lenders under the Prepetition BMO Credit Agreement, (e) the agents and lenders under to the Prepetition CoBank Credit Agreement, (f) the agents and lenders under the DIP Credit Agreement, (g) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), (h) the Plan Sponsor, and (i) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of each of the foregoing, as applicable, from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Equity Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Equity Interest prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder;** _provided_**, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or** _ultra vires_ **acts of any such person or entity;** _provided further_ **that the foregoing will not operate as a waiver of or a release of any causes of action held by a Governmental Unit against any non-Debtor existing as of the Effective Date based on any securities laws of the United States or any domestic state.**

      Certain growers and certain participants in the Debtors' 401(k) plan believe that the releases of non-debtors set forth in this section are inappropriate and impair the claims of holders of General Unsecured Claims. The Debtors disagree and believe such releases are appropriate and supported by prevailing case law.

9. _Releases by Debtors and Reorganized Debtors_

      **Upon the Effective Date, and in consideration of the services provided to the Debtors by such persons, each Debtor and Reorganized Debtor will release and discharge unconditionally and forever each of (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of the Debtors (including the Chief Restructuring Officer), (b) the Committees, (c) the agents and lenders under the Prepetition BMO Credit Agreement, (d) the agents and lenders under to the Prepetition CoBank Credit Agreement, (e) the agents and lenders under the DIP Credit Agreement, (f) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), (g) the Plan Sponsor (except with respect to the Plan Sponsor's obligations under the Stock Purchase Agreement), and (h) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of each of the foregoing in clauses (b) through (g) of this Section 10.9, as applicable, from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the business or contractual arrangements between any Debtor and any such person or entity, or any act, omission, occurrence, or event in any manner**

**related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; *provided*, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.**

10. *Avoidance Actions*

From and after the Confirmation Date, the Debtors will retain the exclusive right to pursue, prosecute and enforce any and all Avoidance Actions, equitable subordination actions or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belonged to the Debtors or Debtors in Possession prior to the Confirmation Date, other than with respect to any cause of action or Avoidance Action released in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. On the Effective Date, the Debtors' right to pursue, prosecute and enforce the actions listed in the immediately preceding sentence will transfer to the Reorganized Debtors, which on and after the Effective Date shall have the exclusive right to pursue, prosecute and enforce such actions.

11. *Retention of Causes of Action/Reservation of Rights*

Except as provided in Sections 10.7 and 10.9 of the Plan, from and after the Confirmation Date, the Debtors will retain the right to pursue, prosecute and enforce any rights or causes of action that the Debtors have under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Entity, to the extent such Entity asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives, (ii) any and all Claims and causes of action for turnover of any property of the Debtors' estates, (iii) any and all Claims and causes of actions that are listed on the Debtors' Schedules, and (iv) any and all Claims and causes of action that are subject to pending litigation in either the Bankruptcy Court or a non-bankruptcy forum. On the Effective Date, the Debtors' right to pursue, prosecute and enforce the actions listed in the immediately preceding sentence will transfer to the Reorganized Debtors, which on and after the Effective Date will have the exclusive right to pursue, prosecute and enforce such actions. Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have.

Nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim. After the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, will have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Commencement Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Debtors' legal and equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

12. *Limitation on Exculpation and Releases of Professionals*

Nothing in Sections 10.7, 10.8 or 10.9 of the Plan is intended to (i) be construed to release or exculpate any entity from fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts, or (ii) limit the liability of the

professionals of the Debtors, the Reorganized Debtors, and the Committees to their respective clients pursuant to the relevant provisions of the Code of Professional Responsibility.

**J.     Dissolution of Statutory Committees and Fee Review Committee**

On the Effective Date, the Committees will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases; *provided, however*, that in the event the Confirmation Order is appealed, any Committee may elect to delay its dissolution until the conclusion of the appeal so as to participate in such appeal.  On the Effective Date, the retention or employment of all attorneys, financial advisors, accountants and other agents of the Creditors' Committee and Equity Committee will terminate other than for purposes of (i) filing, prosecuting and objecting to applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith, and (ii) participating in any appeal of the Confirmation Order.  To the extent not discharged and released on or prior to the Confirmation Date, on the eleventh (11th) day following the entry of an order in respect of the last of any outstanding fee applications, the Fee Review Committee will be released and discharged from its obligations pursuant to the Order Granting Motion for (I) Appointment of a Fee Review Committee and (II) Amendment of the Interim Compensation Order [Docket No. 1624].

**K.     Jurisdiction and Choice of Law**

On and after the Effective Date, the Bankruptcy Court will have exclusive jurisdiction over all matters arising out of, arising under, and related to the Chapter 11 Cases and the Plan pursuant to, and for the purpose of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to the facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided herein;

(d)     To consider Claims and Equity Interests or the allowance, classification, priority, compromise, estimation, or payment of any Claim or Equity Interest;

(e)     To enforce the terms of the ADR Procedures Order and hear any matter arising from the alternative dispute resolution procedures established therein;

(f)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is stayed, reversed, revoked, modified, or vacated for any reason;

(g)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to prevent interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(j)     To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in  any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Confirmation Order; provided, however, that notwithstanding anything to the contrary in Article XII of the Plan, disputes arising in connection with the interpretation, implementation or enforcement of the SPA or the Exit Financing or any other transactions or payments contemplated thereby shall be heard and determined as set forth therein.

(l)     Subject to paragraph (k) of Article XII of the Plan, to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following the Effective Date;

(m)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(n)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(o)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(p)     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(q)     To recover all assets of the Debtors and all property of the Debtors' estates, wherever located;

(r)     Subject to paragraph (k) of Article XII of the Plan, to hear and determine any matters arising out of or related to confidentiality agreements entered into by the Debtors during the Chapter 11 Cases;

(s)     To hear and determine any rights, claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code, any other federal or state statute, or any legal theory;

(t)     To enter a final decree closing the Chapter 11 Cases;

(u)     Subject to paragraph (k) of Article XII of the Plan, to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the

Confirmation Order any of the Plan Documents, or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement; and

(v) To hear and determine any other matter not inconsistent with the Bankruptcy Code.

**L.      Amendments or Modifications of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors will have complied with section 1125 of the Bankruptcy Code; provided further that without the prior written consent of the Plan Sponsor, the Debtors may not propose amendments or modifications to any provision in the Plan that would reasonably be expected to have a material adverse effect on the Plan Sponsor or on the ability of the Company and the Plan Sponsor to consummate the transactions contemplated by the SPA except that no consent shall be required for any amendments or modifications to the Plan proposed by the Debtors that are consistent with the rights of PPC under the SPA. After the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. A holder of a Claim or Equity Interest that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

**M.      Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke and withdraw the Plan prior to the Effective Date. If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order will be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan will be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

**N.      Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to

be invalid, void, or unenforceable, and such term or provision as altered or interpreted will then be applicable. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**O.      Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws thereof; provided, however, that the SPA will be governed by the laws as set forth therein.

# VII.

# REORGANIZED DEBTORS

**A.      Select Historical Financial Information**

Debtors' historical financial information is set forth (without exhibits) on Exhibits C and D hereto, respectively:

- PPC's Annual Report on Form 10-K, as amended, for the fiscal year ended September 27, 2008; and

- PPC's Form 10-Qs for each of the quarters ended December 27, 2008, March 28, 2009 and June 27, 2009.

**B.      Financial Projections (Five (5) Year Business Plan)**

The value of the securities to be issued pursuant to the Plan and the recoveries by holders of Allowed Claims who receive such securities, depend in part upon the ability of the Debtors to achieve financial results projected on the basis of certain assumptions.

To maximize creditor recoveries, the Debtors must seek to maximize the value of their businesses.

Additionally, for the Plan to meet the feasibility test of section 1129(a)(1l) of the Bankruptcy Code, the Bankruptcy Court must conclude that confirmation of the Plan is not reasonably likely to lead to the liquidation or further reorganization of the Debtors.

With these considerations in mind, the Debtors prepared their projections, which as more fully set forth below, are based upon the Debtors' long-term business plan and in turn serve as the basis for the Plan. The Debtors believe that the assumptions that serve as the basis for the projections, subject to the updates described herein, are reasonable under the circumstances and that pursuit of the business plan will maximize the value of the businesses of the Debtors.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY

CODE TO ENABLE THE HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES OR THE ABILITY OF THE DEBTORS AND THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS FOLLOWING THE EFFECTIVE DATE. THE PROJECTIONS SHOULD BE CONSIDERED IN LIGHT OF THE UPDATED INFORMATION DEVELOPED SINCE THEIR PREPARATION DISCUSSED IN "SUMMARY OF SIGNIFICANT ASSUMPTIONS IN FIVE-YEAR PLAN." SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS UTILIZE THE PRELIMINARY VALUATION PREPARED BY LAZARD  SOLELY IN CONNECTION WITH THE FILING OF THE DISCLOSURE STATEMENT. HOWEVER, NO FRESH START ADJUSTMENTS ARE REFLECTED IN THE INCOME STATEMENT INCLUDED IN THE PROJECTIONS. AS A RESULT, THE OPERATING RESULTS MAY NOT BE INDICATIVE OF TRUE PERFORMANCE, AND FINANCIAL RATIOS CALCULATED USING THE PROJECTIONS MAY NOT BE ACCURATE OR REPRESENTATIVE OF THE REORGANIZED DEBTORS AFTER EMERGENCE. ABSENT A STIPULATED OR BANKRUPTCY COURT-DETERMINED ENTERPRISE VALUE OF THE DEBTORS, THE DEBTORS INTEND TO IDENTIFY AN ENTERPRISE VALUE FOR PURPOSES OF "FRESH START" ACCOUNTING UTILIZING MARKET DATA, INCLUDING THE TRADING PRICES OF THE SECURITIES OF THE DEBTORS THAT MAY DIFFER MATERIALLY FROM THE VALUATION ASSUMED IN THE PROJECTIONS.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' INDEPENDENT ACCOUNTANTS, ERNST AND YOUNG, LLP ("E&Y"), HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL

INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY DEBTOR, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. HOWEVER, FROM TIME-TO-TIME, THE DEBTORS WILL PREPARE UPDATED PROJECTIONS IN CONNECTION WITH PURSUING FINANCING (INCLUDING THE EXIT FINANCING), CREDIT RATINGS AND OTHER PURPOSES. SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.

THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES IN CONNECTION WITH EFFECTING FRESH START ACCOUNTING. THE DEBTORS AND THE REORGANIZED DEBTORS WILL BE REQUIRED TO DETERMINE THE ENTERPRISE VALUE, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING COMPUTATIONS. IN ALL EVENTS, THE REORGANIZATION VALUE, AS WELL AS THE DETERMINATION OF THE FAIR VALUE OF THE DEBTORS' PROPERTY, EQUIPMENT, AND INVENTORIES AND THE DETERMINATION OF THEIR ACTUAL LIABILITIES, WILL BE MADE AS OF THE EFFECTIVE DATE. ALTHOUGH THE DEBTORS EXPECT TO UTILIZE A CONSISTENT METHODOLOGY, THE CHANGES BETWEEN THE AMOUNTS OF ANY OR ALL OF THE FOREGOING ITEMS AS ASSUMED IN THE PROJECTIONS AND THE ACTUAL AMOUNTS THEREOF AS OF THE EFFECTIVE DATE MAY BE MATERIAL.

1. *Consolidated Projected Financial Statements ("The Projections")*

Attached as Exhibit F hereto are the Debtors' consolidated projected financial statements.

2. *Purpose and Objectives*

To maximize creditor recoveries, the Debtors must seek to maximize the value of their businesses. Additionally, for the Plan to meet the feasibility test of section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must conclude that confirmation of the Plan is not reasonably likely to lead to the liquidation or further reorganization of the Debtors.

With these considerations in mind, the Debtors prepared their projections, which are more fully set forth below, based on the Debtors' long-term business plan. These projections, in turn, serve as the basis for the Plan. The Debtors believe the assumptions that serve as the basis for the projections, subject to the updates described herein, are reasonable under the circumstances and that pursuit of the business plan will maximize the value of the businesses of the Debtors.

The projections are done on consolidated level basis (for both Debtors and non-Debtors) for the remainder of fiscal year 2009, from fiscal year 2010 to fiscal year 2014.

3.    *Key Drivers of the Projections*

Grain markets: Five-year projected grain markets were provided by Informa Economics and Express Markets Inc.

Poultry market: Five-year projected poultry markets were provided by Informa Economics and Express Markets Inc.

Sales projections: As projected by PPC's sales management

(i)    Fiscal year 2010 sales projections: the projections incorporate improvement on sales mix composition geared towards reducing commodity sales and increasing core business

(ii)    Fiscal year 2011 – 2014 sales projections: the projections incorporate modest annual growth of 2-3% to maintain stable market share going-forward after FY 2010

Operational improvement: Announced and implemented operational improvements such as closures of plants, SG&A reduction and lean initiatives are incorporated in the projections. Future additional improvements will provide further upside to the Debtors' financial performance beyond the projections.

4.    *Cost Assumptions in the Projections*

Live operations costs: Live costs include grain cost assumptions, the costs of milling and delivering feed to live poultry, medication, administration costs, and grower pay to raise the poultry. These costs are projected at current levels, adjusted for known differences, including operational savings.

Operating expenses: Projections of operating expenses include labor, maintenance, utilities, packaging and ingredients based on historic costs (most are expressed as cost per production pound), adjusted for known differences including operational savings.

Corporate overhead: Projected corporate overhead expenses are based on historic costs, adjusted for known differences including operational savings.

Capacity utilization: The projections utilize production schedules provided by the Debtors' supply chain management, which are matched against the sales plan, reflecting the Debtors' business plan on becoming a sales-driven company. Production schedules provide production pounds which drive major cost items in the projections. The Debtors currently operate below full-capacity (full capacity is defined as five-day-a-week full production at all Debtors' facilities currently being operated). The projections incorporate a gradual increase in production from fiscal year 2010 to accommodate increasing future sales, reaching full capacity in fiscal year 2013. The Debtors believe increasing production levels to full capacity in fiscal year 2013 and slightly beyond full capacity in fiscal year 2014 is feasible without any significant capital expenditure since the Debtors believe they have the sufficient capital base employed.

Cost inflationary factor: An inflationary factor of 2.2% (based on USDA Agricultural Projections) is incorporated into the cost items in the projections from fiscal year 2011 to fiscal year 2014.

Interest Expense and Debt Payments: Projections on interest expense and scheduled principal payments conform to the Debtors' exit financing arrangements.

Capital Expenditures and Depreciation: Projected capital expenditures include maintenance and efficiency / expansionary capital spending to accommodate the Debtors' business plan. Furthermore, the Debtors projected certain "catch-up" capital expenditure in fiscal year 2010 and fiscal year 2011 for deferred fixed-asset spending that the Debtors experienced several years prior to commencement of the Chapter 11 Cases. Long-term capital expenditure is expected to be at levels to replace depreciation of fixed assets.

Marketing Program: The projections incorporate a marketing program to support the Debtors' plan on sales mix shift towards core business and efforts on maintaining market share. Purposes of the marketing program will include, but will not be limited to, creating a creative marketing team, developing brand awareness campaign and new promotional, and product development. The marketing program spending will start from fiscal year 2010; and there will be a one-year lag in which the benefits toward core sales price points will be realized one year later from fiscal year 2011.

Working Capital Assumptions: The projections utilize commonly-used methods in estimating working capital going-forward, using measures such as Day Sales Outstanding, Inventory Days and Days Payable Outstanding. These measures are projected based on historic levels, adjusted for known differences. The projections do not assume any significant changes in the Debtors' working capital situation aside from normal movements to support projected business operations.

Reorganization costs: Reorganization costs will be accrued and paid during the period of the Chapter 11 Cases; and any estimated remaining outstanding reorganization costs after the Effective Date will be treated as administrative claims and paid accordingly to the treatment of such claims.

Income taxes: The five-year plan assumes a statutory tax rate of 37%.

Dividends: The projections assume no dividends will be paid.

5. *Poultry Industry Outlook in the Projections*

The outlook for the poultry industry in 2009 is generally considered to be positive due to the decline in feed ingredient prices since mid-2008 and a reduction in the supply of chicken enacted by some of the industry producers. Prices for corn and soybeans, for example, have dropped substantially since July 2008, and are at this time expected to remain relatively flat for the remainder of fiscal year 2009. Prices of the Debtors' chicken products are expected to increase over the next 12 months as total industry supply has been moderated and the wave of beef and pork liquidations are expected to subside. The Debtors are reasonably confident that improved economic conditions in the chicken industry and an improved balance sheet will lead to a successful restructuring of the Debtors' businesses.

6. *Commodity Factor: Grain/Feed Ingredients*

Feed ingredient purchases are the single largest component of the Debtors' cost of sales, representing 34.7% of consolidated cost of sales incurred in the first nine months of fiscal 2009 and 39.5% of consolidated cost of sales incurred in fiscal 2008. The production of feed ingredients is positively or negatively affected primarily by weather patterns throughout the world, the global level of supply inventories and demand for feed ingredients, and the agricultural policies of the U.S. and foreign governments.

The cost of corn and soybean meal, the Debtors' primary feed ingredients, increased sharply during the prior two years and reached unprecedented levels in the last half of fiscal 2008.

Market prices for these feed ingredients decreased in the first nine months of fiscal 2009. Market prices for feed ingredients remain volatile, however, and there can be no assurance that they will not increase materially as a result of, among other things, increasing demand for these products around the world and alternative uses of these products, such as ethanol and biodiesel production.

The following table compares the highest and lowest prices reached on nearby futures for one bushel of corn and one ton of soybean meal during the past four years, for each quarter in fiscal 2008 and for the first, second and third quarters of fiscal 2009:

| | Corn | | Soybean Meal | |
|---|---|---|---|---|
| | Highest Price | Lowest Price | Highest Price | Lowest Price |
| 2009: | | | | |
| Third Quarter | $ 4.50 | $ 3.40 | $ 433.40 | $ 278.00 |
| Second Quarter | 4.28 | 3.38 | 326.00 | 264.00 |
| First Quarter | 5.24 | 2.90 | 302.00 | 237.00 |
| 2008: | | | | |
| Fourth Quarter | 7.50 | 4.86 | 455.50 | 312.00 |
| Third Quarter | 7.63 | 5.58 | 427.90 | 302.50 |
| Second Quarter | 5.70 | 4.49 | 384.50 | 302.00 |
| First Quarter | 4.57 | 3.35 | 341.50 | 254.10 |
| 2007: | 4.37 | 2.62 | 286.50 | 160.20 |
| 2006: | 2.68 | 1.86 | 204.50 | 155.80 |
| 2005: | 2.63 | 1.91 | 238.00 | 146.60 |

Based on the Debtors' feed consumption during the second quarter of fiscal 2009, hypothetical $0.01 per bushel movement in corn price and $1 per ton movement in soybean meal price would have resulted in annualized cost of sales changes of approximately $2 million and $1.8 million, respectively.

According to Informa Economics and Express Markets, Inc., the projected confidence intervals (reflecting one standard deviation or 68% probability) can range from $1 per bushel for corn and $54 per ton for soybean meal. Thus, the Debtors might experience approximately $400 million in annual cost of sales fluctuation due to corn price movement and approximately $190 million due to soybean meal price movement, respectively. This variability could be considered normal movements within the relevant commodity cycles.

## C. Valuation

The Debtors have been advised by Lazard, its investment banker, with respect to the estimated enterprise value of Pilgrim's Pride, as reflected by the estimated equity value of the Reorganized PPC that was agreed upon as part of the transaction with the Plan Sponsor. Lazard has undertaken this valuation analysis for the purpose of determining value available for distribution to holders of Allowed Claims and Allowed Equity Interests pursuant to the Plan. In addition to specific risks mentioned in this section, the discussion of the valuation analysis should be read in conjunction with the discussion of the transaction with the Plan Sponsor and certain risk factors contained in Articles V and VIII.

Pursuant to the SPA, the Plan Sponsor has agreed to purchase 64% of the New PPC Common Stock for $800 million. The remaining 36% of the New PPC Common Stock would be valued at $450 million, resulting in an aggregate estimated total equity value of $1,250 million, before

contemplation of any potential synergies as discussed in Section V(H)[15]. Based upon the anticipated net debt at the Effective Date, of $1,486 million, Lazard's estimate of the enterprise value is $2,736 million (excluding approximately $50 million in estimated restricted cash). This estimate was based in part on information provided by the Debtors, solely for purposes of the Plan, as of November 21, 2009.[16] For purposes of this valuation, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date.

Lazard's analysis addresses the estimated enterprise value of Pilgrim's Pride, as reflected by the estimated equity value of the Reorganized PPC, assuming the Plan is approved and becomes effective. It does not address other aspects of the proposed reorganization, the Plan or any other transactions and does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Lazard's estimated total equity and enterprise values do not constitute a recommendation to any holder of Allowed Claims or Allowed Equity Interests as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to, nor did Lazard, express any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated total equity and enterprise values set forth herein do not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE, AS OF NOVEMBER, 21 2009, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAVE ANY OBLIGATION OR INTENT TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE. THE PROJECTIONS USED IN THE VALUATION ANALYSIS ALSO ASSUME THAT GENERAL ECONOMIC, FINANCIAL, AND MARKET CONDITIONS AS OF THE EFFECTIVE DATE WILL NOT DIFFER FROM THOSE PREVAILING AS OF THE DISCLOSURE STATEMENT.

