Catherine L. Steege (ARDC #06183529) (admitted *pro hac vice*)
Michael S. Terrien (ARDC #6211556) (admitted *pro hac vice*)
Melissa H. Hinds (ARDC #6288246) (admitted *pro hac vice*)
Jenner & Block LLP
353 North Clark
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484
csteege@jenner.com
mterrien@jenner.com
mhinds@jenner.com

-and-

Mark MacDonald (Tex. Bar. No. 12758300)
MacDonald + MacDonald, P.C.
9938 Ontario
Dallas, Texas  75220
Telephone: (214) 922-9050
Facsimile: (214) 351-0640
mark@macdonaldlaw.com

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PILGRIM'S PRIDE CORPORATION, *et al.*, | ) | Case No. 08-45664 (DML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**AMENDED OBJECTION OF BLACK HORSE CAPITAL MANAGEMENT LLC
TO THE DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION
<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

Black Horse Capital Management LLC as manager for Black Horse Capital LP, Black Horse Capital (QP) LP and Black Horse Capital Master Fund Ltd. (collectively "Black Horse"), owners of over 3,000,000 shares of Pilgrim's Pride Corporation ("PPC") common stock and holders of PPC 8 3/8% Senior Subordinated Notes, hereby files this Amended Objection to The Debtors' Amended Joint Plan of Reorganization (as Modified) Under Chapter 11 Of The

Bankruptcy Code (the "Plan"). In support of this Amended Objection, Black Horse states as follows:

## INTRODUCTION

On September 17, 2009, the Debtors filed their proposed joint plan of reorganization (as subsequently amended, the "Plan") and corresponding disclosure statement (as subsequently amended, the "Disclosure Statement"). Confirmation of the Plan should be denied because the Plan is not proposed in good faith and is not fair and equitable to holders of PPC common stock, the only class of claims or interests impaired under the Plan. In addition, the Plan contains releases for third parties that are prohibited under controlling law in this Circuit.

The crux of the Plan is a proposal to enter into a Stock Purchase Agreement with JBS USA Holdings, Inc. ("JBS," and, as referred to in the Plan, the "Plan Sponsor"). Pursuant to that Agreement, JBS will purchase 64% of the "New PPC Common Stock" in exchange for a cash contribution of $800 million (*See* Plan §§ 5.6, 5.7), and existing holders of equity interests in PPC will receive the remaining 36% of the New PPC Common Stock. The primary problem with the arrangement is that the 36% of New PPC Common Stock issued to existing shareholders is subject to a "Mandatory Exchange Transaction" (*Id.* §§ 4.10, 5.8) that is rife with both incentive and opportunity for manipulation by JBS, and essentially devoid of protections for existing holders of PPC equity interests.

The Mandatory Exchange Transaction compels existing holders of PPC common stock to exchange the New PPC Common Stock they are to receive under the Plan for JBS USA Common Stock at an "Exchange Offer Ratio" based on the relative trading prices of the two issues, but it permits JBS to

- set the date on which the Exchange Offer Ratio is determined within a two year window (Plan, Ex. C. § 8.2), in its sole discretion -- which will presumably result in the

2

ratio being fixed as of a date that will minimize the dilution of JBS USA Common Stock resulting from the Mandatory Exchange Transaction, and therefore minimize the recovery of existing holders of PPC common stock;

● set the date on which the Exchange Offer Ratio is determined as early as six days from the *first* filings of the first quarterly reports for PPC and the Plan Sponsor (Plan, Ex. C. § 8.2) thereby permitting the Exchange Offer Ratio to be determined (i) based on a New PPC Common Stock trading price that may be set in the pink sheets, rather than on a major market such as the NYSE or NASDAQ, (*See* Form 10-K, p. 35, attached as Ex. A) (ii) without permitting time for New PPC Common Stock to establish the following among shareholders or analysts that is necessary for a meaningful market price to be established, (iii) while the overhang of the recent bankruptcy of the Debtors continues to weigh on the New PPC Common Stock, and (iv) before new Pilgrim's Pride has an opportunity to establish a track record of financial performance; or

● in the unlikely event that New PPC Common Stock is quickly able to establish a trading price that fairly reflects the value of 36% of new Pilgrim's Pride, there is nothing in the Plan or its supporting documents prohibiting JBS from simply skipping the Mandatory Exchange Transaction altogether.

