U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed October 28, 2010**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, *et. al.* | § | |
| | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the court are *Debtors' Objection to the Texas Comptroller's Proofs of Claims Numbered 1196, 3805, and 5128*, docket no. 2491 (the "POC 5128 Objection") and *Debtors' Objection to the Office of the Attorney General's Claim—Claim Number 1603*, docket no. 5091 (the "POC 1603 Objection," and, with the POC 5128 Objection, the "Objections") filed by Pilgrim's Pride Corporation ("PPC"), PFS Distribution Company, PPC Transportation Company, To-Ricos, Ltd., To-Ricos Distribution, Ltd.,

1

Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd. (collectively, "Debtors"). The court held a hearing on the Objections on August 3, 2010, at which time Debtors and the Texas Comptroller of Public Accounts (the "Comptroller") presented oral argument.

The Objections are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion and order constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

I.  BACKGROUND

Debtors are large chicken integrators with operations in the United States, Puerto Rico, and Mexico. Debtors each commenced a voluntary chapter 11 case in this court on December 1, 2008. The court consolidated these chapter 11 cases for joint administration pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

In accordance with the operation of their business, Debtors conduct various activities off-road that require the use of diesel-powered vehicles. Debtors also transport their products by refrigerated trucks.

Chapter 162 of the TEXAS TAX CODE provides for taxation of purchases of diesel fuel. Section 162.204(a), however, provides tax exemptions for some uses of diesel fuel, including diesel fuel used in the off-road vehicle of an entity holding a "dyed diesel fuel bonded user" license,[1] and dyed diesel fuel used in the fuel tank of a refrigeration unit.[2] The non-taxable fuel is dyed for identification purposes.

---

[1] *See* TEX. TAX CODE §§ 162.204(a)(8). For section 162.204(a)(8) to apply, a "supplier" must deliver the dyed diesel fuel into the "bulk storage facility" of a "dyed diesel fuel bonded user." These terms are explained below.

[2] *See* TEX. TAX CODE §§ 162.204(a)(11). For section 162.204(a)(11) to apply, a "license holder" must deliver dyed diesel fuel into the fuel supply tank of a refrigeration unit. These terms are explained below.

2

PPC purchases dyed diesel fuel to run refrigeration units in its delivery trucks. Debtors contend that the majority of dyed diesel fuel purchased by PPC between November 11, 2004 and June 30, 2008 was used to run these refrigeration units. *See* POC 5128 Objection at 4. The record does not include documentation supporting this assertion. Debtors also state that PPC uses dyed diesel fuel in off-road equipment operated on farms run by PPC.

As discussed below, under chapter 162 of the TEXAS TAX CODE, a person must obtain a license as a "dyed diesel fuel bonded user" (a "Bonded User") to purchase more than 10,000 gallons per month of dyed diesel fuel. Chapter 162 requires this regardless of whether or not any purchases in excess of 10,000 gallons per month are taxable transactions.[3] Neither party disputes that PPC was not licensed as a Bonded User between November 11, 2004 and June 30, 2008.[4]

The Comptroller commenced a diesel fuel tax audit (the "Audit") of PPC in June 2008. On February 27, 2009, the Comptroller filed a proof of claim, assigned number 1196, asserting a priority claim in the amount of $1,163,191.70 ("POC 1196") for diesel fuel taxes and interest allegedly incurred by PPC between November 11, 2004 and June 30, 2008 (the "Audit Period").[5] The Office of the Attorney General, Bankruptcy Collections Division (the "OAG"), thereafter filed a proof of claim asserting an

---

[3] *See* section 162.206(d). Though section 162.206(d) states that any gallons purchased in excess of the 10,000 gallons per month limit constitute a "taxable purchase or sale," as explained below, section 162.204(a) prescribes a list of exemptions whereby a person may exceed the 10,000 gallons per month limit without incurring tax liability.

[4] PPC is now a Bonded User.

[5] Strictly speaking, the auditor investigated PPC's diesel fuel purchases for the period from November 1, 2004 to June 30, 2008. The Comptroller only assessed taxes for the period from November 11, 2004 to June 30, 2008. For sake of simplicity, the court refers to the period from November 11, 2004 to June 30, 2008 as the Audit Period.

3

unliquidated general unsecured claim ("POC 1603") for penalties assessed under TEXAS TAX CODE § 162.402 based on the diesel fuel taxes and interest allegedly incurred and unpaid by PPC during the Audit Period.

