Teresa Wineland (Ark. Bar No. 81168) (pro hac vice)
Peter G. Kumpe (Ark. Bar No. 72073) (pro hac vice)
Williams & Anderson PLC
111 Center St., Suite 2200
Little Rock, AR 72201
Tel.: 501-372-0800
Fax: 501-372-6453

H. Clay Fulcher (Ark. Bar No. 88005) (pro hac vice)
James G. Lingle (Ark. Bar No. 76070) (pro hac vice)
Lingle Law Firm
110 S. Dixieland Road
Rogers, AR 72758
Tel.: 479-636-7899
Fax: 479-636-0095

Josephine Garrett (State Bar No. 07695400)
Josephine Garrett, P.C.
3119 West 5th Street
Fort Worth, TX 76107
Tel.: 817-335-5432
Fax: 817-338-1122

Attorneys for Certain Arkansas, Georgia, North Carolina and Alabama Growers

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re | § | **Chapter 11** |
| | § | **Case No. 08-45664 (DML)** |
| **PILGRIM'S PRIDE CORPORATION et al.,** | § | **Jointly Administered** |
| | § | |
| Debtors. | § | |

## APPENDIX IN SUPPORT OF NORTH CAROLINA CLAIMANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST REORGANIZED DEBTORS FOR VIOLATIONS OF THE PACKERS & STOCKYARDS ACT AND THE NORTH CAROLINA DECEPTIVE TRADE PRACTICES ACT
[Relates to Docket Nos. 4462, 4463, 4632, 4633]

| EXHIBIT | DOCUMENTS | APPENDIX PAGE NO(s). |
|---|---|---|
| 1 | 03/12/2008 PPC Letter regarding Siler City | 001 |
| 2 | "August 2008 Ranking" | 002-019 |
| 3A | 11/03/2008 Hulsey Email to Stroud re: Sanford Rankings  "Confidential, submitted under seal" | 020 |

| | | |
|---|---|---|
| 3B | Rankings and Averages<br><br>"Confidential, submitted under seal" | 021-134 |
| 3C | Rankings and Averages<br><br>"Confidential, submitted under seal" | 135-137 |
| 4 | "September 2008 Ranking"<br><br>"Confidential, submitted under seal" | 138-156 |
| 5 | Osterhaus "September 2008 Ranking"<br><br>"Confidential, submitted under seal" | 157-175 |
| 6 | Termination Letter 10/17/2008 | 176 |
| 7 | Terminated Grower List<br><br>"Confidential, submitted under seal" | 177-180 |
| 8 | 11/05/2008 Email | 181 |
| 9 | FOIA File | 182-225 |
| 10 | "Large Male Bird Ranking"<br><br>"Confidential, submitted under seal" | 226-233 |
| 11 | "Large Male Bird" Data<br><br>"Confidential, submitted under seal" | 234-285 |
| 12 | Hulsey Email<br><br>"Confidential, submitted under seal" | 286-356 |
| 13 | Order with Declarations | 357-369 |
| 14 | Letter Brief | 370-375 |
| 15 | "Sanford Performance.xlsx"<br><br>"Confidential, submitted under seal" | 376-395 |
| 16 | 08/07/2009 Kotcher Email to Wineland | 396 |
| 17 | 08/07/2009 Wineland Email to Kotcher | 397-398 |

| | | |
|---|---|---|
| 18 | 08/10/2009 Kotcher Email to Wineland | 399 |
| 19 | 08/10/2009 Fulcher Email to Kotcher | 400 |
| 20 | 08/10/2009 Fulcher Email to Kotcher | 401 |
| 21 | 08/18/2009 Second Set of Discovery to PPC, Request 22 | 402-406 |
| 22 | 08/12/2009 Hulsey Email<br><br>"Confidential, submitted under seal" | 407 |
| 23 | 11/13/2009 Parker Letter | 408-409 |
| 24 | 12/09/2009 Kumpe Letter | 410-411 |
| 25 | 12/16/2009 Kotcher Letter | 412-413 |
| 26 | Large Male Bird Grower List<br><br>"Confidential, submitted under seal" | 414-416 |
| 27 | Hulsey Deposition Portions (09/2010) | 417-445 |
| 28 | Stroud Deposition I Portions (Live Oak 03/2009) | 446-450 |
| 29 | Stroud Deposition III Portions (11/2010) | 451-454 |
| 30 | Craven Deposition (11/2010) | 455-457 |
| 31 | Robinette Deposition (12/01/2010) (To be supplemented upon receipt) | 458-Unknown |

# App. Ex. 1

Grower Copy



March 12, 2008

Dear Siler City and Sanford Complex Growers:

In response to the crisis facing the U.S. chicken industry from soaring feed ingredient costs, Pilgrim's Pride today announced plans to close the Siler City chicken processing plant, the Staley feed mill and hatchery, and six distribution centers. A copy of the press release is attached.

Our current plans are to redirect some of Siler City's live production operations to supply the Marshville, N.C., complex where additional housing is needed. The remaining Siler City growers will be used to supply the Sanford plant, which will result in increased downtime for these growers and the current Sanford growers. We are currently developing a plan to compensate growers for this extended downtime, and we hope to be able to fully utilize all of our current growout capacity in our North Carolina operations as industry conditions improve. Your service technician will be providing you with the details of this plan soon and will discuss the changes in production that will occur due to the complex closure.

The decision to close a facility is always very difficult, and we regret that such action is necessary. In order to reach this decision, we conducted a company-wide review of our operations and carefully evaluated a number of options. We believe the actions announced today are absolutely necessary to position Pilgrim's Pride as a stronger, more efficient competitor in our industry.

The complex closure will eliminate the jobs of approximately 830 employees at the Siler City plant and Staley feed mill and hatchery. The plant's final day of operation will be between May 23 and June 6, 2008, and the feed mill and hatchery will close earlier, between May 12 and 25, 2008. Pilgrims Pride will be offering employees transition programs to assist them in securing new employment and filing for benefits such as unemployment and COBRA, where applicable.

We know this action creates uncertainty, but we ask for your patience and support as we create a fair and workable plan to ensure that you will continue to be a viable part of Pilgrim's Pride's operations. If you have any immediate questions that your service technician cannot answer, please contact Dale Hulsey, field operations manager, at 919-774-7333.

Sincerely,

J. Clinton Rivers
President and Chief Executive Officer

EXHIBIT
1

4845 US HWY 271 NORTH • PITTSBURG, TEXAS • 75686
PHONE: (903) 434-1000

PPC-LIN 010662

# App. Ex. 2

Farm #, Week Ending, Farm Name — a livestock/broiler performance data table with columns including: Farm #, Week Ending, Farm Name, Bird Type, Avg. Cost, Pay/Lb, Avg. Age, Avg. Wt., Feed Conv., %Livab., %Cond., Wt. Gain, Placed, Head Sold, Condemn'd Lbs, Lbs Marketed, Total lbs for Settlement, Plant Performance, Total Cost, Avg Cost.

| Farm # | West Entry | Farm Name | Bird Type | Avg Cost | Pay / Lb | Avg Age | Avg Wt | Feed Conv | %Loss | %Comm | Wt Gain | Placed | Head Sold | Company Lbs Inc. Mortality | Total Ibs. for Settlement | Peak Performance | Total Cost | Avg Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Farm # | Week Ending | Farm Name | Bird Type | Avg Cost | Pry / Lb | Avg Age | Avg Wt | Feed Conv | %Cond | Wk Gain | Placed | Head Sold | Condemn Lbs | Lbs Marketed | Total Bs To Settlement | Flock Performance | Total Cost | Avg Cost

| Farm # | Grow Ending | Farm Name | Bird Type | Avg Cost | Pay Lb | Avg Age | Avg Wt | Feed Conv | %Condb | SqCond | Wt Gain | Placed | Head Sold | Condemn Lb Sold | Total lbs. to Settlement | Pack Performance -0.# 666667 | Total Cost | Avg Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Table of farm production/settlement data (rotated landscape). Column headers, left to right:

| Farm # | Week Ending / Farm Name | Beef Type | Avg Cost Pay / Lb. | Avg Age | Avg Wt | Feed Conv lb:lb | % Calves | Wt. Gain | Thread | Head Sold | Total No for Settlement | Total for Settlement | Pork Performance | Total Cost | Avg Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Farm# | Week Ending | Farm Name | Bird Type | Avg Cost | Pay/Lb. | Age Avg. | Avg Wt. | Feed Conv. | %Yield | %Cond. | Wt. Gain | Placed | Head Sold | Condemn Lbs Marketed | Total Bo. for Settlement | Flock Performance | Total Cost | Avg Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX4C2007 | 12/15/07 | TONY CURRIN | 57 | 0.1621 | 4.2700 | 56 | 6.07 | 2.13 | 98.33 | 0.22 | 0.1185 | 120,000 | 99,801 | 602 | 631,960 | $131,560 | -12 | $118,904.64 | 0.1647 |
| EX4C2007 | 05/17/08 | TONY CURRIN | 57 | 0.1823 | 0.2535 | 57 | 5.96 | 2.14 | 98.98 | 0.21 | 0.1054 | 130,000 | 129,110 | 838 | 615,917 | 619,817 | -32 | $115,194.56 | 0.1128 |
| EX4C2007 | 09/19/08 | TONY CURRIN | 57 | 0.1659 | 0.0408 | 56 | 5.97 | 2.14 | 97.77 | 0.21 | 0.1041 | 128,000 | 128,263 | 526 | 743,753 | 743,750 | -108 | $137,728.25 | 0.1852 |
| EX4C2007 |  | TONY CURRIN Average | 57 | 0.1793 | 0.0461 | 56 | 5.99 | 2.080 | 98.12 | 0.22 | 0.1035 | 126,000 | 126,272 | 718 | 504,640 | 504,540 | -108 | $124,982.22 | 0.1850 |
| SAN312 | 01/28/08 | CURRIN FARMS | 57 | 0.1647 | 3.2700 | 55 | 6.40 | 2.13 | 99.33 | 0.22 | 0.1085 | 120,000 | 99,601 |  | $116,856.58 |  |  |  | 0.1847 |
| SAN312 | 04/06/08 | CURRIN FARMS | 57 | 0.1880 | 3.8400 | 57 | 6.40 | 2.10 | 96.40 | 0.24 | 0.0918 | 115,000 | 99,793 |  | $131,580.14 |  |  |  | 0.1128 |
| SAN312 | 06/17/08 | CURRIN FARMS | 57 | 0.1860 | 4.4600 | 55 | 6.49 | 2.21 | 97.73 | 0.27 | 0.1090 | 99,000 | 99,279 |  | $102,786.17 |  |  |  | 0.1890 |
| SAN312 | 11/11/08 | CURRIN FARMS | 57 | 0.1851 | 4.1700 | 54 | 5.94 | 2.22 | 95.53 | 0.25 | 0.1200 | 97,000 | 92,693 |  | $110,168.30 |  |  |  | 0.1751 |
| SAN312 | 01/28/07 | CURRIN FARMS | 57 | 0.1482 | 3.5700 | 55 | 5.96 | 2.14 | 98.56 | 0.24 | 0.1025 | 97,000 | 99,872 |  | $110,384.58 |  |  |  | 0.1851 |
| SAN312 | 05/19/07 | CURRIN FARMS | 57 | 0.1809 | 3.6200 | 55 | 6.37 | 2.14 | 97.66 | 0.20 | 0.1091 | 102,000 | 98,983 |  | $103,163.26 |  |  |  | 0.1788 |
| SAN312 | 08/18/07 | CURRIN FARMS | 57 | 0.1858 | 3.8400 | 55 | 5.90 | 2.14 | 97.24 | 0.24 | 0.1025 | 102,000 | 100,72 |  | $110,305.25 |  |  |  | 0.1829 |
| EX4C1032 | 03/10/07 | CURRIN FARMS | 57 | 0.1659 | 0.0456 | 55 | 5.56 | 2.11 | 97.36 | 0.20 | 0.1079 | 99,000 | 99,511 |  | $105,325.26 |  |  |  | 0.1659 |
| EX4C1032 | 06/16/07 | CURRIN FARMS | 57 | 0.1891 | 0.0514 | 55 | 5.40 | 2.11 | 97.86 | 0.29 | 0.0082 | 101,000 | 99,172 |  | $107,739.24 |  | -33 |  | 0.1889 |
| EX4C1032 | 09/14/07 | CURRIN FARMS | 57 | 0.1666 | 0.0514 | 56 | 5.61 | 2.14 | 97.99 | 0.27 | 0.1579 | 97,000 | 99,159 |  | $107,723.26 |  | -33 |  | 0.1692 |
| EX4C1032 | 12/15/07 | CURRIN FARMS | 57 | 0.1880 | 0.0506 | 56 | 5.77 | 2.11 | 95.00 | 0.37 | 0.1020 | 94,000 | 99,433 |  | $107,311.59 |  | -35 |  | 0.1891 |
| EX4C1032 | 05/19/07 | CURRIN FARMS | 57 | 0.1680 | 0.0600 | 55 | 5.77 | 2.12 | 98.00 | 0.31 | 0.1020 | 95,000 | 99,143 |  | $99,274.16 |  | -25 |  | 0.1820 |
| EX4C1032 | 08/18/07 | CURRIN FARMS | 57 | 0.1666 | 0.0550 | 53 | 5.40 | 2.720 | 99.47 | 0.32 | 0.1041 | 102,000 | 99,556 |  | $104,306.17 |  | -101 |  | 0.1629 |
| SAN289 | 01/28/08 | CURRIN FARMS | 57 | 0.1544 | 0.0600 | 53 | 5.06 | 2.720 | 98.00 | 0.35 | 0.1020 | 102,000 | 50,759 |  | $96,709.19 |  | -35 |  | 0.1844 |
| EX4C1032 |  | CURRIN FARMS Average | 57 | 0.1721 | 0.0543 | 55 | 6.02 | 2.13 | 97.19 | 0.35 | 0.1185 | 84,000 | 81,138 | 798 | 584,907.80 |  |  |  | 0.1721 |
| SAN289 | 01/28/08 | 4 N FARM | 57 | 0.1703 | 0.1700 | 55 | 6.49 | 1.978 | 99.00 | 0.40 | 0.1128 | 81,500 | 54,423 |  | $80,721.83 |  | -12 |  | 0.1703 |
| SAN289 | 05/24/08 | 4 N FARM | 57 | 0.1792 | 0.4500 | 56 | 6.56 | 2.071 | 96.53 | 0.27 | 0.1177 | 96,100 | 55,448 |  | $90,054.37 |  | -22 |  | 0.1792 |
| SAN289 | 06/21/08 | 4 N FARM | 57 | 0.2024 | 0.1750 | 56 | 5.71 | 2.025 | 96.36 | 0.29 | 0.1277 | 54,540 | 54,540 |  | $31973.93 |  | -44 |  | 0.2024 |
| EX4C2339 | 07/10/08 | 4 N FARM | 57 | 0.1830 | 0.0455 | 57 | 6.84 | 2.488 | 79.19 | 0.24 | 0.1022 | 95,700 | 55,119 |  | $79,367.99 |  | -24 |  | 0.1830 |
| EX4C2339 | 10/09/07 | 4 N FARM | 57 | 0.1734 | 0.0405 | 57 | 6.58 | 1.870 | 96.36 | 0.13 | 0.1029 | 55,700 | 55,619 |  | $80,529.71 |  | -64 |  | 0.1734 |
| EX4C2339 | 01/17/07 | 4 N FARM | 57 | 0.1734 | 0.1700 | 57 | 5.96 | 1.870 | 96.03 | 0.15 | 0.1168 | 55,700 | 54,834 |  | $80,527.79 |  | -64 |  | 0.1734 |
| EX4C2339 | 03/12/07 | 4 N FARM | 57 | 0.1747 | 0.0469 | 57 | 5.40 | 2.200 | 96.68 | 0.16 | 0.1167 | 55,300 | 55,326 |  | $96,673.61 |  | -6 |  | 0.1732 |
| EX4C2339 | 06/21/07 | 4 N FARM | 57 | 0.1742 | 0.0408 | 57 | 5.61 | 2.200 | 98.46 | 0.18 | 0.1142 | 96,500 | 56,719.14 |  | $56,719.04 |  | -25 |  | 0.1186 |
| EX4C2339 | 09/20/07 | 4 N FARM | 57 | 0.1797 | 0.0408 | 55 | 6.67 | 2.247 | 88.00 | 0.16 | 0.1183 | 96,500 | 55,378.17 |  | $96,479.17 |  | -45 |  | 0.1747 |
| SAN289 | 04/09/07 | 4 N FARM | 57 | 0.2196 | 0.1700 | 56 | 6.22 | 2.247 | 96.21 | 0.24 | 0.1142 | 21,403 | 21,403 |  | $27,425.09 |  | -22 |  | 0.2196 |
| SAN289 | 06/06/07 | 4 N FARM | 57 | 0.1747 | 0.1550 | 55 | 6.47 | 2.14 | 96.53 | 0.26 | 0.1142 | 55,700 | 54,553 |  | $67,911.72 |  | -48 |  | 0.1747 |
| EX4C2339 | 09/19/07 | 4 N FARM | 57 | 0.1837 | 0.0453 | 56 | 6.55 | 2.11 | 97.19 | 0.18 | 0.1138 | 51,500 | 291,008 | 387 | 401,634 | $55,865.12 | -66 | $55,865.12 | 0.1837 |
| EX4C2339 |  | 4 N FARM Average | 57 | 0.1757 | 0.0440 | 55 | 5.73 | 2.61 | 87.19 | 0.35 | 0.1198 | 84,000 | 55,773 | 654 | 491,006 | 379,851 | -95 | $58,907.80 | 0.1721 |
| SAN205 | 04/12/05 | SUNNYSIDE ACRES | 57 | 0.1119 | 0.0563 |  |  |  |  |  |  | 144,000 | 106,064 | 1509 | 832,561 |  | -323 | $170,357.83 | 0.1119 |
| EX4C2304 | 07/05/05 | SUNNYSIDE ACRES | 57 | 0.2071 | 0.0379 |  |  |  |  |  |  | 121,000 | 97,855 | 825 | 607,662 |  | -132 | $176,357.83 | 0.2071 |
|  |  | SUNNYSIDE ACRES Average | 57 | 0.2053 | 0.0319 |  |  |  |  |  |  |  |  |  |  |  |  |  | 0.1719 |
|  |  | Grand Average | 57 | 0.2071 |  |  |  |  |  |  |  |  |  |  |  |  | 0.7285708 | 0.2071 |

# App. Ex. 6

Sent via UPS Delivery
And via U.S. Mail

October 17, 2008

Dear Independent Contract Poultry Grower,

As you are aware, Pilgrim's Pride Corporation announced on or about March 12, 2008 that it was closing the Siler City chicken processing plant, the Staley feed mill and hatchery, and six distribution centers. Pilgrim's Pride took these steps in response to the crisis facing the U.S. chicken industry due to numerous economic factors including, but not limited to, soaring feed ingredient costs.

After closing the Siler City plant, increased downtime between flocks resulted and Pilgrim's Pride developed and implemented a plan to compensate you for the extended downtime.

Since the closure of the Siler complex, the economic environment has worsened. The global banking system is financially strained, which has resulted in a severe credit crunch for companies, including Pilgrim's Pride. Also, Pilgrim's Pride's total feed-ingredient costs in the third quarter of the 2008 fiscal year climbed $266 million, or 41 percent when compared to the same period a year ago. Based on the actual costs incurred during the first three quarters of this fiscal year and the current commodity futures markets for the remaining quarter of this fiscal year, the Company's total feed-ingredient costs for fiscal 2008 will likely be up an estimated $900 million from last fiscal year. These high feed costs, coupled with such other factors as lower market prices for chicken, have resulted in the Company suffering a net loss from continuing operations of $193.0 million during the first three quarters of fiscal 2008.

Pilgrim's Pride is doing everything within its control to manage through this difficult operating environment. This includes making tough decisions, such as closing the Siler Complex, idling the Clinton, Arkansas complex and a processing plant in Bossier City, Louisiana, consolidating our tray-pack business from our El Dorado, Arkansas facility into six other case-ready plants, and reducing our chicken production throughout the remainder of our operations.

Given these adverse economic conditions, Pilgrim's Pride has decided to terminate the broiler production agreements for those growers in your complex who rank at or below the bottom thirty percent. As you know, grower rankings represent a growers' efficiency in raising broilers.

