U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed December 15, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | |
| | § | |
| PILGRIM'S PRIDE CORPORATION, | § | CASE NO. 08-45664-DML-11 |
| ET AL., | § | |
| | § | |
| DEBTORS. | § | |
| | § | JOINTLY ADMINISTERED |

## <u>MEMORANDUM OPINION</u>

Before the court are six motions for summary judgment (the "Grower Motions")[1]

filed by Debtors[2] on August 2, 2010, and one motion for summary judgment (docket

---

[1] The Grower Motions are located at docket numbers 5686, 5688, 5690, 5692, 5694 and 5696. Four of the Grower Motions (docket numbers 5686, 5688, 5690 and 5696) are generally based on the premise that if Debtors (as defined below) had written contracts with the Clinton Growers (as defined below), then the Clinton Growers cannot successfully maintain causes of action against Debtors based on the theory of promissory estoppel. The court analyzes the claims of the Clinton Growers largely on the basis of the significance to the allowance of the claims of *City of Clinton v. Pilgrim's Pride Corp.*, 654 F. Supp. 2d 536 (N.D. Tex. 2009). Debtors principally address that case and its rationale in the Grower Motion entitled *Reorganized Debtors' Motions for Partial Summary Judgment on Promissory Estoppel – Merger* (docket number 5690) (the "Merger Motion"). Accordingly, the court will base its relief on the Merger Motion. Because the court will grant this motion, there is no need for the court to analyze the other three Grower Motions that are based on the existence of a contract between Debtors and the Clinton Growers.

number 5837) (the "Livehaul Motion" and with the Grower Motions, the "Summary

Judgment Motions") filed by Debtors on September 1, 2010.

By the Grower Motions, Debtors ask the court to grant summary judgment as to

107 separate claims filed by individual chicken growers (with the exception of Leonard

and Stephanie Busby (the "Busbys"), the "Clinton Growers") including the Busbys. With

the exception of the Busbys, the facts giving rise to each of the other 106 claims are

substantially identical.[3]

By the Livehaul Motion, Debtors ask the court to grant summary judgment as to

the claim of KP's Livehaul, Inc. ("Livehaul" and with the Clinton Growers, the

"Claimants"). Many of the facts that form the basis for the Livehaul Motion are

substantially similar to those that form the basis for the Grower Motions.

---

One of the remaining Grower Motions (docket number 5694) alleges that the promises made by Debtors' representatives to the Clinton Growers were not of a definite nature, and thus the Clinton Growers cannot maintain a promissory estoppel claim based on those promises, while the other motion (docket number 5692) is based on the statute of limitations applicable to the Clinton Growers' claims. Because the court will grant the Merger Motion, the court need not examine the definiteness of the promises made to the Clinton Growers or the statute of limitations.

The court does not disuss the Grower Motions (specifically, those motions relating to the indefinte nature of the promises and the statute of limitations), other than the Merger Motion, as they relate to the Busbys because there is not enough evidence of the promises made to the Busbys to support summary judgment, and the Busbys do not face a limitations problem. Because there is little evidence regarding the nature of the promises made to the Busby's, the court, at this time, concludes summary judgment based on vagueness theory is inappropriate. For the same reasons as set forth regarding the Busbys, the court does not discuss the sections of the Livehaul Motion (as defined below) relating to the statute of limitations applicable to Livehaul's claim.

[2]     Debtors are Pilgrim's Pride Corporation; PFS Distribution Company; PPC Transportation Company; To-Ricos, Ltd.; To-Ricos Distribution, Ltd.; Pilgrim's Pride Corporation of West Virginia, Inc.; and PPC Marketing, Ltd.

[3]     All individual growers other than the Busbys and Terry Williams entered into poultry growing contracts with Debtors. Terry Williams is treated the same as the other Clinton Growers, however, because it appears from the facts before the court, which Terry Williams does not dispute, that his claims relate to the same chicken houses as those of his brother, Greg Williams, who had entered into a poultry growing contract with Debtors. Thus, while Terry Williams may not have entered into a poultry growing contract himself, the chicken houses to which his claims relate were under such a contract, and Terry Williams's claims are duplicative of (or no different than) Greg Williams's claims.

Debtors and the Claimants filed numerous briefs, which the court has reviewed, together with summary judgment evidence referred to below as necessary. The court held a hearing (the "Hearing") on the Summary Judgment Motions on October 19, 2010, during which counsel for Debtors and the Claimants[4] presented argument to the court. After the Hearing, Debtors and Claimants submitted, at the court's request, additional briefs regarding the law of the case doctrine.

The court exercises core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

Debtors are among the largest chicken integrators in the United States. In November of 2003, Debtors acquired ConAgra Poultry Company ("ConAgra") and, as part of that acquisition, a chicken processing plant located in Clinton, Arkansas (the "Clinton Plant"). At the time that Debtors purchased the Clinton Plant, Livehaul had a chicken hauling contract, and many of the Clinton Growers already had chicken growing contracts with ConAgra.[5] After purchasing the Clinton Plant, Debtors continued to honor the Claimants' chicken growing and chicken hauling contracts.

