U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed March 02, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| *et al.*, | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## MEMORANDUM OPINION

Before the court are *Debtors' Motion for Partial Summary Judgment on Alleged Violations of the Packers and Stockyards Act, 1921* (the "Debtors' MSJ") and *North Carolina Claimants' Motion for Partial Summary Judgment against Reorganized Debtors for Violations of the Packers & Stockyards Act and the North Carolina Deceptive Trade Practices Act* (the "N.C. Growers' MSJ" and, with the Debtors' MSJ, the "Motions"). The Motions address claims

filed by the Growers (as defined below) in Debtors' Chapter 11 cases.[1] The claims assert various theories of liability, including under the Packers and Stockyards Act (the "PSA"), 7 U.S.C. §§ 181 *et. seq.* The Motions address only the claims made under the PSA.

The parties filed briefs in support of the Motions, and, as appropriate, responses and replies to the responses, together with supporting briefs. The parties have also submitted extensive evidentiary appendices in support of their respective positions. Finally, Debtors have filed (1) objections to portions of the record submitted by the Growers,[2] and (2) a motion to exclude the testimony of Growers' expert, Dr. C. Robert Taylor ("Taylor"),[3] and the Growers have filed three motions to supplement the evidentiary record.[4] To the extent the court has not previously ruled on the Objection to N.C. Growers' Documents, the Objection to PSA Response Documents, the Taylor Motion, and the Growers' Third Motion to Supplement either at the

---

[1] Debtors are Pilgrim's Pride Corporation ("PPC"), PFS Distribution Company, PPC Transportation Company, To-Ricos, Ltd., To-Ricos Distribution, Ltd., Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd.

[2] Debtors filed their *Reorganized Debtors' Objections to North Carolina Growers' Documents Affixed to the Appendix in Support of their Motion for Partial Summary Judgment for Violations of the Packers & Stockyards Act and the North Carolina Deceptive Trade Practices Act* (the "Objection to N.C. Growers' Documents"), docket no. 6168, on December 22, 2010. On December 29, 2010, Debtors filed their *Reorganized Debtors' Objections to Certain Documents Affixed to the Appendix in Support of Response to Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violations of the Packers and Stockyards Act, 1921 and Motion to Strike* (the "Objection to PSA Response Documents"), docket no. 6198.

[3] Debtors filed their *Reorganized Debtors' Motion to Exclude the Testimony of Dr. C. Robert Taylor* (the "Taylor Motion"), docket no. 6201, on December 29, 2010.

[4] On January 18, 2011, the court entered the *Order Granting Growers' Motion to Supplement Appendix in Support of Response to Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violation of the Packers and Stockyards Act, 1921* (the "Order Granting Motion to Supplement"), docket no. 6341, in which the court granted Growers' motion to supplement with respect to certain pages from the depositions of PPC's former Chief Operating Officer, Robert A. Wright, and PPC's former Chief Executive Officer, Joseph C. "Clint" Rivers, and denied it with respect to an affidavit of Growers' expert Dr. C. Robert Taylor. The Order Granting Motion to Supplement disposed of Growers' first two motions to supplement the evidentiary record. On January 24, 2011, Growers filed their *Growers Third Motion to Supplement Appendix and Motion to Supplement Brief in Support of Response to Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violation of the Packers and Stockyards Act, 1921* (the "Growers' Third Motion to Supplement").

Hearing (as defined below) or in the Letter Ruling (as defined below), the court now rules in favor of the Growers.

On January 19, 2011, the court held a hearing on, *inter alia*, the Motions (the "Hearing") during which the parties presented oral argument. Thereafter, on January 24, 2011, the court issued a letter ruling (the "Letter Ruling") stating that it would grant the Debtors' MSJ in part and deny it in part and would deny the N.C. Growers' MSJ. The Letter Ruling further stated that the court would explain the reasoning underlying the Letter Ruling in a memorandum opinion to be issued later. This memorandum opinion is intended to provide that explanation.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion represents the court's findings and conclusions. FED. R. BANKR. P. 7052 and 9014.