With respect to the Projections prepared by the management of the Debtors, Lazard assumed that such Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of Pilgrim's Pride. Lazard's estimates of equity and enterprise value, assumes that Pilgrim's Pride will achieve its Projections in all material respects. If the business performs at levels above or below those set forth in the Projections, and/or levels of certain Allowed Claims are lower or higher than previously anticipated, it may have a material impact on the value of New PPC Common Stock. However, pursuant to the terms of the SPA, the initial allocation of New PPC Common Stock will not change.

Such estimates do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly higher or lower than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult

---

[15] The views regarding any synergies that may be created through the transaction with the Plan Sponsor are the views of the Plan Sponsor and have not been independently verified by either the Debtors or Lazard.

[16] If the Plan is approved by the Bankruptcy Court, the Debtors expect to emerge from chapter 11 by the end of December 2009 (the "Assumed Effective Date"). Lazard does not expect the estimated enterprise value of $2,736 million to change materially between November 21, 2009 and the Assumed Effective Date.

to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  As a result, the estimated equity and enterprise values set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Neither the Debtors, Lazard, nor any other person assumes responsibility for their accuracy.  In addition, the valuation of newly issued securities, such as New PPC Common Stock is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition constituents (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of securities such as supply/demand imbalances and levels of liquidity in the secondary market.

THE ESTIMATES OF EQUITY AND ENTERPRISE VALUES DETERMINED BY LAZARD REPRESENT ESTIMATES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE EQUITY VALUE OF THE REORGANIZED PPC ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE FOR THE REORGANIZED PPC ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS.

**D.      Corporate Governance and Management of the Reorganized Debtors**

1.      *Initial Board of Directors*

The identity of the initial board of directors for each Debtor will be disclosed in the Plan Supplement; provided; however, that the identity of the independent director of the Reorganized PPC to be designated by the Plan Sponsor will be disclosed no later than 3 calendar days before the Confirmation Hearing.

Pursuant to the Stockholders Agreement and the Restated Certificate of Incorporation, on the Effective Date, the board of directors of Reorganized PPC will consist of 9 members comprised as follows:

(i)      6 members, including the Chairman of the Board, will be designated by the Plan Sponsor (the "Plan Sponsor Designees").  The chief executive officer of Reorganized PPC will be appointed to the initial board of directors of Reorganized PPC and will be included in the Plan Sponsor Designees.  In addition, it is currently expected that the Plan Sponsor Designees will also include Wesley Mendonça Batista (the current president and chief executive officer of JBS USA), Joesley Mendonça Batista (the current chief executive officer of JBS Brazil and the president of its board of directors), and José Batista Junior (the current director of JBS USA, LLC and JBS Brazil).

(ii)     2 members (the "Equity Directors") will be designated by the Equity Committee.  The Equity Directors will qualify as "independent directors" pursuant to the definition set forth in Section 303A.02 of the New York Stock Exchange Listed Company Manual.

(iii)    1 member will be Lonnie "Bo" Pilgrim.

From and after the Effective Date, the members of the board of directors of Reorganized PPC and its affiliates will be selected and determined in accordance with the provisions of the respective organizational documents and applicable law.

2. *Officers*

As of the Effective Date, the officers of the Debtors shall be the officers of the Reorganized Debtors.

3. *Consulting Agreement*

In connection with the Plan, PPC and Lonnie A. "Bo" Pilgrim ("Mr. Pilgrim") have entered into a consulting agreement, dated September 16, 2009 (the "Consulting Agreement"), which will become effective on the Effective Date. The salient terms of the Consulting Agreement are as follows:[17]

- Mr. Pilgrim will provide services to the Reorganized PPC that are comparable in the aggregate with the services provided by him to PPC prior to the Effective Date;
- Mr. Pilgrim will be compensated for services rendered to Reorganized PPC at a rate of $1.5 million a year for a term of 5 years;
- Mr. Pilgrim will be subject to customary non-solicitation and non-competition provision; and
- Mr. Pilgrim and his spouse will be provided with medical benefits (or will be compensated for medical coverage) that are comparable in the aggregate to the medical benefits afforded to employees of Reorganized PPC.

4. *Management Incentive Plans*

(a)     Short Term Management Incentive Plan

During the Chapter 11 Cases, PPC's board of directors approved, subject to approval of the Plan by the Bankruptcy Court, and in the case of awards that are intended to qualify as "performance-based compensation" under Section 162(m) of the Internal Revenue Code ("162(m) Awards"), subject to approval by the shareholders, the Short Term Management Incentive Plan — an annual incentive program for the use of the Reorganized Debtors providing for the grant of bonus awards payable upon achievement of specified performance goals (the "STIP"). The STIP permits the grant of 162(m) Awards and bonus awards that are not intended to so qualify. Regular, full-time salaried, exempt employees of the Reorganized Debtors and its affiliates who are selected by the administering committee are eligible to participate in the STIP. The maximum aggregate amount that may be paid pursuant to 162(m) Award to a participant in any fiscal year may not exceed $10,000,000. Awards may be granted once the STIP becomes effective, but any 162(m) Awards that are granted before the STIP is approved by PPC's stockholders will not be paid unless and until the STIP is approved by the stockholders. The STIP, substantially in the form of Exhibit D-1 of the Plan, is being submitted to stockholders of PPC for separate approval in connection with the Plan. Exhibit D to the Plan sets forth a summary of material terms of the STIP.

---

[17] The description of the Consulting Agreement herein is for summary purposes only and in case of any conflict between the Consulting Agreement and this Disclosure Statement, the Consulting Agreement will govern.

(b)    Long Term Incentive Plan

During the Chapter 11 Cases, PPC's board of directors approved, subject to approval by shareholders of PPC and of the Plan by the Bankruptcy Court, an omnibus long-term incentive plan ("LTIP") for the use of the Reorganized Debtors providing for the grant of a broad range of long-term equity-based and cash-based awards to the Reorganized Debtors' officers and other employees, members of the Reorganized Debtors' board of directors and any consultants to the Reorganized Debtors, as well as to employees of and any consultants to the Reorganized Debtors' subsidiaries. The equity-based awards that may be granted under the LTIP include "incentive stock option," within the meaning of the Internal Revenue Code, non-qualified stock option, stock appreciation rights, restricted stock awards and restricted stock units. Performance-based awards under Section 162(m) of the Internal Revenue Code, which are payable upon satisfaction of pre-established performance goals, may also be granted in order to preserve the deductibility of these awards for federal income tax purposes. The LTIP provides for issuance of an aggregate number of shares of common stock in the Reorganized PPC equal to the lesser of (i) a number of shares equal to the quotient arrived at by dividing $50,000,000 by the average of the per share closing prices on the Pink OTC Markets, or if the shares are not then traded on the Pink OTC Markets, on the principal exchange, market or quotation system on which the shares are then traded or listed, of the shares during the 10 consecutive trading days ending (and including) the trading immediately preceding the Effective Date, and (ii) 10,000,000 shares, all of which may be issued pursuant to the exercise of "incentive stock options." The LTIP, substantially in the form of Exhibit D-2 of the Plan, is being submitted to stockholders of PPC for separate approval in connection with the Plan. Exhibit D to the Plan sets forth a summary of material terms of the LTIP.

**E.    Description of Certain Securities to be Issued Pursuant to the Plan**

1.    *New PPC Common Stock*

On the Effective Date, the existing common stock of PPC will be cancelled and the New PPC Common Stock will be issued to holders of Allowed Equity Interests and the Plan Sponsor. The Restated Certificate of Incorporation will authorize Reorganized PPC to issue 800,000,000 shares of common stock, par value $.01 per share, and 50,000,000 shares of preferred stock, par value $.01 per share, with Reorganized PPC's Board of Directors being empowered, without stockholder approval, to cause preferred stock to be issued with such rights, preferences and limitations as it may determine. *See* Restated Certificate of Incorporation attached to the Plan as Exhibit C.

In the event JBS USA completes the Offering, or any other initial public offering of the JBS USA Common Stock and the offered shares are listed on a national securities exchange, then, at any time during an Exchange Window (as defined below) falling within the period commencing on the date of the closing of the Offering or such other offering and ending two years and 30 days from the Effective Date, JBS USA will have the right to deliver written notice of the mandatory exchange of the New PPC Common Stock to Reorganized PPC at its principal place of business. Upon delivery to Reorganized PPC of notice of the Mandatory Exchange Transaction each share of New PPC Common Stock held by stockholders other than JBS USA will automatically, without any further action on behalf of Reorganized PPC or any of the Exchanged Holders, be transferred to JBS USA in exchange for a number of duly authorized, validly issued, fully paid and non-assessable shares of JBS USA Common Stock equal to the Exchange Offer Ratio (as defined below). The Mandatory Exchange Transaction will be effected in compliance with all applicable laws. An "Exchange Window" is a period of time beginning on the 6th trading day after the first day on which both Reorganized PPC and JBS USA will have each made their respective annual or quarterly reports or earnings releases relating to the immediately preceding fiscal quarter or year, as applicable, and ending on the last day of the fiscal quarter during which the first day of the Exchange Window fell.

The Exchange Offer Ratio is a fraction, the numerator of which is the average volume-weighted daily trading price per share on the principal Exchange for the New PPC Common Stock and the denominator of which is the average volume-weighted daily trading price per share on the principal exchange for the JBS USA Common Stock, in each case for the Measurement Period. The "Measurement Period" is a number of consecutive trading days which is equal to twice the number of consecutive trading days between (i) the first date on which both JBS USA and Reorganized PPC shall have both made their respective annual or quarterly reports or earnings releases and (ii) the date on which JBS USA delivers to Reorganized PPC the notice of the Mandatory Exchange Transaction.

JBS USA believes that the offer and sale of both the New PPC Common Stock and the JBS USA Common Stock under the circumstances provided in the Plan and summarized above will satisfy the requirements of section 1145(a) of the Bankruptcy Code. Under the terms of the SPA, the Debtors and the Plan Sponsor have agreed to seek a finding of the Bankruptcy Court in the Confirmation Order that the offer and sale of both the New PPC Common Stock and the JBS USA Common Stock will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

## F. Exit Financing

The Debtors are working with various lenders and financial institutions to secure an exit facility (the "Exit Facility") that would provide funding for plan distributions and working capital for the Reorganized Debtors. The Exit Facility, as currently contemplated, will provide a senior secured financing facility (the "Exit Credit Facility) in an aggregate principal amount of at least $1,650,000,000, to include a three-year revolving credit facility, in an aggregate principal amount of at least $500,000,000 (the "Exit Revolving Credit Facility); a three year Term A loan facility in an aggregate principal amount of at least $375,000,000 (the "Term A Loan Facility); and a five- year term B loan facility in an aggregate principal amount of at least $775,000,000 (the "Term B Loan Facility). As contemplated, a portion of the Exit Revolving Credit Facility, of at least $200,000,000, will be available for the issuance of standby letters of credit and trade letters of credit. On August 11, 2009, the Bankruptcy Court entered an order authorizing the Debtors to enter into certain mandate, commitment and fee letters in connection with the Exit Facility and to pay certain fees related thereto. The terms of the Exit Facility itself will be approved as part of confirmation of the Plan. The material terms of the Exit Facility are attached to the Plan as Exhibit A and will be filed as part of the Plan Supplement. Any merger or consolidation of Reorganized PPC with the Plan Sponsor will require consent of the required lenders to the Exit Credit Facility or a refinancing of the Exit Facility.