Incredibly, by agreeing to the Mandatory Exchange Transaction on these terms, the Debtors and the equity committee have truly sold the shareholders out to JBS such that from JBS's perspective, it's a classic question of "heads I win, tails you lose." What looks to the naked eye like retaining a 36% interest in the business will almost certainly result in the pre-ordained stripping from existing shareholders of much of the value to which they should be entitled. Post-Mandatory Exchange Transaction, JBS will own 100% of new Pilgrim's Pride, and existing holders of PPC common stock will likely own far less than 36% of JBS.

In effect, JBS is buying the business. It is just using the "two step" mechanism as a cloak to do so without paying existing stockholders a fair value for their equity. And it is doing so unsupported by a meaningful test of the market, or even a fairness opinion. Moreover while run of the mill shareholders will likely be left with little, insider shareholders, on whose votes it appears confirmation of the Plan will depend, are benefitting by continued employment, generous compensation packages, and broad releases of the shareholder claims brought against

3

them. Further, there may be tax benefits that insiders may realize by virtue of the fact that they are entitled to delay the Mandatory Exchange Transaction's implementation as to their own shares for six months.

Such a plan is neither proposed in good faith, nor fair and equitable, as required by Sections 1129(a) and (b) of the Bankruptcy Code. The Mandatory Exchange Transaction subjects the equity holders to -- if they're lucky -- substantial and unjustifiable risk, and more likely to the virtual certainty that they will not receive a meaningful recovery. It will instead produce a windfall for the Plan Sponsor. It also benefits the insider shareholders by providing them with benefits that other shareholders will not receive. Moreover the releases themselves are simply not permissible under controlling law in this Circuit, and thus if the releases remain part of the Plan, confirmation of the Plan should be denied for that reason alone. Each of these reasons provides a compelling and sufficient basis for this Court to deny confirmation of the Plan. For these reasons, and as further set forth below, Black Horse respectfully requests that the Court deny confirmation of the Debtors' Plan.

## ARGUMENT

Congress has made clear the Court's duty with respect to confirmation: "The court shall confirm a plan only if *all* of the following requirements are met…" 11 U.S.C. § 1129(a) (emphasis added). The Court has a mandatory and independent duty to ensure that the Plan complies with all of the requirements of 11 U.S.C. § 1129. *In re MCorp Financial Inc.*, 137 B.R. 219, 255 (Bankr. S.D. Tex. 1992). That is true with respect to the requirements of 11 U.S.C. § 1129(a) in all cases, and Black Horse believes it will be true with respect to those of § 1129(b) in

4

this case.[1] *In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1897), *aff'd* 80 B.R. 448 (N.D. Ill. 1987); *In re Landscaping Serv., Inc.*, 39 B.R. 588, 590-91 (Bankr. E.D.N.C. 1984). The Debtors' failure to meet any one of the requirements of Section 1129(a) or (b) mandates that the Court deny confirmation. *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434, 441-42 (1999). Moreover, the Debtors bear the burden of proving that their Plan satisfies each and every element of 11 U.S.C. § 1129(a) by a preponderance of the evidence. *In re Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165 (5th Cir. 1993). In addition, assuming that class 10(a) does not accept the Plan pursuant to Section 1126(d), the Debtors also have the burden of proving, by a preponderance of the evidence, that the Plan meets the requirements of 11 U.S.C. § 1129(b). *Id.*

### A. The Debtors' Plan Has Not Been Proposed in Good Faith.

The Court may not confirm the Plan unless it finds that the Plan has been proposed in good faith and not by any means forbidden by law. While good faith in the chapter 11 plan process is not defined by the Code, in considering the good faith of a plan, "the court's inquiry must include a consideration of all facts and circumstances surrounding the plan to determine if the plan will 'fairly achieve a result consistent with the Bankruptcy Code.'" *In re Landing Assoc.,* 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). The Fifth Circuit has adopted a two-part standard for determining if a plan has been proposed in good faith; the plan must be proposed with a

---

[1] Black Horse is filing herewith a Motion to Designate the votes of Pilgrim's Pride insiders who would receive substantial consideration under the Plan that is greater than and different in character from the consideration proposed to be provided to ordinary shareholders such as Black Horse. As of the filing of this Objection, the vote totals are not known. Black Horse is informed and believes that if the insider votes are not considered, Class 10(a) will not be an accepting class and the Debtors will be required to satisfy the requirements of Section 1129(b) as to that class of interests. To preserve its objections, Black Horse has set forth its arguments about why the Plan does not comply with Section 1129(b).