Subsequently, on May 27, 2009, the Comptroller filed proof of claim number 3805 asserting a priority claim for $1,205,606.69 ("POC 3805") amending POC 1196. On June 1, 2009, the Comptroller filed proof of claim number 5128 asserting a priority claim in the amount of $1,205,606.69 ("POC 5128") amending POC 3805.

On April 29, 2009, the court entered an *Agreed Scheduling Order on Texas Comptroller's Motion for Relief from Automatic Stay*, docket no. 1625, whereby Debtors and the Comptroller agreed that Debtors would file any objections to POC 1196 (and, consequently, POC 5128) by June 29, 2009. Debtors timely filed the POC 5128 Objection on June 29, 2009. The Comptroller then filed *Texas Comptroller's Response to Debtor's Objection to Claim 5128*, docket no. 2565, on July 8, 2009 (the "POC 5128 Response"). The court will consider the POC 5128 Objection on the merits. Debtors timely filed the POC 1603 Objection on May 13, 2010. The OAG filed its *Response to Debtors' Objection to Claim No. 1603*, docket no. 5178, on May 25, 2010 (the "POC 1603 Response"). For reasons explained below, the court declines at this time to reach the issue of whether Debtors owe tax penalties under section 162.402 as alleged in the POC 1603 Objection .

## II. DISCUSSION

### A. POC 5128

Debtors object to POC 5128 on two grounds. First, Debtors assert that PPC's use of dyed diesel fuel in PPC's delivery trucks for refrigeration purposes is non-taxable

4

under chapter 162 of the TEXAS TAX CODE regardless of whether or not Debtors held a license as a Bonded User. Second, Debtors argue that PPC's use of dyed diesel fuel in off-road vehicles is non-taxable since PPC could have obtained a license as a Bonded User and, once PPC became a Bonded User, could have purchased dyed diesel fuel tax-free in unlimited quantities. The mere failure of PPC to obtain this license, argue Debtors, did not deprive the state of Texas of any tax revenues to which it was entitled. Moreover, Debtors contend that even if taxes are owed as a result of PPC's failure to obtain a license as a Bonded User, the Comptroller must assess those taxes against and collect them from PPC's suppliers, not PPC.

For reasons discussed below, the parties are instructed to stipulate to facts relevant to the issue of PPC's use of dyed diesel fuel for refrigeration purposes. If the parties cannot stipulate to all relevant facts, they may contact the court to set an evidentiary hearing. The court finds Debtors' arguments regarding PPC's use of dyed diesel fuel in off-road vehicles to be without merit.

**1. Chapter 162 of the TEXAS TAX CODE**

The court must interpret chapter 162, subchapter C of the TEXAS TAX CODE to adjudicate Debtors' arguments in the POC 5128 Objection. Section 162.206(b) provides:

> A sale of dyed diesel fuel may be made without collecting [the applicable tax] if the purchaser furnishes to a licensed supplier or distributor a signed statement, including an end user number issued by the comptroller, that stipulates that:
> (1) all of the dyed diesel fuel purchased on the signed statement will be consumed by the purchaser and will not be resold; and
> (2) none of the dyed diesel fuel purchased on the signed statement will be delivered or permitted to be delivered into the fuel supply tank of a motor vehicle operated on the public highways of this state.

5

Section 162.206 thus allows a purchaser to obtain dyed diesel fuel tax-free by providing a licensed supplier or distributor a signed statement and end user number. Section 162.206(c), however, limits the amount of dyed diesel fuel a purchaser may purchase tax-free using this method. Section 162.206(c) provides:

> A person may not make a tax-free purchase and a licensed supplier or distributor may not make a tax-free sale to a purchaser of any dyed diesel fuel under this section using a signed statement for the first sale or purchase and for any subsequent sale or purchase in a calendar month for more than:
>
> (1) 10,000 gallons of dyed diesel fuel . . . .[6]

Section 162.206(d) provides that a sale to a purchaser of dyed diesel fuel in excess of 10,000 gallons per month constitutes a taxable purchase or sale. Section 162.206(d) also requires a person purchasing more than 10,000 gallons per month of dyed diesel fuel to obtain a license as a Bonded User. A Bonded User must post a bond with the comptroller as required by section 162.212(b) to obtain this license. Additionally, section 162.216(l) requires a Bonded User to keep various records of its dyed diesel fuel use.