Your poultry farm performed in the bottom thirty percent. Accordingly, Pilgrim's Pride hereby notifies you that it will exercise its right to terminate your broiler production agreement for economic necessity, pursuant to Paragraph D of your broiler production agreement. Pilgrim's Pride will terminate your broiler production agreement after the settlement of the flock placed on your farm on or before Monday, October 20, 2008.

We are saddened that these uncontrollable economic circumstances made it an economic necessity to terminate your broiler production agreement. We wish you and yours the very best in the future.

Sincerely,

*Robert A. Wright*

Robert A. Wright
Chief Operating Officer

Pilgrim's Pride Corporation
World Headquarters Park
P.O. Box 93
4845 US Highway 271 North
Pittsburg, Texas 75686-0093
903 434 1000
Web: www.pilgrimspride.com

EXHIBIT
6

# App. Ex. 8

Rollins, John A

From:
Sent:             Randy.Stroud@pilgrimspride.com
To:               Wednesday, November 05, 2008 12:29 PM
Cc:               Rollins, John A
                  ▓▓▓▓@pilgrimspride.com; ▓▓▓▓@pilgrimspride.com;   5(C)(552(b)(6)
                  ▓▓▓▓@BAKERNET.com
Attachments:      Copy of HOUSE CLASS - CUT 10-20-08.xls; Copy of Sanford rankings 106 908.xls

Follow Up Flag:   Follow up
Flag Status:      Flagged

John,

Attached you will find the grower ranking list for Sanford. The growers that were terminated are highlighted in yellow and are at the bottom of the list. The grower settlements included in the ranking being Jan '06 and end with the most recent settlements. The numbers shown to the right are the averages. In this case positive is good and negative is bad. I am sure you will have questions. Probably best if you call ▓▓▓▓ for explanations since he put the sheet together. Also attached is a copy of house class of growers terminated. I think he is working on getting this together for all growers. You had asked for grower rankings by month. We do not have extended periods by month but we do have recaps of all growers that settle in a month if you want that.

The worksheet is not straight out of ▓▓▓ because we had to put info together out of two systems. Please call or e-mail if you have questions.
Thanks,

5(SC.552(b)(4)

Randy Stroud
Senior Vice President Technical Services
Pilgrim's Pride Corporation
WHQ Park Pittsburg, Texas
Office 903-434-1433
▓▓▓▓▓
Fax 972-290-8982

5(SC.552 (b)(6

********************************************************************************
********** The information contained in this e-mail (along with any attachments) is intended only for the use of the individual(s) to whom it is addressed. It is confidential and may contain privileged information. If the reader of this message is not the intended recipient, you are hereby notified that you should not read its contents, and any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received it in error, please immediately (1) delete this transmission and any attachments and (2) notify info@pilgrimspride.com to advise us of the error. THIS E-MAIL IS NOT AN OFFER OR ACCEPTANCE: Notwithstanding the Uniform Electronic Transactions Act or any other law of similar import, absent an express statement to the contrary contained in this e-mail, neither this e-mail nor any attachments are an offer or acceptance to enter into a contract, and are not intended to bind the sender, Pilgrim's Pride Corporation, or any of its subsidiaries, or any other person or entity.
********************************

EXHIBIT
8

9

# App. Ex. 9

# LINGLE LAW FIRM
ATTORNEYS AT LAW
110 S. DIXIELAND
ROGERS, ARKANSAS 72758
TEL: (479) 636-7899
FAX: (479) 636-0095

JAMES G. LINGLE, P.A.
BARBARA E. LINGLE (of COUNSEL)
ABIGAIL F. KEATON

www.linglelaw.com

RICHARD HEDAK, D.D.S.
H. CLAY FULCHER, P.C. *
* LL.M. in Agricultural Law
Also licensed in Wyoming

E-mail: lawyers@linglelaw.com

August 10, 2009

*Via Electronic Mail*

Ms. Joanne C. Peterson
GIPSA FOIA Officer
U.S. Department of Agriculture
Grain Inspection, Packers and Stockyards Administration
Stop 3642
1400 Independence Ave., SW
Washington, DC 20250-3642

Re:    FOIA Request for Pilgrim's Pride

Dear Ms. Peterson:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, please consider this a formal request for the following public documents.

Specifically, I request access to the following records for purposes of inspection and copying:

Any and all files, records and documents, including but not limited to visits, compliance reviews and investigations, memoranda, discussions, correspondence, concerning Pilgrim Pride's termination of approximately 30% of its growers in 2008 at the company's Sanford, North Carolina complex.

I ask that the copies be authenticated by your department for legal purposes.

In the event that Pilgrim's 2008 action at its Sanford complex remains under investigation, your prompt notification of that fact will be appreciated. Finally, I would appreciate an explanation of records being withheld because they are compiled for law enforcement purposes pursuant to 5 U.S.C. § 552(b)(7)(A), specifically whether such a designation means that the records can only be released once either law enforcement proceedings are completed or there is a determination that such proceedings are not warranted.

Should you have any questions with regard to this request, please contact me at the phone number given above. Your assistance in this matter is greatly appreciated.

Sincerely,

Clay Fulcher



EXHIBIT
9

*/*

 **USDA**  United States · Department of · Agriculture | Grain Inspection, · Packers and Stockyards · Administration | Stop 3642 · 1400 Independence Ave., SW · Washington, D.C. 20250-3642

Mr. Clay Fulcher
Lingle Law Firm
110 S. Dixieland
Rogers, Arkansas 72758

SEP 2 4 2009

Dear Mr. Fulcher:

This responds to your August 10 letter to the Grain Inspection, Packers and Stockyards Administration (GIPSA) requesting access under the Freedom of Information Act (FOIA) for "any and all files, records, and documents . . . concerning Pilgrim Pride's termination of approximately 30% of its growers in 2008 at the company's Sanford, North Carolina complex."

GIPSA located 29 pages of documents, which consist of electronic mail between GIPSA and Pilgrim's Pride officials, a growers' ranking list, and house class of growers terminated. GIPSA's release determination follows:

| Pages of documents | Release Determination | Exemption |
|---|---|---|
| 2 | Release in entirety | |
| 4 | Portions redacted | (b)(4) |
| 19 | Withhold in entirety | (b)(4) |
| 3 | Portions redacted | (b)(6) and (b)(4) |
| 1 | Portions redacted | (b)(6) |

- Exemption (b)(4) exemption permits the withholding of documents or portions of documents that contain commercial or financial information obtained from a person that is privileged or confidential. GIPSA is withholding in their entirety or is partially redacting Pilgrim's Pride business information that reflects the total number of poultry growers terminated, poultry growers' production history information, the names of poultry growers who are not your clients, the name of Pilgrim's Pride accounting system, and the name of their automated database system. The documents being withheld in their entirety or the information being released with portions redacted could reasonably be expected to cause substantial competitive harm to Pilgrim's Pride if released.

- Exemption (b)(6) permits the government to withhold information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." GIPSA is withholding individuals' personal home telephone numbers and their cell phone numbers and names of Pilgrim's Pride employees.

*7*

App. 183

Mr. Clay Fulcher

You are advised of your right to appeal my decision within 45 days from the date of this letter by writing to:

> J. Dudley Butler, Administrator
> Grain Inspection, Packers & Stockyards Administration, USDA
> 1400 Independence Avenue, S.W., STOP 3601
> Washington, D.C. 20250-3601

If you decide to appeal, please state with specificity your basis and clearly mark your letter and the envelope with the words "Freedom of Information Act Appeal".

Sincerely,

Joanne C. Peterson
GIPSA Freedom of Information Act Officer
202-720-8087

Enclosures

Rollins, John A

| From: | Randy.Stroud@pilgrimspride.com |
| Sent: | Tuesday, October 21, 2008 2:58 PM |
| To: | Rollins, John A |
| Attachments: | Siler City NC - Preliminary Letter to Growers (10 17 08).pdf |

Follow Up Flag: Follow up
Flag Status: Flagged

*5 USC. 552(b)(4)*

John,
This is the letter that was sent out to ● growers in Siler City/Sanford today. The growers were notified by phone today.
Thanks,

Randy Stroud
Senior Vice President Technical Services
Pilgrim's Pride Corporation
WHQ Park Pittsburg, Texas
Office 903-434-1433

Fax 972-290-8982

*5 USC. 552(b)(6)*

*********************************************************************************
********************* The information contained in this e-mail (along with any attachments) is intended only
for the use of the individual(s) to whom it is addressed. It is confidential and may contain privileged
information. If the reader of this message is not the intended recipient, you are hereby notified that you should
not read its contents, and any dissemination, distribution, or copying of this communication is strictly
prohibited. If you have received it in error, please immediately (1) delete this transmission and any attachments
and (2) notify info@pilgrimspride.com to advise us of the error. THIS E-MAIL IS NOT AN OFFER OR
ACCEPTANCE: Notwithstanding the Uniform Electronic Transactions Act or any other law of similar import,
absent an express statement to the contrary contained in this e-mail, neither this e-mail nor any attachments are
an offer or acceptance to enter into a contract, and are not intended to bind the sender, Pilgrim's Pride
Corporation, or any of its subsidiaries, or any other person or entity.
*********************************************************************************
********************

1

4

Sent via UPS Delivery
And via U.S. Mail

October 17, 2008



Dear Independent Contract Poultry Grower,

As you are aware, Pilgrim's Pride Corporation announced on or about March 12, 2008 that it was closing the Siler City chicken processing plant, the Staley feed mill and hatchery, and six distribution centers. Pilgrim's Pride took these steps in response to the crisis facing the U.S. chicken industry due to numerous economic factors including, but not limited to, soaring feed ingredient costs.

After closing the Siler City plant, increased downtime between flocks resulted and Pilgrim's Pride developed and implemented a plan to compensate you for the extended downtime.

Since the closure of the Siler complex, the economic environment has worsened. The global banking system is financially strained, which has resulted in a severe credit crunch for companies, including Pilgrim's Pride. Also, Pilgrim's Pride's total feed-ingredient costs in the third quarter of the 2008 fiscal year climbed $266 million, or 41 percent when compared to the same period a year ago. Based on the actual costs incurred during the first three quarters of this fiscal year and the current commodity futures markets for the remaining quarter of this fiscal year, the Company's total feed-ingredient costs for fiscal 2008 will likely be up an estimated $900 million from last fiscal year. These high feed costs, coupled with such other factors as lower market prices for chicken, have resulted in the Company suffering a net loss from continuing operations of $193.0 million during the first three quarters of fiscal 2008.

Pilgrim's Pride is doing everything within its control to manage through this difficult operating environment. This includes making tough decisions, such as closing the Siler Complex, idling the Clinton, Arkansas complex and a processing plant in Bossier City, Louisiana, consolidating our tray-pack business from our El Dorado, Arkansas facility into six other case-ready plants, and reducing our chicken production throughout the remainder of our operations.

Given these adverse economic conditions, Pilgrim's Pride has decided to terminate the broiler production agreements for those growers in your complex who rank at or below the bottom thirty percent. As you know, grower rankings represent a growers' efficiency in raising broilers.

Your poultry farm performed in the bottom thirty percent. Accordingly, Pilgrim's Pride hereby notifies you that it will exercise its right to terminate your broiler production agreement for economic necessity, pursuant to Paragraph D of your broiler production agreement. Pilgrim's Pride will terminate your broiler production agreement after the settlement of the flock placed on your farm on or before Monday, October 20, 2008.

We are saddened that these uncontrollable economic circumstances made it an economic necessity to terminate your broiler production agreement. We wish you and yours the very best in the future.

Sincerely,

Robert A. Wright
Robert A. Wright
Chief Operating Officer

Pilgrim's Pride Corporation
World Headquarters Park
P.O. Box 93
4845 US Highway 271 North
Pittsburg, Texas 75686-0093
903 434 1000
Web: www.pilgrimspride.com

App. 186

Rollins, John A

**From:** Randy.Stroud@pilgrimspride.com
**Sent:** Tuesday, November 04, 2008 11:17 AM
**To:** Rollins, John A
**Subject:** RE: Grower List

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

We are working on getting the info together.
Thanks,

Randy Stroud
Senior Vice President Technical Services
Pilgrim's Pride Corporation
WHQ Park Pittsburg, Texas
Office 903-434-1433
~~[redacted]~~
Fax 972-290-8982      *5 USC-552(b)(6)*

**From:** Rollins, John A [mailto:John.A.Rollins@usda.gov]
**Sent:** Tuesday, November 04, 2008 10:10 AM
**To:** Randy Stroud
**Subject:** RE: Grower List

We could send someone over, but we would like to have the documents in the office for verifacation purposes when and if we get calls from growers who are subject to being cut off.

The request for ranking for the past six months is not as important as the final list, but would show us how growers were doing over an extended period of time. If you don't have these rankings, then we will do without. Again this information is for us to deal with complaints, if any, when they come in.

John

**From:** Randy.Stroud@pilgrimspride.com [mailto:Randy.Stroud@pilgrimspride.com]
**Sent:** Tue 11/4/2008 9:18 AM
**To:** Rollins, John A
**Subject:** RE: Grower List

John,
If we make these documents available for you to review in Sanford, would you still need to take posession of the documents. Because we were switching from ~~[redacted]~~ accounting system to ~~[redacted]~~ I am not sure we have the grower ranking by month but ~~[redacted]~~ is checking on it for me.
Thanks,

Randy Stroud
Senior Vice President Technical Services
Pilgrim's Pride Corporation
WHQ Park Pittsburg, Texas
Office 903-434-1433

*5 USC.552(b)(4)*

*5 USC.552(b)(6)*

1


Fax 972-290-8982

5 U5C 552 (b) (6)



Randy:

As we discussed the following is a request for documents relating to the manner in which you determined the growers in the bottom 30 percent to be terminated at the Sanford, North Carolina complex.

1. The final all grower ranking which was the basis for the terminations, with terminated growers highlighted.
2. An all grower ranking for the end of the month for the past six months.
3. A grower list with building types for all growers on the all grower rankings.

As we discussed this information will be held in confidence, but is subject to our FOIA requirements. As an ongoing investigation, the above documents will not be released, until the investigation is completed. If someone would request the documents after the investigation, the grower names would be protected (unless a grower requests, and then only that grower's name would be released) under privacy standards of FOIA.

I am working at home today, so I can be reached at my cell or home phone which are:
▬▬▬▬▬ (cell)
▬▬▬▬▬ (home)      >  5 U5C 552 (b) (6)

John

*****************************************************************************************************
***************** The information contained in this e-mail (along with any attachments) is intended only for the use of the individual(s) to whom it is addressed. It is confidential and may contain privileged information. If the reader of this message is not the intended recipient, you are hereby notified that you should not read its contents, and any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received it in error, please immediately (1) delete this transmission and any attachments and (2) notify info@pilgrimspride.com to advise us of the error. THIS E-MAIL IS NOT AN OFFER OR ACCEPTANCE: Notwithstanding the Uniform Electronic Transactions Act or any other law of similar import, absent an express statement to the contrary contained in this e-mail, neither this e-mail nor any attachments are an offer or acceptance to enter into a contract, and are not intended to bind the sender, Pilgrim's Pride Corporation, or any of its subsidiaries, or any other person or entity.
*****************************************************************************************************
********************

*****************************************************************************************************
***************** The information contained in this e-mail (along with any attachments) is intended only for the use of the individual(s) to whom it is addressed. It is confidential and may contain privileged information. If the reader of this message is not the intended recipient, you are hereby notified that you should not read its contents, and any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received it in error, please immediately (1) delete this transmission and any attachments and (2) notify info@pilgrimspride.com to advise us of the error. THIS E-MAIL IS NOT AN OFFER OR ACCEPTANCE: Notwithstanding the Uniform Electronic Transactions Act or any other law of similar import, absent an express statement to the contrary contained in this e-mail, neither this e-mail nor any attachments are

2

App. 188

an offer or acceptance to enter into a contract, and are not intended to bind the sender, Pilgrim's Pride Corporation, or any of its subsidiaries, or any other person or entity.
**********************************************************************************************************
*******************

3

$\mathcal{S}$

Rollins, John A

From:                 Randy.Stroud@pilgrimspride.com
Sent:                 Wednesday, November 05, 2008 12:29 PM
To:                   Rollins, John A
Cc:                   ████@pilgrimspride.com; ████@pilgrimspride.com;
                      ████@BAKERNET.com                                    5USC·552(b)(6)
Attachments:          Copy OF HOUSE CLASS - CUT 10-20-08.xls; Copy of Sanford rankings 106 908.xls

Follow Up Flag:       Follow up
Flag Status:          Flagged

John,
Attached you will find the grower ranking list for Sanford. The growers that were terminated are highlighted in yellow and
are at the bottom of the list. The grower settlements included in the ranking being Jan '06 and end with the most recent
settlements. The numbers shown to the right are the averages. In this case positive is good and negative is bad. I am sure
you will have questions. Probably best if you call ████ for explanations since he put the sheet together. Also
attached is a copy of house class of growers terminated. I think he is working on getting this together for all growers. You
had asked for grower rankings by month. We do not have extended periods by month but we do have recaps of all
growers that settle in a month if you want that.

The worksheet is not straight out of ███ because we had to put info together out of two systems. Please call or e-mail if
you have questions.
Thanks,

Randy Stroud                                          5USC·552(b)(6)
Senior Vice President Technical Services                                                          5USC·552
Pilgrim's Pride Corporation                                                                       (6)(6)
WHQ Park Pittsburg, Texas
Office 903-434-1433
████
Fax 972-290-8982

*************************************************************************
******************** The information contained in this e-mail (along with any attachments) is intended only
for the use of the individual(s) to whom it is addressed. It is confidential and may contain privileged
information. If the reader of this message is not the intended recipient, you are hereby notified that you should
not read its contents, and any dissemination, distribution, or copying of this communication is strictly
prohibited. If you have received it in error, please immediately (1) delete this transmission and any attachments
and (2) notify info@pilgrimspride.com to advise us of the error. THIS E-MAIL IS NOT AN OFFER OR
ACCEPTANCE: Notwithstanding the Uniform Electronic Transactions Act or any other law of similar import,
absent an express statement to the contrary contained in this e-mail, neither this e-mail nor any attachments are
an offer or acceptance to enter into a contract, and are not intended to bind the sender, Pilgrim's Pride
Corporation, or any of its subsidiaries, or any other person or entity.
*************************************************************************
********************

1

9

App. 190



| SVC | FARM | TYPE | # | W | L | SQ FT |
|---|---|---|---|---|---|---|
| | 4M FARM | IH | | 42 | 400 | 16,800 |
| | 4M FARM | IH | | 42 | 400 | 16,800 |
| | 4M FARM | A | | 42 | 400 | 16,800 |
| | B & K POULTRY | C | | 40 | 500 | 20,000 |
| | B & K POULTRY | C | | 40 | 500 | 20,000 |
| | | IH | | | | |
| | | C | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | BUCKHORN FARM | IH | | 42 | 500 | 21,000 |
| | BUCKHORN FARM | IH | | 42 | 500 | 21,000 |
| | BUCKHORN FARM | IH | | 42 | 500 | 21,000 |
| | CORREAN MCNEIL | C | | 40 | 300 | 12,000 |
| | CORREAN MCNEIL | C | | 42 | 400 | 16,800 |
| | CRAIG BUCHANAN | A | | 42 | 500 | 21,000 |
| | CRAIG BUCHANAN | A | | 42 | 500 | 21,000 |
| | CRAIG BUCHANAN | A | | 42 | 500 | 21,000 |
| | CURRIN FARM | IH | | 42 | 500 | 21,000 |
| | CURRIN FARM | IH | | 42 | 500 | 21,000 |
| | CURRIN FARM | IH | | 42 | 500 | 21,000 |
| | CURRIN FARM | IH | | 42 | 500 | 21,000 |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | DWAYNE PARRISH | IH | | 42 | 500 | 21,000 |
| | FRANK MACON | C | | 40 | 500 | 20,000 |
| | FRANK MACON | C | | 40 | 500 | 20,000 |
| | FRANK MACON | C | | 40 | 500 | 20,000 |
| | FRANK MACON | C | | 40 | 500 | 20,000 |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | C | | | | |
| | | C | | | | |
| | | C | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |
| | | IH | | | | |