In performing their contracts with the Clinton Growers,[6] Debtors would deliver to the Clinton Growers baby chickens, which the growers would raise until maturity, at

---

[4]     The same counsel represents the Busbys as well.

[5]     The court need not determine which of the Clinton Growers had chicken growing contracts with ConAgra.

[6]     Debtors' chicken growing contracts commenced on the date of execution of the contract and continued on a flock-to-flock basis, allowing growers to terminate the contracts between flocks

which time the chickens were returned to Debtors for processing. Because of the

challenges of caring for and transporting live chickens, growers are located close to the

plants that process the chickens they raise. Livehaul's contract[7] provided that it would

transport chickens for Debtors in the Clinton, Arkansas area.

---

and Debtors to terminate the contracts between flocks, at least in limited circumstances (including economic necessity). None of Debtors' chicken growing contracts provided for a perpetual duration, and all of them contained a merger clause which states:

"This Agreement, and any Exhibits hereto, constitute the entire agreement between the parties, and those documents supersede all oral statements and other communications made before the execution of those documents. Independent Grower acknowledges that in entering into this Agreement, he/she has not relied upon any statements that are not contained in this document, and/or the Exhibits hereto."

The chicken growing contracts also contain a clause respecting modification of the contracts which states:

"The parties agree that this Agreement and the Exhibits hereto may not be modified except in writing signed by both the [Debtors] and Independent Grower."

*Appendix in Support of Reorganized Debtors' Motions for Summary Judgment* ("Appendix") (docket number 5702), Exhibit K.3.

[7]    Livehaul's original contract with ConAgra, which Debtors continued to honor after they purchased the Clinton Plant, expired on June 3, 2008. On July 8, 2008, Debtors and Livehaul entered into a second chicken hauling contract (the "Livehaul Contract").

The Livehaul Contract contains two separate terms respecting the duration of the contract. The first term, found in the second clause of the body of the contract, states:

"Either Party may cancel this Agreement on thirty (30) days' written notice; otherwise, the Agreement shall remain in force for a term of one (1) year from the Effective Date (the "Initial Term"). This Agreement will automatically renew for successive one (1) year terms on each anniversary of the Effective Date following the Initial Term (the "Renewal Term") unless otherwise terminated in accordance with the provisions of this Agreement."

The second term, found in Exhibit A to the contract, states:

"This agreement will be for five (5) years with a two percent (2%) increase on each anniversary date (as listed below)."

The Livehaul Contract also contains a merger clause which states:

"This Agreement, including the Exhibits hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof, and all prior understandings and agreements with respect to such matter are superseded by this Agreement. This Agreement may not be modified or amended except in writing duly executed by both parties."

In the summer of 2008, the price of chicken feed rose dramatically while the price of chicken simultaneously declined. Because of these and other factors, Debtors faced severe economic stress. After working to avoid idling any of their processing plants by, *inter alia*, renegotiating Debtors' loans, instituting a hiring freeze and reducing the number and weight of the chickens Debtors processed, Debtors' management decided to idle the Clinton Plant out of economic necessity.[8] Debtors announced their plans to close the Clinton Plant on August 11, 2008. As a result of idling the Clinton Plant, Debtors terminated the Livehaul Contract and Clinton Growers' contracts.[9]

## A. PPC's Promises to the Clinton Growers

---

*Reorganized Debtors' Motion for Summary Judgment With Regard to Claim Filed By KP's Livehaul, Inc. and Brief in Support*, Exhibit A-2

[8] The Claimants do not dispute that Debtors idled the Clinton Plant out of economic necessity.

[9] It is not clear from the evidence before the court when Debtors terminated the Livehaul Contract and the Clinton Growers' contracts. Debtors did, however, continue to utilize Livehaul's services for several of their Arkansas facilities, other than the Clinton Plant, through December 1, 2008. Livehaul filed two proofs of claim in Debtors' cases. The first proof of claim asserted amounts owed to Livehaul for unpaid loads in the aggregate amount of $73,559.62 and was treated as an Allowed Claim (as that term is defined by Debtors' plan). Livehaul filed its second proof of claim asserting damages in the amount of $2,579,240 under the theory of promissory estoppel as discussed below; it is this claim that is at issue in the Livehaul Motion.

Shortly after Debtors idled the Clinton Plant, several of the Clinton Growers filed suit (the "State Court Suit") against Debtors in Arkansas state court. After Debtors filed for bankruptcy in December of 2008, the Clinton Growers, including those who are parties to the State Court Suit, filed proofs of claim alleging identical claims and causes of action against Debtors.

The State Court Suit asserted three causes of action: fraud, violations of the Arkansas Livestock and Poultry Contract Protection Act (the "Arkansas Livestock Act") and promissory estoppel. Debtors filed motions for summary judgment on all three causes of action. The Clinton Growers did not oppose entry of judgment as to the fraud and Arkansas Livestock Act causes of action – leaving only the promissory estoppel causes of action for the court to address.

The Clinton Growers allege, and Debtors do not dispute,[10] that ConAgra's and later Debtors' representatives made numerous representations to the Clinton Growers regarding how long the growers could expect to grow chickens for ConAgra and then Debtors.[11] The Clinton Growers contend that, as a result of the representations, they invested heavily, often with borrowed money, in building and maintaining chicken houses.