## I. Background

Debtors are among the largest producers and wholesalers of chicken products in the United States. On December 1, 2008, Debtors commenced chapter 11 cases in this court. The Growers are chicken farmers who raised chickens under contract to supply certain of Debtors' processing plants.[5] Three of these plants – El Dorado, Arkansas, Farmerville, Louisiana, and Douglas, Georgia – were idled in the second calendar quarter of 2009, resulting in termination of Debtors' contracts with the growers (including certain of the Growers) supplying those plants. Others of the Growers that supplied plants of Debtors in North Carolina were the subject of motions to reject their contracts[6] pursuant to section 365(a) of the Bankruptcy Code[7] or had their

---

[5] For a discussion of the relationship between Debtors and chicken farmers (growers), *see In re Pilgrim's Pride*, 403 B.R. 413 (Bankr. N.D. Tex. 2009).

[6] On October 27, 2009, the court entered the *Order Pursuant to 9019 of the Federal Rules of Bankruptcy Procedure Authorizing and Approving Settlement Resolving Certain Grower Claims* (the "Rejection Order"), docket no. 3864, which granted a motion by Debtors for authority to compromise and settle certain

contracts terminated prepetition pursuant to a clause allowing Debtors to terminate on the basis of economic necessity.[8] One of the Growers, James Pate ("Pate"),[9] was a supplier to Debtors' Enterprise, Alabama plant and was also the subject of a motion to reject his growing contract.[10]

Debtors claim that all of these steps were taken to stem losses caused by dramatic increases in their costs and a drop in demand – and hence the price – for chicken. The Growers, on the other hand, as the principal basis for their claims under the PSA, insist that Debtors, by contracting the supply of chicken, were engaged in a scheme to manipulate the market and improperly increase the price of chicken to consumers. The N.C. Growers' MSJ is alternatively based on the theory that Debtors improperly selected which growers to terminate in North Carolina based on the level of technology used in their chicken houses (*cf. Pilgrim's Pride*, 403 B.R. at 431); in furtherance of this argument, the Growers posit that Debtors misled this court and the Grain Inspectors, Packers and Stockyard Administration ("GIPSA") respecting the rankings used for selecting contracts for termination.

Finally, the Growers argue that when Debtors acquired North Carolina facilities through the acquisition of Gold Kist, Inc. ("GK"), they wrongfully forced growers serving those facilities to execute new contracts with them that allowed Debtors to terminate the contracts on the basis of economic necessity. In support of this claim, the Growers point to representations by Debtors

---

growers' claims. Among other things, the Rejection Order rejected, as of the commencement of Debtors' bankruptcy cases, grower contracts between Debtors and certain growers.

[7] 11 U.S.C. §§ 101 *et. seq.*

[8] It is the court's understanding that several growers who had seen their growing contracts terminated prepetition on the basis of economic necessity were also included in the Rejection Order by Debtors for the sake of thoroughness.

[9] Pate filed administrative expense claims both individually and on behalf of his deceased spouse, Ruthie Pate.

[10] *See Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the Debtors to Reject Certain Broiler Grower Agreements*, docket no. 2591. Pate's growing contract was one of the contracts rejected by the Rejection Order.

that they would honor "all existing grower contracts" and to certain alleged strong-arm conduct by Debtors' employees in obtaining growers' signatures on the new contracts.

## II. Discussion

A. Standard for Summary Judgment

Rule 56(a) of the FEDERAL RULES OF CIVIL PROCEDURE provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it . . . ." FED. R. CIV. P. 56(e). Rule 56 thus "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[T]he [initial] burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has carried this initial burden, its opponent must establish that there exists a "genuine" issue of fact, something which requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must rather come forward with "specific facts" showing that a genuine issue for trial exists. *Id.* at 587. "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether the nonmoving party has properly shown that a genuine issue for trial exists, the court should "construe all facts and inferences in the light most favorable to the nonmoving party . . . ." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

B. The PSA

The PSA was enacted in 1921 as a statute specially crafted to address problems unique to the meat packing industry. *See Armour & Co. v. United States*, 402 F.2d 712, 721 (7th Cir. 1968) ("The main Congressional motivation [behind the PSA] was not the deficient reach of the Sherman, Clayton, Interstate Commerce Commission and Federal Trade Commission Acts, but the felt need for specialized regulation of the many-tiered packing industry, with its unique problems arising from marketing and distributing livestock and poultry, including all the complications arising from packer ownership of stockyards."); *see also Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 358 (5th Cir. 2009) (en banc) (discussing *Wilson & Co. v. Benson*, 286 F.2d 891 (7th Cir. 1961), in which the Court of Appeals for the Seventh Circuit stated that "the legislative history of the PSA supported a wider power to prohibit unfair methods of competition than did antecedent anti-trust legislation").