## VIII.

## CERTAIN RISK FACTORS

HOLDERS OF EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN, THE FINANCIAL PROJECTIONS AND OTHER RISKS THAT COULD IMPACT THE REORGANIZED DEBTORS' FUTURE FINANCIAL CONDITION AND OPERATIONS, RISKS RELATING TO THE FINANCIAL AND OPERATIONAL RESULTS OF THE PLAN SPONSOR AND RISKS RELATING TO THE JBS COMMON STOCK. THESE FACTORS

SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.     Certain Risks Related to the Plan**

      1.     *The Debtors may not be able to obtain confirmation of the Plan*

      The Debtors cannot ensure that they will receive the requisite Plan acceptances to confirm the Plan.  Even if the Debtors receive the requisite Plan acceptances, the Debtors cannot ensure that the Bankruptcy Court will confirm the Plan.  The adequacy of the Disclosure Statement or the balloting procedures and results may be challenged as not being in compliance with the Bankruptcy Code, and even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things:  (i) a finding by a bankruptcy court that a plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (ii) confirmation is not likely to be followed by a liquidation or a need for further financial reorganization and (iii) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the Debtors believe that the Plan does not unfairly discriminate and is fair and equitable, will not be followed by a need for further financial reorganization, and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.

      Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  In addition, although the Debtors believe that the Effective Date will occur on or before December 31, 2009, there can be no assurance as to such timing.

      2.     *Undue delay in confirmation of the Plan may significantly disrupt operations of the Debtors*

      The impact a continuation of the Chapter 11 Cases may have on the operations of the Debtors and their businesses cannot be accurately predicted or quantified.  Since the filing of the Chapter 11 Cases, the Debtors have suffered disruptions in operations, including losses of customers and suppliers.  The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could further adversely affect the Debtors' operations and relationships with the Debtors' customers, vendors, suppliers and employees.  If confirmation of the Plan does not occur expeditiously, the Chapter 11 Cases could result in, among other things, increases in costs, professional fees and similar expenses.  In addition, prolonged Chapter 11 Cases may make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' businesses.

      3.     *Holders of Equity Interests in PPC  may face significant losses in the event of a subsequent liquidation or financial reorganization by the Debtors*

      The management of the Debtors believes that, if it is permitted to implement its business plan and if the Debtors meet their current financial projections as updated by the subsequently identified

variances discussed herein, the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors. Nevertheless, there can be no assurance that such liquidation will not occur or that the need for such financial reorganization will not arise. Substantially all of the unencumbered assets of the Debtors will be pledged to secure the Debtors' obligations under the Exit Facility. Accordingly, after consummation of the Plan, if the Debtors were to be liquidated or if the need for a further financial reorganization were to arise, the unencumbered assets of the Debtors likely would be insufficient to provide the holders of Equity Interests in PPC with any material recovery.

4. *The satisfaction or waiver of the closing conditions to the SPA is a condition precedent for the confirmation of the Plan and may prevent or delay confirmation of the Plan if such conditions are not satisfied or waived as provided in the SPA*

The Plan Sponsor has entered into the SPA and has agreed to purchase 64% of the New PPC Common Stock as provided therein. However, the SPA is subject a number of conditions precedent that must be satisfied or waived by the parties thereto. If any of the closing conditions in the SPA are not satisfied or waived, the Debtors will not be able to meet a condition precedent for confirmation of the Plan. The Debtors can provide no assurance that the closing conditions in the SPA will be satisfied or, if not satisfied, waived by the parties thereto.

5. *If the Plan Sponsor's ownership percentage in the Reorganized PPC increases to 90% or more there will be no Equity Directors on the Reorganized PPC's board of directors.*

Pursuant to the terms of the Restated Certificate of Incorporation, the Plan Sponsor has the right to elect six directors to the Reorganized PPC's board of directors, with the minority stockholders having the right to elect two Equity Directors (as defined in the Restated Certificate of Incorporation). If the Plan Sponsor's ownership percentage in the Reorganized PPC increases to 90% or above, the minority stockholders will no longer have the right to elect the Equity Directors.

**B. Risks Related to the Mandatory Exchange Transaction**

1. *Holders of New PPC Common Stock may ultimately receive shares of JBS USA Common Stock pursuant to the Mandatory Exchange Transaction so the risk factors regarding the Plan Sponsor and the JBS USA Common Stock should be carefully considered*

In connection with the consummation of the Plan, holders of Allowed Equity Interests will receive shares of common stock of Reorganized PPC in exchange for their existing shares of PPC Common Stock. In the event JBS USA completes the Offering, or any other initial public offering of the JBS USA Common Stock, and the offered shares are listed on a national securities exchange, then, at any time during an Exchange Window falling within the period commencing on the date of the closing of the Offering or such other offering and ending two years and 30 days from the Effective Date, JBS USA will have the right to deliver written notice of the mandatory exchange of the New PPC Common Stock to Reorganized PPC at its principal place of business. Upon delivery to Reorganized PPC of notice of the Mandatory Exchange Transaction each share of New PPC Common Stock held by stockholders other than JBS USA will automatically, without any further action on behalf of Reorganized PPC or any of the Exchanged Holders, be transferred to JBS USA in exchange for a number of duly authorized, validly issued, fully paid and non-assessable shares of JBS USA Common Stock equal to the Exchange Offer Ratio (as defined below). The Mandatory Exchange Transaction is required to be effected in compliance with all applicable laws in accordance with Section 8.2(a) of the Restated Certificate of Incorporation.

The Exchange Offer Ratio is a fraction, the numerator of which is the average volume-weighted daily trading price per share on the principal Exchange for the New PPC Common Stock and the denominator of which is the average volume-weighted daily trading price per share on the principal exchange for the JBS USA Common Stock, in each case for the Measurement Period. The "Measurement Period" is a number of consecutive trading days which is equal to twice the number of consecutive trading days between (i) the first date on which both JBS USA and Reorganized PPC shall have both made their respective annual or quarterly reports or earnings releases and (ii) the date on which JBS USA delivers to Reorganized PPC the notice of the Mandatory Exchange Transaction.

As a result of the Mandatory Exchange Transaction, stockholders should carefully read and consider the information provided in Section V(B) and the risk factors contained below regarding the Plan Sponsor and the JBS Common Stock, as the shares of New PPC Common Stock may in the future be exchanged for shares of JBS USA Common Stock without the consent or election of such stockholder.

For more information about the Plan Sponsor and its business, a copy of the Plan Sponsor's Registration Statement on Form S-1 filed with the SEC on July 22, 2009 is attached hereto as Exhibit E. These documents were prepared by, and are the responsibility of JBS. JBS intends to include more recent financial statements with the Plan Supplement. However, there is no assurance that the more recent financial statements, if included, will not include information that is materially different from that included in the Registration Statement on Form S-1 attached hereto as Exhibit E. The Debtors disclaim any responsibility for the accuracy or completeness of these documents.

    2.    *The market price of the JBS Common Stock may adversely affect the market price for New PPC Common Stock*

If JBS USA completes the Offering, or any other initial public offering of the JBS USA Common Stock prior to the expiration of the deadline for their exercise of the Mandatory Exchange Transaction, the market price of the JBS USA Common Stock may influence the market price of the New PPC Common Stock. For example, the market price of the New PPC Common Stock could become more volatile and could be depressed by (a) lack of trading activity in New PPC Common Stock as a result of investors' anticipation of JBS USA's potential exercise of the Mandatory Exchange Transaction, (b) possible sales by holders of New PPC Common Stock who do not wish to receive shares of JBS USA Common Stock, and (c) hedging or arbitrage trading activity that may develop involving New PPC Common Stock and JBS USA Common Stock.

    3.    *Holders of New PPC Common Stock will bear the full risk of a decline in the market price of New PPC Common Stock*

The number of shares of JBS USA Common Stock that holders of New PPC Common Stock will receive upon JBS USA's exercise of the Mandatory Exchange Transaction will be equal to the Exchange Offer Ratio (as defined above). As a result, the number of shares that holders of New PPC Common Stock will receive in JBS USA is not fixed, but instead will depend on the market values of both companies during a specified period of time. The aggregate market value of the JBS USA Common Stock deliverable upon the consummation of the Mandatory Exchange Transaction may be less than the aggregate market value of the New PPC Common Stock originally received pursuant to the Plan. Accordingly, holders of New PPC Common Stock will bear the full risk of a decline in the market price of New PPC Common Stock. Any such decline could be substantial.

4. *The Plan Sponsor has no obligation to maintain a listing for JBS USA Common Stock after the consummation of the Mandatory Exchange Transaction*

The SPA does not require the Plan Sponsor to maintain a listing for JBS USA Common Stock after it completes the Mandatory Exchange Transaction. There can be no assurance that there will be sufficient liquidity in the market for JBS USA Common Stock, or that it will be possible to sell shares of JBS USA Common Stock when desired, at a reasonable price or at all

5. *Holders of New PPC Common Stock will have no rights with respect to JBS USA Common Stock prior to the Mandatory Exchange Transaction but may be negatively affected by certain actions taken by JBS USA*

Until the consummation of the Mandatory Exchange Transaction, holders of New PPC Common Stock will have no rights with respect to the JBS USA Common Stock (including, without limitation, voting rights, rights to receive dividends or other distributions (if any) and rights to respond to tender offers). For example, in the event that an amendment is proposed to the articles of incorporation of JBS USA requiring stockholder approval and the record date for determining the stockholders of record entitled to vote on the amendment occurs prior to the consummation of the Mandatory Exchange Transaction, holders of New PPC Common Stock will not be entitled to vote on the amendment, although they will nevertheless be subject to any changes in the powers, preferences or special rights of the JBS USA Common Stock. In addition, JBS USA may issue additional shares of JBS USA Common Stock, including in connection with future acquisitions. The issuance of a significant amount of JBS USA Common Stock would dilute the shares of JBS USA Common Stock acquired by holders of New PPC Common Stock pursuant to the Mandatory Exchange Transaction and could depress the trading price of the JBS USA Common Stock.