'legitimate and honest purpose to reorganize and [have] a reasonable hope of success.'" *Id.* at 811-12 (quoting *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir. 1985). If good faith is contested, as it is here, the debtor has the burden of proof and the standard of proof is the preponderance of evidence. *In re Barnes,* 309 B.R. 888, 892 (Bankr. N.D. Tex. 2004) (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 802 (5th Cir. 1997).

Given these important policies of bankruptcy law, courts must carefully scrutinize a debtor's plan to determine whether it is fundamentally fair in the manner in which it deals with creditors. *Madison Hotel*, 749 F.2d at 425. Such scrutiny requires not only that the terms of the plan be considered, but also that the plan be viewed in light of the totality of the circumstances surrounding its proposal. *Id.*; *accord Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op, Inc.),* 150 F.3d 503, 519 (5th Cir. 1998), *cert. denied* 526 U.S. 1144 (1999). "In evaluating the totality of circumstances surrounding a plan a court has 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (quoting *In re American Family Enter.*, 256 B.R. 377, 401 (D. N.J. 2000); *In re New Valley Corp.*, 168 B.R. 73, 80-81 (Bankr. D.N.J. 1994)).

The Debtor's Plan has not been proposed in good faith because its practical effect will be to squeeze out existing shareholders, likely for little, if any, value. By forming an equity committee and negotiating a Plan that -- at first blush -- leaves substantial equity for existing common shareholders, the Debtors have effectively conceded that this is the rare Chapter 11 case where equity is substantially "in the money." But they have accepted a Mandatory Exchange Transaction as part of the Plan that is a poisoned pill. With it, the Plan gives with one hand but

allows JBS to take with the other. Once blessed by this Court, JBS has neither the obligation nor the incentive to treat the existing PPC shareholders fairly in the Mandatory Exchange Transaction. Indeed, it arguably has a fiduciary obligation to its own shareholders to manipulate the Mandatory Exchange Transaction for their benefit, and to the detriment of the existing PPC shareholders. The only beneficiaries of this arrangement are JBS as purchaser, and the insiders who, while shareholders, have interests separate and apart from those of non-insider shareholders. Existing non-insider shareholders are left to the mercies of JBS's charity. Imposing that risk on PPC's in-the-money existing non-insider shareholders simply cannot be said to be "good faith" particularly in light of the many benefits insider shareholders have received to obtain their support of the Plan. Thus, for the same reason that insider votes should not be counted here, as set forth in the Motion to Designate, the Plan is not proposed in good faith.

The terms of the Plan are not fundamentally fair in the manner in which they deal with the equity holders. Their recovery is placed squarely in the cross-hairs of the understandable self-interest of JBS. But if the equity holders are entitled to a recovery, they are entitled to a recovery that is more than a chimera, a recovery that is not subject to the risk -- indeed the likelihood -- that it will vanish as quickly as it appeared. Thus, the totality of the circumstances demonstrate that the Plan was not proposed in good faith and therefore should not be confirmed.

**B.    The Debtors' Plan Does Not Satisfy Section 1129(b) with Respect To Interests in Class 10(a).**

Assuming that Class 10(a), the only impaired class under the Plan, rejects the Plan, the Debtors will not be able to cram down the Plan because the Plan is not fair and equitable. Under section 1129(b), the Debtors may only cram down the Plan over Black Horse's objection if the Plan is fair and equitable. While section 1129(b)(2)(C) sets forth a minimum standard for what

7

qualifies as fair and equitable to a class of interests, the minimum standards prescribed therein are not intended to exclude other considerations of what is fair and equitable. The plain language of section 1129(b)(2) so states: "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class *includes* the following requirements. . ." (emphasis supplied). *See Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1352 (5th Cir. 1989) (Section 1129(b) sets "minimal standards that a plan must meet, and does not require that 'every plan not prohibited be approved.'") (quoting *D&F Constr., Inc.,* 865 F.2d 673, 675 (5th Cir. 1989); *Bank of New York Trust Company v. Official Unsecured Creditors' Committee (In re The Pacific Lumber Co.),* 584 F.3d 229, 245 (5th Cir. 2009) (Even a plan compliant with the "alternative minimum standards is not necessarily fair and equitable.").