Notwithstanding section 162.206, section 162.204(a) provides instances in which a person is excused from paying tax on purchases in excess of the 10,000 gallons per month limitation. Two of these instances are potentially relevant to this case. First, section 162.204(a)(8) states that the tax imposed on diesel fuel purchases under subchapter C does not apply to "dyed diesel fuel sold or delivered into the bulk storage[7]

---

[6] Section 162.206(c) allows a user to purchase up to 25,000 gallons per month of dyed diesel fuel tax-free in two situations not applicable here. Section 162.206(c)(2) prescribes a 25,000 gallons per month limit when "the purchaser stipulates in the signed statement that all of the fuel will be consumed by the purchaser in the original production of, or to increase the production of, oil or gas and furnishes the licensed supplier or distributor with a letter of exception issued by the comptroller . . . ." Section 162.206(c)(3) prescribes a 25,000 gallons per month limit "if the purchaser stipulates in the signed statement that all of the fuel will be consumed by the purchaser in agricultural off-highway equipment."

[7] "Bulk storage" is defined as a container of more than 10 gallons. *See* TEX. TAX CODE § 162.001(10-a).

facility of a [Bonded User] . . . ."[8] By its plain language, section 162.204(a)(8) requires the recipient of this dyed diesel fuel to hold a Bonded User license.

Second, section 162.204(a)(11) provides that "[t]he tax imposed by [subchapter C of chapter 162] does not apply to: . . . dyed diesel fuel delivered by a license holder into the fuel supply tanks of . . . refrigeration units . . . ." Though the language of section 162.204(a)(8) plainly exempts from taxation only a fuel purchase by—or delivery to—a Bonded User,[9] section 162.204(a)(11) includes no such limitation. Rather, section 162.204(a)(11) exempts from taxation dyed diesel fuel delivered by a "license holder" for use in refrigeration units. A "license holder" is defined in section 162.001 as "a person licensed by the comptroller under section . . . 162.205 . . . ." Section 162.205(a) requires a person to obtain the appropriate license before conducting the activities of a supplier, distributor, or Bonded User. The plain language of section 162.204(a)(11) thus exempts from taxation dyed diesel fuel delivered by a supplier or distributor for use in refrigeration units regardless of whether the person operating the refrigeration unit (and so purchasing and using the dyed diesel fuel) has obtained any type of license from the comptroller, provided the supplier or distributor *actually delivers* the dyed diesel fuel into the fuel tank of the refrigeration unit.[10] Should a *purchaser* deliver the dyed diesel fuel

---

[8] The Comptroller's "Motor Fuels Audit Procedures Manual — Chapter 162, Chapter 11: Bonded User" (the "Comptroller Manual") explains the unlimited exemption for licensed dyed diesel fuel bonded users in considerable detail. *See* Comptroller Manual at 110 ("A bonded user license authorizes a user to purchase dyed diesel fuel tax-free for non-highway use from licensed suppliers and distributors. There are no single load or monthly limitations on the quantity of dyed diesel fuel that can be purchased.").

[9] Section 162.204(a)(8) also exempts from taxation a purchase by a person providing a signed statement as provided in 162.206. This exemption, however, only underscores the language in section 162.206(b) and (c) allowing a person to purchase up to 10,000 gallons of dyed diesel fuel per month tax-free using a signed statement and end user number.

[10] The Comptroller Manual supports this reading of section 162.204(a)(11). *See* Comptroller Manual at 104 ("Licensed suppliers and distributors can make deliveries of tax-free dyed diesel fuel into the fuel supply tanks of . . . refrigeration units."). Debtors cite a statement from page 110 of the Comptroller

7

*itself* into the fuel tank, however, section 162.204(a)(11)'s plain language requires the purchaser to have obtained a license as a Bonded User to qualify for the tax exemption afforded deliveries by a "license holder" under this section.

### 2. Dyed diesel fuel used in PPC's refrigeration units

Debtors assert that the majority of dyed diesel fuel on which the Comptroller assessed tax was used in the refrigeration units of PPC's reefer delivery trucks. *See* POC 5128 Objection at 4. Debtors argue that this use of dyed diesel fuel is nontaxable, presumably relying on the argument that section 162.204(a)(11)'s exemption applies.