10

| Name | Code | | | |
|---|---|---|---|---|
| ████████ | A | | ██ | ████ |
| ████████ | A | | ██ | ████ |
| ████████ | IH | | | |
| ████████ | IH | | | |
| KEITH MCNEILL | A | 42 | 400 | 16,800 |
| KEITH MCNEILL | A | 42 | 400 | 16,800 |
| KEITH MCNEILL | A | 42 | 400 | 16,800 |
| KEITH MCNEILL | A | 42 | 400 | 16,800 |
| ████████ | IH | | | |
| ████████ | IH | ██ | ██ | ████ |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LITTLE RIVER FARM | IH | 42 | 500 | 21,000 |
| LONNIE THOMAS | IH | 40 | 500 | 20,000 |
| LONNIE THOMAS | IH | 40 | 500 | 20,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| LYNWOOD HOLLAND | IH | 42 | 500 | 21,000 |
| MAGNOLIA HILL FARM | IH | 42 | 400 | 16,800 |
| MAGNOLIA HILL FARM | IH | 42 | 400 | 16,800 |
| MARK CURRIN | IH | 40 | 500 | 20,000 |
| MARK CURRIN | IH | 40 | 500 | 20,000 |
| MARK CURRIN | IH | 42 | 500 | 21,000 |
| MARK CURRIN | IH | 42 | 500 | 21,000 |
| ████████ | A | | | |
| ████████ | A | | | |
| ████████ | A | ██ | ██ | ████ |
| ████████ | A | | | |
| MIKE NEWTON | A | 42 | 500 | 21,000 |
| MIKE NEWTON | A | 42 | 500 | 21,000 |
| MIKE NEWTON | A | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| MORGAN FARM | IH | 42 | 500 | 21,000 |
| PAT AUMAN | C | 40 | 450 | 18,000 |
| PAT AUMAN | C | 40 | 450 | 18,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |

11

App. 192

all redactions (b)(4)

| | | | | |
|---|---|---|---|---|
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PATTERSON & SONS, INC. | A | 42 | 500 | 21,000 |
| PHILLIP LEACH | C | 40 | 450 | 18,000 |
| PHILLIP LEACH | C | 40 | 450 | 18,000 |
| PILKINGTON FARM | T | 42 | 400 | 16,800 |
| PILKINGTON FARM | T | 42 | 400 | 16,800 |
| PILKINGTON FARM | T | 42 | 220 | 9,240 |
| RICKY JONES | A | 42 | 500 | 21,000 |
| RICKY JONES | A | 42 | 500 | 21,000 |
| RICKY JONES | A | 42 | 500 | 21,000 |
| RICKY JONES | A | 42 | 500 | 21,000 |
| RIVERBEND POULTRY | IH | 42 | 500 | 21,000 |
| RIVERBEND POULTRY | IH | 42 | 500 | 21,000 |
| RIVERBEND POULTRY | IH | 42 | 500 | 21,000 |
| RIVERBEND POULTRY | IH | 42 | 500 | 21,000 |
| | A | | | |
| | A | | | |
| | A | | | |
| | A | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| | A | | | |
| | IH | | | |
| | A | | | |
| | A | | | |
| | A | | | |
| | A | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| | IH | | | |
| TIM NEWTON | IH | | | |
| TIM NEWTON | IH | 42 | 500 | 21,000 |
| TIM NEWTON | IH | 42 | 500 | 21,000 |
| TONY CURRIN | IH | 42 | 500 | 21,000 |
| TONY CURRIN | IH | 42 | 500 | 21,000 |
| TONY CURRIN | IH | 42 | 500 | 21,000 |
| TONY CURRIN | IH | 42 | 500 | 21,000 |
| TONY CURRIN | IH | 42 | 500 | 21,000 |
| TONY STOUT | IH | 42 | 400 | 16,800 |
| TONY STOUT | IH | 42 | 400 | 16,800 |

12

all redactions (b)(4)

| | | | | |
|---|---|---|---|---|
| TONY STOUT | IH | 42 | 400 | 16,800 |
| TONY STOUT | IH | 42 | 400 | 16,800 |
| TONY STOUT | IH | 42 | 500 | 21,000 |
| TONY STOUT | IH | 42 | 500 | 21,000 |
| VINCE DENNY | IH | 42 | 500 | 21,000 |
| VINCE DENNY | IH | 42 | 500 | 21,000 |
| VINCE DENNY | IH | 42 | 500 | 21,000 |
| WADSWORTH POULTRY | A | 42 | 500 | 21,000 |
| WADSWORTH POULTRY | A | 42 | 500 | 21,000 |
| WAYNE SIMMONS | IH | 42 | 500 | 21,000 |
| WAYNE SIMMONS | IH | 42 | 500 | 21,000 |
| WAYNE SIMMONS | IH | 42 | 500 | 21,000 |
| WAYNE SIMMONS | IH | 42 | 500 | 21,000 |
| WILSON FARM | IH | 42 | 500 | 21,000 |
| WILSON FARM | IH | 40 | 450 | 18,000 |
| WILSON FARM | IH | 40 | 450 | 18,000 |
| WILSON FARM | IH | 40 | 500 | 20,000 |
| WILSON FARM | IH | 40 | 500 | 20,000 |

Company Farm

13

**LINGLE LAW FIRM**
ATTORNEYS AT LAW

JAMES G. LINGLE, P.A.
BARBARA E. LINGLE (OF COUNSEL)

110 S. DIXIELAND
ROGERS, ARKANSAS 72758
TEL: (479) 636-7899
FAX: (479) 636-0095

www.linglelaw.com

RICHARD HEBAR, D.D.S.
H. CLAY FULCHER, P.C.*
* LL.M. in Agricultural Law
Also licensed in Wyoming

E-mail: lawyers@linglelaw.com

October 13, 2009

J. Dudley Butler, Administrator
Grain Inspection, Packers & Stockyards Administration, USDA
1400 Independence Avenue, S.W., STOP 3601
Washington, D.C. 20250-3601

Re: Freedom of Information Act Appeal

Dear Mr. Butler:

Please consider this my appeal of the Agency's decision to withhold in their entirety 19 pages of documents claimed exempt pursuant to (b)(4). Since one of the documents produced, a November 5, 2008 email from Randy Stroud to John Rollins, references a grower ranking list, it is my belief that the 19 pages withheld are the ranking list used to choose which 30% of the Sanford growers to terminate. My basis for arguing that at least some of the 19 pages, with appropriate redactions, ought to be released is as follows.

According to the September 24, 2009 response I received from the Agency, exemption (b)(4) permits the withholding of commercial or financial information, and business information that reflects the total number of poultry growers terminated, poultry growers' production history information, the name of growers who I do not represent, and information about Pilgrim's accounting or database systems.

The critical information that I seek and that is included in the ranking list can be produced without disclosing any of the information deemed to be exempt with one exception. That exception is the number of growers terminated. The September 24th response does not include the total number of growers at the Sanford complex as information that is exempted.

14

In fact, the total number of growers at Sanford is public knowledge and revealing that the Sanford grower base included approximately 150-160 growers could in no way cause any harm to Pilgrim's, much less substantial competitive harm.

Since the total number of growers is not privileged or confidential, then it follows that the number of growers terminated should not be considered privileged or confidential either. Pilgrim's stated in letters that the bottom 30% of Sanford growers were being terminated and has filed numerous documents in the Pilgrim's bankruptcy reflecting this percentage. Therefore, the fact that Pilgrim's terminated approximately 45 growers at its Sanford complex is neither privileged nor confidential.

In order to protect commercial, financial, production history, accounting, and database system information, GIPSA can still produce the 19 pages withheld if it redacts all of the information on the ranking list it deems necessary with two exceptions: (1) word "average" following each grower's name and flock history and (2) the yellow highlighting that is referenced in Mr. Stroud's November 5, 2008 email to Mr. Rollins. By leaving in the word "average" following each grower's name, I can confirm that Pilgrim's included all of its Sanford growers on the ranking list. If the yellow highlighting marks grower's names, and redacting the grower's name will obscure the yellow highlighting, then it seems that GIPSA could determine some other reasonable means to indicate the yellow highlighting.

By leaving the word "average" and the yellow highlighting or some substitute for the highlighting, I will be able to verify whether Pilgrim's actually terminated the bottom 30% according to the ranking list provided to GIPSA or allowed certain growers who were ranked lower than my clients to continue to raise flocks.

*15*

I am also concerned about another issue and that is the lack of any reference in the September 24, 2009 FOIA response to any notes or internal memoranda related to the termination of the North Carolina growers. Attorneys for Pilgrim's declare that a complaint was filed with GIPSA related to the terminations and the November 5, 2008 email from Mr. Stroud to Mr. Rollins, referring to the ranking list that Pilgrim's provided, states that it is "(p)robably best if you call [redacted] for explanations since he put the sheet together." There was no reference in the September 24th response to any record of a complaint being filed or any communications between Mr. Stroud and Mr. Rollins subsequent to the November 5th email.

Records of communications between Mr. Rollins and Mr. Stroud after the November 5th email are very important since they might reveal alleged reasons why some growers, lower on the ranking list than my clients, were not terminated. I can only think of three possible reasons why there is no record of any communication between GIPSA and Pilgrim's after the November 5th email: one, Mr. Rollins never requested an explanation of the ranking list; two, Mr. Rollins was provided an explanation, but failed to make a written record; or, three, Mr. Rollins did make a written record but that record has not been located.

Your consideration in this matter is greatly appreciated.

Sincerely,

Clay Fulcher

16

 **USDA**

| United States Department of Agriculture | Grain Inspection, Packers and Stockyards Administration | Stop 3601 1400 Independence Ave., SW Washington, D.C. 20250-3601 |

Mr. Clay Fulcher
Lingle Law Firm
110 S. Dixieland
Rogers, Arkansas 72758

DEC − 2 2009

Dear Mr. Fulcher:

This responds to your October 20, 2009, correspondence in which you appealed the Grain Inspection, Packers and Stockyards Administration's (GIPSA) September 24, 2009, determination under the Freedom of Information Act to withhold from disclosure 19 pages of documents pursuant to 5 U.S.C. § 552(b)(4). The basis for our determination was that the document—Pilgrim's Pride's grower ranking list—contained commercial or financial information obtained from a person that is privileged or confidential. GIPSA believed that if released the information contained therein could reasonably be expected to cause substantial competitive harm to Pilgrim's Pride—the submitter of the information.

I have re-evaluated the 19-page document that GIPSA withheld initially. I am granting your appeal and am disclosing only the word average on pages 1-12 of the grower ranking list because the disclosure of that word will not cause competitive harm. The remaining data is exempt from disclosure because it indicates the flock histories of growers who are not your clients. Furthermore, I have determined that the flock history information of your clients on pages 13-19 should not be exempt from disclosure pursuant to 5 U.S.C. 552(b)(4); therefore, I am granting your appeal and am disclosing this data. However, portions of those pages are exempt from release because the flock histories pertain to growers who are not your clients.

GIPSA conducted a further search to determine if any other records exist regarding Pilgrim's Pride's termination of 30 percent of its growers at the Sanford, North Carolina, complex. We located a spreadsheet entry in a discontinued log regarding an October 27, 2008, complaint that we received by way of GIPSA's hotline. I have determined that the entry, consisting of eight pages, can be disclosed in its entirety.

You also expressed concern that GIPSA did not produce any other records of communications between Messrs. Rollins and Stroud after the November 5, 2008, email. GIPSA's searches did not locate any additional records of communications.

You may seek judicial review of the above determinations in an appropriate United States District Court pursuant to 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Alan R. Christian
Deputy Administrator
Packers and Stockyards Program

Enclosures

*17*



(b)(4)

(b)(4)

(b)(4)

(b)(4)

(b)(4)

18









.22

App. 203





24



(5)(4)

(5)(4)

(4)(4)

25





(b)(4)

(b)(4)

(b)(4)

(b)(4)

(b)(4)

27



$(+)(b)(H)$

28



(b)(4)

(b)(4)

29



30



32



(b)(4)



(ρ)(4)

(ρ)(4)

34



(b)(4)

36

| FiscalYear | InvestigationID | IgativeCategory | Priority | ABusinessID | ChildrensID | NatureofComplaint | DateOfComplaint | RecievedBy | InvestigationAssi |
|---|---|---|---|---|---|---|---|---|---|
| 2009 | T0409091 | 12-12 | | | | Pilgrims Pride grower left a message on the Grain Inspection Hotline and her complaint is she was cut off on October 21, 2008 for performance. There about 44 growers that were affected. The company sent her a letter that said growers that were at the bottom 25% will be cut off based on performance. The 44 growers hired a lawyer to represent their complaint. She said there were other growers who were also at the bottom 30% that did not get cut off. She said that was unfair to the other 44 growers. | 27-Oct-08 | Jerrole A. Ellis | |

37

App. 218

| Investigator 1 | Investigator 2 | PrimaryReason | CompetitiveHold | SafetyViolation | JointPractices/Inefficiency | Oaklight-Provisions/Violation | Inabs-ending/Violation | InteAccount/Violation | NegEntry/Violation | Registration/Violation | ContractViolation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| John A. Rollins | | Unfair/Deceptive Practices | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE |

38

| RecordViolation | Tariff/Violation | ReasonToCede | AmountOfRecovery | TypeOfRecovery | SendingRecommendation | Remarks | ImplementiedTied | BondActivities | Bribery |
|---|---|---|---|---|---|---|---|---|---|
| FALSE | FALSE | No Violation | | | | Pilgrim's has sent in the full grower ranking list for the past year, and other supporting documents to support their selection of the 44 growers. They used an average of the past years ranking for each grower in the Sanford compile to determine who would be terminated. Typically this is the method that Pilgrim's and other companies use to determine a ranking of growers over a period of time. The information that was sent included the individual grower results of the past two years. We have verified that the ranking provided and the growers that were terminated matched and that there were no producers who were in the bottom 44 that were not terminated.JAR | FALSE | FALSE | FALSE |

39

App. 220

| CheckKiting | rationIndustryStd | tePoultyWarranty | CustodialAccount | FalseRecords | FailuretoPay | lluretoPayWhend | queeItemsProcedi | legalIndicument | Merchandise | Other | PackerTrust | PoultryTrust | PreferentialTreatment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | FALSE |

40

App. 221

| Registration/Jurisdiction | Reparations | RestrictionofCompetition | Scales | Solvency | Tariff | Unfair/DeceptivePractices | IghtandPriceFmarkPricingPractice | UpdateBy | UpdateTime | Terminated |
|---|---|---|---|---|---|---|---|---|---|---|
| FALSE | FALSE | FALSE | FALSE | FALSE | FALSE | TRUE | FALSE | FALSE GIPSA\JWdoore | 13-Mar-09 | FALSE |

41



42



| CAddressId | OtherBusinessId | OtherBusinessId | RegionState | RegionCity | InjuriesInvolved | BSE | StartingFactor | DateLODNServed | SpecialsInvolved | AgentSendsSupervisorSendsLegal | DateLODSendDCHGtdOrTerminated |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5355 | 5356/FSP-GA | Atlanta | | 2009 | FALSE | Complaint | Poultry | | | Trade Practice Unit Staff |

43

App. 224

| assClosedOrTerm | BondClaims | toryActivity/NoOfDirectAnnualReptActivityConds/PriceMonitoringurementsSaleste | Ref | bellinquentReport |
|---|---|---|---|---|
| 12-Mar-09 | FALSE | FALSE | FALSE | FALSE in P&SP Office | FALSE | FALSE | | FALSE |



# App. Ex. 13

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS
ON THE COURTS DOCKET
TAWANA C. MARSHALL, CLERK

D. Michael Lynn
U.S. Bankruptcy Judge

APR 20 2009

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| PILGRIM'S PRIDE CORPORATION, *et al.*, | § | Case No. 08-45664 (DML) |
| | § | |
| Debtors. | § | JOINTLY ADMINISTERED |

AGREED ORDER REGARDING MOTION
OF LIVE OAK CHICKEN GROWERS TO REOPEN
PROCEEDINGS TO ALLOW RECEIPT OF ADDITIONAL EVIDENCE
(Relates to Docket No. 1451)

Upon the Motion of Live Oak Chicken Growers to Reopen Proceedings to

Allow Receipt of Additional Evidence [Docket No. 1451] ("Motion to Reopen"), based

upon the agreement of counsel for the Live Oak Chicken Growers (the "LOCGs"),

DA1\355064\05\BW@G05! DOC\47466 0003



EXHIBIT
13

Pilgrim's Pride Corporation ("PPC") and its affiliated chapter 11 Debtors (collectively "Debtors"), and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), it is hereby

ORDERED that the Motion to Reopen is granted in limited part as set forth herein;

ORDERED that the Declarations of Gracie Freeman, Dwayne Parrish, and Timothy Patterson, attached hereto as Exhibits A, B, and C, are admitted into evidence in the contested matter related to the Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014 Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property [Docket No. 416] (the "Motion to Reject") filed by the Debtors;

ORDERED that the Declarations of Randy Stroud and Dale Hulsey, attached hereto as Exhibits D and E, are admitted into evidence in the contested matter related to the Motion to Reject;

ORDERED that no additional discovery will be allowed in the contested matter related to the Motion to Reject;

ORDERED that the Debtors may file a letter brief no later than April 20, 2009 at 4:00 p.m. (central time) explaining what effect, if any, the Declarations attached hereto as Exhibits A, B, C, D, and E should have on the Court's decision regarding the Motion to Reject;

ORDERED that if the Debtors file a letter brief in accordance with the immediately preceding paragraph, then the LOCGs may file a letter brief in response to Debtors' letter brief no later than April 21, 2009 at 4:00 p.m. (central time);

DA1\5550640\05\BW@G05! DOC67466.0003

2

ORDERED that all other and further relief sought in the Motion to Reopen

not specifically granted herein is DENIED.

# # # END OF ORDER # # #

### DECLARATION OF GRACIE FREEMAN

**GRACIE FREEMAN** declares under penalty of perjury:

1.    My father Lonnie Thomas was a chicken farmer for over fifteen (15) years in the Siler City Complex, previously owned by Goldkist. After Pilgrim's Pride acquired Goldkist, I began working on the farm to help my father and he invested $80,000 in upgrades as required by Pilgrims Pride.

2.    In October 2008 Steve Davis, my service representative, told me that my father's contract was being terminated because he was in the bottom 30% of growers. Initially, Mr. Davis told me he did not know how the determination was made. After I complained that it would not be fair to terminate the contract using the ranking from a January 2008 flock that had LT disease, he said he'd have to call me back. When he called me back he told me that his supervisor Don Osterhouse confirmed that Pilgrim's Pride had used flocks going back to 2005 to select growers to terminate and that they excluded the flock that have the LT virus in 2008.

I DECLARE under penalty of perjury that the foregoing is true and correct.
Signed this 12th day of April, 2009

_Gracie J. Freeman_
**Gracie Freeman**

\\Svr003\firm_documents\PILGRIM'S PRIDE (50301)\Pleadings - DRAFTS\2009 04 10 - DECLARATION OF Gracie
Freeman.doc

## DECLARATION OF DWAYNE PARRISH

**DWAYNE PARRISH** declares under penalty of perjury.

    1.    I have been a chicken grower for about 7 years. I grew chickens for the Siler City North Carolina Complex and the Sanford Complex now owned by Pilgrim's Pride. Over the seven years my ranking have gone up and down

    2    In October 2008 my service representative Gary Buffkin told me that I was going to be terminated because I was in the bottom 30% of growers. I told him that I did not believe I was in the bottom 30%. He told me that was the ranking Pilgrim's Pride came up with because it had used flocks from 2005, and 2006 and generally not 2007 and 2008 to decide who to terminate. I called the Live Production manager Don Osterhaus and he also told me that Pilgrim's Pride had used the flocks from 2005 and 2006 to select the growers that it would group in the bottom 30%. He asserted that the company was doing so to avoid using flocks grown during a period during which some growers' flocks had a disease known as LT

    I **DECLARE** under penalty of perjury that the foregoing is true and correct.
Signed this 13th day of April, 2009

_signature_

DWAYNE PARRISH

FROM BEST BROADWAY
04/13/2009 08:07 FAX 307 455 3483          H CLAY FULCHER PC                              ᠒002

### DECLARATION OF TIMOTHY PATTERSON

**TIMOTHY PATTERSON** declares under penalty of perjury:

1.      I have been a chicken grower for 7 years.  I grew chickens for the Siler City North Carolina Complex now owned by Pilgrim's Pride.