As the Clinton Growers note in *Clinton Growers' and KP's Livehaul, Inc.'s Brief on Law of the Case* ("Claimants' Brief"), the "representations [Debtors made to the Clinton Growers] were virtually uniform in substance in regard to each [Clinton Grower]." Some representations that representatives of Debtors made to the Clinton Growers include telling grower Michael Chism that he would receive chickens as long as he met the company's requirements, assuring grower James Curry that Debtors "[were] here for the long haul" and reassuring grower Shane Kasper that Debtors were "stronger" than ConAgra and that he would make his investment in his chicken house back. At the time that Debtors' representatives made these sorts of representations to the Clinton Growers, they believed their statements to be true. Jamie Statler deposition, pp. 55-6 located at Appendix, Exhibit W, page 3239. On the other hand, senior management of Debtors did not authorize or know of the representations.

---

[10]    In considering a motion for summary judgment, the court must take as true all evidence supporting the respondent's claim, indulge every reasonable inference, and resolve any doubts in the respondent's favor. *See, e.g.*, *Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 429 (5th Cir. 2009). Even if Debtors disputed the Clinton Growers' allegations, the court would take, for the purpose of the Summary Judgment Motions, in the absence of evidence to the contrary, the Clinton Growers' allegations as fact.

[11]    Debtors are not the only chicken integrators in the Clinton area, and some of the representations appear to have been that the growers would be able to grow chickens for some company, not necessarily Debtors.

### B. PPC's Promises to Livehaul

Debtors continued to honor the chicken hauling contract Livehaul had with ConAgra until it expired on July 3, 2008. Livehaul then entered into the Livehaul Contract with Debtors on July 8, 2008. Livehaul alleges, and Debtors do not deny, that in order to induce it into entering into the Livehaul Contract, representatives of Debtors orally assured Livehaul that Debtors would use Livehaul's services for at least five years (from 2008 through 2013). As with the Clinton Growers, those making the oral assurances believed them to be true and management was unaware of them.

### C. The Busbys

The Busbys did not have a written chicken growing contract with Debtor.[12] The Busbys had, however, talked to Debtors about raising chickens for them in 2008, and that year the Busbys borrowed $600,000 in order to build breeder houses to grow chickens for Debtors in anticipation of executing a grower contract. They did so based on representations made to them by Jason Ballard ("Ballard"). Ballard allegedly told the Busbys they could expect to grow chickens for Debtors "for a long time." Debtors ended any relationship with the Busbys in August of 2008, before the Busbys had completed construction of their chicken houses. *See* Appendix, Exhibit A.15.

## II. Discussion

### A. Standard for Summary Judgment

---

[12]     Debtors do not dispute that they did not have a written contract with the Busbys.

Summary Judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Jenkins v. Chase Home Mortg. Corp. (In re Mapple Mortg., Inc)*, 81 F.3d 592, 595 (5th Cir. 1996). It is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is inappropriate when conflicting inferences and interpretations may be drawn from evidence. *Askanase v. Fatjo*, 130 F.3d 657, 665 (5th Cir. 1997); *James v. Sadler*, 909 F.2d 834, 836-37 (5th Cir. 1990). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247.

**B. Law of the Case**

During the Hearing and in their briefs Debtors argued that the court should follow United States District Judge Terry R. Means's decision in *City of Clinton*,[13] while the Claimants argued that the court should follow the Arkansas Supreme Court's decision in *Tyson Foods, Inc. v. Davis*, 66 S.W.3d 568 (Ark. 2002) ("*Tyson v. Davis*"). The court concludes that not only should it follow *City of Clinton* as it would a binding precedent,

---

[13]    The *City of Clinton* adversary proceeding was filed in this court in connection with Debtors' bankruptcy cases. Judge Means, on this court's recommendation, withdrew the reference as to the adversary proceeding and adjudicated the matter. The Claimants were not parties to the *City of Clinton* proceeding, though the facts of *City of Clinton* are substantially similar to those presented by the Summary Judgment Motions, and, though posed as an adversary proceeding, the decision in *City of Clinton* also effected disallowance of claims based on facts and legal theories virtually the same as Claimants'.

but that *City of Clinton* is, in fact, law of the case. Moreover, the court finds *City of Clinton* to be a well-reasoned, correct analysis.

In *City of Clinton*, growers located in Texas, Arkansas, Oklahoma and Louisiana asserted claims against Debtors under several theories including promissory estoppel. The plaintiffs in *City of Clinton* complained that Debtors terminated their grower contracts despite the fact that Debtors' representatives had promised them, *inter alia*, that they "could raise chickens in their houses as long as they wanted to raise chickens." The Court ruled that, because Debtors had contracts with the plaintiffs addressing all of the promises that Debtors' representatives had made to the plaintiffs, including the duration of the grower agreements and how the plaintiffs would be compensated, the plaintiffs could not successfully maintain a promissory estoppel claim against Debtors.

### 1. The Doctrine of Law of the Case

The law of the case doctrine is a judicial doctrine that promotes finality and efficiency in the judicial process by encouraging courts to follow their own decisions within any given case. *See, e.g., Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988); *In re Ramey*, 2006 Bankr. Lexis 2603 (Bankr. S.D. Tex. 2006). The Supreme Court has said that "the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson*, 486 U.S. at 816 (alterations omitted).