The operative section for purposes of the Motions is section 202, codified (and hereafter referred to) as 7 U.S.C. § 192, which provides:

> § 192. Unlawful practices enumerated
>
> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
>   (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

    (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or

    (c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

    (d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

    (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

    (f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

    (g) Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

The Growers in their claims allege that Debtors have violated subsections (a), (b) and (e) of this provision.

    1.  Section 192(e)

Unlike section 192(a) and (b), section 192(e) by its terms requires a showing that the alleged violator of the PSA engaged in a course of business "for the purpose or with the effect of" manipulating the market or creating a monopoly. For the reasons stated below in section II.B.3 of this memorandum opinion, the court concludes that Debtors did not act to advance a forbidden purpose. The evidence does not support a conclusion that prices were manipulated by reason of Debtors' conduct. Rather, the evidence supports

Debtors' assertion that the plant closings and the culling of growers had little or no impact on the supply of chicken, and hence, on prices.

Moreover, just as is true of section 192(a) and (b), actions justifiable for legitimate business reasons do not violate section 192(e), especially where the challenged actions benefit competition. *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1280 (11th Cir. 2005). That is the case with Debtors' conduct here. Certainly there is no evidence that Debtors sought to create a monopoly in the protein industry. The competition in Debtors' industry has been and remains robust.

2. Effect on Competition

While subsections (a) and (b) do not contain typical antitrust language of the sort found in subsection (e),[11] courts have consistently imposed an antitrust overlay on subsections (a) and (b) as well. *See, e.g.*, *Wheeler*, 591 F.3d at 362 ("[T]he clear antitrust context in which the PSA was passed, the placement of [subsections (a) and (b)] among other subsections that clearly require anticompetitive intent or effect, and the nearly ninety years of circuit precedent" require a plaintiff to prove an anticompetitive effect to sustain a claim under subsection (a) or (b).); *Armour*, 402 F.2d at 722 ("[I]n [7 U.S.C. § 192(a)] Congress gave the [Secretary of Agriculture] no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged."). Thus, in order to support their claims, the Growers must show that the conduct of Debtors that they

---

[11] *Compare* subsections (a) and (b), which respectively prohibit "[e]ngag[ing] in or us[ing] any unfair, unjustly discriminatory, or deceptive practice or device" and "[m]ak[ing] or giv[ing] any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject[ing] any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever," *with* subsection (e), which prohibits "[e]ngag[ing] in any course of business or do[ing] any act for the purpose or with the effect of *manipulating or controlling prices*, or of *creating a monopoly* in the acquisition, buying, selling, or dealing in, any article, or of restraining commerce . . . ." (emphasis added).

complain of has an anticompetitive effect. *See Wheeler*, 591 F.3d at 362. A showing that Debtors' conduct gave them an advantage over their competitors would satisfy this element. *See, e.g., Armour*, 402 F.2d at 719 ("Lawful price differentiation is a legitimate means for [encouraging competition]. It becomes illegal only when it is tainted by the purpose of . . . attempting to destroy competition or a competitor, thus substantially lessening competition . . . ."). Alternatively, the Growers might show an anticompetitive effect on their own level. *See, e.g., Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1233-34 (10th Cir. 2007) (genuine issue of material fact existed with respect to whether company violated 7 U.S.C. § 192(a), where "[g]rowers [were] paid the same under [company's] pricing system during periods of reduced production as they [were] during periods of average and above average production," allowing company "to reduce production (to reap the benefits of higher prices on the wholesale market), [without having to] pay its growers the higher prices that a reduction in supply would demand in a competitive market"). Finally, the Growers might provide evidence that Debtors' actions adversely impacted consumers. *See, e.g., id.* at 1233 ("[W]ithout competition from other buyers, a monopsonist will lower prices paid to sellers, which over time results in higher consumer prices," and therefore "a seller [who] show[s] that the buyer's practices threaten to injure competition by arbitrarily decreasing prices paid to sellers with the likely effect of increasing resale prices" has a cause of action under 7 U.S.C. § 192(a)).