**C.    Risks Related to the Capitalization of the Reorganized Debtors**

1. *The Reorganized Debtors' future financial and operating flexibility may be adversely affected by their significant leverage as a result of the Exit Facility*

The Reorganized Debtors will have substantial indebtedness, which could adversely affect their financial condition. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will, on a consolidated basis, have approximately $1.4 billion in secured indebtedness and will have the ability to borrow approximately $0.3 billion under the Exit Facility on the Effective Date, unless such requirement is waived by the lenders party thereto. Significant amounts of cash flow will be necessary to make payments of interest and repay the principal amount of such indebtedness.

The degree to which the Reorganized Debtors are leveraged could have important consequences because:

- It could affect the Reorganized Debtors' ability to satisfy their obligations under the Exit Facility;

- A substantial portion of the Reorganized Debtors' cash flow from operations will be required to be dedicated to interest and principal payments and may not be available for operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- The Reorganized Debtors' ability to obtain additional financing and to fund working capital, capital expenditures and other general corporate requirements in the future may be impaired;

- The Reorganized Debtors may be more highly leveraged than some of their competitors, which may place the Reorganized Debtors at a competitive disadvantage;

- The Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business may be limited;

- It may limit the Reorganized Debtors' ability to pursue acquisitions and sell assets; and

- It may make the Reorganized Debtors more vulnerable in the event of another downturn in their business or the economy in general.

The Reorganized Debtors' ability to make payments on and to refinance their debt, including the Exit Facility, will depend on their ability to generate cash in the future. This, to a certain extent, is subject to various business factors (including, among others, the commodity prices of feed ingredients and chicken) and general economic, financial, competitive, legislative, regulatory, and other factors that are beyond the control of the Reorganized Debtors.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that future borrowings will be available under credit facilities in an amount sufficient to enable the Reorganized Debtors to pay their debt obligations, including obligations under the Exit Facility, or to fund their other liquidity needs. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity. There can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

2. _The covenants in the Exit Facility could hinder the Reorganized Debtors' business activities and operations_

The Exit Facility will contain various provisions that may limit the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of its assets. In addition, the Exit Facility will require the Reorganized Debtors and certain of their subsidiaries to maintain certain financial ratios and meet certain tests, including leverage and interest coverage ratios. Covenants in the Exit Facility will also require the Reorganized Debtors to use a portion of their cash flow and the proceeds they receive from certain asset sales and specified debt or equity issuances and upon the occurrence of other events to repay outstanding borrowings under the Exit Facility. These covenants may have important consequences on the Debtors' operations, including, without limitation, restricting their ability to obtain additional financing and potentially limiting their ability to adjust to rapidly changing market conditions.

The Debtors cannot assure you that the Reorganized Debtors and certain of their subsidiaries will be able to comply with the provisions of their respective debt instruments, including, without limitation, the financial covenants in the Exit Facility. Any failure to comply with the restrictions of the Exit Facility or any other such subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to

which a cross-acceleration or cross-default provision applies. The Debtors cannot provide assurance that the Reorganized Debtors and certain of their subsidiaries' assets or cash flow would be sufficient to fully repay borrowings under the outstanding debt instruments, either upon maturity or if accelerated upon an event of default, or that they would be able to refinance or restructure the payments on such debt. If the Reorganized Debtors are unable to repay amounts outstanding under the Exit Facility when due, the lenders thereunder could, subject to the terms of the relevant agreements, seek to sell or otherwise transfer the assets that are pledged to secure the indebtedness outstanding under those facilities and notes. The Exit Facility will be secured by substantially all of the Assets of PPC.

3. *The Debtors may not be able to list the New PPC Common Stock on a national securities exchange or an active market for shares of New PPC Common Stock may not develop*

Prior to the Petition Date, PPC Common Stock was listed on the New York Stock Exchange, or the NYSE. On the Petition Date, PPC Common Stock was delisted from the NYSE and has traded on an electronic quotations system, such as the system known as the "Pink Sheets" during the Chapter 11 Cases. PPC intends to seek to list the New PPC Common Stock on a national securities exchange in connection with the effectiveness of the Plan. However, there is no assurance that Reorganized PPC, or the New PPC Common Stock, will comply with the listing requirements of a national securities exchange. In addition, even if the Debtors are able to list New PPC Common Stock on a national securities exchange, there can be no assurance that a regular trading market for New PPC Common Stock will develop, or if a trading market does develop, that it will be sustainable. Pursuant to the SPA, the Plan Sponsor and Reorganized PPC are required to use their commercially reasonable efforts to cause the New PPC Common Stock to comply with the continued listing standards of such national securities exchange so that the New PPC Common Stock will continue to be listed and traded thereon. However, the Plan Sponsor has no obligation to ensure that the share price or the market value of the shares of New PPC Common Stock are sufficient to maintain the listing of such shares. In addition, under certain circumstances and with the consent of the required lenders under the Exit Facility, Reorganized PPC may be able to repurchase New PPC Common Stock, which may reduce the liquidity of the New PPC Common Stock. There can be no assurance that there will be sufficient liquidity in the market for New PPC Common Stock, or that it will be possible to sell shares of New PPC Common Stock when desired, or at all.

4. *The purchase price paid by the Plan Sponsor for the New PPC Common Stock is not intended to represent the trading or market value of New PPC Common Stock and there is no assurance that a holder will be able to sell the New PPC Common Stock at such a price or at all.*

The determination of the purchase price of the New PPC Common Stock was based on the Plan Sponsor's and the Debtors' assessments of the reorganized Pilgrim's Pride's financial projections, business prospects, business opportunities, risks and other factors, as applicable, and was not intended to represent the trading values of New PPC Common Stock in public or private markets. Several factors may cause the price of New PPC Common Stock to vary including those discussed below in "Risks Related to the Financial and Operational Results of the Reorganized Debtors." Additionally, the stock market has experienced extreme volatility in recent months and this volatility has often been unrelated to the operating performance of particular companies. All of these factors, among others, may cause the price of the New PPC Common Stock to fluctuate after trading commences and it may not be possible to sell the New PPC Common Stock at such a price, or at all.

5. *The Plan Sponsor will hold a majority of the New PPC Common Stock and will have the ability to control the vote on most matters brought before the holders of New PPC Common Stock*

Following consummation of the Plan, the Plan Sponsor will hold a majority of the shares and voting power of the New PPC Common Stock and will be entitled to appoint a majority of the members of the board of directors of the Reorganized PPC. As a result, the Plan Sponsor will, subject to restrictions on its voting power and actions in the Stockholders Agreement and the Restated Certificate of Incorporation, have the ability to control the management, policies and financing decisions of the Reorganized Debtors, elect a majority of the members of Reorganized PPC's board of directors at the annual meeting and control the vote on most matters coming before the holders of New PPC Common Stock. For more information about the Plan Sponsor, see Section V(B). For specific risk factors regarding the Plan Sponsor, including its status as a controlled company, see the "Risks Related to the Financial and Operational Results of the Plan Sponsor" below.

**D.      Risks Related to the Financial and Operational Results of the Reorganized Debtors**

1. *The Chapter 11 Cases may have negatively affected the businesses of the Reorganized Debtors, including relationships with certain customers, suppliers and vendors, which could adversely impact the Reorganized Debtors' future financial and operating results*

Due to the disruptions caused by the Chapter 11 Cases, certain of the Debtors' relationships with customers, suppliers and vendors may have been adversely affected and/or terminated. Customers, suppliers or vendors may have entered into alternate relationships with other counterparties or modified their relationship with the Debtors due to performance issues or concerns. In some instances, customers, suppliers and vendors are holders of Claims in connection with the Chapter 11 Cases. The effect of the bankruptcy process and the resolution of such Claims against the Debtors (including the confirmation of the Plan) may have adversely affected or may in the future adversely affect the relationships between such parties and the Debtors. Changes in relationships with customers, suppliers and vendors could have a material adverse effect on the Reorganized Debtors' financial and operating results.

2. *The Debtors' actual financial results may vary significantly from the financial projections included in this Disclosure Statement*

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the business plan of the Debtors and the validity of the numerous assumptions contained therein. The significant assumptions underlying the projections, including certain updates to those assumptions, are discussed in greater detail in Section VII(B).

Many of these assumptions are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may adversely affect the financial results of the Debtors. Although the Debtors believe that the projections and assumptions as updated by the subsequently identified variances, are reasonable, variations between the actual financial results and those projected may be material.

3. *The expected synergies between the Plan Sponsor and PPC may not materialize*

While the Plan Sponsor has significant acquisition experience and historically has been able to realize substantial benefits through synergies, the Plan Sponsor may not be able to fully achieve all of the anticipated synergistic gains of the PPC transaction within the time frames expected. The

combined company's ability to realize the anticipated benefits of the acquisition will depend, to a large extent, on the ability of JBS USA to integrate the businesses of Reorganized PPC with JBS USA. The combination of two independent companies is a complex, costly and time-consuming process. As a result, the combined company will be required to devote significant management attention and resources to integrating the business practices and operations of JBS USA and Reorganized PPC. The integration process and realizing the benefits of the synergies will be additionally challenging so long as Reorganized PPC remains an independent, publicly-traded entity. The integration process may disrupt the business of either or both of the companies and, if implemented ineffectively, would preclude realization of the full benefits expected by JBS USA. The failure of the combined company to meet the challenges involved in integrating successfully the operations of JBS USA and Reorganized PPC or otherwise to realize the anticipated benefits of the transaction could cause an interruption of, or a loss of momentum in, the activities of the combined company and could seriously harm its results of operations. In addition, the overall integration of the two companies may result in unanticipated problems, expenses, liabilities, competitive responses, loss of customer and supplier relationships, and diversion of management's attention, and may cause the New PPC Common Stock price to decline. The difficulties of combining the operations of the companies include, among others:

- consolidating corporate and administrative infrastructures and eliminating duplicative operations;

- maintaining employee morale and retaining key employees;

- the diversion of management's attention from ongoing business concerns;

- coordinating geographically separate organizations;

- unanticipated issues in integrating information technology, communications and other systems; and

- managing tax costs or inefficiencies associated with integrating the operations of the combined company.

In addition, even if the operations of JBS USA and Reorganized PPC are integrated successfully, the combined company may not realize the full benefits of the transaction, including the synergies, cost savings or sales or growth opportunities that JBS USA expects. These benefits may not be achieved within the anticipated time frame, or at all. As a result, while JBS USA expects and believes that the transaction will result in substantial benefits from the synergies outlined above, it cannot make any affirmative guarantees that these results will be fully realized within the anticipated time frame given the risks involved.

The views regarding any synergies that may be created through the Plan Sponsor Transaction are the views of the Plan Sponsor and have not been independently verified by either the Debtors or their advisors.

4. *Industry cyclicality can affect earnings of the Reorganized Debtors, especially due to fluctuations in commodity prices of feed ingredients and chicken.*

Profitability in the chicken industry is materially affected by the commodity prices of feed ingredients and chicken, which are determined by supply and demand factors. As a result, the chicken industry is subject to cyclical earnings fluctuations.