The requirement that a plan be "fair and equitable" incorporates a corollary of the absolute priority rule that a senior class cannot receive more than full compensation for its claims. *See MCorp Financial,* 137 B.R. at 235; *In re Granite Broadcasting Corp.,* 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007); *In re Exide Technologies,* 303 B.R. 48, 61 (Bankr. D. Del. 2003). In applying the fair and equitable standard contained in section 1129(b), "[i]f former shareholders' interests are impaired and a class of creditors is provided for more than in full, the plan will not be confirmed." *MCorp Financial,* 137 B.R. at 235. In *MCorp Financial,* the court held that the plan could not be confirmed where the plan established no upper limit on the amount that junior creditors could receive, while providing no payment to equity holders. *Id.* The court noted that "[r]elatively simple plan language allocating to equity holders any excess from this asset above 100% of principle…for Junior Creditors would have eliminated this problem." *Id.* In this case, although no creditor will receive more than full compensation, all

8

creditors will receive payment in full, and equity is "in the money." Although the Plan provides for equity to receive stock in New PPC, such value can be easily stripped pursuant to the Mandatory Exchange Transaction. As such, JBS, rather than equity holders, will receive any excess value. This is a violation of section 1129(b) and the absolute priority rule incorporated therein. *See Granite Broadcasting,* 369 B.R. at 140 ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, *and that excess value must be allocated to junior classes of debt or equity, as the case may be.*") (emphasis added).

As an example of JBS taking excess value which rightfully belongs to the existing in-the-money equity holders, PPC has applied for a tax refund of $162 million, a fact disclosed in the recent 10-K but not the Disclosure Statement. (Form 10-K, p. 175, attached as Ex. A). This refund is based upon a recent change in the tax laws and would result in value of $2.19 per share. Because the basis of the tax refund originates prior to the Transactions, the refund is property of the estate and should benefit the shareholders. Under the terms of the Transactions, however, if allowed in full, a substantial portion, if not all, of the $162 million tax refund will enure to the benefit of the Plan Sponsor as a windfall. Existing in-the-money shareholders interests in this refund may be further diluted if the Mandatory Exchange Transaction occurs before it is received.

The Mandatory Exchange Transaction unnecessarily creates for equity holders the risk -- even the likelihood -- that their recoveries in this case will be illusory. The Mandatory Exchange Transaction may take place as early as six days from the *first* filings of the first quarterly reports for PPC and the Plan Sponsor (Plan, Ex. C. § 8.2), which could be very soon after the Debtors emerge from bankruptcy. Because the Exchange Offer Ratio, which determines the number of JBS shares to be received by existing equity holders, will be based upon the relationship between

9

the trading prices of the New PPC Common Stock and the JBS USA Common Stock, how the Debtor's New PPC Common Stock is valued upon emergence is critical. The Plan Sponsor will have an obvious interest in effecting the Mandatory Exchange Transaction at a time that minimizes the JBS USA Common Stock that must be exchanged for the New PPC Common Stock, and the Mandatory Exchange Transaction as structured will provide JBS with neither an obligation nor an incentive to do anything other than minimize the JBS USA Common Stock ultimately distributed to existing PPC equity holders. Indeed, JBS can manipulate the timing of the Mandatory Exchange Transaction to suit its purposes at will.

JBS need not wait until new Pilgrim's Pride has had an opportunity to develop a financial track record, or until New PPC Common Stock has developed a following among shareholders or analysts. JBS need not wait until New PPC Common Stock is out of the shadow of this bankruptcy proceeding. JBS need not even wait until New PPC Common Stock is trading in a liquid major market, as opposed to in the pink sheets as a penny stock. JBS can effect the Mandatory Exchange Transaction virtually any time it likes, at a time it perceives as most advantageous to JBS. And in the ultimate trump card, in the unlikely event that New PPC Common Stock overcomes the obstacles and quickly begins to trade at something approaching its fair value, JBS need not effect the Mandatory Exchange Transaction at all. Heads I win, tails you lose. As equity holders, the holders of Class 10(a) interests obviously have to bear some risk. That is what equity does. But the Mandatory Exchange Transaction fundamentally warps the risk/reward relationship that is inherent in equity. JBS has set itself up with the right to fix the price it will pay -- post-confirmation -- for any upside in New PPC Common Stock, while leaving existing equity with unlimited downside. That is neither fair nor equitable to "in the money" shareholders of a chapter 11 debtor.