The Comptroller does not address whether a user of dyed diesel fuel may take advantage of section 162.204(a)(11) regardless of whether the user holds a Bonded User license. Instead, the Comptroller responds that PPC is presumed to have used dyed diesel fuel for taxable purposes under section 162.012(a). *See* POC 5128 Response at 5-6. Section 162.012(a) provides:

> A person *licensed under this chapter or required to be licensed under this chapter*, or other user, who fails to *keep a record*, issue an invoice, or file a return or report *required by this chapter* is presumed to have sold or used for taxable purposes all motor fuel shown by an audit by the comptroller to have been sold to the license holder or other user.

> (emphasis added).

---

Manual—"[t]he tax-free use of dyed diesel by any *bonded user* includes the delivery into the fuel supply tanks of refrigeration units . . . ."—as supporting the proposition that dyed diesel fuel is tax-free when used for refrigeration purposes, regardless of whether the user is a licensed dyed diesel fuel bonded user. *See* POC 5128 Objection at 4 (emphasis added). This statement cannot mean what Debtors contend, as the inclusion of the term "bonded user" plainly makes this statement applicable only to use by licensed dyed diesel fuel bonded users. The plain language of section 162.204(a)(11) and page 104 of the Comptroller Manual make clear that an unlicensed user enjoys a tax exemption when the dyed diesel fuel is delivered into a refrigeration unit by a licensed supplier or distributor. The Comptroller does not quarrel with Debtors' position on this issue, instead focusing on Debtors' alleged absence of adequate records detailing Debtors' use of dyed diesel fuel in refrigeration units, discussed below.

8

The Comptroller argues that PPC, when asked to provide records during the Audit of non-taxable use of dyed diesel fuel, admitted it had not maintained records of the volumes of dyed diesel fuel taken from bulk storage and put into truck refrigeration units. *Id.* at 6. The Comptroller contends that PPC was required to maintain these records pursuant to section 162.216(l)(4). Section 162.216(l)(4) requires a Bonded User to keep records showing the number of gallons of "dyed and undyed diesel fuel used in off-highway equipment or for other nonhighway purposes . . . ." The Comptroller argues that, as a person purchasing dyed diesel fuel in excess of the 10,000 gallons per month limit, PPC was required under section 162.206(d) to obtain a license as a Bonded User. Therefore, reasons the Comptroller, if PPC failed to keep records of dyed diesel fuel put into truck refrigeration units, PPC violated section 162.012(a) by failing to keep a record required by chapter 162. And because PPC violated section 162.012(a), argues the Comptroller, PPC is "presumed [under that section] 'to have sold or used for taxable purposes'" all dyed diesel fuel shown by the Audit to have been sold to PPC. *Id.* at 5 (quoting TEX. TAX CODE § 162.012(a)). Accordingly, the Comptroller asserts, any dyed diesel fuel used in refrigeration units by PPC is subject to tax by the Comptroller.

The court cannot determine from the record whether Debtors owe tax on dyed diesel fuel used in the refrigeration units of PPC's delivery trucks.[11] It is not apparent from the record whether PPC itself delivered dyed diesel fuel into refrigeration units, or whether a licensed supplier or licensed distributor did so. If the latter is true, any

---

[11] The court need not consider the possible argument that the record keeping requirement applies only to Bonded Users. To adopt a construction of the statute that would favor a party like PPC, which failed to comply with the state's licensing requirements, over a complying taxpayer, would be so patently absurd as to not pass the "red face" test. On the other hand, if a Bonded User delivered dyed diesel fuel into PPC's refrigeration units, the records of that Bonded User would satisfy the statutory requirement for exemption from the tax.

9

deliveries would be non-taxable under section 162.204(a)(11). If the former is true, the deliveries would be taxable, since PPC was not a Bonded User during the Audit Period, and therefore would not fall under the term "license holder" in section 162.204(a)(11).

The court also cannot tell whether PPC or its suppliers kept records of its use of dyed diesel fuel for nonhighway purposes in accordance with section 162.216(l)(4). If PPC failed to do so, then PPC failed to comply with section 162.012(a) and is presumed to have used for taxable purposes all dyed diesel fuel shown by the Audit to have been sold to PPC. This result would obtain even if PPC's purchases are otherwise non-taxable under section 162.204(a)(11).