2.      In October 2008 my service representative Steve Davis told me that I was going to be terminated because I was in the bottom 30% of growers.  I told him that was not possible as I reviewed my previous five flocks and my costs were only about 2 points (0.0002) worse than the average or middle grower costs during that period.  Mr. Davis would never explain to me how Pilgrim's had determined the bottom 30%.  I also spoke with service representative Gary Buffkin and when I asked him for an explanation how the bottom 30% was determined, he stated he was instructed not to say anything.  Both Davis and Buffkin had previously told me that I was one of the company's best growers.

I **DECLARE** under penalty of perjury that the foregoing is true and correct.
Signed this 13th day of April, 2009

TIMOTHY PATTERSON

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | § | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| PILGRIM'S PRIDE CORPORATION, *et al.*, | § | Case No. 08-45664 (DML) |
| | § | |
| | § | |
| Debtors. | § | JOINTLY ADMINISTERED |
| | § | |

### DECLARATION OF DALE HULSEY

I, Dale Hulsey, hereby declare under penalty of perjury:

1.      My name is Dale Hulsey. I am over the age of 18 years, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated and that they are true and correct. I have never been convicted of a felony.

2.      I currently work for Pilgrim's Pride Corporation ("PPC") and have worked for PPC since it purchased Gold Kist, Inc. in 2006. Before that, I worked for Gold Kist since 1978. I am the Live Production Manager of the Sanford, North Carolina Plant and have been since April 2008. Before my current position, I was the Live Production Manager for the grow-out base that served both the Sanford processing plant ("Sanford Plant") and PPC's processing plant in Siler City, North Carolina ("Siler City Plant"). For purposes of this Declaration, I refer to this grow-out base that served both the Sanford Plant and the Siler City Plant as the "Sanford/Siler City Grow-Out Base." I was the Live Production Manager for the Sanford/Siler City Grow-Out Base for approximately 16 years.

3.      The Siler City Plant and the Sanford Plant processed different types of birds from one another, but were close enough to one another that broiler growers in the Sanford/Siler City Grow-Out Base were able grow chickens for either plant. The Siler City Plant processed large male birds, weighing approximately 8 to 9 pounds each, while the Sanford Plant processed small

DAL:555142\01\B\WCM01!\DOC\67\06 0003

female birds and small "straight run" – mixed gender – birds, weighing about 6 to 6.25 pounds
each.

4.      In or around March 2008, PPC decided to idle the Siler City Plant. At that time,
PPC transferred the broiler growers in Scotland and Richmond Counties, North Carolina from
the Sanford/Siler City Grow-Out Base to the grow-out base for PPC's plant in Marshville, North
Carolina. The decision to transfer these growers was based on PPC's plan to expand the
Marshville Plant. However, the plans to expand the Marshville Plant were ultimately abandoned.

5.      In or around August 2008, I was in discussions with other members of PPC
management during which PPC determined to terminate approximately four million square feet
of the Sanford/Siler City Grow-Out Base. As Live Production Manager, I was responsible for
creating a spreadsheet (the "Ranking") compiling flock performance information for each of
these broiler growers, calculating the average performance for each grower, and then ranking the
growers from least efficient to most efficient based on flock performance.

6.      In compiling the Ranking, I used flock performance information from January
2006 through August 2008. PPC determined to use this period of performance data because of a
number of circumstances unique to the Sanford/Siler City Grow-Out Base. Using flock
performance numbers for the relevant time period – reflected on the settlement sheets generated
from the "tournament system" in which the growers compete with one another – I calculated
each grower's average flock performance.

7.      First, the Siler City and Sanford area suffered a severe outbreak of
Laryngotracheitis ("LT") beginning in February 2007 and extending into September 2008. LT is
a very contagious and serious avian disease that causes the birds to suffocate. During 2007, there
were 123 confirmed cases of LT in North Carolina. The disease can easily kill one-third or more
of a flock. Because LT is so contagious, it is impossible to control with normal bio-safety

App. 364

measures. Instead, aggressive vaccination programs are needed to try to contain the disease. Accordingly, PPC was required to vaccinate approximately 2/3 of the flocks within the Sanford/Siler City Grow-Out Base. A known side-effect of the LT vaccine is that it can cause the chickens to run a fever and prevent them from gaining weight as efficiently as they otherwise would, which negatively affects flock performance. Because the LT vaccination program instituted to contain and limit LT in 2007 and 2008 may have negatively affected performance of as many as 75% of the flocks raised by growers in the Sanford/Siler City Grow-Out Base within the year before the determination of which growers to terminate, PPC decided to use a longer period of performance data to balance out any negative performance in more recent flocks that may have been attributable to the LT vaccine.

8.    Second, PPC decided to exclude all flocks of large male birds from the Ranking because large-male flocks are more difficult to raise and have higher mortality rates than small female and straight run birds. These factors adversely affect the feed conversion rate of growers who raise large male birds when compared to growers who raise small birds. Accordingly, growers who raised more large-male flocks would have been unfairly penalized if their performance numbers for large-male flocks were used when ranking those growers against growers who primarily raised small-bird flocks. As a result of excluding the large-male flocks, some growers on the Ranking only had one or two flocks upon which their performance was judged, even though the time period covered by the Ranking extended back to January 2006, whereas other growers who primarily raised small birds had twelve or more flocks upon which their average performance was calculated.

9.    In addition, I decided to exclude four flocks from the Ranking due to extraordinary circumstances. Three of the excluded flocks had an abnormally severe adverse reaction to the LT vaccine. When trying to control an LT outbreak – like the one that occurred

from February 2007 through September 2008 — PPC may have to vaccinate birds that have already come into contact with LT. In those cases, the vaccine can worsen the negative effects of the disease and result in a much higher mortality rate than occurs when a healthy flock is vaccinated. Even so, PPC requires the growers to vaccinate flocks during a LT outbreak because more birds are saved with the vaccination than die because of it. Because PPC forces the growers to vaccinate their flocks, I decided it would be unfair to include the three flocks that had severe adverse reactions to the LT vaccine in the Ranking.

10.     The fourth flock excluded from the Ranking due to extraordinary circumstances was raised by a grower who had a chicken house struck by lightning. The grower's service representative was present on the farm when the lightning occurred. He confirmed that the lightning strike, and not poor grower management, resulted in a power outage to one of the grower's chicken houses. Because of the power outage, the grower lost all of the chickens in the affected house. Because the lightning strike and power outage were outside the grower's control, I decided to use my judgment to exclude them from the Ranking.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: April 17, 2009
Sanford, North Carolina

_Dale Hulsey_
Dale Hulsey

DAIA555147201B-WCM011-DOCWM66 0003                     4

App. 366

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| PILGRIM'S PRIDE CORPORATION, *et al.*, | § | Case No. 08-45664 (DML) |
| | § | |
| | § | |
| Debtors. | § | |
| | § | JOINTLY ADMINISTERED |

## DECLARATION OF RANDY STROUD

I, Randy Stroud, hereby declare under penalty of perjury:

1.      My name is Randy Stroud. I am over the age of 18 years, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated and that they are true and correct. I have never been convicted of a felony.

2.      I am currently employed by Pilgrim's Pride Corporation ("PPC") and have worked for PPC for nearly thirty years. I am the Senior Vice President of Live Technical Services and have been since 2007. I am responsible for developing, implementing, and enforcing Live Production policies and procedures.

3.      In my current position, I was involved in the decision to idle PPC's processing plant in Siler City, North Carolina ("Siler City Plant"). I was also involved in the decision to reduce production at PPC's processing plant in Live Oak, Florida ("Live Oak Plant").

4.      When I testified in my deposition and at trial about the method used to terminate growers in connection with PPC's decision to idle the Siler City Plant, I was mistaken about the number of flocks and the time period included in the ranking created for the broiler growers who raised chickens for PPC's plants in Siler City and Sanford, North Carolina ("Sanford Plant").[1]   I

---

[1] Before the Siler City Plant was idled, it shared a common grower base with the Sanford Plant. For the purposes of this Declaration, I will refer to this common grow-out base that served both the Sanford Plant and the Siler City Plant as the "Sanford/Siler City Grow-Out Base."

DA1355177RMBWDLHP5A2C47-24 0001

regret my failure to accurately remember the details of the process used when terminating growers in the Sanford/Siler City Grow-Out Base.

5.      As a result of the Motion of Live Oak Chicken Growers to Reopen Proceedings to Allow Receipt of Additional Evidence [Docket No. 1451] ("Motion to Reopen"), I reviewed the process by which growers were terminated in connection with the closing of the Siler City Plant. My memory has been refreshed that the ranking created for the Sanford/Siler City Grow-Out Base included flock performance data for January 2006 to August 2008. A longer period of time was considered for the ranking involving the Sanford/Siler City Grow-Out Base than for the ranking PPC created for the broiler growers in the Live Oak Complex because of unique circumstances affecting the Sanford/Siler City Grow-Out Base. Because these unique circumstances were not present in the Live Oak Complex, I continue to believe that one year of performance data provided an appropriate measure of grower performance for the broiler growers in the Live Oak Complex.

6.      When PPC determined to idle the Siler City Plant, it sought to preserve as many broiler growers as possible by shifting production from the Siler City Plant to the PPC plants in Sanford and Marshville, North Carolina ("Marshville Plant"). The Siler City growers already raised chickens for both the Siler City Plant and the Sanford Plant because those plants shared a common grower base. To make up for the lost processing capacity caused by closing the Siler City Plant, PPC intended to expand the Marshville Plant. Due to the faltering economy, however, PPC was unable to implement these expansion plans. Accordingly, PPC was required to terminate approximately four million square feet of the Sanford/Siler City Grow-Out Base.

7.      PPC decided to use grower performance data to determine which growers in the Sanford/Siler City Grow-Out Base to terminate. As in Live Oak, PPC used settlement sheets from the "tournament system" to compile flock performance data and identify the least efficient

DA1-\555177 03 DWDL03FFIXIF 6·165 0003                    2

broiler growers.   PPC then eliminated the appropriate square footage of grow-out space.
However, the ranking created for the Sanford/Siler City Grow-Out Base took into account a
longer period of time than the time period considered in Live Oak.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: April 17, 2009
Pittsburgh, Texas

_____
Randy Stroud

App.  369

# App. Ex. 14

# WEIL, GOTSHAL & MANGES LLP

200 CRESCENT COURT

SUITE 300

DALLAS, TEXAS 75201

(214) 746-7700

FAX: (214) 746-7777

AUSTIN
BOSTON
BUDAPEST
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW
WASHINGTON, D.C.

YVETTE OSTOLAZA
DIRECT LINE (214) 746-7805
E-MAIL: yvette.ostolaza@weil.com

April 20, 2009

**VIA HAND DELIVERY**

The Honorable D. Michael Lynn
United States Bankruptcy Court
Eldon B. Mahon U.S. Courthouse
501 W. Tenth Street
Fort Worth, TX 76102-3643

Re: *In re Pilgrim's Pride Corporation; et al.*, Case No. 08-45664 (DML C)
**Letter-Brief in Support of PPC's Motion to Reject [Docket No. 416]**

Dear Judge Lynn:

The Court has admitted three grower declarations filed by the Live Oak Chicken Growers (collectively, the "LOCGs") and two declarations from Pilgrim's Pride Corporation ("PPC") and its affiliated chapter 11 Debtors (collectively "Debtors") regarding the process used to terminate broiler growers in Siler City, North Carolina. (*See* Agreed Order Regarding Motion of Live Oak Chicken Growers to Reopen Proceedings to Allow Receipt of Additional Evidence ("Agreed Order") at Exs. A-E.) The issues addressed in the declarations are not material to the Court's decision on Debtors' Motion to Reject[1] because the process used to identify growers for rejection in Siler City is, at best, tangentially relevant to the issue of whether PPC exercised its business judgment in determining which Broiler Agreements to reject for the Live Oak Complex.

PPC provided testimony at trial regarding its decision to terminate broiler growers in the grow-out base (the "Sanford/Siler City Grow-Out Base") for PPC's plants in Sanford, North Carolina ("Sanford Plant") and Siler City, North Carolina ("Siler City Plant"). (*See* March 10, 2009 Hr'g Tr. v.1 at 70:8-23.) The testimony that PPC employed a similar process for the Live Oak Complex was offered as evidence that it did not identify Live Oak growers for

---

[1] Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014 Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property [Docket No. 416] (the "Motion to Reject").

DA1\5553560\08\NBWSK08!.DOC\67466.0003

EXHIBIT
**14**

App. 370

WEIL, GOTSHAL & MANGES LLP

The Honorable D. Michael Lynn
April 20, 2009
Page 2

rejection with discriminatory or capricious intent. Subsequent to Mr. Stroud providing his testimony regarding the Siler City Plant, the Court issued three rulings expressing its findings that PPC did not create the spreadsheet compiling the data used to rank the Live Oak broiler growers (the "Live Oak Ranking") with the intention of discriminating against growers or violating federal law. (See April 1, 2009 Hr'g Tr. v.1 at 73:18-74:3.) Specifically, the Court found the following: (1) "that the persons who made the decision to terminate, or to cut two million-plus square feet of space, did not make that decision in an effort to discriminate;" (2) "that they did not select their methodology with a view toward effecting discrimination;" and (3) "that they did not intend through the rejection to discriminate or to retaliate or to effect any violation of the Packers and Stockyards Act." (Id.) As explained more fully below, none of the new evidence offered by the LOCGs relates to these issues. Accordingly, the testimony submitted in the declarations is only material to the Court's decision on the Motion to Reject if the process used for the Sanford/Siler City Grow-Out Base was sufficiently distinct from that used for the Live Oak Complex that it causes the Court to reconsider whether PPC used the process in Live Oak with discriminatory or capricious intent. Because the Declarations of Randy Stroud and Dale Hulsey show that the process used to identify broiler agreements for rejection in Live Oak was substantially similar to the process used for the Sanford/Siler City Grow-Out Base, the new evidence should not impact the Court's decision in this matter.

In both Siler City and Live Oak, PPC used a ranking system based upon flock performance from the "tournament system" for all of the broiler growers over a given time period. (See Ex. D ¶¶ 5-6; Ex. E ¶ 7.) In both instances, PPC calculated each grower's average flock performance rating and ranked the growers from least efficient to most efficient. (Id.) And in both places, PPC determined to eliminate a certain quantity of grow-out space -- four million square feet in Siler City and two million square feet in Live Oak -- and used the rankings to identify growers sufficient to make up the pre-determined square footage. (Id.) Thus, the additional testimony submitted in the declarations shows that PPC has consistently applied the concept of terminating less-efficient growers in favor of keeping growers who are more efficient and, therefore, more profitable. Nothing in the LOCGs' or the Debtors' declarations indicates that PPC used a different process in Live Oak with discriminatory intent.

Moreover, to the extent the LOCGs argue that PPC did not exercise proper business judgment in identifying their broiler agreements for rejection because it used a slightly different process when terminating growers in the Sanford/Siler City Grow-Out Base, that argument should be rejected. Even if the Court agrees that the process PPC used with respect to the Sanford/Siler City Grow-Out Base is relevant to determining whether PPC exercised proper business judgment in Live Oak, the fact that the process differed does not prove -- or indicate -- that PPC failed to exercise its business judgment in identifying broiler agreements for rejection in the Live Oak Complex. To the contrary, the Declarations of Randy Stroud and Dale Hulsey show that the differences in the processes used to identify growers for termination and rejection resulted from the unique circumstances affecting the Sanford/Siler City Grow-Out Base and was well within the Debtors' business judgment. (See generally Agreed Order at Exs. D and E.)

WEIL, GOTSHAL & MANGES LLP

The Honorable D. Michael Lynn
April 20, 2009
Page 3

As Mr. Hulsey testified, flock performance data for January 2006 to August 2008 was considered in the ranking for the Sanford/Siler City Grow-Out Base (the "Siler City Ranking") because of extraordinary circumstances. First, the Siler City and Sanford area suffered a severe outbreak of Laryngotracheitis ("LT") beginning in February 2007 and extending into September 2008. (Id. at Ex. D ¶ 7.) Because the LT vaccination program required to contain and limit LT in 2007 and 2008 may have negatively affected performance of as many as 75% of the flocks raised by growers in the Sanford/Siler City Grow-Out Base within the year before the determination of which growers to terminate, PPC, using its business judgment, decided to use a longer period of performance data to balance out any negative performance in more recent flocks that may have been attributable to the LT vaccine. (Id.) Nothing in the record indicates that any disease as serious or pervasive as LT affected the Live Oak Complex during the relevant time period.[2]

Second, PPC excluded all flocks of large-male birds from the Siler City Ranking. (Id. ¶ 8.) Mr. Hulsey states that growers who raised more large-male flocks would have been unfairly penalized if their performance numbers for large-male flocks were used when ranking those growers against growers who primarily raised small-bird flocks. (Id.) Moreover, because large-male flocks were excluded, some growers on the Siler City Ranking only had one or two flocks upon which their performance was judged, even though the time period covered by the Siler City Ranking extended back to January 2006; whereas other growers who primarily raised small birds had twelve or more flocks upon which their average performance was calculated. (Id.) Therefore, a longer period of time was considered to make sure there were enough flocks for the Siler City Ranking. Nothing in the record indicates that it would have been unfair to include a particular type of flock in the Live Oak Ranking, and, unlike Siler City, all of the Live Oak growers were ranked based on five flocks. Therefore, no evidence supports the conclusion that it would have been appropriate for PPC to use a longer period of performance data when creating the Live Oak Ranking. Indeed, having refreshed his recollection and considered the differences in the process used at Live Oak versus the process used in Siler City, Mr. Stroud nonetheless believes that one year of performance data was an appropriate measure of grower performance in Live Oak. (Agreed Order at Ex. E ¶ 5.)

The LOCGs may contend that PPC did not exercise proper business judgment because it excluded flocks from the Siler City Ranking, but did not exclude flocks in the Live Oak Ranking. However, the LOCGs have presented no evidence that PPC should have excluded any flocks for extraordinary circumstances in Live Oak.

---

[2] Indeed, the evidence at trial showed that coccidiosis – the primary disease affecting Live Oak broiler growers – is easily controlled with medications in the feed. (See March 10, 2009 Hr'g Tr. v.1 at 93:1-3 (R. Stroud).) The evidence further showed that coccidiosis and other minor diseases can be caused by poor farm management. (Id. at 125:1-6 (R. Stroud); see also March 13, 2009 Hr'g Tr. v.1 (under seal) at 111:6-8 (R. Taylor).) By contrast, LT cannot be avoided by good farm management and proper biosecurity. (See Agreed Order at Ex. D ¶ 7.)

WEIL, GOTSHAL & MANGES LLP

The Honorable D. Michael Lynn
April 20, 2009
Page 4

Mr. Hulsey excluded four flocks from the Siler City Ranking due to extraordinary circumstances. (Agreed Order at Ex. D ¶ 9.) Three of the excluded flocks had an abnormally severe adverse reaction to the LT vaccine. (*Id.*) The fourth flock was from a grower who had a chicken house struck by lightning. (*Id.* ¶ 10.) Because the LT reaction for the first three growers and the lightning strike and resulting power outage for the fourth grower were outside the growers' control, PPC used its business judgment and decided to exclude those flocks from the Siler City Ranking. (*Id.* ¶¶ 9-10.) There is no evidence that similar extraordinary circumstances affected any flocks considered in the Live Oak Ranking.

Moreover, when Trinder Farm – owned by Roland Buchanan and leased by Jesus Martinez – had a negative flock performance because of a disease that was not caused by the grower, that flock was excluded from the settlement process and received an average performance rating. (*See* April 1, 2009 Hr'g Tr. v.1 at 24:5-25:7 (Martinez); Debtors' Ex. 24 at Bates No. 652.) The difference between the decision to give Trinder Farm an average rating and PPC's decision to exclude certain flocks in the Siler City Ranking is that PPC agreed to exclude Trinder's flock from the Live Oak Ranking on the front end – at the time the flock was settled – and PPC decided to exclude the three LT flocks from the Siler City Ranking on the back end – when the ranking was created. Indeed, Trinder Farm benefited from the decision to give the sick flock an average performance rating rather than exclude the flock from consideration. (*See* Debtors' Ex. 3.) Trinder Farm would have received an average performance rating of -18.75 (which is a below average rating) if the sick flock, which received a performance rating of 0 (which is a neutral rating), was excluded from the Live Oak Ranking and only the other four flocks during the chosen time period were considered in calculating Trinder Farm's average performance – a process that would have mirrored the one used for the Siler City Ranking. (*Id.*) Instead, because PPC gave the flock an average performance rating, Trinder Farm's average performance was a -15.