The law of the case doctrine is not limited to situations in which one court retains a case from beginning to end, but also extends to decisions of a coordinate court in the

same case; the second court should apply the law of the case doctrine if appropriate.[14] *See id.*

In the case at bar, a coordinate court[15] – the District Court for the Northern District of Texas – heard and decided, in the same chapter 11 cases, virtually identical issues to those presently before the court and issued a written opinion, *City of Clinton*, describing its reasoning and rulings.

### 2. Law of the Case in Bankruptcy

A bankruptcy case is comprised of all components of the bankruptcy that are "commenced by the filing of a petition" including all litigation. 7 COLLIER ON BANKRUPTCY ¶ 1109.04[1][a][i] (16th ed. 2009); *see also, e.g., Term Loan Holder Comm. v. Ozer Group, L.L.C. ( In re The Caldor Corp.)*, 303 F.3d 161 (2d Cir. 2002);

---

[14]     The law of the case doctrine is not a limitation on a court's power, but rather directs a court's discretion. A court may revisit its decisions in a case, but should be "loathe to do so in the absence of extraordinary circumstances." *Christianson,* 486 U.S. at 817. The discretionary nature of the law of the case doctrine is discussed in greater detail below.

[15]     "Coordinate court" does not appear in Black's Law Dictionary; however, the term "coordinate jurisdiction" does. "Coordinate jurisdiction" is not itself defined, but the Black's entry refers researchers to "concurrent jurisdiction" found as a subterm to "jurisdiction." "Concurrent jurisdiction" is defined as "jurisdiction that might be exercised simultaneously by more than one court over the same subject matter and within the same territory, a litigant having the right to choose the court in which to file the action." *Black's Law Dictionary* 927 (9th ed. 2010).

While a district court does not, in the strictest sense of the word, share concurrent jurisdiction with a bankruptcy court – under most orders referring cases arising under title 11 from district courts to bankruptcy courts, debtors must file their bankruptcy cases initially in bankruptcy court – district courts and bankruptcy courts are generally considered to share jurisdiction to hear cases arising under title 11, and, the bankruptcy court only enjoys that jurisdiction at the discretion of the district court through the latter's order of reference.

District courts are given jurisdiction to hear cases arising under title 11 by 28 U.S.C. § 1334. District courts are also given authority to refer cases arising under title 11 to bankruptcy courts by 28 U.S.C. § 157. Most, if not all, districts in the United States have standing orders referring bankruptcy cases to their respective bankruptcy courts. Such referral orders, however, do not divest the district courts of jurisdiction to hear bankruptcy cases, and the reference to the bankruptcy courts may be withdrawn by the district courts as was done in the case of the *City of Clinton* adversary proceeding. For the sake of clarity, this opinion refers to district courts as "coordinate courts" to bankruptcy courts.

*Artra Group v. Salomon Bros. Holding Co.*, 1996 U.S. Dist. LEXIS 16380 (N.D. Ill. Oct. 31, 1996). Adversary proceedings are part of a bankruptcy case. *Cohen v. Bucci*, 905 F.2d 1111 (7th Cir. 1990) ("Adversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case….").

The law of the case doctrine applies in adversary proceedings in a bankruptcy case, and even between separate adversary proceedings in the same bankruptcy case. *See, e.g.*, *Bourdeau Brothers, Inc. v. Montagne (In re Montagne)*, 2010 Bankr. LEXIS 212, *15 (Bankr. D. Vt. Jan. 22, 2010) ("Since different adversary proceedings in the same main case do not constitute different 'cases,' it would follow that the law of the case doctrine as articulated in one adversary proceeding would apply in another adversary proceeding filed in the same case."); *see also Cohen v. Bucci*, 905 F.2d at 1112.

Claimants argue in the Claimants' Brief that rulings made by Judge Means in *City of Clinton* should not be applied as law of the case as to them because *City of Clinton* would not be given the effect of *res judicata* as to them. This argument is without merit. *Res judicata* and the law of the case doctrine are distinctly different legal concepts and may be applied differently. *C.f. Cohen v. Bucci*, 905 F.2d at 1112 (opining that application of law of the case and issue preclusion (there collateral estoppel) may lead to different results).[16]

While *res judicata* has very specific requirements, tests which must be met for its successful invocation, the law of the case doctrine is an "amorphous concept." *Compare Arizona v. California*, 460 U.S. 605 (1983) *with Allen v. McCurry*, 449 U.S. 90 (1980). In the bankruptcy context, the law of the case doctrine should be applied to disputes arising

---

[16] The court notes that *res judicata* and law of the case are discussed in separate sections of *Moore's Federal Practice*; law of the case is not a subsection of *res judicata* or vice-versa. *See* 18 *Moore's Federal Practice* §§ 131 and 134 (Matthew Bender 3rd ed. 2008).

in the main bankruptcy case as well as all of its related adversary proceedings. The doctrine of *res judicata*, on the other hand, is applied where the same dispute is posed to a court as was (or should have been) adjudicated in a prior proceeding before that or another (not necessarily coordinate) court.