The Growers assert that they have met this requirement by showing that Debtors sought to constrict the supply of chicken on the commodity market through curtailment of production in geographic areas where Debtors stood in the position of a monopsonist.[12]

---

[12] BLACK'S LAW DICTIONARY defines "monopsony" as "[a] market situation in which one buyer controls the market." BLACK'S LAW DICTIONARY 1023 (9th ed. 2009). As Debtors had, at most, a dominant position in

*See Brief in Support of Response to Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violations of the Packers and Stockyards Act, 1921* (the "Growers' Response Brief") at 21-25 (section 192(e)), 26-30 (section 192(a)), 57-59 (section 192(b)). The result, the Growers claim, was an increase in the price of chicken to consumers.[13] *See id.* Hence, according to the Growers, Debtors closure of plants, chosen with the purpose of reducing supply, and the termination of growers to a similar end, harmed consumers and so competition. *See id.*

The evidentiary support for the Growers' argument is, however, thin at best. The Growers largely rely on Taylor's expert report. *See Appendix in Support of Response to Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violations of Packers and Stockyards Act, 1921* (the "Appendix to Growers' Response"), exh. 32. That report, in turn, is not based on proven facts but rather on inferences – for example, Taylor states that, given Debtors' share of the commodity chicken market prior to the plant closings, the closings would automatically effect a sufficient constriction of supply to force up the price of chicken. *See id.* at 644.

The court doubts that Taylor's report and the bits and pieces of other anecdotal evidence the Growers point to would be sufficient, in light of the substantial record offered to support it, to defeat the Debtors' MSJ. The court need not decide the Debtors' MSJ on that basis, though. Rather, the Debtors' MSJ must be granted based upon

---

the areas surrounding the closed plants, they do not meet this definition. At the Hearing, the Growers argued that an entity could be found to be a monopsonist if it dominated the purchasing in a given area. After the Hearing, at the court's invitation, counsel for the Growers submitted a letter in support of this argument in which *Been v. O.K. Indus., Inc.*, 495 F.3d 1217 (10th Cir. 2007) was cited. Given the court's conclusion that Debtors had a valid purpose in reducing the supply of chicken – to stem serious losses – the court need not decide whether the Growers are correct in their broader definition of "monopsonist."

[13]  There is dispute about whether the price to consumers in fact did increase and whether any such increase was in any way attributable to Debtors' reductions in supply.

Debtors' proof that the plant closings and selection of grower contracts for termination or rejection were undertaken for a valid business purpose and were more beneficial than detrimental to competition.

      3.   Valid Purpose

Courts have held that, where the alleged anti-competitive effect is collateral to a valid business purpose, there is no violation of section 192. *See IBP, Inc. v. Glickman*, 187 F.3d 974, 978 (8th Cir. 1999) (right of first refusal under beef marketing agreement, which allowed company "to have a more reliable and efficient method of obtaining a supply of cattle," did not violate PSA, since "[t]he [PSA] was designed to promote efficiency, not frustrate it" (quoting *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995))); *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 828 (E.D. Va. 2002) (company's "series of acquisitions of competing packers and its development of sources of supply of its raw materials," which the evidence suggested were not motivated by anything other than "considerations of quality control and efficiency," did not give rise to PSA claim). Some courts have ruled that effects beneficial to competition may offset negative effects of a business-justified course of conduct, thus excusing what otherwise might be a violation of the statute. *See Pickett*, 420 F.3d at 1280 ("If a packer's course of business promotes efficiency and aids competition in the cattle market, the challenged practice cannot, by definition, adversely affect competition."); *Armour*, 402 F.2d at 725 (competitive justifications for coupon plan "negate[d] its being unjust, undue, or unreasonable" under 7 U.S.C. § 192(a) and (b)).