The production of feed ingredients is positively or negatively affected primarily by the global level of supply inventories and demand for feed ingredients, the agricultural policies of the United States and foreign governments and weather patterns throughout the world. In particular, weather patterns often change agricultural conditions in an unpredictable manner. A significant change in weather patterns could affect supplies of feed ingredients, as well as both the industry's and the Reorganized Debtors' ability to obtain feed ingredients, grow chickens or deliver products.

The cost of corn and soybean meal, the Debtors' primary feed ingredients, increased significantly from August 2006 to July 2008, before moderating in 2009, and there can be no assurance that the price of corn or soybean meal will not significantly rise again as a result of, among other things, increasing demand for these products around the world and alternative uses of these products, such as ethanol and biodiesel production.

High feed ingredient prices have had, and may continue to have, a material adverse effect on the Reorganized Debtors' operating results, which has resulted in, and may continue to result in, additional non-cash expenses due to impairment of the carrying amounts of certain assets. The Debtors periodically seek, to the extent available, to enter into advance purchase commitments or financial derivative contracts for the purchase of feed ingredients in an effort to manage feed ingredient costs. The use of such instruments may not be successful.

5. *Outbreaks of livestock diseases in general and poultry diseases in particular, including avian influenza, can significantly affect the Reorganized Debtors' ability to conduct their operations and demand for their products.*

The Debtors take precautions designed to ensure that their flocks are healthy and that their processing plants and other facilities operate in a sanitary and environmentally-sound manner. However, events beyond the Debtors' control, such as the outbreaks of disease, either in their own flocks or elsewhere, could significantly affect demand for their products or their ability to conduct their operations. Furthermore, an outbreak of disease could result in governmental restrictions on the import and export of the Reorganized Debtors' fresh chicken or other products to or from their suppliers, facilities or customers, or require them to destroy one or more of their flocks. This could also result in the cancellation of orders by the Reorganized Debtors' customers and create adverse publicity that may have a material adverse effect on their ability to market their products successfully and on the business, reputation and prospects of the Reorganized Debtors.

During the first half of 2006, there was substantial publicity regarding a highly pathogenic strain of avian influenza, known as H5N1, which has been affecting Asia since 2002 and which has also been found in Europe and Africa. It is widely believed that H5N1 is being spread by migratory birds, such as ducks and geese. There have also been some cases where H5N1 is believed to have passed from birds to humans as humans came into contact with live birds that were infected with the disease.

Although highly pathogenic H5N1 has not been identified in North America, there have been outbreaks of low pathogenic strains of avian influenza in North America, and in Mexico outbreaks

of both high and low-pathogenic strains of avian influenza are a fairly common occurrence. Historically, the outbreaks of low pathogenic avian influenza have not generated the same level of concern, or received the same level of publicity or been accompanied by the same reduction in demand for poultry products in certain countries as that associated with the highly pathogenic H5N1 strain. Accordingly, even if the highly pathogenic H5N1 strain does not spread to North or Central America, there can be no assurance that it will not materially adversely affect demand for North or Central American produced poultry internationally and/or domestically, and, if it were to spread to North or Central America, there can be no assurance that it would not significantly affect the ability of the Reorganized Debtors to conduct their operations and/or demand for their products, in each case in a manner having a material adverse effect on the business, reputation and/or prospects of the Reorganized Debtors.

6. *If the Reorganized Debtors' poultry products become contaminated, they may be subject to product liability claims and product recalls.*

Poultry products may be subject to contamination by disease-producing organisms, or pathogens, such as Listeria monocytogenes, Salmonella and generic E.coli. These pathogens are generally found in the environment and, as a result, there is a risk that they, as a result of food processing, could be present in the Reorganized Debtors' processed poultry products. These pathogens can also be introduced as a result of improper handling at the further processing, foodservice or consumer level. These risks may be controlled, although not eliminated, by adherence to good manufacturing practices and finished product testing. The Reorganized Debtors will have little, if any, control over proper handling once the product has been shipped. Illness and death may result if the pathogens are not eliminated at the further processing, foodservice or consumer level. Even an inadvertent shipment of contaminated products is a violation of law and may lead to increased risk of exposure to product liability claims, product recalls and increased scrutiny by federal and state regulatory agencies and may have a material adverse effect on the business, reputation and prospects of the Reorganized Debtors.

In October 2002, one product sample produced in the PPC's Franconia, Pennsylvania facility that had not been shipped to customers tested positive for Listeria. PPC later received information from the USDA suggesting environmental samples taken at the facility had tested positive for both the strain of Listeria identified in the product and a strain having characteristics similar to those of the strain identified in a Northeastern Listeria outbreak. As a result, PPC voluntarily recalled all cooked deli products produced at the plant from May 1, 2002 through October 11, 2002. PPC carried insurance designed to cover the direct recall related expenses and certain aspects of the related business interruption caused by the recall.

7. *Product liability claims or product recalls can adversely affect the business reputation of the Reorganized Debtors and expose them to increased scrutiny by federal and state regulators.*

The packaging, marketing and distribution of food products entail an inherent risk of product liability and product recall and the resultant adverse publicity. The Reorganized Debtors may be subject to significant liability if the consumption of any of their products causes injury, illness or death. The Reorganized Debtors could be required to recall certain of their products in the event of contamination or damage to the products. In addition to the risks of product liability or product recall due to deficiencies caused by the production or processing operations of the Reorganized Debtors, the same risks may occur if any third party tampers with their products. There can be no assurance that the Reorganized Debtors will not be required to perform product recalls, or that product liability claims will not be asserted against them, in the future. Any claims that may be made may create adverse publicity that would have a material adverse effect on the ability of the Reorganized Debtors to market their products successfully or on their business, reputation, prospects, financial condition and results of operations.

If the Reorganized Debtors' poultry products become contaminated, they may be subject to product liability claims and product recalls. There can be no assurance that any litigation or reputational injury associated with product recalls will not have a material adverse effect on the ability of the Reorganized Debtors to market their products successfully or on their business, reputation, prospects, financial condition and results of operations.

8.  *The Reorganized Debtors are exposed to risks relating to product liability, product recall, property damage and injuries to persons for which insurance coverage is expensive, limited and potentially inadequate.*

The Reorganized Debtors' business operations will entail a number of risks, including risks relating to product liability claims, product recalls, property damage and injuries to persons. The Debtors currently maintain insurance with respect to certain of these risks, including product liability insurance, property insurance, workers compensation insurance, business interruption insurance and general liability insurance, but in many cases such insurance is expensive, difficult to obtain and no assurance can be given that such insurance can be maintained by Reorganized Debtors in the future on acceptable terms, or in sufficient amounts to protect the Reorganized Debtors against losses due to any such events, or at all. Moreover, even though the Reorganized Debtors' insurance coverage may be designed to protect them from losses attributable to certain events, it may not adequately protect them from liability and expenses incurred in connection with such events. For example, the losses attributable to the PPC's October 2002 recall of cooked deli products produced at one of their facilities significantly exceeded available insurance coverage. Additionally, in the past, two of the Debtors' insurers encountered financial difficulties and were unable to fulfill their obligations under the insurance policies as anticipated and, separately, two of the Debtors' other insurers contested coverage with respect to claims covered under policies purchased, forcing the Debtors to litigate the issue of coverage before being able to collect under these policies.

9.  *Competition in the chicken industry with other vertically integrated poultry companies may make the Reorganized Debtors unable to compete successfully in these industries, which could adversely affect their business.*

The chicken industry is highly competitive. In both the U.S. and Mexico, the Reorganized Debtors will primarily compete with other vertically integrated chicken companies.

In general, the competitive factors in the US chicken industry include:

- Price;

- Product quality;

- Product development;

- Brand identification;

- Breadth of product line; and

- Customer service.

Competitive factors vary by major market. In the foodservice market, competition is based on consistent quality, product development, service and price. In the US retail market, the Debtors believe that competition is based on product quality, brand awareness, customer service and price.

Further, there is some competition with non-vertically integrated further processors in the prepared chicken business. In addition, the filing of the Chapter 11 Cases and the associated risks and uncertainties may be used by competitors in an attempt to divert existing customers or may discourage future customers from purchasing products under long-term arrangements.

In Mexico, where product differentiation has traditionally been limited, product quality and price have been the most critical competitive factors. The North American Free Trade Agreement eliminated tariffs for chicken and chicken products sold to Mexico on January 1, 2003. However, in July 2003, the US and Mexico entered into a safeguard agreement with regard to imports into Mexico of chicken leg quarters from the US. Under this agreement, a tariff rate for chicken leg quarters of 98.8% of the sales price was established. On January 1, 2008, the tariff was eliminated. In connection with the elimination of those tariffs in Mexico, increased competition from chicken imported into Mexico from the US may have a material adverse effect on the Mexican chicken industry in general, and on the Mexican operations of the Reorganized Debtors in particular.

10.  *The loss of one or more of the largest customers could adversely affect the business of the Reorganized Debtors.*

The Debtors' two largest customers accounted for approximately 16% of their net sales in 2008, and the Debtors' largest customer, Wal-Mart Stores Inc., accounted for 11% of their net sales. The filing of the Chapter 11 Cases and the associated risks and uncertainties may have affected the Debtors' customers' perception of their business and increased their risk of losing key customers. The Reorganized Debtors' business could suffer significant setbacks in revenues and operating income if they lost one or more of the largest customers, or if their customers' plans and/or markets should change significantly.

11.  *The foreign operations of the Reorganized Debtors pose special risks to their business and operations.*

The Reorganized Debtors will continue to have significant operations and assets located in Mexico and may participate in or acquire operations and assets in other foreign countries in the future. Foreign operations are subject to a number of special risks, including among others:

- Currency exchange rate fluctuations;

- Trade barriers;

- Exchange controls;

- Expropriation; and

- Changes in laws and policies, including those governing foreign-owned operations.

Currency exchange rate fluctuations have adversely affected the Debtors in the past. Exchange rate fluctuations or one or more other risks may have a material adverse effect on the business or operations of the Reorganized Debtors in the future.

The Reorganized Debtors' operations in Mexico will be conducted through subsidiaries organized under the laws of Mexico. The Reorganized Debtors may rely in part on intercompany loans and distributions from their subsidiaries to meet obligations. Claims of creditors of subsidiaries, including trade creditors, will generally have priority as to the assets of the Reorganized Debtors' subsidiaries over claims by the Reorganized Debtors. Additionally, the ability of the Reorganized Debtors' Mexican

subsidiaries to make payments and distributions to the Reorganized Debtors will be subject to, among other things, Mexican law. In the past, these laws have not had a material adverse effect on the ability of the Mexican subsidiaries to make these payments and distributions. However, laws such as these may have a material adverse effect on the ability of the Reorganized Debtors' Mexican subsidiaries to make these payments and distributions in the future.