The Debtors essentially acknowledge what they are doing in their most recent 10-K, filed November 23, 2009. They note that the holders of new Pilgrim's Pride's common stock "will bear the full risk of a decline in the market price of Reorganized PPC's common stock." (10-K, p.32, attached as Ex. A). Indeed, the 10-K goes on to recognize that the market price of the JBS USA Common Stock itself may even adversely affect the market price for New PPC's common stock. As explained in the 10-K:

> If JBS USA completes an initial public offering of its common stock prior to the expiration of the deadline for their exercise of the Mandatory Exchange Transaction, the market price of the JBS USA common stock may influence the market price of the common stock of Reorganized PPC. For example, the market price of the Reorganized PPC's common stock could become more volatile and could be depressed by (a) lack of trading activity in the Reorganized PPC's common stock as a result of investors' anticipation of JBS USA's potential exercise of the Mandatory Exchange Transaction, (b) possible sales by holders of Reorganized PPC's common stock who do not wish to receive shares of JBS USA common stock, and (c) hedging or arbitrage trading activity that may develop involving Reorganized PPC's common stock and JBS USA common stock.

(*Id.*). In addition, the "issuance of a significant amount of JBS USA common stock would dilute the shares of JBS USA common stock acquired by holders of Reorganized PPC's common stock pursuant to the Mandatory Exchange Transaction and could depress the trading price of the JBS USA common stock." (*Id.*, p. 33). Holders of Reorganized PPC's common stock will bear the full risk of a decline in the market price of Reorganized PPC's common stock, and "such decline could be substantial." (*Id.*, p. 32). This risk is even worse than that described by the Debtors because under the terms of the Mandatory Exchange Transaction, JBS will have every right -- and indeed perhaps an obligation to its shareholders -- to effect the exchange at a time that provides maximum benefit to JBS and maximum detriment to existing holders of PPC equity. While existing in-the-money equity is stuck bearing all this risk, JBS has the right, likely by acting quickly, to largely cap any upside existing equity might obtain by implementing the exchange at an exchange ratio that is artificially depressed. There is no reason to subject the

11

equity holders to such risk to the benefit of JBS. *In re EFH Grove Tower Assoc.,* 105 B.R. 310, 314 (Bankr. E.D.N.C. 1989) ("The costs of the debtor's reorganization should be borne by those who stand to gain from the reorganization.").

### C. The Plan Fails to Comply with Section 1129(a)(1) Because It Contains Non-Consensual Non-Debtor Releases.

The Plan provides for broad, third-party releases by the debtors and holders of claims and interests to parties including the present and former directors and officers, lenders, and Plan Sponsor from any negligence that arose from the operation of the business of the Debtors or that occurred during the course of the bankruptcy. (*See* Plan §§ 10.8, 10.9). Section 10.8 of the Plan states that all persons, not only those that have agreed to grant releases, are enjoined from pursuing all claims and causes of action against the debtors, reorganized debtors, and non-debtors. Specifically, Section 10.8 provides:

> *each holder of a Claim or an Equity Interest that votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Equity Interest that does not vote to accept the Plan*, shall release and discharge unconditionally and forever each of (a) the Debtors and the Reorganized Debtors, (b) the Chief Restructuring Officer, (c) the Committees, (d) the agents and lenders under the Prepetition BMO Credit Agreement, (e) the agents and lenders under to the Prepetition CoBank Credit Agreement, and (f) the agents and lenders under the DIP Credit Agreement, (g) Pilgrim Interests, Ltd. (solely in its capacity as guarantor under the Guarantee Agreements), (h) the Plan Sponsor, and (i) the present and former directors, officers, employees, affiliates, agents, financial advisors, investment bankers, attorneys, and representatives of each of the foregoing… from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors…the transaction giving rise to, the Claim or Equity Interest of such holder…or any act, omission, occurrence, or event in any manner related to such subject matter…or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder.