Because the record does not provide sufficient facts to determine whether Debtors owe tax on dyed diesel fuel used in the refrigeration units of PPC's delivery trucks, the parties are instructed to stipulate to any facts which may be relevant to determining this issue. If the parties cannot agree on all relevant facts, they should contact the calendar clerk of the court to set an evidentiary hearing.[12]

### 3. Dyed diesel fuel used by PPC in off-road vehicles

Debtors make two arguments as to why the court should determine PPC's use of dyed diesel fuel in off-road vehicles to be non-taxable. First, Debtors note that "[t]he Comptroller cannot dispute the fact that if PPC had been a [Bonded User]" during the Audit Period, all purchases of dyed diesel fuel during that period "would have been tax-free pursuant to [section 162.204(a)(8)]." POC 5128 Objection at 5. Therefore, "the State of Texas has not been deprived of any tax revenue associated with PPC's purchase of [dyed diesel fuel used in off-road vehicles]." *Id.*

---

[12] If the parties agree that no records of use exist, the court's conclusion that the dyed diesel fuel was subject to tax would obtain.

Debtors point to no authority, and the court has found none, supporting the proposition that a person may avoid taxes levied on unlicensed purchases simply because the purchaser could have, but did not, acquire the proper license. Section 162.206(d) expressly required PPC to become a Bonded User when PPC purchased over 10,000 gallons of dyed diesel fuel in a single month. The mere fact that PPC could have become a Bonded User had it exercised proper diligence does not excuse tax liability under any provision of chapter 162.

Debtors alternatively contend that, even if PPC's unlicensed purchases of dyed diesel fuel in excess of 10,000 gallons per month are taxable transactions, the Comptroller must collect this tax not from Debtors but rather from the suppliers from whom PPC purchased the dyed diesel fuel. According to Debtors, the plain language of section 162.201 does not require a purchaser to remit the diesel fuel tax to the Comptroller. Therefore, Debtors reason, any tax owed by PPC should be assessed against "the suppliers from whom PPC purchased such diesel fuel." *Id.*

Section 162.201 provides:

(a) A tax is imposed on the removal of diesel fuel from the terminal using the terminal rack other than by bulk transfer. *The supplier or permissive supplier is liable for and shall collect the tax imposed by this subchapter from the person who orders the withdrawal at the terminal rack.*

(b) A tax is imposed at the time diesel fuel is imported into this state, other than by a bulk transfer, for delivery to a destination in this state. *The supplier or permissive supplier is liable for and shall collect the tax imposed by this subchapter from the person who imports the diesel fuel into this state. If the seller is not a supplier or permissive supplier, the person who imports the diesel fuel into this state is liable for and shall pay the tax.*

(c) A tax is imposed on the removal of diesel fuel from the bulk transfer/terminal system in this state. *The supplier is liable for and shall collect the tax imposed by this subchapter from the person who orders the removal from the bulk transfer/terminal system.*

11

. . . .

(emphasis added).[13]

Debtors contend that "PPC does not fall under any of the[] categories of persons who have to remit diesel fuel taxes to the State of Texas," since section 162.201

---

[13] The following terms appearing in section 162.201 are defined as follows:

Section 162.001(58) defines "terminal" as "a motor fuel storage and distribution facility to which a terminal control number has been assigned by the Internal Revenue Service, to which motor fuel is supplied by pipeline or marine vessel, and from which motor fuel may be removed at a rack."

Section 162.001(50) defines "rack" as "a mechanism for delivering motor fuel from a refinery, terminal, marine vessel, or bulk plant into a transport vehicle, railroad tank car, or other means of transfer that is outside the bulk transfer/terminal system."

Section 162.001(11) defines "bulk transfer" as "a transfer of motor fuel from one location to another by pipeline or marine movement within a bulk transfer/terminal system, including:

(A) a marine vessel movement of motor fuel from a refinery or terminal to a terminal;

(B) a pipeline movement of motor fuel from a refinery or terminal to a terminal;

(C) a book transfer or in-tank transfer of motor fuel within a terminal between licensed suppliers before completion of removal across the rack; and

(D) a two-party exchange between licensed suppliers or between licensed suppliers and permissive suppliers."