The parties agree that there were two differences between the process used to rank the Sanford/Siler City Grow-Out Base and that used to rank the broiler growers for the Live Oak Complex: (1) PPC considered about two and a half years of flock performance data when determining which growers to terminate in the Sanford/Siler City Grow-Out Base, and (2) PPC excluded four flocks from the Siler City Ranking due to extraordinary circumstances but did not exclude any flocks when creating the Live Oak Ranking because no extraordinary circumstances existed. (*See generally* Agreed Order at Exs. A-E.) The Declaration of Gracie Freeman provides testimony, in relevant part, that (i) PPC considered flocks from 2005[3] to 2008 in determining which growers in the Sanford/Siler City Grow-Out Base to terminate, and (ii) PPC excluded one flock from her father's farm that had LT when it created the Siler City Ranking. (*See* Agreed Order at Ex. A.) The Declaration of Dwayne Parrish provides testimony, in relevant part, that

---

[3] The Ranking for the Sanford/Siler City Grow-Out Base included flocks settled in early 2006. The birds for those flocks were provided to the growers in 2005.

WEIL, GOTSHAL & MANGES LLP

The Honorable D. Michael Lynn
April 20, 2009
Page 5

PPC considered flocks from 2005 and 2006 when it created the Siler City Ranking because of an outbreak of LT in 2007 and 2008. (*See id.* at Ex. B.) Finally, the Declaration of Timothy Patterson provides testimony, in relevant part, that Mr. Patterson believes his contract would not have been terminated if PPC had limited the Siler City Ranking to his most recent five flocks, thereby implying that PPC used more than five flocks of performance data when it created the Siler City Ranking. (*See id.* at Ex. C.) This testimony merely indicates that the Siler City Ranking differed from the Live Oak Ranking in the two ways stated above and admitted in the declarations submitted by PPC. (*See id.* at Ex. D ¶¶ 6-10; Ex. E ¶¶ 4-7.) Yet, the testimony does not indicate that the extended time period used for the Siler City Ranking should have been used for the Live Oak Ranking.

      The process used to identify growers for rejection in Siler City is, at best, tangential and immaterial to the issue of whether PPC exercised its business judgment in determining which broiler agreements to reject for the Live Oak Complex.[4] Nothing in any of the five declarations attached to the Agreed Order – or in the testimony elicited during the trial on Debtors' Motion to Reject – indicates that unique or extraordinary circumstances similar to those affecting the Sanford/Siler City Grow-Out Base affected growers in the Live Oak Complex. Accordingly, the declarations attached to the Agreed Order should have no bearing on the Court's decision regarding Debtors' Motion to Reject. Even if the Court believes that the process PPC used to identify broiler agreements for rejection in Live Oak was imperfect or that the process used for the Sanford/Siler City Grow-Out Base was superior, the evidence still supports a finding that PPC exercised proper business judgment. (*See generally* March 10, 2009 Hr'g Tr. v.1 (testimony from Dr. Jackson and Mr. Stroud).) Accordingly, the Court should defer to PPC's exercise of business judgment in this matter, and grant the Motion to Reject. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121-22 (Bankr. D. Del. 2001).

      Respectfully submitted,

Yvette Ostolaza

---

[4] At any other complexes where PPC may seek to reject grower contracts, it will consider the appropriate factors necessary to exercise its business judgment.

DA1\3553360\08\BWSK08!.DOC\67466.0003

WEIL, GOTSHAL & MANGES LLP

The Honorable D. Michael Lynn
April 20, 2009
Page 6

cc:    Deborah Deitsch-Perez, Esq. (via email)
       Robert Pfeffer, Esq. (via email)
       Jason S. Brookner, Esq. (via email)
       Jason E. Thelen, Esq. (via email)
       Clayton E. Bailey, Esq. (via email)
       Melanie Gray, Esq. (via email)
       Stephen Youngman, Esq. (via email)

# App. Ex. 16

No. 16

from Teresa M. Wineland <twineland@williamsanderson.com>

to "Kotcher, Liani" <liani.kotcher@weil.com>

cc "Peter G. Kumpe" <pkumpe@williamsanderson.com>,
LLF - Jim Lingle <Jim@linglelaw.com>,
clayfulcher@wyoming.com,
Josephine Garrett <jgarrett@jgarrettlaw.com>,
"Judy K. Helm" <jhelm@williamsanderson.com>,
Julia@linglelaw.com

date Fri, Aug 7, 2009 at 11:41 AM

subject Pilgrim's discovery

Liani,

Has the protective order been submitted yet? I have not yet received notice that it has been entered.

Please advise when we can expect to receive the contracts, Live Oak material (including transcript, exhibits, depositions, and documents produced in discovery), North Carolina material (including documents used to determine which growers would be terminated and calculations on which the decision was based), documents which you contend constitute notice of rejection if you are claiming retroactive rejection prior to the date of filing your motion, and documents provided to the Unsecured Creditors Committee which were shared with Mark Brodeur.

I understand that a status conference is set for Aug. 18 on the issues of (1) whether the public interest exception to the business judgment rule applies when Sec. 192(e) of the Packers and Stockyards Act is implicated; and (2) whether, if rejection of the executory contracts is allowed at all, the rejection can be retroactive to a date earlier than the date on which the order allowing rejection is entered, and if so, to what earlier date. We will be discussing the possibility of an agreed order on one or both of these issues in the meantime.

Teresa Wineland

Williams & Anderson PLC

111 Center Street

Twenty-Second Floor

Little Rock, Arkansas 72201

Tel: (501) 396-8453 (Direct)

(501) 372-0800 (Main)

Fax: (501) 396-8553

twineland@williamsanderson.com



EXHIBIT
16

# App. Ex. 17

No. 17

fromKotcher, Liani <liani.kotcher@weil.com>
to"Kotcher, Liani" <liani.kotcher@weil.com>,
"jbrookner@akllp.com" <jbrookner@akllp.com>,
"JasonThelen@andrewskurth.com" <JasonThelen@andrewskurth.com>,
"michael.mcconnell@khh.com" <michael.mcconnell@khh.com>,
"nancy.ribaudo@khh.com" <nancy.ribaudo@khh.com>,
"eweisfelner@brownrudnick.com" <eweisfelner@brownrudnick.com>,
"jcoffey@brownrudnick.com" <jcoffey@brownrudnick.com>,
"spohl@brownrudnick.com" <spohl@brownrudnick.com>,
"twineland@williamsanderson.com" <twineland@williamsanderson.com>,
"clayfulcher@wyoming.com" <clayfulcher@wyoming.com>,
"jim@linglelaw.com" <jim@linglelaw.com>,
"pkumpe@williamsanderson.com" <pkumpe@williamsanderson.com>,
"arochelle@williamsanderson.com" <arochelle@williamsanderson.com>,
"jgarrett@jgarrettlaw.com" <jgarrett@jgarrettlaw.com>,
"Julia@LingleLaw.com" <Julia@linglelaw.com>,
"sgoodwin@ccsb.com" <sgoodwin@ccsb.com>,
"brodeurlaw@aol.com" <brodeurlaw@aol.com>,
"levy@irlevylaw.com" <levy@irlevylaw.com>,
"laughterlaw@optilink.us" <laughterlaw@optilink.us>
cc"Beagles, Vance" <vance.beagles@weil.com>,
"Youngman, Stephen" <stephen.youngman@weil.com>,
"Melson, Liz E." <Liz.melson@weil.com>,
"Kerley, Peggy" <Peggy.Kerley@weil.com>,
"Cade, Nancy" <nancy.cade@weil.com>
dateFri, Aug 7, 2009 at 4:43 PM
subjectDocument Production

Counsel,

We will be making a limited production next week responsive to Teresa and team's requests. This
production, at a minimum, will include:

Grower contracts

Live Oak materials

Notices to growers

**EXHIBIT**

**17**

As of right now, one copy set is being made for Teresa and her team. No copies will be made for Mark
and his team at this time, per their request. UCC, EC, BMO, and Laughter LLC, please let me know if you

wish to have a copy. UCC please note you already have a copy of the entire Live Oak production as far as I can remember.

Thank you and have a nice weekend.

Liani Kotcher
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
Phone: (214) 746-8157
Fax: (214) 746-7777

# App. Ex. 18

**No. 18**

from Kotcher, Liani <liani.kotcher@weil.com>
to "Teresa M. Wineland" <twineland@williamsanderson.com>
cc "Peter G. Kumpe" <pkumpe@williamsanderson.com>,
LLF - Jim Lingle <Jim@linglelaw.com>,
"clayfulcher@wyoming.com" <clayfulcher@wyoming.com>,
Josephine Garrett <jgarrett@jgarrettlaw.com>,
"Judy K. Helm" <jhelm@williamsanderson.com>,
"Julia@LingleLaw.com" <Julia@linglelaw.com>,
"Beagles, Vance" <vance.beagles@weil.com>,
"Youngman, Stephen" <stephen.youngman@weil.com>
date Mon, Aug 10, 2009 at 2:14 PM
subject RE: Pilgrim's discovery

8/10/09

Teresa,

For discussion on today's call, please find attached (1) Judge Lynn's Memorandum Opinion in Live Oak (which not only adopts the business judgment standard for rejection of grower contracts but also specifically addresses the performance ranking method in North Carolina in footnote 41 as even "more thoughtfully subjective" than the method used in Live Oak -- which was approved by the Court under the business judgment standard -- and even "preferable" to the method used in Live Oak); (2) evidence considered by Judge Lynn with respect to the North Carolina performance ranking method including affidavits of Dale Hulsey and Randy Stroud; (3) Debtors' brief addressing performance ranking issues in North Carolina that was also reviewed and analyzed for the Live Oak Memorandum Opinion; and (4) In re Old Carco LLC, the S.D.N.Y. Bankruptcy Court's decision that adopts Judge Lynn's holding that business judgment standard, and not a heightened standard, will apply in circumstances similar to this contested matter.

We look forward to talking with you at 4:30.



EXHIBIT
18

# App. Ex. 19

**No. 19**

fromClay Fulcher <clayfulcher@wyoming.com>
to"Kotcher, Liani" <liani.kotcher@weil.com>
cc"Teresa M. Wineland" <twineland@williamsanderson.com>,
"Peter G. Kumpe" <PKumpe@williamsanderson.com>,
LLF - Jim Lingle <jim@linglelaw.com>,
Josephine Garrett <jgarrett@jgarrettlaw.com>
dateMon, Aug 10, 2009 at 2:49 PM
subjectRe: Pilgrim's discovery

Liani: I recognize that Judge Lynn adopted the business judgment rule, but I cannot agree that the Court's "more thoughtfully subjective" comment about North Carolina is equivalent to blessing the methodology used there. In the same sentence of the Opinion as the footnote, the Court states that it "does not consider reliance on the more distant past an alternative to Debtor's methodology that would be more fair..." What we are requesting with respect to the North Carolina growers is the same consideration given those in Live Oak, an opportunity to meet the standard as set out by the Court on page 20 of the Opinion.

Unlike the Live Oak situation, I do not anticipate that such an exercise will involve multiple hearing days or nearly as much discovery as was done in Live Oak. I am mindful of time and expense considerations. Basically what we need in addition to the information in the Live Oak case, including depositions, is (1) **all of the information that was used and reviewed by Pilgrim's in choosing the bottom 30% including which flocks for which growers were used** and which were discarded (basically a spreadsheet for all growers going back to 2006 with over-under cost, size of bird, and vaccination information); Mr. Hulsey states that as few as 2 flocks, and as many as 12 or more were used to determine performance for various growers; (2) **information that was provided to and received from GIPSA;** (3) the names of growers other than our clients who were part of the bottom 30% and whether any were subsequently provided flocks; and, (4) a printout of the 5 flock averages for all growers as of the date of the decision choosing the bottom 30% by the more thoughtfully subjective methodology. In addition, I would request a day for the depositions of Messrs. Stroud, Hulsey, and Don Osterhouse. I can assure you that I take short depositions and will not be asking these gentlement to educate me on basic poultry live production issues. Clay Fulcher



EXHIBIT
19

# App. Ex. 20

20

fromClay Fulcher <clayfulcher@wyoming.com>
to"Kotcher, Liani" <liani.kotcher@weil.com>
ccLLF - Julia Crenshaw <Julia@linglelaw.com>
dateMon, Aug 10, 2009 at 9:01 PM
subjectNC growers

Liani:  Until I see the spreadsheets for the North Carolina growers I will not know what is included, but I will tell you that **I will need all of the relative cost information for all growers' flocks from January 2006 through August 2008** to fully understand how the bottom 30% was derived.  It may be that the spreadsheets include information (1) on every growers' relative costs for each flock during that period; the relative costs for each grower (over under average for that week) are referenced at column "R1" for the Gold Kist flocks and at the "Flock Performance" column for the Pilgrim's flocks; (2) on whether or not the flock was vaccinated; and, (3) on the type bird being grown. I know this repeats some of my earlier email request, but my concern is that the spreadsheets only give flock and cost information on those flocks used to determine the bottom 30% and not the flocks that were discarded.  I wanted to give you as much advance notice as possible if the spreadsheets do not include this basic information.  Clay Fulcher



EXHIBIT
20

# App. Ex. 21

Teresa Wineland (Ark. Bar No. 81168) (pro hac vice)
Peter G. Kumpe (Ark. Bar No. 72073)(pro hac vice)
Williams & Anderson PLC
111 Center St., Suite 2200
Little Rock, AR 72201
Tel.: 501-372-0800
Fax: 501-372-6453

H. Clay Fulcher (Ark. Bar No. 88005) (pro hac vice)
James G. Lingle (Ark. Bar No. 76070) (pro hac vice)
Lingle Law Firm
110 S. Dixieland Road
Rogers, AR 72758
Tel.: 479-636-7899
Fax: 479-636-0095

Josephine Garrett (State Bar No. 07695400)
Josephine Garrett, P.C.
3119 West 5th Street
Fort Worth, TX 76107
Tel.: 817-335-5432
Fax: 817-338-1122

Attorneys for North Carolina Broiler Growers

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | | |
|---|---|---|
| In Re | § | Chapter 11 |
| | § | |
| PILGRIM'S PRIDE CORPORATION et al., | § | Case No. 08-45664 (DML) |
| | § | |
| Debtors. | § | Jointly Administered |

## SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS PROPOUNDED BY NORTH CAROLINA BROILER GROWERS TO THE DEBTORS

Come Fletcher Auman and Patricia A. (Pat) Auman, William Craig Buchanan and Cynthia Buchanan, Johnny Carroll and Dawn Carroll and Keith Brown (Buckhorn Farm), James Mark Currin and Renee P. Currin, Tony D. Currin and Darlene S. Currin and Thurman A. Currin Jr. and Susan B. Currin (Currin Farms), Henry Vince Denny and Amy Denny, Bobby J. Doby and Kay Doby (B & K Poultry), Robert ("Ronnie") Godwin, Lynwood Holland and Catina P. Holland, Ricky L. Jones, Little River Trails Farm & Ranch, Inc., Carlos Wayne Lanier and Ester Lanier, Kenneth Larry Lanier and Lori

Lanier, Philip Leach and Ramona Leach, Arden Frank Macon and Phillis P. Macon, W. Keith McNeill, Ben McNeill and Correan McNeill, Louis Andrew Meeks and Chana Meeks (4-M Farm), Morgan Family Farms, LLC, Louis Morgan and Debra Morgan, Arthur C. Morgan and Linda Morgan, Lee Morgan and Gabrielle Morgan, Michael Newton and Linda B. Newton, Tim Newton, Billy Dwayne Parrish and Jennifer L. Parrish, Patterson & Sons, Inc., Timothy C. Patterson, Pilkington Farms LLC, Kenneth Pilkington and Cecilia Pilkington, Robert Robinson and Elizabeth Robinson (Riverbend Farm), Anthony Stout, Lonnie M. Thomas and Betty J. Thomas, Farley Grant Webster and Angela C. Webster (Magnolia Hill), Michael A. Wilson and Jackie Wilson, Jimmie R. Wilson and Helen E. Wilson, and Wilson Farms Partnership ("North Carolina Broiler Growers") and propound the following Second Set of Interrogatories and Request for Production of Documents to the Debtors in accordance with Rules 33 and 34, FED.R.CIV.P.

Interrogatory No. 21: Please confirm that "Attorney Eyes Only" documents PPCGRO 3194-3201 include the large bird flocks that Mr. Hulsey states in his 4/17/09 Declaration were excluded in his ranking of growers from least efficient to most efficient based on flock performance.

Interrogatory No. 22: Please state whether any flocks during the period of January 2006 through September 2008, inclusive, have been deleted or omitted from the "Attorney Eyes Only" documents PPCGRO 3175-3201, other than the large bird flocks settled in 2006, and if so, please identify all such deleted or omitted flocks and state the reason each was deleted or omitted.

Interrogatory No. 23: Please state whether any flocks, other than the large bird flocks referenced as "Attorney Eyes Only" documents PPCGRO 3194-3201, and the four flocks referenced at paragraphs 9 and 10 in Mr. Hulsey's 4/17/09 Declaration, were excluded during the period covered by "Attorney Eyes Only" documents PPCGRO 3175-3193 in determining the growers who were terminated as part of the bottom 30% as referenced in October 2008 letters to those growers who were terminated, and if so, please identify such flocks and state the reason that each was excluded.

Interrogatory No. 24: Please identify each grower and/or farm that was terminated in 2008 as part of the bottom 30% of growers.

Interrogatory No. 25: Please identify any persons, besides Mr. Hulsey, who were involved in or responsible for the determination of which grower data to use to determine the most efficient versus least efficient growers in the Siler City/Sanford grow-out base.

Request for Production of Document No. 18: Please produce all documents supporting Mr. Hulsey's contention that the four flocks referenced in Interrogatory No. 25 were either affected by an abnormally severe adverse reaction to LT vaccine or were affected by a power outage beyond the grower's control.

Request for Production of Document No. 19: Please produce all documents that identify each flock that was vaccinated for LT during 2007 and 2008 as referenced in paragraph 7 of Mr. Hulsey's 4/17/09 Declaration, and the four flocks that were excluded as referenced at paragraphs 9 and 10 in Mr. Hulsey's 4/17/09 Declaration.

Request for Production of Document No. 20: Please produce all documents that identify whether any growers that were raising broiler flocks during any part of 2007 or 2008 have been excluded or omitted from the "Attorney Eyes Only" documents PPCGRO 3175-3201, and if so, that identify all such excluded or omitted growers.

Request for Production of Document No. 21: Please produce all documents that identify whether any flocks, other than the large bird flocks referenced as "Attorney Eyes Only" documents PPCGRO 3194-3201, and the four flocks referenced at paragraphs 9 and 10 in Mr. Hulsey's 4/17/09 Declaration, were excluded during the period covered by "Attorney Eyes Only" documents PPCGRO 3175-3193 in determining the grower rankings compiled by Mr. Hulsey, and if so, that identify each such flock.

Request for Production of Document No. 22: Please produce any other rankings spreadsheets that were created and/or considered by Pilgrim's in 2008 in reducing the production at Sanford by approximately 30%.