It is especially appropriate to apply the law of the case in the case at bar. One of the goals of Congress in enacting bankruptcy legislation is that claimants holding similar claims receive similar treatment. *See, e.g.,* 11 U.S.C. § 1123(a)(4); *Till v. SCS Credit Corp.,*

541 U.S. 465, 477 (2004); *Begier v. IRS*, 496 U.S. 53, 58 (1990); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) ("The Bankruptcy Code furthers the policy of 'equality of distribution among creditors' by requiring that a plan of reorganization provide similar treatment to similarly situated claims."). While this maxim is most often applied to require like treatment under a plan or in distributions from a liquidation, it only makes sense that it would apply equally to the allowance and disallowance of claims. There are few things that would frustrate the purpose of the Bankruptcy Code and the certainty of bankruptcy proceedings more than if a court arrived at different results in a given case respecting the allowance and disallowance of claims based on identical or substantially similar facts and identical legal theories. To allow the claims of the Clinton Growers while claims based on like facts and the same legal theory are disallowed in the same chapter 11 cases by the District Court's holdings in *City of Clinton* would fly in the face of Congressional goals and policy.

### 3. Exceptions to Law of the Case

The law of the case doctrine is not a limit on a court's power, but rather a guide as to how a court should apply its discretion. Because the law of the case doctrine is not a limit on a court's power, a court is free to revisit its own decisions (and the decisions of coordinate courts), though it should not do so absent extraordinary circumstances. *Christianson,* 486 U.S. at 817.

The Court of Appeals for the Fifth Circuit has opined that a court should generally refuse to revisit its own decisions (or those of a coordinate court) unless "(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Royal Ins. Co. v. Quinn-L Capital Corp.*, 3 F.3d 877, 880 (5th Cir. 1993). With this guidance, the court concludes that its disposition of the case at bar should be consistent with the decision of the District Court in *City of Clinton*.

As to the first reason to revisit a prior decision – that "the evidence on a subsequent trial was substantially different" – this is clearly not applicable here. All of the relevant facts giving rise to the Clinton Growers' claims against Debtors are materially the same as the facts giving rise to the claims disallowed in *City of Clinton*. Both sets of claims are based on the theory of promissory estoppel, both sets of claimants relied on very similar promises[17] and both sets of claimants had contracts with Debtors.

---

[17]    During the Hearing, Debtors presented a chart depicting the types of promises made to the Clinton Growers and the growers in *City of Clinton*. The claimants did not dispute that the promises made in each case were substantially identical.

There are two differences between the promises made to the *City of Clinton* claimants and those made to Livehaul. First, the *City of Clinton* claimants, like the Clinton Growers, claimed that Debtors' representations were that they could raise chickens for as long as they wanted – a perpetual period. Livehaul, on the other hand, only claims Debtors' representations were that Debtors would use Livehaul's services for five years. Second, there are conflicting terms

Because the relevant facts of the case at bar and *City of Clinton* are substantially identical, this test will not support re-examination of *City of Clinton*.

A court should consider revisiting its own decisions in a case if the controlling authority has "since made contrary decision of the law applicable to such issues." The Claimants point to *Tyson v. Davis* as being a contrary decision to *City of Clinton*. However, *Tyson v. Davis* was decided several years before *City of Clinton*. The decision in *Tyson v. Davis* is not an intervening decision, and is more properly considered in the court's analysis of the third test – whether *City of Clinton* "was clearly erroneous and would work a manifest injustice."

The third test that the Court of Appeals for the Fifth Circuit instructs courts to consider in deciding whether to follow a prior decision is whether that decision "was clearly erroneous and would work a manifest injustice" if followed. The Claimants argue that *City of Clinton* was wrongly decided and that following it would work a manifest injustice as to them. In support of this argument they point to *Tyson v. Davis* and argue that Judge Means did not cite *Tyson v. Davis* in his *City of Clinton* opinion and that it was not cited to him by the parties. They further argue that, had Judge Means been aware of *Tyson v. Davis*, he would have decided *City of Clinton* differently and, thus, that *City of Clinton* is wrongly decided.[18]

---

regarding duration in the Livehaul Contract, something not present in the Clinton Growers' contracts. The term found in the contract's body provides that the contract has a one year duration and automatically renews unless cancelled, while the term in exhibit A to the contract, which provides for price increases each year, states that the contract has a five year term. The court is not prepared to make a finding as to which term controls the contract's duration without first receiving evidence and testimony from the parties.

[18]     The Claimants argue, incorrectly, that *Tyson v. Davis* was not cited to Judge Means prior to his decision in *City of Clinton*. In fact, the claimants in *City of Clinton* cited to *Tyson v. Davis* in *Plaintiff's Brief in Support of Their Response to Pilgrim's Pride Corporation's Motion to Dismiss Under Rule 12(b)(6)*, pp. 21-2 (docket number 10 in civil action number 4:09-cv-00387-Y, which

*Tyson v. Davis* in some respects is factually similar to both *City of Clinton* and the case at bar. In *Tyson v. Davis*, Tyson Foods, Inc. ("Tyson") appealed a jury verdict awarding Don Davis ("Davis") $891,660 in damages.