In the case at bar, the evidence is overwhelming that Debtors were incurring huge losses that could best be stemmed by reducing their production of chicken for the

commodity market. *See generally Brief in Support of Reorganized Debtors' Motion for Partial Summary Judgment on Alleged Violations of the Packers and Stockyards Act, 1921* (the "Debtors' MSJ Brief") at 6-22; *Appendix in Support of Motion for Summary Judgment on Alleged Violations of Packers and Stockyards Act, 1921* (the "Appendix to Debtors' MSJ"), exh. B, at 471-473, exh. M, at 982-984. The evidence is that Debtors selected for closing plants, the idling of which would eliminate the worst losses they were suffering. *See* Debtors' MSJ Brief at 52-56; Appendix to Debtors' MSJ, exh. B, at 477, exh. I, at 741-743 (Siler City); exh. E, at 599 (Clinton); exh. E, at 599, exh. M, at 1025 (Douglas); exh. K, at 826, exh. E, at 599, exh. M, at 1026 (El Dorado); exh. E, at 599, exh. M, at 1027 (Farmersville). The plants selected were poor performers and/or required immediate, substantial investment. *See id.* Thus, Debtors clearly had a valid business purpose for their actions. It would not be possible for a reasonable jury to conclude otherwise.

The same is true of their culling of growers. While confusion accompanying the selection of North Carolina growers for termination may have led to termination of some growers that, under Debtors' methodology, should have been retained,[14] all growers that were terminated were below average performers,[15] and their termination to bring supply to the remaining North Carolina plants into line with the plants' requirements was rational and not a violation of section 192.

---

[14] *See Brief in Support of North Carolina Claimants' Motion for Partial Summary Judgment against Reorganized Debtors for Violations of the Packers & Stockyards Act and the North Carolina Deceptive Trade Practices Act* (the "N.C. Growers' Brief") at 8-15.

[15] *See Reorganized Debtors' Brief in Support of Response to North Carolina Growers' Motion for Partial Summary Judgment for Violations of the Packers & Stockyards Act and the North Carolina Deceptive Trade Practices Act* (the "Debtors' Response Brief to N.C. Growers' MSJ") at 10; *Appendix in Support of Reorganized Debtors' Response to North Carolina Claimants' Motion for Partial Summary Judgment for Violations of the Packers & Stockyards Act and the North Carolina Deceptive Trade Practices Act* (the "Appendix to Debtors' Response to N.C. Growers' MSJ"), exh. K, attachments 2 and 3, at 665-701.

Moreover, Debtors' actions were reasonably necessary to Debtors' survival. Had Debtors not put a stop to their losses, it is likely that their business would either have failed entirely or would have had to be cut back even more at a future date. *See* Appendix to Debtors' MSJ, exh. B, at 473, exh. M, at 950-955, 982-984. Indeed, as it was, Debtors' losses were sufficient to force them into bankruptcy. As the Growers' counsel admitted at the Hearing, competition was clearly benefited by Debtors' survival and continued participation in the market place. Consequently, the court concludes that Debtors' actions were justified by business imperatives. As these actions aided in Debtors' survival, they had off-setting beneficial effects for competition of the sort important to the *Pickett* and *Armour* Courts.

Nor have the Growers presented evidence sufficient to rebut Debtors' contention that Debtors acted out of necessity. The Growers were required to do more than "show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Taylor's expert report, conclusory in content as opposed to presenting "specific facts," *id.* at 587, is not sufficient to block summary judgment. Other than Taylor's report, the Growers principally rely on an email sent by William Snyder, Debtors' chief restructuring officer. *See* Growers' Response Brief at 10, 22, 58. This email suggests Debtors did not wish to sell the Farmerville plan to a competitor. *See* Appendix to Growers' Response, exh. 40, at 746. Snyder explained the email during his deposition. *See* Appendix to Debtors' MSJ, exh. Y, at 2036-2045. While the explanation is somewhat confusing, the email (together with other bits and pieces of evidence suggesting Debtors were wary of aiding a competitor), without more, is not sufficient to controvert Debtors' evidence.

For the foregoing reasons, Debtors' MSJ must be GRANTED except as specified below.