12. *Disruptions in international markets and distribution channels could adversely affect the business of the Reorganized Debtors.*

Historically, the Debtors have targeted international markets to generate additional demand for chicken dark meat, specifically leg quarters, which are a natural by-product of their US operations, given their concentration on prepared chicken products and the US customers' general preference for white meat. As part of this initiative, the Debtors have created a significant international distribution network into several markets, including Eastern Europe, including Russia; the Far East, including China; and Mexico. The success of the Reorganized Debtors in these markets could be, and the success of the Debtors in recent periods has been, adversely affected by disruptions in poultry export markets. These disruptions are often caused by restrictions on imports of US-produced poultry products imposed by foreign governments for a variety of reasons, including the protection of their domestic poultry producers and allegations of consumer health issues, and may also be caused by outbreaks of disease such as avian influenza, either in the flocks of the Reorganized Debtors or elsewhere in the world, and resulting changes in consumer preferences. There can be no assurance that one or more of these or other disruptions in the international markets and distribution channels will not adversely affect the business of the Reorganized Debtors.

13. *Regulation, present and future, is a constant factor affecting the business of the Reorganized Debtors.*

The operations of the Reorganized Debtors will continue to be subject to federal, state and local governmental regulation, including in the health, safety and environmental areas. The Reorganized Debtors anticipate increased regulation by various agencies concerning food safety, the use of medication in feed formulations and the disposal of poultry by-products and wastewater discharges.

Also, changes in laws or regulations or the application thereof may lead to government enforcement actions and the resulting litigation by private litigants. The Reorganized Debtors are aware of an industry-wide investigation by the Wage and Hour Division of the US Department of Labor to ascertain compliance with various wage and hour issues, including the compensation of employees for the time spent on such activities such as donning and doffing work equipment. PPC has been named a defendant in a number of related suits brought by employees. Due, in part, to the government investigation and the recent US Supreme Court decision in *IBP, Inc. v. Alvarez*, it is possible that the Reorganized Debtors may be subject to additional employee claims.

Unknown matters, new laws and regulations, or stricter interpretations of existing laws or regulations may materially affect the business or operations of the Reorganized Debtors in the future.

14. *New immigration legislation or increased enforcement efforts in connection with existing immigration legislation could cause the costs of doing business to increase, cause the Reorganized Debtors to change the way they conduct business or otherwise disrupt their operations.*

Immigration reform continues to attract significant attention in the public arena and the United States Congress. If new federal immigration legislation is enacted or if states in which the

Reorganized Debtors do business enact immigration laws, such laws may contain provisions that could make it more difficult or costly for the Reorganized Debtors to hire United States citizens and/or legal immigrant workers. In such case, the Reorganized Debtors may incur additional costs to run their business or may have to change the way they conduct their operations, either of which could have a material adverse effect on business, operating results and financial condition of the Reorganized Debtors. Also, despite the Debtors' past and continuing efforts to hire only United States citizens and/or persons legally authorized to work in the United States, the Reorganized Debtors may be unable to ensure that all of their employees are United States citizens and/or persons legally authorized to work in the United States. US Immigration and Customs Enforcement has recently been investigating identity theft within the Debtors' workforce. With their cooperation, during 2008 US Immigration and Customs Enforcement arrested approximately 350 of their employees believed to have engaged in identity theft at five of their facilities. No assurances can be given that further enforcement efforts by governmental authorities will not disrupt a portion of the Reorganized Debtors' workforce or their operations at one or more facilities, thereby negatively impacting the business of the Reorganized Debtors.

15. _Loss of essential employees could have a significant negative impact on the Reorganized Debtors' business._

The success of the Reorganized Debtors is largely dependent on the skills, experience, and efforts of their management and other employees. The deteriorating financial performance of PPC, along with the Chapter 11 Cases, creates uncertainty that could lead to an increase in unwanted attrition. The loss of the services of one or more members of the senior management of the Debtors or of numerous employees with essential skills could have a negative effect on the business, financial condition and results of operations of the Reorganized Debtors. The proposed acquisition of the New PPC Stock by the Plan Sponsor would constitute a change in control of PPC under the terms of change in control agreements between PPC and its executive officers and certain of its key employees. The change in control of PPC may create difficulties for PPC in retaining the services of these officers and employees, which may negatively impact PPC's business and the integration of the Plan Sponsor's and PPC's operations. If the Debtors are not able to attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect the ability of the Reorganized Debtors to achieve their business objectives.

16. _Extreme weather or natural disasters could negatively impact the business of the Reorganized Debtors._

Extreme weather or natural disasters, including droughts, floods, excessive cold or heat, hurricanes or other storms, could impair the health or growth of the Reorganized Debtors' flocks, production or availability of feed ingredients, or interfere with operations due to power outages, fuel shortages, damage to production and processing facilities or disruption of transportation channels, among other things. Any of these factors could have an adverse effect on the financial results of the Reorganized Debtors.

**E.      Risks Related to the JBS Common Stock**

1. _The Plan Sponsor is controlled by JBS S.A., which is a publicly traded company in Brazil, whose interests may conflict with the holders of JBS Common Stock._

The Plan Sponsor is a wholly owned indirect subsidiary of JBS S.A., a publicly traded company in Brazil. After the consummation of the initial public offering of the JBS USA Common Stock, it is expected that JBS S.A. will indirectly own a majority of the JBS Common Stock. The Batista family indirectly owns and controls approximately 50.1% of the voting equity capital of JBS S.A. Prior to the

initial public offering of the JBS Common Stock, all of the Plan Sponsor's directors and its president and chief executive officer are members of the Batista family. Members of the Batista family are also officers of JBS S.A. Accordingly, JBS S.A. is, and will continue to be, able to exercise significant influence over the Plan Sponsor's business policies and affairs, including the composition of its board of directors, which has the authority to direct business and appoint and remove officers, and over any action requiring the approval of stockholders, including the adoption of amendments to the certificate of incorporation and bylaws, which govern the rights attached to the shares of JBS Common Stock, and the approval of mergers or sales of substantially all assets.

JBS S.A. and its subsidiaries comprise the largest exporter of canned beef in the world. With respect to business opportunities relating to customers or markets which would otherwise be available to both the Plan Sponsor and JBS S.A.'s other subsidiaries, JBS S.A. may not permit the Plan Sponsor to pursue those opportunities or JBS S.A.'s other subsidiaries may directly compete with the Plan Sponsor for those opportunities. For example, in January 2007, JBS S.A. acquired SB Holdings and its subsidiaries, which comprise one of the largest distributors of processed beef in the United States. This acquisition provided JBS S.A. (and not the Plan Sponsor) with access to the processed beef market in the United States through two distribution centers located in Fort Lauderdale, Florida and Newport Beach, California. JBS S.A. is a public company in Brazil, and therefore, its directors have their own independent fiduciary duties and their interests may conflict or compete with those of the Plan Sponsor.

The concentration of ownership of shares of JBS Common Stock may also delay, defer or even prevent an acquisition by a third party or other change of control of the Plan Sponsor in a transaction that might otherwise give holders of JBS Common Stock the opportunity to realize a premium over the then-prevailing market price of the JBS Common Stock, even if stockholders perceive such transaction to be in the best interests of minority stockholders. This concentration of ownership may also adversely affect the stock price of the JBS Common Stock.

2.  *The Plan Sponsor's directors who have relationships with its controlling stockholder may have conflicts of interest with respect to matters involving the Plan Sponsor.*

Upon completion of the initial public offering of the JBS Common Stock, the majority of the Plan Sponsor's directors are expected to be affiliated with JBS S.A. These persons will have fiduciary duties to both the Plan Sponsor and JBS S.A. As a result, they may have real or apparent conflicts of interest on matters affecting both the Plan Sponsor and JBS S.A., which in some circumstances may have interests adverse to those of the Plan Sponsor. It may also limit the ability of these directors to participate in consideration of certain matters. In addition, as a result of JBS S.A.'s ownership interest, conflicts of interest could arise with respect to transactions involving business dealings between the Plan Sponsor and JBS S.A. including, but not limited to, potential acquisitions of businesses or properties, the issuance of additional securities, the payment of dividends and other matters.

3.  *The Plan Sponsor is expected to be a "controlled company" within the meaning of the NYSE rules, and, as a result, will rely on exemptions from certain corporate governance requirements that provide protection to stockholders of other companies.*

Upon completion of the initial public offering of JBS Common Stock, JBS S.A. will own more than 50% of the total voting power of the shares of JBS Common Stock and the Plan Sponsor will be a "controlled company" under the NYSE, corporate governance standards. As a controlled company, exemptions under the NYSE standards will free the Plan Sponsor from the obligation to comply with certain NYSE corporate governance requirements, including the requirements:

- that a majority of the Plan Sponsor's board of directors consists of "independent directors," as defined under the rules of the NYSE;

- that the Plan Sponsor has a corporate governance and nominating committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities;

- that the Plan Sponsor has a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and

- for an annual performance evaluation of the nominating and governance committee and compensation committee.

Accordingly, for so long as the Plan Sponsor is a "controlled company," holders of shares of JBS Common Stock will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

4. *There has been no prior public market for the JBS Common Stock and the trading price of the JBS Common Stock may be adversely affected if an active trading market does not develop.*

Prior to the any Offering of the JBS Common Stock, there will have been no public market for the JBS Common Stock, and an active trading market may not develop or be sustained. There can be no assurance that investor interest will lead to the development of an active trading market in shares of the JBS Common Stock or whether such a market will be sustained. The initial offering price of JBS Common Stock in any Offering will be determined through the Plan Sponsor's negotiations with the underwriters and may not be indicative of the market price of the JBS Common Stock after the initial public offering. The market price of shares of JBS Common Stock may decline below the initial public offering price, and holders of JBS Common Stock may not be able to sell their shares of JBS Common Stock at or above the initial public offering price, or at all.

5. *The stock price of the JBS Common Stock may be volatile, and holders of JBS Common Stock may be unable to resell their shares at or above the offering price or at all.*

The market price of the JBS Common Stock after the initial public offering will be subject to significant fluctuations in response to, among other factors, variations in the Plan Sponsor's operating results and market conditions specific to its industry. The combination of the relatively limited number of locations that the Plan Sponsor operates in and the significant investment associated with each new unit may cause the Plan Sponsor's operating results to fluctuate significantly, which could add to the volatility of the price of the JBS Common Stock. Furthermore, the stock markets have experienced price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These fluctuations often have been unrelated or disproportionate to the operating performance of those companies. Future market fluctuations may negatively affect the market price of the JBS Common Stock.