(Plan, § 10.8) (emphasis added). Pursuant to section 524(e), "discharge of a debt of the debtor does not affect the liability of any other entity, or the property of any other entity for, such debt."

12

11 U.S.C. § 524(e). The Fifth Circuit has held that section 524(e) releases only the debtor, not co-liable third parties. *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (citing *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993)).

In *Pacific Lumber*, the Fifth Circuit evaluated a confirmed plan, which included unauthorized third-party release and exculpation provisions that released, among other parties, the Debtor's and plan sponsor's officers and directors and Plan committees. (*Id.* at 251) The court noted that nothing in the record suggested that the Debtor's or plan sponsor's officers or directors were jointly liable for the Debtor's pre-petition debt as they were not guarantors. (*Id.* at 252). With the exception of the releases for the committees, the court struck, as invalid, the non-debtor releases and held that the "essential function of the exculpation clause…[was] to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy."[2] (*Id.* at 252-53). The court further stated that under § 524(e), the "fresh start" that Chapter 11 provides to debtors was not intended to serve that purpose. (*Id.*). Similarly, in this case, the Plan seeks to release from negligence, not only the Debtor's and Plan Sponsor's officers and directors, but also agents and lenders affiliated with them. (*See* Plan § 10.8). As the Fifth Circuit commented in *Pacific Lumber*, in a variety of contexts, Fifth Circuit law seems to "broadly foreclose non-consensual non-debtor releases…" (*Id.* at 252).

Therefore, based on applicable Fifth Circuit and other law, the Plan cannot be confirmed with non-consensual non-debtor releases. *See Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 760 (5th Cir. 1995) (holding that nondebtor releases violated Section 524(e) of the

---

[2] The *Pacific Lumber* court noted that 11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties. Further, the scope of protection, does not insulate them from willfulness and gross negligence.

13

Bankruptcy Code); *In re Wool Growers Central Storage Co.,* 371 B.R. 768, 778 (Bankr. N.D. Tex. 2007) (holding that nonconsensual third-party release prevented court from confirming plan); *In re Steiner Pianos USA, Inc.,* 292 B.R. 109, 116 (Bankr. N.D. Tex. 2002) (holding that a plan that releases a nondebtor could not be confirmed over creditor objections); *see also Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1351 (5th Cir. 1989) (noting that "the Bankruptcy Code cannot operate to release nondebtor guarantors"). Thus, the Plan, in providing broad non-Debtor third-party releases fails to comply with section 1129(a)(1) and cannot be confirmed.

### D. The Plan Fails to Comply With Section 1129(a)(5)(B).

Section 1129(a)(5)(B) requires that the Debtors disclose the identity of any insider that will be employed or retained post-confirmation and the nature of such insider's compensation. To the extent that the Debtors fail to disclose such information prior to confirmation, Black Horse reserves the right to argue that the Plan cannot be confirmed for failing to meet the requirements of section 1129(a)(5)(B).

## CONCLUSION

For all of the foregoing reasons, Black Horse respectfully requests that this Court deny approval of the Debtors' Plan and grant such other relief as this Court deems just.

Dated: December 1, 2009                    Respectfully submitted,

**BLACK HORSE CAPITAL MANAGEMENT LLC**


By: */s/ Catherine L. Steege*
       One of its Attorneys


Catherine L. Steege (ARDC #06183529)
(admitted *pro hac vice*)
Michael S. Terrien (ARDC #6211556)
(admitted *pro hac vice*)
Melissa H. Hinds (ARDC #6288246) (admitted *pro hac vice*)
Jenner & Block LLP
353 North Clark Street
Chicago, IL 60654
Telephone: (312) 222-9350
Facsimile: (312) 527-0484
csteege@jenner.com
mterrien@jenner.com
mhinds@jenner.com

-and-

Mark MacDonald (Tex. Bar. No. 12758300)
MacDonald + MacDonald, P.C.
9938 Ontario
Dallas, Texas 75220
Telephone: (214) 922-9050
Facsimile: (214) 351-0640
mark@macdonaldlaw.com