Section 162.001(12) defines "bulk transfer/terminal system" as "the motor fuel distribution system consisting of refineries, pipelines, marine vessels, and IRS-approved terminals. Motor fuel is in the bulk transfer/terminal system if the motor fuel is in a refinery, a pipeline, a terminal, or a marine vessel transporting motor fuel to a refinery or terminal. Motor fuel is not in the bulk transfer/terminal system if the motor fuel is in a motor fuel storage facility, including:

(A) a bulk plant that is not part of a refinery or terminal;

(B) the motor fuel supply tank of an engine or a motor vehicle;

(C) a marine vessel transporting motor fuel to a motor fuel storage facility that is not in the bulk transfer/terminal system; or

(D) a tank car, railcar, trailer, truck, or other equipment suitable for ground transportation."

expressly provides that a "supplier" or "permissive supplier" is liable for and must collect any tax owed to the state.  *Id.* at 7.  Debtors make two arguments supporting this position.

First, Debtors argue that the Comptroller does not have an implied power to impose tax directly on Debtors, since section 162.201's statutory scheme expressly provides for suppliers or permissive suppliers to collect the tax.  Debtors cite two Texas Courts of Appeal cases, *Denton County Electric Cooperative v. Public Utility Commission of Texas*, 818 S.W.2d 490 (Tex. App.—Texarkana 1991, writ denied), and *ASAP Paging Inc. v. Public Utility Commission of Texas*, 213 S.W.3d 380 (Tex. App.—Austin 2006, pet. denied), both of which interpret the Texas Public Utility Regulatory Act, for the proposition that "an implied power does not exist [under Texas law] when a statutory scheme expressly delegates and prescribes a specific method of enforcement." *Id.* at 8.  Debtors also cite *Sharp v. Morton Buildings, Inc.*, 953 S.W.2d 300 (Tex. App.—Austin 1997, pet. denied), arguing that tax imposition statutes must be strictly construed against the taxing authority in Texas.  Debtors conclude from these precedents that "[t]he Comptroller's attempt to expand on the enforcement scheme devised by the legislature . . . violates this well established rule of statutory construction."  *Id.* at 9.

The Comptroller responds by analogizing collection of motor fuel taxes to collection of sales-and-use taxes.  Both taxes are a type of transaction tax, argues the Comptroller, as opposed to a tax assessed against a party.  *See* POC 5128 Response at 9.  Because Texas law clearly allows the Comptroller to assess a sales-and-use tax against a purchaser when the seller fails to remit the tax to the state,[14] the Comptroller contends it

---

[14] The Comptroller cites several cases for this proposition, including *Bullock v. Delta Industrial Construction Co.*, 668 S.W.2d 502 (Tex. App.—Austin 1991, no writ), *Bullock v. Foley Brothers Dry Goods Corp.*, 802 S.W.2d 835 (Tex. App.—Austin 1991, writ denied), *Davis v. State*, 904 S.W.2d 946

13

should be able to do the same to a purchaser of dyed diesel fuel. *Id.* at 8-9. Furthermore, notes the Comptroller, section 162.201 states that "[a] tax is imposed on the removal of diesel fuel from the terminal using the terminal rack . . ."—in other words, on a transaction. *Id.* at 11.

Debtors respond that section 151.515 of the TEXAS TAX CODE, a provision applicable to sales tax, allows the Comptroller to proceed against a consumer for an amount of tax that the consumer should have paid but did not. Debtors argue that the Texas legislature knows when it wants to provide the Comptroller with an express power to collect a tax directly from a purchaser. As the legislature did so in section 151.515 but did not do so in section 162.201, Debtors argue, the court should not read an implied power for the Comptroller to do so into section 162.201.[15] *See* POC 5128 Objection at 11.

Debtors' second argument in support of their position that the Comptroller may only pursue PPC's suppliers for taxes owed by PPC is that the Texas legislature made a conscious decision in 2003 to "move[] the imposition and collection of diesel fuel tax up the supply chain from the distributor level 'to the point where fuel is removed from the terminal rack'" in order to "increase the efficiency of tax collection 'by reducing the number of persons who remit the tax to the comptroller's office from the current 2,000 plus to fewer than 100.'" *Id.* at 5-6 (quoting Fiscal Note, Tex. H.B. 2458, 78th Leg., R.S.

---

(Tex. App.—Austin 1995, no writ), and *Malcuit v. Texas (In re Malcuit)*, 134 B.R. 185 (N.D. Tex. 1991), a case relying on *Davis*.