Respectfully submitted,

s/ Teresa Wineland___(Ark. Bar No. 81168)
      (pro hac vice)
Peter G. Kumpe (Ark. Bar No. 72073)
      (pro hac vice)
Williams & Anderson PLC
111 Center St., Suite 2200
Little Rock, AR 72201
Tel.: 501-372-0800
Fax: 501-372-6453

H. Clay Fulcher (Ark. Bar No. 88005)
      (pro hac vice)
James G. Lingle (Ark. Bar No. 76070)
      (pro hac vice)
Lingle Law Firm
110 S. Dixieland Road
Rogers, AR 72758
Tel.: 479-636-7899
Fax: 479-636-0095

Josephine Garrett (State Bar No. 07695400)
Josephine Garrett, P.C.
3119 West 5th Street

Fort Worth, TX 76107
Tel.: 817-335-5432
Fax: 817-338-1122

Attorneys for North Carolina
Broiler Growers

## CERTIFICATE OF SERVICE

I, Teresa Wineland, hereby certify that a copy of the above and foregoing was served by email on the following on this 18th day of August, 2009:

COUNSEL FOR THE DEBTORS:

Martin A. Sosland
Stephen A. Youngman
WEIL, GOTSHAL & MANGE LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
stephen.youngman@weil.com
martin.sosland@weil.com

Gary T. Holtzer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
gary.holtzer@weil.com

U. S. TRUSTEE:

Lisa L. Lambert
Erin Marie Schmidt
Office of the United States Trustee
515 Rusk Avenue, Suite 3516
Houston, TX 77002
Lisa.L.Lambert@usdoj.gov
Erin.Schmidt2@usdoj.gov

OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

Jason S. Brookner
Jonathan Irvin Levine
Paul N. Silverstein

ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
jbrookner@akllp.com
jlevine@akllp.com
psilverstein@akllp.com

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS:

Michael A. McConnell
Nancy Ribaudo
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
michael.mcconnell@khh.com
nancy.ribaudo@khh.com

Edward S. Weisfelner
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
eweisfelner@brownrudnick.com

Jeremy B. Coffey
Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
jcoffey@brownrudnick.com
spohl@brownrudnick.com

/s Teresa Wineland

# App. Ex. 23

 **USDA**

| United States | Grain Inspection, | 75 Spring St., Suite 230 |
| Department of | Packers and Stockyards | Atlanta, GA 30303-3308 |
| Agriculture | Administration | 404-562-5840 Office |
| | | 404-562-5848 Fax |

November 13, 2009

Pilgrim's Pride Corporation
Randy Stroud, Senior Vice President
PO Box 93
Pittsburg, TX 75686-0093

Dear Mr. Stroud:

The Packers and Stockyards Program has received complaints from contract poultry growers in the Siler City –Sanford, North Carolina area alleging Pilgrim's Pride committed unfair and deceptive practices. Pilgrim's Pride closed the Siler City, North Carolina facility in the fall of 2008, while the Sanford, North Carolina facility remains open. Numerous contract growers in the Siler City-Sanford grower area were notified by Pilgrim's Pride of the termination of their contracts due to economic necessity. Packers and Stockyards is aware that Pilgrim's Pride is operating under Chapter 11 bankruptcy; however, the complaints received from these growers regarding the methodology used to select growers for contract termination requires investigation.

In order to investigate the complaints received, the following records are required:

1.  A listing of all contract growers for the Siler City location for the years 2005-2008.
2.  A listing of all contract growers for the Sanford location for the years 2005-2008.
3.  Weekly ranking sheets, with all grower names included, for the years 2005-2008 for the Siler City location.
4.  Weekly ranking sheets, with all grower names included, for the years 2005-2008 for the Sanford location.
5.  A listing of the contract poultry growers whose farms were vaccinated for the LT virus and the dates of vaccination for the Siler City and Sanford locations during the period 2005 – 2008.
6.  A listing of the contract poultry growers whose farms were confirmed with the LT virus for the Siler City and Sanford locations. This listing should include the farm name and the date of the outbreak.
7.  Copies of all correspondence sent to contract growers relative to their termination due to economic necessity at the Siler City and Sanford locations.
8.  Copies of all production or grow-out contracts for growers who were terminated due to economic necessity at the Siler City and Sanford locations.
9.  Copies of Pilgrim's Pride notes, memorandum and methodology used to determine the growers whose contracts were terminated due to economic necessity at the Siler City and Sanford locations.

*✧ ✧ Treat Every Customer and Employee Fairly, Equitably, and with Dignity and Respect ✧ ✧*
*Visit us on the Internet at www.usda.gov/gipsa*         *Call the GIPSA Hotline at 1-800-998-3447*

**EXHIBIT**

**23**

10. Copies of housing specifications from 2005 – 2008 for the Siler City and Sanford locations.

11. Any and all documents not specifically mentioned above used to determine the growers whose contracts were terminated due to economic necessity at the Siler City and Sanford locations.

We are requesting that this information be supplied in dual form, both paper and electronic. We request this information be available either for delivery to Packers and Stockyards or for pick-up by our agents during the week of November 30, 2009. If during the investigation, it is determined that additional information is needed, you will be contacted in a timely manner. Thank you for your cooperation in this matter. If you have any questions, please do not hesitate to contact Creig Stephens or me at the above telephone number.

Sincerely,

Elkin W. Parker
Regional Director

PPC-LIN 050076

# App. Ex. 24



**WILLIAMS & ANDERSON PLC**

TWENTY-SECOND FLOOR
111 CENTER STREET
LITTLE ROCK, ARKANSAS 72201

PETER G. KUMPE
pkumpe@williamsanderson.com

DIRECT DIAL
(501) 396-8431

(501) 372-0800
TELECOPIER
(501) 372-6453

December 09, 2009

Stephen A. Youngman, Esquire
**WEIL, GOTSHAL & MANGES LLP**
200 Crescent Court, Suite 300
Dallas, TX 75201

Liani Kotcher, Esquire
**WEIL, GOTSHAL & MANGES LLP**
200 Crescent Court, Suite 300
Dallas, TX 75201

*Sent via electronic mail &*
*U.S. mail*

Vance L. Beagles, Esquire
**WEIL, GOTSHAL & MANGES LLP**
200 Crescent Court, Suite 300
Dallas, TX 75201

     RE:    Pilgrim's Pride Corporation et. al

Dear Counsel:

    In discovery requests served by us in connection with objections to your client's attempted rejection of grower contracts, one of our document requests was for the grower ranking information that was used to determine the bottom 30% of growers in connection with grower terminations in North Carolina. Presumably this is the same information that was provided to GIPSA. On page 3 of Pilgrim's April 6, 2009, letter brief in the motion to reject certain Live Oak growers' contracts, the writer stated that Mr. Stroud contacted GIPSA, that GIPSA investigated a complaint related to the terminations, and that GIPSA investigated how Pilgrim's selected grower contracts to terminate. The intent of our discovery request was to examine what information Pilgrim's provided GIPSA that was used to select the bottom 30% of growers.

    We have completed a FOIA request to GIPSA for documents related to the North Carolina terminations. On November 4, 2008, GIPSA employee John Rollins requested that Randy Stroud provide copies of documents related to the manner in which Pilgrim's determined the bottom 30% of

**EXHIBIT**

**24**

growers. On November 5, 2008, Stroud sent a grower ranking list. The grower ranking list provided to GIPSA consisted of 19 pages.

The grower ranking list of small bird flocks that was produced to us by your office also consisted of 19 pages though most of the similarities between these two ranking lists end there. Even with grower names redacted on the ranking list provided by GIPSA, it is clear that there are significant differences in the grower ranking list produced pursuant to our request and that list provided to GIPSA.

Part of the reason we did not pursue our objection to the motion to reject the North Carolina contracts was the good faith belief that we were being provided the same information provided to GIPSA that was used to select the bottom 30%. This is obviously not the case. At this point we are not sure who has the true list that was used by your client, GIPSA or us. You are surely aware that GIPSA is conducting a follow-up investigation of the North Carolina terminations. GIPSA and we are entitled to the actual documents utilized in the termination decision. Therefore, I respectfully request that you produce for us the original 19 page ranking list that you provided GIPSA and that you also produce to GIPSA the ranking list (PPCGRO 003175-003193) that was produced to us. If you are willing to voluntarily provide these documents as requested, please advise us by close of business this Friday; otherwise, we will file a motion with the Court to obtain the complete documentation.

Cordially,

WILLIAMS & ANDERSON PLC

Peter G. Kumpe

PGK.j

# App. Ex. 25

# WEIL, GOTSHAL & MANGES LLP

200 CRESCENT COURT
SUITE 300
DALLAS, TEXAS 75201
(214) 746-7700
FAX: (214) 746-7777

AUSTIN
BOSTON
BUDAPEST
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW
WASHINGTON, D.C.

WRITER'S DIRECT LINE

214.746-8157
liani.kotcher@weil.com

December 16, 2009

<u>VIA FACSIMILE AND ELECTRONIC MAIL</u>

Peter G. Kumpe, Esq.
Williams & Anderson PLC
111 Center Street
Little Rock, Arkansas 72201

        Re:    *In re Pilgrim's Pride Corporation et al.*
                Case No. 08-45664 (DML C)

Dear Peter:

        This letter responds to your letter of December 9, 2009, in which you inquired about the differences between the grower ranking information provided to GIPSA on November 5, 2008 and the grower ranking information provided in response to your request for production in connection with your objection to Pilgrim Pride Corporation's rejection of grower contracts.

        In November 2008, Mr. Stroud, in anticipation of having to terminate certain growers' contracts, contacted GIPSA, informed them of these pending terminations, and provided GIPSA with a grower ranking list based on the North Carolina growers' flock settlements as of the end of August 2008, the most current information Mr. Stroud then had available. Mr. Stroud offered to provide additional information to GIPSA but they did not pursue any further inquiries. The grower ranking list that you received sometime later was based on the North Carolina growers' flock settlements as of the end of September 2008 and was the actual list used to determine which growers' contracts to terminate or reject.

        To assuage your concerns, please find attached the documents that Mr. Stroud sent to GIPSA. These documents are the grower ranking information and a list of the house class of growers whose contracts were terminated. We are also providing GIPSA with the ranking list (PPCGRO 003175-003193).

        Please do not hesitate to contact me if you have any further questions.

US_ACTIVE:\43255214\05\67466.0003

**EXHIBIT**

**25**

WEIL, GOTSHAL & MANGES LLP

Peter G. Kumpe, Esq.
December 16, 2009
Page 2

Sincerely,

Liani Kotcher

LK:grj

Enclosures
cc:     Teresa M. Wineland, Esq.
        Stephen A. Youngman, Esq.
        Vance L. Beagles, Esq.

US_ACTIVE:M3255214\05\67466.0003

# App. Ex. 27

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In Re:                          )
                                )   Case No. 08-45664 (DML)
Pilgrim's Pride                 )
Corporation, et al.,            )   Chapter 11
                                )
              Debtors.          )   Jointly Administered
_____/

VIDEOTAPE DEPOSITION OF DALE L. HULSEY

(Taken by Growers)

Sanford, North Carolina

Tuesday, September 14th, 2010

EXHIBIT
27

Reported in Stenotype by:
Judy F. Reins, RPR
Transcript produced by computer-aided transcription



setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1    were going on in the bankruptcy court being some of

2    the Live Oak Florida growers and Pilgrim's?

3         A    I remember that going on, yes, uh-huh, but

4    I don't, but I don't remember that this was, you

5    know --

6              MR. BAILEY:  Mr. Fulcher, as lead counsel

7         on that, I'll stipulate that it was.

8         A    Yes.

9         Q    All right.  Have you reviewed this

10   document before you came in to testify today?

11        A    Not this particular one, no.

12        Q    All right.  Did, did you do some

13   preparation for your deposition before you came in

14   today?

15        A    Yes, uh-huh.

16        Q    And how long did you spend preparing for

17   your deposition today?

18        A    Probably about two hours.

19        Q    If you could turn to page 2 of Exhibit 5,

20   paragraph 5.  Do you see that?

21        A    Yes, uh-huh.

22        Q    All right.  It states:  (Reading)

23              In or around August, 2008, I was in

24   discussions with other members of PPC management

25   during which PPC determined to terminate


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1  approximately four million square feet of the

2  Sanford/Siler City Grow-Out Base.  Do you see that

3  first sentence?

4        A    Yes, uh-huh.

5        Q    Tell me a little bit about these

6  discussions.  I guess, first of all, tell me where

7  these discussions took place, if you can recall.

8        A    They were mostly phone discussions, and, I

9  mean, I was in, you know, in my office and, in

10  talking to Randy Stroud and also our complex manager

11  at that time, Ralph Upton, and then there was also,

12  well, in talking just to my folks, too, where we had

13  a discussion about how many square feet we had out

14  there, and since the Siler City plant had shut down,

15  how much down time we had, and this, too, was around

16  the time that they, it was decided that the

17  expansion of the Marshville plant was going to be

18  put off, and so we realized that we had, you know,

19  more square footage than we could keep birds in.

20        Q    Do you recall that any of the other

21  members of PPC management were involved in these

22  discussions other than Mr. Upton and Mr. Stroud?

23        A    Well, at that time, let's see, I believe

24  Ron, Ron Morris was there, was one of the VP's, and,

25  let's see.  I'm trying to think if Walt was involved



setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   you know, a period of time there and we figured out

2   what the performance, not cost but performance was

3   on all of our growers on the Sanford base, and, you

4   know, took a ranking sheet as such and seeing who

5   had the better performance and who --

6          Q     Now --

7          A     -- from top to bottom.

8          Q     Okay.  Now, at this time in August, 2008,

9   Siler City was shut down.  Correct?

10         A     Yes, I believe it was shut down in March,

11  uh-huh.

12         Q     All right.  And most of the growers who

13  had been producing large birds for Siler City were,

14  by August, 2008, producing a smaller bird for the

15  Sanford complex?

16         A     Yes, all the growers were producing,

17  uh-huh.

18         Q     Okay.  Do you recall whether or not you

19  ran different versions of ranking information, for

20  instance, that covered different periods of time?

21         A     Yes, we did, uh-huh.

22         Q     And where are all of those versions of the

23  different ranking sheets that you ran?

24         A     There -- well there were only, I think

25  there were only two versions.  There was one that


**setdepo**

The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   we had the large bird ranking and then we have a

2   small bird ranking that goes through the end of

3   August, 2008.

4        A    September, 2008, yes.

5        Q    And another one that goes through the end

6   of September --

7        A    Yeah.

8        Q    -- 2008?

9        A    Yes.

10       Q    All right.  So we're talking about three

11  different rankings that you can recall were created,

12  a large bird --

13       A    Okay, yes.

14       Q    A small bird through the end of August,

15  2008 --

16       A    Yeah.

17       Q    And a small bird that goes through the end

18  of September, 2008.

19       A    Yes, uh-huh.

20       Q    Okay.  You don't recall whether or not you

21  ever created a ranking when we were looking to come

22  up with this four million square feet that separated

23  out straight-run from females?

24       A    I don't recall right off the bat, but

25  there may -- there has been a ranking done like


SETdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 421

1    that.  I just can't remember if it was for this

2    particular thing right here, but there has been one

3    of those, uh-huh.

4         Q    If you could do me a favor and --

5         A    Yeah.

6         Q    -- and check your files.

7         A    Okay.

8         Q    Talk to your attorney about it.

9         A    Okay.

10        Q    If there is a possibility that there

11   are --

12        A    Yeah.

13        Q    -- additional ranking sheets --

14        THE COURT REPORTER:  Sir, please, let him

15   finish and don't interrupt.  Thank you.

16        Q    If there are different -- if there are

17   additional ranking sheets besides the three we're

18   going to talk about that there were considered,

19   please provide him with that.

20        Back to paragraph five of the declaration

21   that you've got in front of you.  You still have

22   paragraph 4, 5, 6, 7, that page?  All right.  The

23   second sentence says:  (Readin⸱:

24        As live production manager, I was

25   responsible for creating a spreadsheet, (the



setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 422

# APP. 423
# INTENTIONALLY
# LEFT BLANK

1  "Ranking") compiling flock performance information
2  for each of these broiler growers, calculating the
3  average performance for each grower, and then
4  ranking the growers from least efficient to most
5  efficient based on flock performance.
6          Is it my understanding that each and every
7  grower who was producing small birds for Sanford was
8  included in both the August and September
9  spreadsheets?
10      A     Yes, sir.
11      Q     And then in paragraph 6, it states:
12  (Reading)
13          In compiling the ranking, I used flock
14  performance information from January, 2006, through
15  August, 2008.  Do you see that sentence?
16      A     Yes, sir.
17      Q     And is that accurate?
18      A     It would be more like September, 2008.
19      Q     Okay.  So that is not an accurate
20  statement?
21      A     That's not an accurate statement.
22      Q     When you signed this declaration, you
23  stated:  (Reading)
24          I hereby declare under penalty of perjury
25  that the foregoing is true and correct.  Do you



1    remember that?

2        A    Yes, uh-huh.

3        Q    And so what you're telling me today is you

4    did not rely on the ranking that went through

5    August, 2008.  You relied on the ranking that went

6    through September, 2008?

7        A    Yes, sir.

8        Q    And was the September, 2008 ranking the

9    one that was produced to the Grain Inspection

10   Packers and Stockyards Administration?

11       A    Yes, sir.

12       Q    You're absolutely sure?

13       A    Yes, uh-huh.

14       Q    Do you recall Randy Stroud copying you on

15   an email to John Rollins at GIPSA stating that if

16   Mr. Rollins had additional questions about the

17   ranking, he should contact you?

18       A    Yes, uh-huh.

19       Q    And do you also recall that that email

20   attached a copy of the ranking or the spreadsheet

21   that Mr. Stroud had sent to Mr. Rollins?

22       A    I remember he sent him a spreadsheet, yes,

23   uh-huh.

24       Q    Okay.  And so you --

25       A    I'm not positive which spreadsheet he sent



1       A    Okay.

2       Q    I'm just curious whether or not you've

3   seen that file as I put it together as an exhibit

4   today.

5       A    I saw part, I mean, I saw parts of it.

6       Q    Okay.  Well, that's fine.  If, if you'll

7   look in the bottom, right-hand corner of your set,

8   Clayton will have to count for himself because I

9   failed to mark his pages, but if you'll look to page

10  9 in that set of documents, I believe you'll see an

11  email from Randy Stroud to John Rollins dated

12  Wednesday, November 5th, 2008 at 12:29 p.m. Do you

13  see that one?

14      A    Yes.

15      Q    It's cc'd to several people.  Those are

16  redacted, and then it, it says, it's got an, a

17  couple of attachments, a copy of HOUSE CLASS - CUT

18  and a date and copy of Sanford rankings.  Do you see

19  that?

20      A    Yes, uh-huh.

21      Q    Okay.  So, do you recall being copied on

22  this particular email?

23      A    Yes, uh-huh, uh-huh.

24           (EXHIBIT HULSEY 7 WAS MARKED FOR

25      IDENTIFICATION)



**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
                www.setdepo.com

App.  426

1       THE VIDEOGRAPHER:  Going back on record.

2   The time on the monitor is 1:11.  Please

3   continue.

4   BY MR. FULCHER:

5       Q    Mr. Hulsey, when we went on lunch break,

6   we were talking about the ranking sheets.  I don't

7   remember exactly where we were.  Exhibit 6 that you

8   have in front of you with the various documents, the

9   emails to Mr. Stroud and a copy of the ranking sheet

10  that was provided him by Randy Stroud, large

11  portions of it are redacted, but can you tell me

12  again whether or not you believe that ranking sheet

13  that was provided to Mr. Stroud, or provided by

14  Mr. Stroud to Mr. Rollins was the August, 2008

15  ranking sheet or the September, 2008 ranking sheet?

16      A    This one was the August, 2008 ranking

17  sheet.

18      Q    All right.  Why did you provide, or why

19  did Mr. Stroud provide, if you know, Mr. Rollins the

20  August, 2008 ranking sheet?

21      A    I have, I have no idea.  He had all the

22  ranking sheets, but I don't know if he just clicked

23  the wrong thing in his email or what he did on that.

24      Q    Okay.  Was Pilgrim's intent to provide

25  Mr. Rollins the September, 2008 ranking sheet?



1      A    Yes.

2      Q    We looked at the November 5th email in

3  that packet.  Again, it's page 9, if you turn to

4  that page.  Are you there?

5      A    Yes, uh-huh.

6      Q    Okay.  Again, on November 5th, it appears

7  that Mr. Stroud sent Mr. Rollins the ranking sheet

8  and he copied you with that ranking sheet.  Correct?

9      A    I know that he sent me the email.  I'm,

10  I'm assuming he sent the whole thing, yes.

11      Q    All right.  Can you explain to me why you

12  would not have corrected Mr. Stroud when you

13  realized that he had sent the August, 2008 ranking

14  sheet instead of the September, 2008 ranking sheet?

15      A    I probably didn't look at the ranking

16  sheet.  I probably just assumed that it was the

17  right one.