Davis had contracted with Tyson to raise hogs for Tyson in a bedded-floor program at his farm in Arkansas. Before agreeing to raise hogs for Tyson, Davis researched bedded-floor hog programs and their costs and concluded that in order to turn a profit he would need to grow hogs for several years. Davis therefore asked numerous Tyson employees how long he could expect to grow hogs for Tyson. Tom Johnson ("Johnson"), a regional manager for Tyson, informed Davis that "he would be growing hogs all his life if he wanted to." He also told Davis that while he could expect to grow hogs for as "long as he want[ed]," Tyson only entered into one year contracts. Johnson further explained that Tyson used the same short term contracts for its poultry growers, but that one of its poultry growers had been growing poultry for Tyson for thirty-five years. On the basis of Johnson's representations, Davis decided to enter into a hog growing contract with Tyson. *Tyson v Davis*, 66 S.W.3d at 571-5.

The contract that Davis entered into with Tyson provided, as Davis expected, a one year term. During his contract term, Davis allowed Tyson's employees and guests to tour his farm. During one such tour Davis overheard a Tyson employee explaining to his guests that the bedded-floor program was a temporary program and would be discontinued shortly. Upon hearing this, Davis called Johnson, who told him that nothing

---

is referenced by docket number 26 in civil action number 4:09-cv-00386-Y). Debtors also cited *Tyson v. Davis* in *Pilgrim's Pride Corporation's Reply in Support of its Motion to Dismiss*, p. 9 n. 3 (docket number 15 in civil action number 4:09-cv-00387-Y, which is referenced by docket number 27 in civil action number 4:09-cv-00386-Y).

had changed and that he had heard nothing of the sort from the Tyson "big wigs." In fact, Johnson inquired of Davis whether he knew of any other facilities in his vicinity that could grow hogs in a bedded-floor program. Davis then expressed an interest in purchasing more farms, but told Johnson he was worried about the availability of hogs. Johnson told Davis that he would "have hogs… hogs is no problem." Based upon this representation Davis purchased another farm and received a one year contract on the new farm. *Id.* After a while and being told several times by his liaison with Tyson and the regional manager, Johnson, that he could expect to receive hogs long-term, Davis was informed by Tyson that he would not receive any more hogs. *Id.*

At the completion of the trial, the jury was instructed on negligence, fraud and promissory estoppel. The jury returned a general verdict, finding for Davis and awarding him damages in the amount of $891,660. *Id.* Because the jury returned a general verdict, the *Tyson v. Davis* Court was unable to determine on which of the theories submitted to the jury the verdict was based. *Id* at 576. Claimants, however, cite the case to show that a promissory estoppel claim will lie in Arkansas notwithstanding entry into a subsequent contract.

*Tyson v. Davis* is distinguishable from the case at bar for numerous reasons. The *Tyson v. Davis* Court notes that the case is based on "misrepresentation, fraud, or promissory estoppel… not contract." *Id.* at 575. The Court then goes on to describe the elements of fraud and to analyze, at length, the possibility that the trial court jury could have awarded damages based on fraud. The Court does not describe the elements of promissory estoppel in Arkansas or make any statement that could be construed as a holding that promissory estoppel actions can be maintained in Arkansas even if a contract

exists between the parties. In fact, the Court states, "[i]t is true that as a general proposition of the common law, in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject."[19] *Id* at 576.

The Court did not have to examine Davis's promissory estoppel claim at length because the jury had returned a general verdict. As the *Tyson v. Davis* Court notes, a general verdict is an "indivisible entity or, in other words, a finding upon the whole case." *Id* at 576. Once the *Tyson v. Davis* Court determined that the jury's verdict could be supported by the fraud claim, a discussion of promissory estoppel would have been superfluous.

*Tyson v. Davis* is also factually distinguishable from the case at bar for several reasons. The evidence available to the court in the case at bar shows not only that chicken integrators other than Debtors are available to contract with the Clinton Growers, but that some of the Clinton Growers have already entered into chicken growing contracts with other chicken integrators. In contrast, the *Tyson v. Davis* Court noted that:

> The evidence put before the jury showed this bedded-floor program was experimental, and Davis testified that other producers who utilized the bedded-floor program were not available. He also testified that he would have had to go to the lagoon system to receive hogs from other producers and that would require substantial alteration to the facilities and environmental permits.

*Id*. at 577.

Another distinguishing fact is that in the case at bar none of the people that made

---

[19]     Shortly after this, the Court, in the section of the opinion entitled "Fraud," states, "[h]owever, this argument presupposes that this is simply a contractual dispute, which it is not." *Id.*

representations to the Claimants was in a management position with Debtors. Further, not only did management not make any representations to the Claimants, but the evidence is that management was unaware that representations were being made by any of Debtors' employees and that those making the representations did not know they were untrue. In *Tyson v. Davis*, on the other hand, the Court notes that it was reasonable for Davis to rely on Johnson's statements because Johnson was in a "position of significant authority" at Tyson. *Id* at 580. Further, the *Tyson v. Davis* Court observes that Davis claimed that Johnson knew that his statements were false at the time he made them and that the jury must have believed this. *See id.* at 578.