Although this effectively disposes as well of the N.C. Growers' MSJ, the court would note that the Growers' conclusions respecting Debtors' motivations in selecting growers for termination require leaps in logic bordering on paranoia. The Growers would have the court believe that Debtors willfully misled it and GIPSA in order to maintain contracts with a handful of technologically advanced but underperforming growers, while terminating the contracts of slightly more efficient growers with less technologically advanced facilities. To reach such a conclusion, the court would need hard evidence rather than the dark suggestion that it should infer such motivation from facts more easily explained by innocent mistakes. The court thus concludes the N.C. Growers' MSJ must be DENIED.

4. Economic Necessity Language

Paragraphs C and D of Debtors' growers' contract[16] contain language that allows Debtors to terminate the contract on the basis of economic necessity.[17] *See* Appendix to Growers' Response, exh. 57, at 847. It was on the basis of this language that Debtors terminated their contracts with growers in North Carolina prior to commencement of their chapter 11 cases. *See* N.C. Growers' Brief at 4.

The Growers have two complaints regarding the economic necessity language. First, they argue that the provisions of the grower contract allowing Debtors to terminate

---

[16] The court does not find paragraphs C and D of Debtors' contract easily reconcilable and even sees some ambiguity in paragraph D ("Termination") standing alone. The parties, however, agree that paragraph D allows for termination by Debtors on the grounds of economic necessity, and the court will read that provision accordingly.

[17] It is not clear whether all of Debtors' grower contracts contain this language.

for economic necessity violate a federal regulation, 9 C.F.R. § 201.100(a)(1), which requires that a poultry contract "clearly specify . . . conditions for the termination of the contract."[18] *See* Growers' Response Brief at 30-37. Because "economic necessity" is vague and because Debtors' representatives did not call to the attention of growers or explain to them the provisions in question, the Growers insist that Debtors violated section 192(a) by failing to comply with 9 C.F.R. § 201.100(a)(1). *See id.*

However, it is clear that Congress did not intend in enacting the PSA to interfere with the freedom of parties to formulate their own contracts. *See Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995) ("[T]he purpose behind [7 U.S.C. § 192] was not to so upset the traditional principles of freedom of contract."); *Armour*, 402 F.2d at 720 ("[T]he Senate Committee Report makes it clear that [11 U.S.C. § 192(a)] was promoted primarily by fear of monopoly and predation, but even so, caution was expressed against stifling the initiative of the industry." (citing S. REP. NO. 429, at 1, 3 (1920))).

Moreover, if "economic necessity" is a term that is not readily definable, it is something that is certainly recognizable – at least as it was applied in the case at bar. For Debtors to avoid total collapse, it was economically necessary for them to constrict their production. That, in turn, required that they reduce the number of chickens supplied to them. *See* Appendix to Debtors' MSJ, exh. B, at 471-473, exh. M, at 982-984; *see generally* Debtors' MSJ Brief at 6-22; *see, similarly, Pilgrim's Pride*, 403 B.R. at 428-29 (Debtors' management determined that, in order to save $800,000 or more per week, Debtors should limit two production lines at their Live Oak, Florida plant to a single

---

[18] The language Growers cite from 9 C.F.R. 201.100(a)(1) was in effect through January 3, 2010. Language almost identical to former section 201.001(a)(1) is presently found at 9 C.F.R. § 201.100(c)(1).

shift, requiring Debtors to reject executory contracts with certain growers). The court thus does not find the economic necessity language objectionable *per se* nor does it consider this language to have been invoked short of Debtors indeed being *in extremis*.

As to the contention that the contract does not "clearly specify" under what conditions it may be terminated for economic necessity, the term is repeated twice in the contract, both in reference to its term (paragraph C) and in the provision relating to termination (paragraph D). *See* Appendix to Growers' Response, exh. 57, at 847. In the world of commerce, where two businesses – the grower and the integrator – are entering into a binding agreement, this is sufficient specificity to pass muster.