6. *Actual dividends paid on shares of JBS Common Stock may not be consistent with the dividend policy adopted by the Plan Sponsor's board of directors.*

The Plan Sponsor's board of directors is expected to adopt a dividend policy pursuant to which any future determination relating to dividend policy will be made at its discretion and will depend

on a number of factors, including the Plan Sponsor's business and financial condition, any covenants under its debt agreements and its parent company's legal obligation to distribute dividends. The Exit Facility Documents will not permit the payment of dividends by PPC without the approval of the required lenders under the Exit Facility. Under Brazilian law, the Plan Sponsor's parent company, JBS S.A., is required to pay dividends equal to 25% of its net income (as calculated under generally accepted accounting principles in Brazil, subject to certain adjustments mandated by Brazilian corporate law and other exceptions). However, the Plan Sponsor's board of directors is under no obligation to support the Brazilian legal requirements. The Plan Sponsor's board of directors may increase or decrease the level of dividends provided for in its dividend policy or entirely discontinue the payment of dividends. Future dividends with respect to shares of JBS Common Stock, if any, will depend on, among other things, the Plan Sponsor's results of operations, cash requirements, financial condition, distribution of dividends made by its subsidiaries, contractual restrictions, business opportunities, provisions of applicable law and other factors that its board of directors may deem relevant. For the foregoing reasons, holders of shares of JBS Common Stock will not be able to rely on dividends to receive a return on their investment. In addition, to the extent that the Plan Sponsor pays dividends, the amounts distributed to its shareholders may not be available to the Plan Sponsor to fund future growth and may affect its other liquidity needs.

7. *Provisions in the Plan Sponsor's amended and restated certificate of incorporation and amended and restated bylaws and Delaware law may discourage, delay or prevent a change of control or changes in management.*

The Plan Sponsor's amended and restated certificate of incorporation and amended and restated bylaws and Delaware law will contain provisions that could act to discourage, delay or prevent a change of control or changes in management. These provisions:

- authorize the issuance of "blank check" preferred stock that the Plan Sponsor's board of directors could issue to increase the number of outstanding shares to discourage a takeover attempt;

- provide for a classified board of directors (three classes);

- provide that stockholders may only remove directors for cause;

- provide that any vacancy on the Plan Sponsor's board of directors, including a vacancy resulting from an increase in the size of the board, may only be filled by the affirmative vote of a majority of directors then in office, even if less than a quorum;

- provide that a special meeting of stockholders may only be called by the Plan Sponsor's board of directors or by the chairman of the board of directors;

- provide that action by written consent of the stockholders may be taken only if JBS S.A. and any of its subsidiaries own at least 50% of the outstanding shares of JBS Common Stock;

- limit the liability of, and provide indemnification to, the Plan Sponsor's directors and officers;

- limit the ability of the Plan Sponsor's stockholders to call and bring business before special meetings and to take action by written consent in lieu of a meeting; and

- provide that the board of directors is expressly authorized to make, alter or repeal the Plan Sponsor's bylaws.

Additionally, the Plan Sponsor is subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with any "interested" stockholder for a period of three years following the date on which the stockholder became an "interested" stockholder.

These provisions may act to prevent a change of control, a change in management or other actions, including actions that the Plan Sponsor's stockholders may deem advantageous. These provisions may also have a negative effect on the trading price of the JBS Common Stock.

8. _Holders of JBS Common Stock may be subject to dilution._

The Plan Sponsor intends to implement a stock option plan that will grant options to its executive officers to purchase shares of JBS Common Stock with exercise prices that may be below the price calculated pursuant to the Mandatory Exchange Transaction. To the extent that these options are granted and exercised, holders of JBS Common Stock will experience further dilution.

**F.     Risks Related to the Financial and Operational Results of the Plan Sponsor**

1. _Outbreaks of BSE, Foot-and-Mouth Disease, or FMD, or other species-based diseases in the United States, Australia or elsewhere may harm demand for the Plan Sponsor's products._

An outbreak of disease affecting livestock, such as BSE, could result in restrictions on sales of products to customers or purchases of livestock from suppliers. Also, outbreaks of these diseases or concerns that these diseases may occur and spread in the future, whether or not resulting in regulatory action, can lead to cancellation of orders by customers and create adverse publicity that may have a material adverse effect on customer demand for products of the Plan Sponsor. In December 2003, the USDA reported the first confirmed case of BSE in the United States. Following the announcement, substantially all international export markets banned the import of U.S. beef. Canada also confirmed its first case of BSE in 2003, leading to the USDA's closure to imports of live cattle from Canada. As a result, export demand declined and negatively impacted the volume of processing at the Plan Sponsor's facilities. The United States currently imports cattle that is 30 months of age or younger from Canada, and Mexico reopened its borders to U.S. beef in April 2004. However, the late June 2005 announcement by the USDA of a second confirmed case of BSE in the United States followed by a third confirmed case in March 2006 has extended some border closures and slowed the re-entry of U.S. beef to some foreign markets. On July 27, 2006, Japan announced it would resume importing some U.S. beef, restricted to cattle that is 20 months or younger from approved U.S. processing plants. In 2006, South Korea reopened its market to boneless beef from the United States. However, disagreements and lack of clarity over import rules and procedures slowed the re-entry of U.S. boneless beef such that such exports to South Korea did not truly commence until 2008. As of March 29, 2009, 16 countries were still closed to U.S. beef. The Plan Sponsor is currently unable to assess whether or when these remaining foreign markets may fully open to U.S. beef or whether existing open markets may close.

In addition to BSE (in the case of cattle) and FMD (a highly contagious animal disease), cattle, sheep and pigs are subject to outbreaks of other diseases affecting such livestock. An actual outbreak of BSE, FMD or any other diseases, or the perception by the public that such an outbreak has occurred, could result in restrictions on domestic and export sales of products of the Plan Sponsor (even if its products are not actually affected by any disease), cancellations of orders by its customers and adverse publicity. In addition, if the products of the Plan Sponsor's competitors become contaminated, the adverse

publicity associated with such an event may lower consumer demand for products of the Plan Sponsor. Any of these events could have a material adverse effect on the Plan Sponsor.

2. *Any perceived or real health risks related to the food industry could adversely affect the ability of the Plan Sponsor to sell its products. If its products become contaminated, the Plan Sponsor may be subject to product liability claims and product recalls.*

The Plan Sponsor is subject to risks affecting the food industry generally, including risks posed by the following:

- food spoilage or food contamination;

- evolving consumer preferences and nutritional and health-related concerns;

- consumer product liability claims;

- product tampering;

- the possible unavailability and expense of product liability insurance; and

- the potential cost and disruption of a product recall.

The Plan Sponsor's beef products and pork products in the United States have in the past been, and may in the future be, exposed to contamination by organisms that may produce foodborne illnesses, such as E. coli, Listeria monocytogenes and Salmonella. These organisms are generally found in the environment and, as a result, there is a risk that they could be present in the Plan Sponsor's products. These pathogens can also be introduced to products through tampering or as a result of improper handling at the further processing, food service or consumer level. Once contaminated products have been shipped for distribution, illness or death may result if the products are not properly prepared prior to consumption or if the pathogens are not eliminated in further processing.

Although the Plan Sponsor has systems in place designed to monitor food safety risks throughout all stages of its processes, such systems, even when working effectively, may not eliminate the risks related to food safety. As a result, the Plan Sponsor may voluntarily recall, or be required to recall, its products if they are or may be contaminated, spoiled or inappropriately labeled. For example, on June 25, 2009, the Plan Sponsor voluntarily recalled 41,280 pounds of beef products that may have been contaminated with E. coli. Following further investigations, on June 28, 2009, the Plan Sponsor voluntarily expanded this recall to include an additional 380,000 pounds of assorted beef products. The recalled beef products were produced on April 21 and April 22, 2009 at its Greeley, Colorado facility and were shipped to distributors and retailers in multiple states and internationally. While the Plan Sponsor was unable to ascertain the exact cost incurred relating to these voluntary recalls, the total cost of these recalls was anticipated to be less than $4 million. Although no direct link has been confirmed, the Centers for Disease Control and Prevention has stated that cases of E. coli illnesses may be associated with the consumption of these beef products.

The Plan Sponsor may be subject to significant liability in the jurisdictions in which its products are sold if the consumption of any of its products causes injury, illness or death and such liability may be in excess of applicable liability insurance policy limits. Adverse publicity concerning any perceived or real health risk associated with its products could also cause customers to lose confidence in the safety and quality of the Plan Sponsor's food products, which could adversely affect its ability to sell products. The Plan Sponsor could also be adversely affected by perceived or real health risks associated

with similar products produced by others to the extent such risks cause customers to lose confidence in the safety and quality of such products generally. Any of these events may have a material adverse effect on the Plan Sponsor.

3. *The Plan Sponsor's pork business could be negatively affected by concerns about A(H1N1) influenza.*

In 2009, A(H1N1) influenza spread to several countries. More than 94,000 cases and over 400 deaths worldwide have been recorded since the outbreak of A(H1N1) influenza in Mexico, and on June 11, 2009, the World Health Organization, or WHO, declared a flu alert level six, signaling a "global pandemic." Although the WHO has stated that there is no relation between those infected with Influenza A(H1N1) and contact with persons living near swine or the consumption of pork, several countries, including Russia, Thailand, Ukraine, China and the Philippines, have stopped importing some or all pork produced in the affected states in the United States and certain other affected regions in the world.

Any further outbreaks of the disease could have a negative impact on the consumption of pork in the markets of the Plan Sponsor, and a significant outbreak could negatively affect its pork net sales and overall financial performance. Any further outbreak of A(H1N1) influenza could lead to the imposition of costly preventive controls on pork imports in its international markets. Accordingly, any spread of A(H1N1) influenza, or increasing concerns about this disease could negatively impact the Plan Sponsor's pork results of operations and its ability to sell pork in existing and new markets.

4. *The Plan Sponsor's results of operations may be negatively impacted by fluctuations in the prevailing market prices for livestock.*

The Plan Sponsor is dependent on the cost and supply of livestock and the selling price of its products and competing protein products, all of which can vary significantly over a relatively short period of time. Livestock prices demonstrate a cyclical nature both seasonally and over periods of years, reflecting the supply of and demand for livestock on the market and the market for other protein products such as livestock and fish. These costs are determined by constantly changing market forces of supply and demand as well as other factors over which the Plan Sponsor has little or no control. These other factors include:

- environmental and conservation regulations;

- import and export restrictions;

- economic conditions;

- livestock diseases; and

- declining cattle inventory levels in the United States and/or Australia.

The Plan Sponsor does not generally enter into long-term sales arrangements with its customers with fixed price contracts, and, as a result, the prices at which the Plan Sponsor sells its products are determined in large part by market conditions. A majority of its livestock is purchased from independent producers who sell livestock to the Plan Sponsor under marketing contracts or on the open market. A significant decrease in beef or pork prices for a sustained period of time could have a material adverse effect on the net sales revenue of the Plan Sponsor and, unless its raw material costs and other costs correspondingly decrease, on the Plan Sponsor's operating margins.