[15] Debtors point to section 151.103 as an example of a tax which, "if not collected by the retailer is owed by the purchaser." POC 5128 Objection at 11. Debtors' assertions notwithstanding, nothing in section 151.103's language suggests that a purchaser owes tax to anyone but the seller. Moreover, section 151.103 is almost identical to section 151.052(a), the section at issue in *Davis*, where the court ruled that "[w]hile sellers have a legal duty to collect sales taxes from purchasers, both sellers and purchasers are liable to the state for sales taxes." *Davis*, 904 S.W.2d at 952.

14

(2003); Senate Finance Comm., Bill Analysis, Tex. H.B. 2458, 78th Leg., R.S. (2003)). According to Debtors, the legislature intended the current statutory scheme to allow the Comptroller to pursue only sellers like PPC's suppliers, since it was the suppliers' "responsibility . . . to comply with the requirements of the tax . . . ." *Id.* at 12.

Debtors' arguments are not persuasive. To begin, nothing in chapter 162 suggests that the Texas legislature intended anyone other than the purchaser of taxable dyed diesel fuel to be the ultimate payor of the tax. Debtors' argument—that the Comptroller must proceed against a supplier who fails to collect tax from a purchaser, rather than the purchaser itself—contravenes the very purpose of chapter 162, as expressed in its language. Section 162.201(g) makes clear which party the legislature intended to bear responsibility for any tax assessed under chapter 162: "In each subsequent sale of diesel fuel on which the tax has been paid, the amount of the tax shall be added to the selling price *so that the tax is paid ultimately by the person using or consuming the diesel fuel*" (emphasis added). *See also* TEX. TAX CODE § 162.2025(a) ("In each subsequent sale of diesel fuel on which the tax has been paid, the tax imposed by this subchapter *shall be collected from the purchaser* so that the tax is paid ultimately by the person who uses the diesel fuel.") (emphasis added). The court cannot believe that, in drafting such language, the Texas legislature intended to have PPC, as ultimate consumer of dyed diesel fuel, either pay tax at point of sale or escape liability if it failed to do so. To read the statute to such effect would reward the purchaser that, by deception, persuades its supplier that it falls within one of the exemptions from the tax.

As noted by the Comptroller, Texas case law has plainly held that the Comptroller may collect a sales-and-use tax from a purchaser even when the statutory scheme

15

provides for the seller to remit the tax to the state in the usual transaction. Chapter 162 obviously imposes a transaction tax on the buyer for purchases of dyed diesel fuel based on the amount of dyed diesel fuel purchased. Section 162.202 provides that "[t]he diesel fuel tax rate is 20 cents for each net gallon or fractional part on which the tax is imposed under Section 162.201." Section 162.206(c)(1) limits a purchaser of dyed diesel fuel to 10,000 gallons per month tax-free, unless the purchaser becomes a Bonded User and qualifies for an exemption under section 162.204(a). Section 162.206(c-1) states that "[t]he monthly limitations prescribed by [section 162.206(c)] apply regardless of whether the dyed diesel fuel is purchased *in a single transaction during that month or in multiple transactions during that month*" (emphasis added). Chapter 162's tax simply cannot be characterized as anything other than a transaction tax.

Debtors' argument that the Comptroller may only proceed against a purchaser under an express statutory power, as opposed to an implied power, while appealing at first glance, ultimately fails to support Debtors' position. Debtors cite no case involving a transaction tax in which a court has held that a tax may be assessed only under an express statutory power. Rather, Debtors cite cases interpreting the Public Utility Regulatory Act, a statute which has no bearing on the case at hand. The court simply cannot, based on such inapposite authority, ignore case law holding that a transaction tax may be assessed against a purchaser, regardless of the collection method imposed by the statutory scheme.[16]

---

[16] *See, e.g.*, *Davis*, 904 S.W.2d at 952: "While sellers have a legal duty to collect sales taxes from purchasers, both sellers and purchasers are liable to the state for sales taxes . . . . [Under section 151.052 of the Texas Tax Code] the economic burden of the tax is on the purchaser: the sales tax will either be collected by the seller from the purchaser under the state's authority and then remitted to the state; or, if the seller fails to bill the purchaser, the tax will be collected directly by the state from either the seller or purchaser."

16

Nor is Debtors' inverse comparison of sections 151.515 and 162.201 persuasive. Debtors do not fully quote section 151.515, which states that "[chapter 151] *does not prohibit* the comptroller from proceeding against a consumer for an amount of tax that the consumer should have paid but failed to pay" (emphasis added). The mere fact that chapter 151 does not prohibit the Comptroller from collecting a tax directly from a consumer does not, by negative implication, mean that chapter 162 does prohibit the Comptroller from directly pursuing a purchaser who failed to pay fuel taxes.