18           (EXHIBIT HULSEY 8 WAS MARKED FOR

19      IDENTIFICATION)

20      Q    I'll ask you to look at what I've marked

21  as Exhibit 8.  And take your time.  There's several

22  pages there, but if you'd look through it, paying

23  special attention to the last dates for each

24  particular grower, and then I'm going to ask you a

25  question about this document.



setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

1      Q    Do you recall whether or not in August,

2  2008, September, 2008 there were approximately 180

3  to 185 growers producing birds for the Sanford

4  complex?

5      A    Uh-huh, that's probably a pretty close

6  number, uh-huh.

7      Q    Can you tell me whether or not each of

8  those growers who had, who was producing small birds

9  for the Sanford complex was included on this August,

10  2008 ranking?

11      A    Yes, they all should have been included,

12  uh-huh.

13      Q    All right.

14           (EXHIBIT HULSEY 9 WAS MARKED FOR

15           IDENTIFICATION)

16      Q    Let me hand you what we've marked as

17  Plaintiff's 9, I've got mine mixed up here, give me

18  just a minute, and ask if you can identify that

19  particular document.

20      A    Yes, it's a ranking of the Sanford growers

21  going through, going into September, uh-huh.

22      Q    Possibly even to the end of September?

23      A    Yes.

24      Q    And if I've understood your previous

25  testimony, it was, in fact, this ranking that went



setdepo
The Evolution of Deposition Management

1   you see that down at the bottom?

2       A    Yes, uh-huh.

3       Q    And then above that, Tony Currin?

4       A    Yes.

5       Q    And then B & P Farms is above that.  They

6   also settled a flock on --

7       A    Yes.

8       Q    -- august 30th, '08.

9       A    Yes.

10      Q    And then if we go up past Ricky Jones and

11  Lynwood Holland, we see a Michael Yow, Y-o-w.

12      A    Yes.

13      Q    Do you see that?

14      A    Uh-huh.

15      Q    The last flock he settled was July 12th,

16  2008.  Correct?

17      A    Yes, uh-huh.

18      Q    Now, Michael Yow ought to be on the

19  August, 2008 ranking sheet, should he not?

20      A    Yes, uh-huh.

21      Q    Michael Yow's average, according to this

22  September, 2008 ranking sheet was negative 30.5.  Is

23  that correct?

24      A    On which sheet now?

25      Q    The, the sheet you're looking at.



setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:     1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1     A     Okay.

2     Q     I mean, it looks like he has two flocks.

3     A     Yeah.

4     Q     He had three points over and 64 points

5  under and he had a negative 30.5 flock average?

6     A     Yes, uh-huh.

7     Q     Was Michael Yow terminated?

8     A     No, uh-uh.

9     Q     And why not?

10    A     Because he only had -- we looked at the

11  ones that just had, I believe we said six flocks or

12  over, and then are, unless, like, on the Sunshine

13  Farms situation, he was the very bottom grower on

14  the, on the male settlement, but we took into

15  consideration what their, what their ranking was

16  over on the, on the male side, too.  If he was,

17  like, a top grower over on the male side and pulled

18  a small minus over with just two flocks, we didn't

19  feel like that was fair.

20    Q     Okay.  So even if a grower would have been

21  subject to termination because they were in the

22  bottom 30 percent, you took some other things into

23  consideration on whether to terminate them?

24    A     Well, what we took into consideration was

25  how you did on the male flocks, if you grew males



Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

1   also.

2        Q    Did you not swear under oath that you did

3   not take into consideration the male flocks and, in

4   fact, excluded all those flocks from your

5   consideration?

6        A    Excluded all of the flocks?

7        Q    All the male flocks.

8        A    We excluded -- we didn't take the male

9   flocks, the Sanford -- I mean the Siler City

10  ranking.  You know, we took those growers that was

11  this -- that was mainly a male grower right there

12  from that side of the equation, and we looked at

13  mainly the Sanford growers, yeah.

14       Q    Did you make sure that Mr. Stroud knew

15  that you had allowed some of the large bird growers

16  to avoid termination because of how they performed

17  on large bird flocks?

18       A    Well, we, we felt like that it was not

19  fair for a person to be cut off just because of two

20  flocks that he had on this sheet, is what we looked

21  at.  We said, you're going to have to have at least

22  five or six flocks or five -- I can't remember

23  exactly where the cutoff, whether we said five or

24  six, but that you had to have so many flocks before

25  you would be considered, you know, in the, in the


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

App. 432

1  mix here.

2      Q    So if you had less than a certain number

3  of flocks, you were not considered for termination?

4      A    Well, you were not considered to be, to be

5  primarily a grower on this side.

6      Q    I don't understand.  A grower on which

7  side?

8      A    On what type of bird that you grew.  Let

9  me start over.

10     Q    Okay.

11     A    Like the two -- you know, a person, as we

12 looked at this, it was, I mean, this was not a -- we

13 took a ranking and we went up through here, and

14 we've looked at the growers from the standpoint of

15 how many flocks did you have, and then, you know, if

16 you just had -- it would not have been fair if a

17 grower just had one flock or two flocks, and, like,

18 over a period, we see here on this one that he had

19 one in February and then one in July.

20         So there was some male, probably a male

21 flock in between that one there, and, but he was

22 mainly a grower over on the, on the other, from the

23 other plant, and it wouldn't have been fair just to

24 cut this guy off because he had two flocks over here

25 on the, on the female side.


**setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

App. 433

1  that GIPSA got to look at?

2       A    Yes, uh-huh.

3       Q    And somebody filed a complaint, and GIPSA

4  looked at this sheet --

5       A    Yes.

6       Q    -- and said, it looks like you got the

7  bottom 30 percent.

8       A    Yeah.

9       Q    We don't see anybody on there that was

10  below there.

11       A    Uh-huh.

12       Q    But that wasn't the accurate information

13  that they were seeking, was it?

14            MR. BAILEY:  Objection, calls for -- lack

15       of foundation, calls for speculation on your

16       end, but go ahead.

17       A    I just sent the sheets, you know, to

18  Mr. Stroud, and, you know, I wasn't aware that he

19  sent the wrong one, you know, to them.

20       Q    I mean, it was pretty important that when

21  GIPSA asked for information, they get accurate

22  information, is it not?

23       A    That's right.

24       Q    All right.  And you were copied with this

25  ranking sheet and had an opportunity to correct



1  Mr. Stroud almost two years ago.  Correct?

2     A    I did receive the sheet back, yes.

3     Q    Yeah, if you had looked at it and paid

4  attention --

5     A    Yes, yeah.

6     Q    Okay.  Look at the very first page of

7  Exhibit 8.  See the one that starts with Dan Smith

8  and then Beal Family Farms up at the top?

9     A    Yes.

10    Q    I mean, I see quite a few growers, Billy

11 Needham, Varner's Farm, Fields Family Farm, Garry

12 Emerson, Harrington Brothers, Roy Wood, John

13 English, Janet Allen.  Then if you go down a little

14 bit, Billy Doby, and a little bit farther, Norma's

15 Place.  All those people had only grown, it looks

16 like, one or maybe two small bird flocks.  Correct?

17    A    Yes.

18    Q    Can you explain to me why we see so many

19 of these large bird growers who only grew one or two

20 or three flocks of small birds above the cutoff

21 line, but the only large bird grower who grew one or

22 two or three small bird flocks who was actually

23 below the cutoff line is Sunnyside Acres?

24    A    The reason that, you know, this was a one

25 field op or one live operation's group where it was


The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 435

1    Q    I'm not exactly sure what you're saying,

2  but my question is:  Is it possible that somebody

3  has gone through this August, 2008 ranking and

4  somehow physically removed some number of growers

5  that only had one or two flocks?

6    A    I don't recall us removing any.  I mean,

7  it was just, it was a trial run, you know, when we

8  first, you know, 'cause we had discussions about,

9  we've got to, we've got to pull out of so many

10 square feet, or, you know, we were told we was going

11 to have to pull out so many square feet.  We need to

12 look at performance and see where performance is at,

13 and so we started, because we knew the biggest

14 problem was going to be the part about two separate

15 accounting systems, trying to get all the numbers

16 crunched together just, you know, to get our

17 numbers.

18        And so we, we ran, you know, a trial sheet

19 here, but as far as someone making an effort to go

20 through, I mean, this was a lot of trouble to put

21 together to start with.  I don't, I don't see why we

22 would have.  I mean, why would we have pulled

23 anything out?

24   Q    It was my understanding that at least some

25 number of growers who had been producing large



Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

1  birds, but were only producing small birds for one

2  or two or three flocks as of the time you were

3  determining these rankings, that there was a

4  decision made to get those growers a pass, even if

5  they fell below the cutoff line.

6      A    I wouldn't call it a pass.  I would say

7  that they really didn't have enough, didn't enough

8  information on them if they only had two flocks as

9  compared to people that had as many as nine or ten

10 flocks that you were comparing them with.  Am I

11 going to compare your results and you've just grew

12 two flocks for me and get somebody that grew ten

13 flocks for me.  Would you consider that to be fair?

14     Q    Well, I don't know whether I'd consider it

15 to be fair, sir.  What I want to know is:  What was

16 the standard by which you determined which growers

17 to terminate in September or October, 2008?

18     A    Uh-huh.  It was the performance sheet, and

19 we said they'd have to have enough, like, five

20 flocks, in order to, in order to be counted as, as

21 having a, a big enough sample to terminate.

22     Q    Okay.  If you had to have five flocks, why

23 did you file this sworn declaration saying that some

24 growers only had one or two flocks upon which their

25 performance was judged?



setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1       A      Okay.  Let's see.  Which exhibit is that?

2       Q      That is Exhibit 5.

3              MR. BAILEY:  What paragraph, sir?

4              MR. FULCHER:  Paragraph 8, the very last

5       sentence.

6       A      Yes.  All that's saying, it says, as a

7       result of excluding the large male flocks, some

8       growers on the ranking only had one or two flocks

9       upon which their performance, you know, was judged,

10      even though the time period covered more, whereas

11      other growers would primarily raise small birds at

12      twelve or more flocks under which their average

13      performance was calculated.

14             Judge might have been a bad word, might

15      have been whether it was calculated, you know, but

16      that's just telling the reason that there's just

17      two -- or the way I took that is that's just telling

18      the reason that there's just two flocks on some of

19      the -- one or two flocks on that sheet was because,

20      you know, of the large bird flocks.  That was the

21      reason behind that.

22      Q      But it says you're judging performance on

23      every grower in the Sanford facility, and some of

24      the growers only had one or two flocks and some of

25      them had twelve or more flocks.



setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:       1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1  believe that Kenneth Ring was.

2      Q    Did, did Sam Talley have two different

3  farms?

4      A    Yes, sir.

5      Q    And was the Sam Talley farm terminated but

6  the other farm he had, Talley's Poultry Farm, was it

7  not terminated?

8      A    Yes.  Two houses were and two houses were

9  kept on.

10      Q    Okay.  So do you still have Exhibit 9

11  there in front of you?

12      A    Yes, uh-huh.

13      Q    Okay.  Turn over to page 003185, which is

14  in about the middle.  Are you there?

15      A    Yes, uh-huh.

16      Q    Okay.  About the middle of that page, we

17  see Second Generation.  They ranked higher than

18  Kenneth Ring, Talbert Farm -- Tally's Farm, but

19  you're telling me that Second Generation was

20  terminated and these other farms were not?

21      A    Yes.  Second Generation had probably

22  another six or seven flocks on the very bottom of

23  the, of the male settlement, yes.

24      Q    Okay.  I thought you didn't take into

25  consideration the male flocks because that would be


setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

App.  439

1  unfair to compare those to the small flocks.

2       A    It would be, but we looked at these and

3  then said, well, if you've got, on two or three

4  different cases here that if their performance was

5  poor, at the very -- well, we looked at the, the

6  bottom three on the male side, then, you know, that

7  that would be a consideration on this other one.  If

8  that one, if Second Generation had had, you know,

9  some flocks on up in the middle of the page on the

10  male side, then, you know, it would have been.

11      Q    Was there some average that you looked at

12  on the large bird side to determine if they did a

13  certain level of performance on the large bird side,

14  they would either be terminated or not terminated,

15  even if they had poor performance on the small bird

16  side?

17      A    Repeat that, please.

18      Q    How did you come up with this list of

19  people to terminate?  I mean, I can't understand

20  what's --

21      A    Okay.

22      Q    -- what's happened here.

23      A    We took, we took the, the September sheet,

24  and we knew what our square footage that we needed

25  to take off.  This was the performance ranking.  We



1   start at the bottom of the sheet.  We wrote down a

2   name.  We wrote how many square feet he had.  We

3   went to the next one, next person on the sheet,

4   wrote it down, wrote how many square feet that he

5   had.  And then when we got to the amount of square

6   footage, you know, that we needed to, to meet where

7   we wouldn't have so much downtime, and, you know,

8   the four million square feet or whatever, and then

9   we stopped..

10        We tried to stop as early as possible

11  because we -- now, when I say four million, we also

12  took into consideration our own company farm, which

13  we had 16 houses on, which we also stopped placing

14  birds on.  Even though it was a better than average

15  performer, we didn't feel like it would be right to

16  continue to place birds on our own farm whenever we

17  were, you know, taking people off on these other

18  farms, and so it was, it was not taken lightly in

19  doing the sheet.

20        You know, we looked at it from a pure

21  performance, what our better performers.  It was

22  performance based strictly.  We, we were very

23  object -- not, you know.  We drew a line in the sand

24  and said, everybody over here is here and everybody

25  here is here, but, you know, there were some -- when



1  you looked at, you know, if you had a bird -- I mean

2  a, a grower, like Kenneth Ring or, who was the one

3  that you mentioned ago, the one above Kenneth?

4       Q    Talbert.

5       A    Yeah, or one of those that was growing

6  just had two flocks, yet it was a real poor male

7  grower, you know, we had to take that into

8  consideration for the program and so, but, if you

9  look at the, you know, more than the majority of the

10 people, it was just straight up the line until it

11 got to a certain point.  We probably could have cut

12 off another 15 and really not hurt the program as

13 far as the program goes, but we stretched everybody

14 as far as we could stretch them on downtime trying

15 to keep as many people as we could in birds, and,

16 like I said, it was not something that was taken

17 lightly.

18       We, we twisted to look at it.  I shouldn't

19 say twisted.  We looked at it not to, you know, pick

20 out certain people or anything.  We had one of our

21 own employees that, whose contract was canceled, and

22 so it was, like I said, it was not, it was not taken

23 lightly, but it was to pull out the poorest

24 performing houses that we had.

25       Q    You will agree with me, though, that the



Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   every flock down on the September 1.  And then, you

2   know, as a result, it says, of excluding, that was

3   just to make it a reason, to tell you a reason why

4   there was only one or two flocks on that sheet in

5   some of those cases.

6        Q     But apparently you determined at some

7   point, which is not stated here, that you did not

8   feel that the one or two flocks was sufficient to

9   judge their performance accurately.

10       A     Right.

11       Q     Okay.

12       A     Yeah, the one or two flocks would be,

13  would not be a fair method of, of judging their

14  performance.

15       Q     All right.

16       A     Yeah.

17       Q     And if I understand you, you came up with

18  other ways to judge their performance if they'd only

19  grown one or two small flock, or small bird flocks.

20       A     We looked at the performance that they had

21  on the large flocks, on large bird flocks.

22       Q     And even if they had mostly negative or

23  poor performing large bird flocks, except for Second

24  Generation and Sunnyside Acres, you kept those large

25  bird, or those former large bird growers.


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1    information through the end of September, 2008 by

2    early November, 2008?

3         A     When you say --

4         Q     In other words, the ranking sheet we've

5    been looking at, Exhibit 9, the September, 2008

6    ranking information, would that not have been

7    available within a couple weeks after September 30th

8    or after October 1st?

9         A     Probably so, yes, uh-huh.

10        Q     So the statement that the most current

11   grower ranking information that was available in

12   November was that as of the end of August, 2008 is

13   not correct.

14             MR. BAILEY:  Objection.  Misstates the

15        statement in the document.  The document speaks

16        for itself.  Go ahead.

17        A     See, like I said, I don't know what

18   Mr. Stroud was.

19        Q     How did you get, how did you get

20   Mr. Stroud the September ranking information?

21             MR. BAILEY:  Objection.  Mischaracterizes

22        the prior testimony.

23        A     Just --

24        Q     I mean, after you --

25        A     Just email.



The Evolution of Deposition Management

                              Nationwide Scheduling
                    Toll Free:      1.800.451.3376
                    Toll Free Fax:  1.888.451.3376
                              www.setdepo.com

1      Q     Okay.  And, and you had emailed him both
2   the August ranking sheet and the September ranking
3   sheet?
4      A     At some time, yeah, but I, I don't think
5   it was right together by no means.
6      Q     Okay.  And where are copies of those
7   emails?
8      A     I, you know, they probably just shut it
9   off.  I said email; may have went on a fax, you
10  know.
11     Q     Okay.  Would you have had a fax cover
12  sheet to document that you sent something to
13  Mr. Stroud?
14     A     There probably would have been a cover
15  sheet, but it -- I don't know right off where it's
16  at, but.
17     Q     Why would you send a 15, 20-page document
18  by fax when you can push a button and just send it
19  to him electronically?
20     A     Well, at that particular time, I don't
21  know that we had the, I don't know that we had
22  enough, a scanner to do that, or whatever.  We were
23  using a fax a lot at that time.
24     Q     I mean, weren't these ranking sheets
25  created on computers?


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

# App. Ex. 28

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF TEXAS

3             FORT WORTH DIVISION

4

    In re:                    Chapter 11
5

    PILGRIM'S PRIDE CORPORATION,   Case No. 08-45664 (DML)
6    et al.,

                              Jointly Administered
7    Debtors.