In summary, *Tyson v. Davis* is not, as the Claimants argue, a white horse case. First, the opinion does not clearly support Claimants' argument that a promissory estoppel theory can be maintained in Arkansas despite the existence of a written contract. Second, the facts, while similar in some respects to those of the case at bar, are different in crucial ways – in *Tyson v. Davis* (1) there were no other hog producers near him that could utilize Davis's services; (2) the promises made to Davis came from management; and (3) the people making the promises to Davis knew they were false at the time they made them. None of these three facts is present in the case at bar. For these reasons, the court does not view application of *City of Clinton* as producing a result at odds with established Arkansas law (as discussed below) – and so following *City of Clinton* will not lead to an injustice.


## C. Weight of Authority of *City of Clinton*

Though *City of Clinton* is perhaps not technically binding precedent for this court, it is at least extremely persuasive authority. *Compare Villarreal v. Showalter (In re Villarreal)*, 413 B.R. 633 (Bankr. S.D. Tex. 2009) (noting that the principle of *stare decisis* does not apply to district court decisions and that district court decisions are not binding on bankruptcy courts) *with In re DePugh*, 409 B.R. 125 (Bankr. S.D. Tex. 2009) (noting that district court decisions are binding precedent for bankruptcy courts within the same district); *In re Jobs.com, Inc.*, 283 B.R. 209, 218 (Bankr. N.D. Tex. 2002) (decisions from a district court *on appeal* are binding precedent for bankruptcy courts in this district).

*City of Clinton* is especially persuasive to this court because it is part of the same chapter 11 proceedings and addresses substantially similar facts and the same legal theory as the case at bar. While *City of Clinton* may arguably not be binding on this court, the court would not, even if it did not agree with Judge Means's analysis, consider itself free to reach a conclusion clearly at odds with that of Judge Means.[20] In any case, the court is of the opinion that *City of Clinton* correctly analyzes the law.

### D. *City of Clinton* Was Correctly Decided; Summary Judgment Would Be Granted in the Absence of *City of Clinton*

*City of Clinton* was correctly decided, and the court would grant summary judgment on the merits even if *City of Clinton* did not exist. Under Arkansas law, "[p]romissory estoppel may be a basis for recovery only when formal contractual elements do not exist." *Taylor v. George*, 212 S.W.3d 17, 25 (Ark. Ct. App. 2005); *see*

---

[20] This is especially true where, as here, it is as likely as not that Judge Means will hear any appeal from this court's decisions respecting Claimants' case.

*also Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 934 (8th Cir. 1999);

*Billingsley v. Weyerhaeuser Co.*, 2010 U.S. Dist. LEXIS 95254, *13 (W.D. Ark. Aug. 24,

2010); *Skallerup v. City of Hot Springs*, 309 S.W.3d 196, 201 (Ark. 2009) ("Promissory

estoppel applies when the elements of a contract cannot be shown."); *Farmers

Cooperative Ass'n v. Garrison*, 454 S.W.2d 644 (Ark. 1970); *Moore v. Keith Smith Co.*,

2009 Ark. App. 361 (Ark. Ct. App. 2009); *Cmty. Bank of N. Ark. v. Tri-State Propane*,

203 S.W.3d 124, 127 (Ark. Ct. App. 2005); *Superior Fed. Bank v. Mackey*, 129 S.W.3d

324, 341 (Ark. Ct. App. 2003); *MDH Builders, Inc. v. Nabholz Constr. Corp.*, 17 S.W.3d

97, 101 (Ark. Ct. App. 2000).[21] *Tyson v. Davis* does not purport to overrule the general

rule enunciated in these cases (and, in fact, was decided prior to many of these cases),

and the court concludes that they represent the law in Arkansas.

Though *City of Clinton* does not review Arkansas law specifically, the District

Court's assertion that "promissory-estoppel applies only where no contract on the subject

matter exists" is certainly correct under *Skallerup* and *Taylor v. George. City of Clinton*,

654 F. Supp.2d at 544 (citing *Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84

S.W.3d 212 (Tex. 2002)). Judge Means, therefore, in this court's view, correctly

concluded that the claimants in *City of Clinton* could not maintain promissory estoppel

claims because Debtors had "produced agreements that address[ed]… the duration of the

grower arrangements…." *City of Clinton*, 654 F. Supp.2d. at 544.

In the case at bar, none of the Clinton Growers dispute that they had valid

contracts with Debtors. Because there is no question of material fact respecting the

---

[21]    Citation to certain of these opinions may be arguably inconsistent with Rule 5-2 of the Rules of
the Supreme Court of Arkansas. While these opinions are not binding authority, the court finds
their reasoning to be persuasive.

existence of contracts between the Clinton Growers and Debtors, and because under Arkansas law a claim for promissory estoppel does not lie if a contract exists between the parties, summary judgment is appropriate. Therefore, the court must grant the Merger Motion on the bases that the Claimants' claims are barred by contract and that the promises Debtors made to Claimants are extinguished by the common law doctrine of merger and the merger clauses contained in all of the Claimants' contracts.[22]

The Busbys, on the other hand, did not have a contract with Debtors and may, therefore, maintain a cause of action against Debtors under the theory of promissory estoppel.