The court can find no cases interpreting section 201.100(a)'s language. The plain language of that provision, however, does not support Growers' interpretation of it. Section 201.100(a)(1) requires a poultry dealer to furnish a grower with "a true written copy of the contract, which shall clear specify: (1) The duration of the contract and *conditions* for the termination of the contract . . . ." 9 C.F.R. § 201.100(a)(1) (emphasis added). Though this section plainly requires Debtors to clearly state the grounds by which Debtors could terminate the contract – e.g., economic necessity – nothing in its language mandates that Debtors specify every condition which would fall *within* the term "economic necessity," as Growers assert. *See* Growers' Response Brief at 33.

It is reasonable that section 201.100(a)'s language should not so require, as such a rule would essentially prohibit integrators from contracting for the right to respond flexibly to unforeseen economic conditions. While section 201.100(a) certainly prohibits Debtors from including a condition in a poultry contract if that condition is so vague so as to provide a grower with no idea whatsoever of what might constitute grounds for

termination, the term "economic necessity" does not constitute such a condition. The use of the word "necessity" implies not just any less-than-desirable set of economic circumstances, but rather refers precisely to the type of situation Debtors found themselves in here, where they faced a choice between production cutbacks and corporate extinction. *See* Appendix to Debtors' MSJ, exh. B, at 473, exh. M, at 950-955, 982-984; *see generally* Debtors' MSJ Brief at 6-22. For these reasons, the court cannot conclude Debtors did not "clearly specify" the conditions under which the Growers' contracts could be terminated.

The Growers' second argument is more persuasive. They argue that Debtors, by initially representing that they would honor the GK contracts and then using strong-arm tactics to cause North Carolina growers to sign contracts containing the economic necessity language, violated the PSA. *See Growers' Response Brief* at 52-54. Since such economic necessity language is not standard in the industry, the Growers argue that Debtors gained an advantage over their competitors through unfair and deceptive practices. *See id.*

There is sufficient evidence in the summary judgment record to support the Growers' contentions respecting both Debtors' undertaking to honor GK's grower contracts and the use of strong-arm tactics at the instance of Debtors' management to cause growers in North Carolina to sign new contracts containing the economic necessity language. *See Growers' Response Brief* at 52-54; Appendix to Growers' Response, exh. 49, at 791, exh. 57, at 847-856, exh. 51, at 798-803, exh. 8, at 130-131, 133, exh. 10, 145-146, exh. 12, at 198-199, 208, exh. 16, at 271, exh. 18, at 303-304, exh. 13, at 222-224. On the other hand, while the record reflects other integrators also utilized economic

necessity language, it cannot be said to be common throughout the industry. Not only do Debtors offer few examples of like language,[19] but the language in the GK contract, which Debtors argue is equivalent to their economic necessity language, is distinctly different. *See Reorganized Debtors' Reply Brief in Support of Motion for Partial Summary Judgment on Alleged Violations of the Packers and Stockyards Act, 1921* at 6-7. Section A(1) of the GK contract provides:

> Gold Kist agrees to sell and deliver to [Grower] . . . flocks . . ., as such Flocks are available for placement . . . under prevailing market and production conditions . . . .

*See* Appendix to Growers' Response, exh. 58, at 857.

The difference between this provision and the "economic necessity" language used by Debtors is that this provision does not allow termination of a grower's contract, and, at least arguably, would not permit GK to pick and choose among growers for delivery of flocks. Debtors' "economic necessity" language therefore provides greater flexibility for Debtors, as opposed to other integrators, in responding to the vagaries of the economy. If that flexibility was obtained by wrongful techniques – i.e., misleading or strong-arming growers – Debtors obtained a potential competitive advantage in violation of section 192(a).

### III. Conclusion

Since the Hearing, the court has ruled on the record respecting the remaining PSA claims of the Growers.[20] Counsel for Debtors is accordingly

---

[19] The record reveals only two other integrators whose contracts provide for termination based on economic necessity.

[20] A motion to reconsider that ruling is pending. *See Growers' Motion for Reconsideration of Judgment on Partial Findings*, docket no. 6478.

directed to prepare and submit a judgment respecting the Growers' PSA claims consistent with that ruling and this memorandum opinion.

# # # # END OF MEMORANDUM OPINION # # # #

G:\ORD-Server\activePDF\JobInputDirectory\102912_692659.doc
Page 19 of 19