The court finds it difficult to believe that, in attempting during the 2003 legislative session to make collecting motor fuels taxes more efficient, the Texas legislature intended to relieve a purchaser from liability which ultimately rests squarely on the purchaser's shoulders merely because the purchaser failed to tender tax to the seller. Indeed, that a purchaser could avoid paying a transaction tax for which it is ultimately responsible by shifting liability to its suppliers via a statutory argument supported by no relevant case law would be, in a word, inequitable. Presumably, a purchaser could exceed the 10,000 gallons per month limit through transactions with multiple sellers and a particular seller would have no way of knowing its purchaser has exceeded the exemption limit and so it should collect the tax. To read the statute in a fashion where only that seller—as opposed to the purchaser who should have paid the tax—could be pursued by the Comptroller would be to follow a path leading to an absurd result, and so to violate a basic rule of statutory construction. *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the

17

courts—*at least where the disposition required by the text is not absurd*—is to enforce it according to its terms.") (internal citations omitted) (emphasis added). In the case at bar, where the statute may as easily be read to avoid motivating a Bonded User to evade payment of tax through tricking its seller, it is clear the court must prefer and adopt that reading.

The court therefore concludes that Debtors have no valid objection to the Comptroller's imposition of taxes under chapter 162 as a result of PPC's unlicensed purchases of over 10,000 gallons per month of dyed diesel fuel for use in PPC's off-road vehicles. The POC 5128 Objection is overruled to the extent it relates to taxes imposed on PPC's purchases of dyed diesel fuel used in off-road vehicles. The parties are instructed to determine the amount of tax owed by Debtors as a result of PPC's purchases of dyed diesel fuel for use in off-road vehicles.

**2. POC 1603**

In the POC 1603 Response, the OAG asserts that Debtors owe civil penalties under sections 162.402(12) and (13). Section 162.402(12) provides for a civil penalty of not less than $25 and not more than $200 if a person "fails or refuses to comply with or violates a provision of [chapter 162]." Section 162.402(13) provides for a civil penalty of not less than $25 and not more than $200 if a person "fails or refuses to comply with or violates a comptroller's rule for administering or enforcing [chapter 162]."

As the court has now overruled the POC 5128 Objection in part, it is possible Debtors may be liable for civil penalties under sections 162.402(12) and (13).[17] To date, however, the OAG's claim remains unliquidated. The court cannot determine the amount

---

[17] The OAG asserts that Debtors are liable under sections 162.402(12) and (13) regardless of whether POC 5128 is allowed. POC 1603 Objection at 2. Because the court declines to decide the POC 1603 Objection on the merits at the present time, the court also declines to address the OAG's assertion in this opinion.

18

of any civil penalties owed by Debtors as it is unclear from the record how many of PPC's transactions failed to comply with a provision of chapter 162 or a comptroller's rule for enforcing chapter 162. It is not clear from section 162.402 what the amount of any civil penalties should be, as sections 162.402(12) and (13) both provide for a minimum penalty of $25 and a maximum penalty of $200, presumably for each violation. The court therefore declines to reach the issue of whether Debtors owe civil penalties under sections 162.402(12) and (13). The parties are instructed to stipulate if they are able to the amount of civil penalties Debtors owe under sections 162.402(12) and (13), if any. If the parties cannot agree on an amount, they are instructed to contact the calendar clerk of the court to schedule an evidentiary hearing.

### III.   CONCLUSION

For the foregoing reasons, the court concludes that the parties should stipulate to any facts relevant to Debtors' alleged tax liability for purchases of dyed diesel fuel used in the refrigeration units of PPC's delivery trucks. If the parties cannot agree on the relevant facts they should contact the court to set the matter for evidentiary hearing. The portion of the POC 5128 Objection objecting to taxes imposed by the Comptroller on purchases of dyed diesel fuel used by PPC in off-road vehicles is overruled. The parties are instructed to stipulate if they are able to the amount of Debtors' tax liability for purchases of dyed diesel fuel used in off-road vehicles, and to the amount of civil penalties, if any, owed by Debtors under sections 162.402(12) and (13). If the parties cannot agree, they are directed to set an evidentiary hearing.

IT IS SO ORDERED.

### # # # END OF MEMORANDUM OPINION # # #