8    _____

9

            DEPOSITION OF RANDY STROUD
10

              Dallas, Texas
11

            March 3rd, 2009 - 9:09 a.m.
12

13

    *    * CONTAINS ATTORNEYS' EYES ONLY PORTIONS    *    *
14

15

16   Reported by:

17   SUSAN S. KLINGER, RMR-CRR

18   JOB NO. 21433

19

20

21

22

23

24

25

EXHIBIT
28

1 so I don't remember what -- if you knew, if you could
2 tell me the specifics of what drugs it was and when it
3 was, I could probably address the issue.
4    Q. Okay.
5    A. There would be no reason that we would make a
6 change that would cause any problems or cause any
7 detriment to the chickens, because that is, that is our
8 job is to get them to perform as well as we can.
9    Q. Was there ever a time when the company decided to
10 take something out of the feed and then make it part of
11 the medicine that was then chargeable to the growers as
12 opposed to part of the feed cost which was paid for by
13 the company?
14    MS. GRAY: Objection, form.
15    A. No, there wouldn't be any reason we would do
16 that. The medications in the feed are the most
17 efficient way to get the medication in the feed and we
18 don't charge the growers for the medication.
19    Q. The medication outside of the feed you don't
20 charge the growers for?
21    A. No.
22    Q. It is not charged against them on the, on the
23 settlement sheet in their rankings?
24    A. It is on the settlement sheet for information,
25 but it does not affect the rankings.
   TSG Reporting - Worldwide  877-702-9580

1    Q. If, if a flock of birds has high mortality
2 because the chicks don't get medicine fast enough, let's
3 say, the grower asks for medicine and it takes a day or
4 two to get to them. Are the chicks that die counted
5 against the grower in the tournament system?
6    MS. GRAY: Objection, form.
7    A. Mortality does affect the tournament system.
8    Q. Is there anything that the company does to
9 evaluate whether or not some action of the company has
10 caused a higher mortality rate, and therefore, the
11 growers had a bad tournament because of that?
12    MS. GRAY: Objection, form.
13    A. If it is something unusual or something that we
14 feel like we were responsible for, we have made
15 adjustments.
16    Q. How do you do that, how does that work?
17    A. Normally just take a five flock average and pay
18 them based on their average that they have made in the
19 past. And I don't, I don't know if this has happened in
20 Live Oak or not.
21    Q. How variable do you find the grower rankings?
22    MS. GRAY: Objection, form.
23    A. Do you mean top to bottom?
24    Q. Uh-huh, yes.
25    A. A good complex would keep it within one cent top
   TSG Reporting - Worldwide  877-702-9580

1 to bottom, maybe a little tighter. You have others that
2 are not as good.
3    Q. What, what is the point at which growers are put
4 on probation?
5    MS. GRAY: Objection, form.
6    A. In most of our contracts we have a grower
7 improvement program that is at most of them are at
8 three-quarters of a cent from average.
9    Q. And the growers that are being terminated, how
10 far from average were they?
11    A. Looks like the worst one was 49 points.
12    Q. And so that is, that is not half as near to get
13 to -- you have a long way to go to get to be on
14 probation with that?
15    MS. GRAY: Objection, form.
16    A. Yes, unfortunately this was a good complex,
17 results were good in Live Oak.
18    Q. I mean is the Live Oak complex overall a lower
19 cost producer of chickens than other complexes?
20    MS. GRAY: Objection, form.
21    A. Performance is good, because of Live Oak being in
22 Florida, our freight rates on grain and soybean meal are
23 not very competitive. It is a long way from the grain
24 mill, so we have high feed input costs in Live Oak.
25    Q. Is that in any way reflected in the average costs
   TSG Reporting - Worldwide  877-702-9580

1 that are in the tournament sheets?
2    A. No. As I said, it is a standard cost that is the
3 reason we do that.
4    Q. Year-to-year, how -- strike that. Even flock to
5 flock, how, how variable are grower results?
6    MS. GRAY: Objection, form.
7    A. For the same grower?
8    Q. Uh-huh.
9    A. One flock to the next?
10    Q. Yes.
11    A. They can vary. In general, good growers get --
12 growers that are efficient growers get good results.
13 Less efficient growers are typically not as good. They
14 typically stay in their range that they are in.
15    Q. Did you in trying to decide how to effect the
16 terminations at the Live Oak plant take a look at what
17 the results would be if you used the last two years
18 instead of only, instead of only five flocks?
19    A. No.
20    Q. Did you look at three years?
21    A. No.
22    Q. Why?
23    A. One year is what we've always used. It is an
24 accepted practice. It measures -- it doesn't rely on
25 just one flock, but it relies on enough history that we
   TSG Reporting - Worldwide  877-702-9580

1 feel like it is an accurate indicator of what the grower
2 has done recently.
3 Q. Well, you said something like it is what we've
4 always done. What do you mean by that?
5 A. Well, we've always used ranking sheets. That is
6 typically when you can -- that is typically the history
7 we look at, the one year history.
8 Q. Is that because you are doing, like, annual
9 financials so you will typically look at a year because
10 people look at financial results year-to-year?
11 MS. GRAY: Objection, form.
12 A. It has nothing to do with being annual. It is
13 just a reasonable amount of time to look at.
14 Q. For what purpose have you used five flocks of
15 data?
16 A. For what purpose?
17 Q. Yes. You said we've done this, you know, we
18 generally do this?
19 A. For ranking the growers.
20 Q. For what purpose?
21 A. To see how they're doing, and also, you have this
22 grower improvement program in the, in the contract and
23 so you have to be able to help them improve, we have to
24 know how they're doing.
25 Q. What options did you consider in deciding how to

1 go about terminating a certain amount of the production
2 capacity at Live Oak?
3 A. This was the only option.
4 Q. Who was involved in making the determination of
5 what -- how to effect the production reduction?
6 A. As a result of how many growers would be kept
7 or --
8 Q. Who was involved in making the decision?
9 A. Well, the reduction in growers was directly
10 related to reducing the amount of birds that would be
11 processed at the plant. So the decision to reduce the
12 capacity at the plant drove the decision to have to
13 reduce the amount of growing capacity we have.
14 Q. Who was involved in the decision of how to go
15 about cutting production?
16 A. I was.
17 Q. Who else?
18 A. My immediate supervisor would have been notified
19 that that was the way we wanted to do it.
20 Q. Who was your immediate supervisor?
21 A. Well, I have had a couple, but at that time I
22 believe it was Clint Rivers.
23 Q. Who was involved in the decision to use five
24 flock tournament rankings as a basis to cut production?
25 A. I was.

1 Q. Anybody else?
2 A. No.
3 Q. Did you talk with anybody at the Live Oak
4 facility about whether this actually was going to result
5 in getting rid of the highest cost growers?
6 MS. GRAY: Objection, form.
7 A. No.
8 Q. Did you look at any of the underlying data in
9 cutting the 26 growers that are on Exhibit 1?
10 A. No.
11 Q. So was the only thing you looked at to determine
12 who to cut Stroud Exhibit 1?
13 MS. GRAY: Objection, form.
14 A. I instructed Curtis Carey to do the rankings and
15 eliminate the 2 million square foot with the highest
16 cost. I did not actually do this sheet.
17 Q. Did you and he discuss doing the rankings?
18 A. No.
19 MS. GRAY: Objection, form.
20 A. I told him to run the rankings based on the five
21 flocks, and we would eliminate the 2 million square feet
22 that had the highest cost.
23 Q. Did he say anything to you in response to your
24 request?
25 A. No.

1 Q. Absolutely no discussion? I mean you called him
2 and said do a ranking of the growers in Live Oak and cut
3 the 26 with the highest negative numbers and he
4 didn't -- he said thank you and good-bye?
5 MS. GRAY: Objection, form, mischaracterizes
6 his testimony.
7 Q. I'm just trying to find out what the conversation
8 was back and forth. It seems unlikely you called, gave
9 him that order and he didn't say a word, so I'm just
10 trying to find out the conversation?
11 MS. GRAY: Objection, form.
12 A. Well, I didn't tell him to eliminate 26, because
13 I didn't know how many it would be, how many it would
14 correlate to be, but yes, that is basically the
15 conversation.
16 Q. Why 2 million square feet?
17 A. Well, we actually considered 3 million which
18 would have directly related more to the cut that was
19 made, the shift being eliminated, but to try to keep as
20 many growers -- to affect as few growers as we could we
21 arrived at 2 million square foot. We thought that was
22 the number that the remaining growers could continue to
23 be economically viable, pay their bills and be able to
24 grow chickens for us. It left more capacity there than
25 we typically have, but we were trying to affect the

1      MS. GRAY: Objection, form. Outside the
2 scope of the 30(b)(6) designation.
3    A. A new grower typically would build a new farm,
4 but growers can buy existing farms or new growers could
5 buy an existing farm.
6    Q. Okay. And when a new grower buys an existing
7 farm, are there requirements to upgrade it in order to
8 get a contract?
9      MS. GRAY: Objection, form..
10    A. Typically, yes to bring them up to new standards
11 so they would be able to compete with the new growers.
12    Q. And why is that?
13      MS. GRAY: Objection, form.
14    A. We want them to do as well as they can.
15    Q. Is it also the idea that having the newer farms
16 is better for Pilgrim's?
17      MS. GRAY: Objection, form.
18    A. It is better for Pilgrim's and the grower.
19    Q. Are there farms in the Live Oak complex that
20 could not be sold at this point to someone without the
21 buyer agreeing to make considerable upgrades?
22      MS. GRAY: Objection, form.
23    A. I'm not aware if there are farms for sale.
24    Q. No, no, that is not what I'm asking. I'm asking
25 are there farms in the Live Oak complex which could not

TSG Reporting - Worldwide   877-702-9580

1 he sold unless considerable upgrades were made?
2      MS. GRAY: Objection, form.
3    A. Typically we require farms to be brought up to
4 new house standards.
5    Q. And are there farms in the Live Oak complex that
6 are wood frame houses, older than 30 years that have not
7 had upgrades, any significant upgrades in more than 12
8 years?
9      MS. GRAY: Objection, form.
10    A. I don't know, I don't know. I would assume there
11 is, yes.
12    Q. And would Pilgrim's allow someone to buy a wood
13 frame house of older than 30 years that hadn't had
14 upgrades in more than 12 years and give the buyer a
15 contract?
16      MS. GRAY: Objection, form.
17    A. If they agreed to make the upgrades?
18    Q. Okay. If they didn't --
19      MS. GRAY: Same objection.
20    Q. -- agree to make the upgrades?
21      MS. GRAY: Same objection.
22    A. We would not offer them the contract.
23    Q. Was any consideration made in determining how to
24 cut production to cutting farms that were basically no
25 longer saleable in any event?

TSG Reporting - Worldwide   877-702-9580

1      MS. GRAY: Objection, form.
2    A. No.
3    Q. Why not?
4      MS. GRAY: Objection, form.
5    A. We treat all farms the same as long as they are
6 competing, growing competitively. We don't know the
7 economic status of the grower, that is not our business.
8 They're independent contract growers. We don't know how
9 much money they owe on the farms so...
10    Q. I'm not asking about how much money they owe on
11 the farms. I'm asking about whether or not any
12 consideration was given to cutting farms that were not
13 saleable as is?
14      MS. GRAY: Objection, form.
15    A. No.
16    Q. If Pilgrim's eventually increases its production
17 at Live Oak so that it has two shifts, will 8 million
18 square feet of broiler farms be sufficient to supply two
19 shifts?
20      MS. GRAY: Objection, form.
21    A. I need to do the math again, but probably not.
22    Q. And so if Pilgrim's went back to two shifts at
23 Live Oak, I take it new farms, newer farms would be
24 better for, for them to be viable than old farms?
25      MS. GRAY: Objection, form.

TSG Reporting - Worldwide   877-702-9580

1    A. Not necessarily.
2    Q. Why?
3    A. If the older farms were still there and were in
4 the usable condition and we had growers that were
5 willing to, that owned them or were willing to buy them
6 and use them, we would, we would use them.
7    Q. How long?
8    A. I think we would prefer to use existing
9 facilities, rather than build new if it was of benefit
10 to the growers that owned the houses.
11    Q. How long can a chicken house be idled before it
12 is not usable anymore?
13      MS. GRAY: Objection, form. I mean we're
14 way outside the scope of the 30(b)(6) designation.
15    A. If they're maintained, I don't think there is
16 any -- I think it could be indefinite.
17    Q. What would you have to do to maintain it?
18      MS. GRAY: Objection, form.
19    A. Keep the roof from leaking, keep the, keep water
20 from getting inside the houses, probably run the
21 equipment from time-to-time and we currently have farms
22 idle ourselves.
23    Q. Did you consider in determining how to cut
24 production at Live Oak simply doing a pro rata reduction
25 across all of the farms?

TSG Reporting - Worldwide   877-702-9580

1　A. If you mean by pro rata that we would just keep
2　all of them and spread the amount of chickens that we're
3　going to grow amongst all of the growers, is that what
4　you are --
5　Q. Yes, whether by reducing, whether by reducing
6　density or by rotating houses or some methodology by
7　which everybody had 20 percent less as opposed to
8　cutting 20 percent of growers?
9　A. No.
10　　　MS. GRAY: Objection, form.
11　A.. No.
12　Q. Why didn't you?
13　　　MS. GRAY: Objection, form.
14　A. We thought it would place undue economic stress
15　on the, all of the growers. They would not be
16　economically viable and not be able to pay their bills,
17　continue to grow chickens for us. And it would penalize
18　the existing growers, our more efficient growers and in
19　the end would damage all the growers.
20　Q. What did you do to determine that was the case?
21　　　MS. GRAY: Objection, form.
22　A. Just based on history of what a grower needs to
23　make to be able to exist.
24　Q. What does a grower need to make in order to be
25　able to exist?

1　A. Most of the growers are setup on making payments
2　by the, by the flock. At the end of each flock their
3　banks typically depend on about five flocks a year to
4　make their payments, that is a generalization. We are
5　already under five flocks as it is now, so we didn't --
6　to go lower, to go -- to have kept all of these growers
7　would mean that they would only be growing chickens half
8　the time basically and so they would not be able to make
9　enough money to exist.
10　Q. How do you know?
11　　　MS. GRAY: Objection, form.
12　A. Just based on history and experience.
13　Q. Did you contact any of the lenders to the Live
14　Oak chicken growers? And I don't mean that these
15　particular ones, I mean little C, little G, the Live Oak
16　chicken growers as a whole, did you talk to Farm Credit
17　or Lafayette or Mercantile or First Federal or First
18　Financial, any of the principal lenders to the chicken
19　growers in Florida?
20　A. No.
21　Q. Did you make any inquiries among the growers
22　whether they would rather have growers cut or struggle
23　for a period to see if they could all be salvaged?
24　A. No.
25　Q. Did you do any actual pen to paper economic

1　analyses of whether or not the Live Oak chicken growers
2　could actually manage on three flocks a year for a year
3　or two?
4　A. No.
5　Q. If, in fact, the banks would work with the
6　growers to enable them to live with three flocks a year
7　for a year or two, would it be to Pilgrim's benefit to
8　be able to maintain all of its growers so that when
9　business is better they have that capacity available?
10　　　MS. GRAY: Objection, form.
11　A. I don't know how to answer that. We made a
12　business decision based on our best knowledge of what
13　the situation was.
14　Q. That wasn't my question. Can you read the
15　question back?
16　　　(Record read.)
17　　　MS. GRAY: Same objection.
18　A. Yes.
19　Q. Has Pilgrim's ever terminated growers before by
20　using a five flock ranking system?
21　A. Yes.
22　Q. When was that?
23　A. It was in Siler City earlier in 2008.
24　Q. Any other time?
25　A. Not in, not a group of growers. We have the

1　grower improvement program that worked through normally
2　and that, but it eliminates growers at times that
3　performance continues -- does not improve.
4　Q. Uh-huh.
5　A. But it is generally, like, one or two at a time?
6　Q. Okay. The Siler City, one of the plants is now
7　closed completely?
8　A. Yes.
9　Q. Going back for a minute to the factors that
10　affect ranking. And we talked about feed conversion and
11　I think we talked about age of the chicks and density.
12　Are there any other factors that are in the control of
13　Pilgrim's as opposed to the grower that affect how the
14　grower will rank in a given tournament?
15　　　MS. GRAY: Object to the form of the
16　question.
17　A. We provide the chicks and the feed and the
18　supervision or guidance to grow the chicks.
19　Q. So is it correct that chicks from certain age
20　chicken moms are better than chicks from either very
21　young chicken moms or very old chicken moms?
22　　　MS. GRAY: Object to the form of the
23　question.
24　A. The younger flocks tend to -- the chicks tend to
25　be a little smaller, but they usually perform just as

# App. Ex. 29

Certified Copy

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In re:

                           CASE NO. 08-45664(DML)
                           Chapter 11
Pilgrim's Pride Corporation,    Jointly Administered
et al.,

        Debtors.
~~~~~~~~~~~~~~~~~~~~~~~~

NON-CONFIDENTIAL PORTIONS

ORAL DEPOSITION OF

RANDY STROUD

November 5, 2010
9:05 a.m.

2306 Greenhill Road
Mount Pleasant, Texas 75455

Reported By: Julie Vrooman, Certified Shorthand Reporter



EXHIBIT
tabbies
29



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1    Q    Okay.

2    A    Whether it's the August and September list and

3    that's --

4    Q    All right.  As of -- as of August 2009, did

5    you realize that the list -- the list that had been sent

6    to GIPSA was not the list that Mr. Hulsey had used to

7    determine the bottom 30 percent?

8    A    I don't know when I became aware of that.  I

9    honestly can't remember.

10    Q    Okay.  Is it possible you knew that in

11    August 2009?

12    A    Yes.

13    Q    Okay.  And had you known it in August 2009,

14    would you have called up Mr. Rollins or somebody else

15    from GIPSA and said, Hey, I made a mistake or somebody

16    made a mistake back in November 2008, we sent you the

17    wrong rank -- ranking list?

18    A    I think he had the list by then.

19    Q    Okay.  You think --

20    A    Yeah.

21    Q    -- Mr. Rollins or somebody from GIPSA had

22    both --

23    A    Not Rollins, I don't think, because I think he

24    was out of the picture by then.

25    Q    All right.



**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 452

1      A    But I think they had been provided the second

2  list by that time.

3      Q    All right.  Do you have --

4      A    The correct list.

5      Q    Do you have any e-mails or correspondence that

6  would reflect that either you or somebody else from

7  Pilgrim's sent GIPSA the list?

8              MR. BAILEY:  Here's my letter.  See, was

9  that not produced?  That should have been produced --

10             MR. FULCHER:  In December 2009.

11             MR. BAILEY:  Let's go off the record for

12  a second.

13             THE VIDEOGRAPHER:  Off the record at

14  1:58.

15             (Recess taken)

16             THE VIDEOGRAPHER:  We're on the record.

17  The time is 1:59.

18      Q    (By Mr. Fulcher) It's -- it's my recollection,

19  Mr. Stroud, that we actually asked Liani Kotcher's

20  permission to forward the September 2008 ranking list to

21  GIPSA sometime at the end of 2009 because they did not

22  have it.  But that's why I was asking you, you know,

23  about August 2009.  You believe they had it so --

24      A    I -- I -- I don't know.

25      Q    Okay.



setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1  not going to get cut off?  I mean, there was no reason

2  to take them out.

3      Q    Well, the reason to take them out would be so

4  GIPSA would not think that any of those growers were not

5  considered for termination.  Does that not make sense?

6      A    I do not -- the -- the list was not generated

7  to -- to do anything with GIPSA.  It was generated to

8  determine who was terminated and it was done to

9  terminate the poorest growers and they did the best job

10  they knew how to do to do that.

11     Q    The September 2008 ranking listed all the

12  growers, as far as we know, each and every grower, even

13  if they grew one or two or three flocks, right?

14     A    I believe so, yes.

15     Q    Okay.  So why would the August 2008 ranking be

16  any different?  Why wouldn't they list all the growers?

17     A    I would say it was just a mistake, error.  I

18  don't think there was any intent to deceive anyone.

19     Q    Even though the only growers that would --

20  were left off were those below the cut-off line?

21          MR. BAILEY:  This is all assuming

22  facts --

23     A    Well, what would that accomplish?

24          MR. BAILEY:  It's speculation.

25     A    Why would they do that?


setdepo™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 454

# App. Ex. 30

**Original Transcript**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In Re:

Pilgrim's Pride
Corporation, et al.,

Debtors.

Case No. 08-45664 (DML)

Chapter 11

Jointly Administered

**NON-CONFIDENTIAL PORTION**

**VIDEOTAPE DEPOSITION OF**

**APRIL M. CRAVEN**

November 9, 2010
11:06 a.m.

The Hampton Inn
1904 South Horner Boulevard
Sanford, North Carolina

Judy F. Reins
Notary Public, in and for the State of North Carolina

EXHIBIT
**30**



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1    scanner?

2         A    Yes, uh-huh.

3         Q    What I'd like to know is if you would scan

4    a document on the scanner, would you then have it on

5    your computer?

6         A    Yes.

7         Q    Do you know what type of format a document

8    that had been placed through the scanner would come

9    up as, like a TIFF document, PDF?

10        A    I believe it was a PDF.  It was with

11   Adobe.  I believe it was PDF.

12        Q    All right.  So as far as you know, it

13   wouldn't make any difference if you printed out a

14   letter from Word or an Excel spreadsheet.  If you

15   scanned that document in, it would be saved as a PDF

16   document on Adobe?

17        A    Yes, uh-huh.

18        Q    Some of the growers that we discussed

19   earlier today with Mr. Hackney included Ruth

20   McNeill, William Richardson, and Ray Callicutt.  Do

21   you recall those were people who raised poultry for

22   Pilgrim's?

23        A    Yes.

24        Q    Do you know whether one or more of those

25   three growers were terminated during sometime in



14

1   2008?

2        A    Yes.

3        Q    Did you provide or did you receive any

4   information as to why those growers were terminated?

5        A    I was told that they were terminated

6   because they had conventional houses.

7        Q    And who told you that?

8        A    Don Osterhaus.

9        Q    Okay.  A couple of the other names that

10  were mentioned, I believe, was David Hayes and a

11  Glenn Powers.  Are you familiar with those two

12  growers?

13       A    I remember Glenn Powers, and David Hayes

14  does sound familiar.  I believe that he was a

15  grower.

16       Q    Do you know whether or not he was

17  terminated or not?

18       A    Yes.

19       Q    Do you recall whether he was terminated at

20  the same time McNeil, Richardson, and Callicutt were

21  terminated or possibly at some other time?

22       A    I believe it was at the same time.  I'm

23  not 100 percent sure, but I do believe it, it was

24  near, maybe within a couple of weeks.

25       Q    Let me show you what we will mark as --



setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

App. 457