### E. Livehaul

---

[22]     As noted above, the Clinton Growers' contracts contain merger clauses. The merger clauses are limited to "all oral statements and other communications made before the execution of [the contract]." However, the Clinton Growers' contracts also contain language that requires any modification of the contracts to be in writing, and executed by Debtors and the respective grower. Therefore, both pre and post-contract oral statements are excluded from the Clinton Growers' contracts.

    The doctrine of merger and contract provisions requiring that modifications be in writing are valid in Arkansas. *See, e.g., Stacy v. St. Charles Custom Kitchens, Inc.*, 683 S.W.2d 225, 226 (Ark. 1985) ("The appellant argues that a novation of the sales contract occurred in Arkansas when changes were made on the original blueprints. This argument is not persuasive however since the contract itself provided that it 'cannot be altered or modified except in writing executed by the 'Seller.''"); *Farmers Cooperative*, 454 S.W.2d at 646 ("It is a general proposition of the common law that in the absence of fraud, accident or mistake, a written contract merges, and thereby extinguishes, all prior and contemporaneous negotiations, understandings and verbal agreements on the same subject.") (citing 3 Corbin on Contracts, § 573 (1960)); *Gadwall Prods., Inc. v. Fletcher*, 2007 Ark. App. LEXIS 411, *19-20 (Ark. Ct. App. May 30, 2007) ("The parol evidence rule is a rule of substantive law in which all antecedent proposals and negotiations are merged into the written contract and cannot be added to or varied by parol evidence. Where a contract is plain, unambiguous, and complete in its terms, parol evidence is not admissible to contradict or add to the written terms. However, parol evidence may be admitted to prove an independent, collateral fact about which the written contract was silent. A merger clause extinguishing all prior and contemporaneous negotiations, understandings, and verbal agreements is simply an affirmation of the parol evidence rule.") (internal citations omitted); *Gray v. Gray*, 1986 Ark. App. LEXIS 2032 (Ark. Ct. App. Feb. 26, 1986).

Livehaul cannot maintain a claim against Debtors under the theory of promissory estoppel because it had a contract with Debtors.[23] While Debtors have framed the issue before the court as one involving a claim under the theory of promissory estoppel, this is not the case. Livehaul's proof of claim sets forth that it is a "claim for promissory estoppel under Arkansas state law," and that Livehaul "reserves the right to amend its claim for any reason including but not limited to, asserting any and all other claims that Claimant may have against PPC to which the Claimant might be entitled, or if Claimant discovers further damages caused by PPC. The filing of this proof of claim is not to be construed as an election of remedies."

Though Livehaul cannot maintain a promissory estoppel claim against Debtors in light of its contract with them, it may have a claim against them under another theory such as breach of contract.[24] In order to assert a claim under a theory other than promissory estoppel, Livehaul must amend its proof of claim to reflect the proper basis for its claim.[25]

---

[23]     The court cannot determine from Livehaul's proof of claim or filings whether Livehaul takes a position similar to the one of the Clinton Growers – that the contract it entered into with Debtors is what it expected, but that the alleged oral statements by Debtors create a promissory estoppel action extrinsic to the contract – or that Debtor's alleged promises work to invalidate the 30 day termination clause found within the Livehaul Contract. In either case, Livehaul cannot maintain an action for promissory estoppel.

[24]     The court notes, without finding and concluding here, that it is likely that any damages for breach of contract would be limited to 30 days damages because of the 30 day termination period found in the body of the Livehaul Contract.

[25]     The court will not determine here whether Livehaul should be allowed to amend its proof of claim. The bar date for filing proofs of claim is not determinative as to whether Livehaul should be allowed to amend its claim. As the Court of Appeals for the Fifth Circuit noted in *Kolstad*, "[a]mendments to timely creditor proofs of claim have been liberally permitted to 'cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim.'" *In re Kolstad*, 928 F.2d 171, 175 (5th Cir. 1991) (citing *In re International Horizons, Inc.*, 751 F.2d 1213 (11th Cir. 1985)).

The Livehaul Contract contains two different terms regarding the duration of the contract – one provides for a one year duration and automatic renewal unless canceled and the other provides for a five year duration.[26] The differing duration terms found in the Livehaul Contract raise a question of material fact, making summary judgment inappropriate for Livehaul's claim.

### III. Conclusion

Though *City of Clinton* is arguably not binding precedent, the court will follow it because the court concludes that it is law of the case in these bankruptcy cases and that it was correctly decided. Even in the absence of *City of Clinton*, the court would have determined that summary judgment must be granted as to the Clinton Growers. The court, therefore, grants the Merger Motion – however, the Busbys are not among the Clinton Growers as that term is defined herein and the Merger Motion is overruled as to them. Because the court is granting the Merger Motion, the remaining Grower Motions are moot.

Because there is a question of material fact regarding the duration of the Livehaul Contract itself, summary judgment is inappropriate for Livehaul's claim if it is based on a theory other than promissory estoppel. Otherwise, the Livehaul Motion is granted. Counsel for Debtors is instructed to submit a judgment consistent with this memorandum opinion.

### ### END OF MEMORANDUM OPINION ###

---

[26] The Livehaul Contract's merger clause is of no use in determining which duration term applies because both terms are part of the written contract or its exhibits.