U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS
ON THE COURT'S DOCKET
TAWANA C. MARSHALL, CLERK

MAR 2 4 2011

*[signature]*

D. Michael Lynn
U.S. Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **PILGRIM'S PRIDE CORPORATION,** | § | **Case No. 08-45664 (DML)** |
| | § | |
| Debtor. | § | **Jointly Administered** |

## ORDER GRANTING REORGANIZED DEBTORS' MOTION FOR
## JUDGMENT ON PARTIAL FINDINGS

Before the Court is Pilgrim's Pride Corporation's ("Pilgrim's Pride") and its affiliated reorganized debtors' (collectively, as reorganized, the "Debtors")[1] Motion for Judgment on Partial Findings (the "Motion"). This Motion came before the Court during trial at the close of the Growers'[2] case-in-chief on alleged violations of the Packers and Stockyards Act, 1921 ("PSA"). The only claim that proceeded to trial was whether Pilgrim's Pride violated section 192(a) of the PSA by using any unfair or deceptive practices to induce Growers to sign a new Pilgrim's Pride poultry grower contract containing a provision that allowed Pilgrim's Pride to terminate a grower for economic necessity when the Growers' previous contracts with other

---

[1] The Reorganized Debtors in the above referenced chapter 11 cases are Pilgrim's Pride; PFS Distribution Company, PPC Transportation Company; To-Ricos, Ltd.; To-Ricos Distribution, Ltd.; Pilgrim's Pride Corporation of West Virginia, Inc.; and PPC Marketing, Ltd.

[2] "Growers" is defined as those chicken farms who raised chickens under contract to supply certain Debtors' processing plants located in (1) El Dorado, Arkansas, (2) Douglas, Georgia, (3) Siler City/Sanford, North Carolina, and (4) Enterprise, Alabama.

**REORGANIZED DEBTORS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW FOR TRIAL – Page 1**

...

poultry companies later acquired by Pilgrim's Pride did not contain an economic necessity termination provision. As explained below, the Court finds that the Motion is meritorious and should be GRANTED.

## I. Applicable Legal Standard

Federal Rule of Civil Procedure 52(c) provides that "if during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party." Fed. R. Civ. P. 52(c). "The Court is not required to draw any inferences in favor of the non-moving party, as would be required for a motion for judgment as a matter of law under Rule 50, but can make findings in accordance with its own view of the evidence." *Miles-Hickman v. David Powers Homes, Inc*, 613 F. Supp. 2d 872, 880 (S.D. Tex. 2009). Judgment is appropriate at the end of a plaintiff's case-in-chief if the plaintiff failed to offer evidence for or otherwise prove an essential element of its case. *Downey v. Denton County*, 119 F.3d 381, 385-86 (5th Cir. 1997); *see also Hamad v. IRS*, No. A-94-CA-644, 1997 U.S. Dist. LEXIS 7698 at *7 (W.D. Tex. May 22, 1997) ("A Rule 52(c) dismissal is warranted when the Court, even before hearing the defendant's case, determines that the plaintiff has failed to render persuasive evidence regarding the necessary elements of his case. The Court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.").

To enter judgment under Rule 52(c), the Court must satisfy the requirements of Rule 52(a) and make specific findings of fact and conclusions of law. Fed. R. Civ. P 52(a)(1); *see also Miles-Hickman*, 613 F. Supp. 2d at 880. "Rule 52(a) does not require that the district court set out findings on all factual questions that arise in a case." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1053-54 (5th Cir. 1997). And it "exacts neither punctilious detail nor slavish

tracing of the claims issue by issue and witness by witness." *Century Marine Inc. v U.S.*, 153 F.3d 225, 231 (5th Cir. 1998) (internal quotations and citations omitted). Rather, the district court need only provide a clear understanding of the analytical process by which its ultimate findings were reached. *Valley*, 118 F.3d at 1053-54. Accordingly, the Court makes the following findings of fact and conclusions of law on which its judgment is based.

## II. Jurisdiction

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(B). This represents the court's findings and conclusions. Fed. R. Bankr. P. 7052 and 9014.

## III. Findings of Fact

1. Pilgrim's Pride operates in a competitive industry where a number of ~~major~~ broiler companies compete with each other for the US chicken market. The competition in Debtors' industry has been and remains robust. *See* Memorandum Opinion signed March 2, 2011 (Dkt. Entry No. 6509, p. 8 of 19).

2. At all relevant times, the Growers in this case were businessmen who operated their own chicken farms, and who were independent contractors with Gold Kist and/or Pilgrim's Pride. *E.g.* Transcript of Trial Proceedings on January 31, 2010 (minus the testimony of Dwayne Parrish) at 56:5-14 [hereinafter Trial Tr. Vol. 1] (where Claimant Carroll admits he was an independent contractor for both Gold Kist and Pilgrim's Pride); *id.* at 50:6-16:4 (where Claimant Carroll describes his business experience); *see also* Debtors' Tr. Exs. 1 at § B(8), and 2 at § A.

3. In December 2006, Pilgrim's Pride acquired a majority of the outstanding common stock of Gold Kist, Inc. ("Gold Kist") through a tender offer. Pilgrim's Pride acquired the remaining shares of Gold Kist in January 2007.

4. Before the acquisition of Gold Kist, Pilgrim's Pride represented to the Growers that it would honor Gold Kist contracts. And, in fact, the record establishes that Pilgrim's Pride did honor the Growers' contracts with Gold Kist during 2007. Transcript of Trial Proceedings on February 14, 2010 at 56:2-25; 58:10-24 [hereinafter Trial Tr. Vol. 2].

5. Section C(7) of the Gold Kist contract provided: "[t]he terms and conditions of this agreement may be changed by Gold Kist with respect to flocks not yet delivered to producer at the time written notice of such change is given to producer, provided 1) that producer may elect to terminate the agreement with respect to any future flocks by written notice to Gold Kist prior to the delivery of a new flock if the producer does not consent to such change, and 2) that the same changes are made in the same manner in all other similar existing contracts of Producers producing broilers for Gold Kist." Debtors' Tr. Ex. 1 at § C(7).

6. In late December 2007 and early January 2008, Pilgrim's Pride circulated a Pilgrim's Pride contract for former Gold Kist growers to sign. This contract contained some different terms and conditions than the Gold Kist contract, such as a provision that allowed Pilgrim's Pride to terminate a grower's contract for economic necessity. The Pilgrim's Pride contract provided to growers was written, and its terms and conditions were the same for all former Gold Kist Growers who had Gold Kist contracts. Trial Tr. Vol. 2 at 58:10-62:12.

7. When the Growers signed the new Pilgrim's Pride contract, Pilgrim's Pride and the Growers effectively modified the original terms and conditions of the Gold Kist contracts and thus the former Gold Kist contracts ceased to be valid.

8. Pilgrim's Pride's circulation of and request that the Growers sign the new Pilgrim's Pride contract was done in accordance with section C(7).

9. The evidence demonstrates that if a Grower did not elect to sign the new Pilgrim's Pride contract, Pilgrim's Pride's management's custom and practice was to allow the Grower to remain under the Growers' existing contract.

10. Pilgrim's Pride's circulation of the new Pilgrim's Pride contract was also performed in order to promote efficiency in the administration of the contracts and performance thereunder, such as accounting operations when calculating Grower pay.

11. No Grower elected to terminate the contract in accordance with section C(7) of the Gold Kist contract after Pilgrim's Pride began circulating the new Pilgrim's Pride contract in late 2008.

12. The new Pilgrim's Pride contract included language that allowed Pilgrim's Pride to terminate the contract for economic necessity.

13. The economic necessity termination provision appeared in sections C and D of the Pilgrim's Pride contract. Both sections C and D are located approximately in the middle of the first page of the contract. Section C is titled "Term" and section D is titled "Termination."

14. This economic necessity provision gave Pilgrim's Pride greater flexibility in responding to changes within the marketplace. Debtor's Tr. Ex. 2 at § D; Trial Tr. Vol. 2 at 62:13-63:17.

15. However, the evidence establishes that the new contract was not "rolled out" for the purpose of securing the advantage of the economic necessity provision, but to improve efficiency and provide the Growers with a raise in pay. Trial Tr. Vol. 2 at 60:7-23, 57:1-13.

16. The evidence also establishes that the Growers could have time to review the contracts and could have taken the contracts to an attorney if they desired. Although the Growers have consistently pointed to the fact that many of the contracts were presented to the

Growers on either Christmas Eve or New Year's Eve, most of those contracts were not signed until several days and in some cases over a week later. *E.g.* Debtor's Tr. Exs. 5, 8, 24, 26. Consistent with this, there was testimony from Pilgrim's Pride service technicians that service technicians would leave contracts at the Growers' farms and then pick the contracts up at a later date. Trial Tr. Vol. 1 at 125:9-22; 128:12-23; 174: 23-176:5; 176:24-177:1; 178:3-14; 180:22-181:8. This evidences that the Growers had time to review the contracts if they wanted it.

17. With the exception of Gary Buffkin the service technicians also testified that they did not put pressure on the growers to sign the contracts, that the Growers would have time to read the contract and take it to an attorney if they wanted to do so, and that the service technicians did not tell the Growers "sign this contract or you will get no more birds." Trial Tr. Vol. 1 at 125:9-22; 128:12-14; 176:1-5; 178:3-14; 180:22-25.

18. Accordingly, Pilgrim's Pride did not engage in or use unfair, unjustly discriminatory, or deceptive practices or devices when Pilgrim's Pride presented the new Pilgrim's Pride contracts to the Growers, or when Pilgrim's Pride obtained the Growers' signatures on those contracts.

19. The only evidence of misrepresentations or unfair practices came from the testimony of former Pilgrim's Pride service technician Gary Buffkin. Mr. Buffkin testified that Pilgrim's Pride was pushing for quick signatures of the contracts without permitting the Growers an opportunity to review the contract, and that service technicians were forcing Growers to sign contracts under threat that the grower would otherwise receive no more birds. However, in light of all the evidence presented at trial the Court finds Mr. Buffkin's testimony not credible. [handwritten: The court further finds that Mr. Buffkin was not authorized to force Growers to sign and acted]

20. Instead, as stated above, the court finds that the evidence presented at trial establishes that the Growers were not told "sign the contract or you will get not more birds," or, if any Grower [handwritten: contrary to company policy in doing so.]

was so informed it was contrary to Pilgrims Pride's policies and practice and beyond the scope of the speaker's authority and competence.

**IV.     Conclusions of Law**

1.     The text of section 192(a) of the PSA provides that "[i]t shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device." 7 U.S.C. § 192(a).

2.     The Supreme Court and the Fifth Circuit recognize that section 192 of the PSA is an antitrust statute, which Congress enacted for the purpose of preventing anticompetitive behavior in the food production and processing industry. *Stafford v. Wallace*, 258 U.S. 495 (1922); *Mahon v. Stowers*, 416 U.S. 100, 106 (1974) (per curiam); *Wheeler v Pilgrim's Pride Corp.*, 591 F.3d 355, 357-363 (5th Cir. 2009) (en banc).

3.     As Chief Justice Taft wrote, "[T]he 'chief evil' at which [the PSA] was aimed was 'the monopoly of the packers, enabling them *unduly and arbitrarily* to lower prices to the shipper who sells, and *unduly and arbitrarily* to increase the price to the consumer who buys." *Mahon*, 416 U.S. at 106 (quoting *Stafford v. Wallace*, 258 U.S. at 514-15) (emphasis added); *see also Wheeler*, 591 F.3d at 358.

4.     In light of the plain-meaning of section 192 of the PSA, and given its objective, a party alleging violations of any subsection of the statute must demonstrate "proof of injury, or likelihood of injury, to competition." *Wheeler*, 591 F.3d at 363.

5.     Further, Courts have held that, where the alleged anti-competitive effect is collateral to a valid business purpose, there is no violation of section 192. *See IBP, Inc v*

*Glickman*, 187 F.3d 974, 978 (8th Cir. 1999) (right of first refusal under beef marketing agreement which allowed company "to have a more reliable and efficient method of obtaining a supply of cattle," did not violate PSA, since "[t]he [PSA] was designed to promote efficiency, not frustrate it" (quoting *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995)); *Griffin v Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 828 (E.D. Va. 2002) (company's "series of acquisitions of competing packers and its development of sources of supply of its raw materials," which the evidence suggested were not motivated by anything other than "considerations of quality control and efficiency," did not give rise to PSA claim). Some courts have ruled that effects beneficial to competition may offset negative effects of a business-justified course of conduct, thus excusing what otherwise might be a violation of the statute. *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1280 (11th Cir. 2005) ("If a packer's course of business promotes efficiency and aids competition in the cattle market, the challenged practice cannot, by definition, adversely affect competition."); *Armour & Co. v. United States*, 402 F.2d 712, 725 (7th Cir. 1968) (competitive justifications for coupon plan "negate[d] its being unjust, undue, or unreasonable" under 7 U.S.C. § 192(a) and (b)).

6.    Thus, in order for the Growers to prevail under section 192(a), they must establish two elements: (1) that Pilgrim's Pride engaged in conduct falling within the specific terms of section 192(a) such as misrepresentations or other unfair practices; and (2) that such conduct produced an anticompetitive effect. If Growers satisfy this burden, Pilgrim's Pride may be excused from what otherwise might be a violation of section 192 of the PSA by presenting evidence of an independent, legitimate business reason beneficial to competition. *See Pickett*, 420 F.3d at 128.

7. The Court concludes the Growers have not met their burden to show that Pilgrim's Pride engaged in an unfair or deceptive acts of the sort that fall within section 192(a). Accordingly, for this reason alone, the Growers' PSA claims must fail.

8. The Court holds that it was neither unfair nor deceptive for Pilgrim's Pride to state that it would honor Gold Kist contracts. The Growers continued to operate under their Gold Kist contracts for one year before Pilgrim's Pride circulated its contract with new terms and conditions.

9. The Court holds that it was neither unfair nor deceptive for Pilgrim's Pride to circulate the new Pilgrim's Pride contract to all the Growers within the same complex and to request that the Growers sign the contracts.

10. The Court holds that Pilgrim's Pride did not engage in any unfair or deceptive practices or devices with respect to any representations that Pilgrim's Pride representatives may have made to the Growers when the new Pilgrim's Pride contract was circulated. The Growers are independent contractors with Pilgrim's Pride and under a duty to read the contracts they sign. *Spartan Leasing v Pollard*, 400 S.E.2d 476, 479 (N.C. App. 1991). The evidence establishes that with the exception of unauthorized conduct by Gary Buffkin the Growers were given an opportunity to review the contracts before signing, and even could have taken the contract to an attorney if they so chose.

11. The Court further holds that the evidence does not support a finding that Pilgrim's Pride engaged in any strong-arm tactics in violation of section 192(a) of the PSA.

12. The term "economic necessity" in the Pilgrim's Pride contracts is valid, enforceable, and certainly recognizable—at least as it was applied in the case at bar.

13. The inclusion of the economic necessity language in the contracts provided Pilgrim's Pride greater flexibility, as opposed to other integrators who did not include the same or similar language in their contracts, in responding to the vagaries of the marketplace. However, to the extent that the inclusion of the economic necessity language provided Pilgrim's Pride greater flexibility, this is the sort of flexibility and efficiency that courts view as the intention of Congress in enacting the Packers and Stockyards Act. *See Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995) (acknowledging that "the purpose behind § 202 of the PSA, 7 U.S.C. § 192, was not to so upset the traditional principles of freedom of contract. The PSA was designed to promote efficiency, not frustrate it.").

14. Accordingly, the Court holds that Pilgrim's Pride has not undertaken any practices or used devices that are unfair, unjustly discriminatory, or deceptive under section 192(a) as it relates to Growers.

15. Additionally, the Court concludes that the evidence demonstrates that Debtors had at least one independent legitimate business reason that defeats the Growers' section 192(a) claims. For instance, Debtors had independent legitimate business reasons for circulating the new Pilgrim's Pride contract in late 2008. The circulation of the new Pilgrim's Pride contract was performed for the purpose of improving efficiency and providing the Growers a pay raise. Pilgrim's Pride did not know that it would be relying on the economic necessity language at a later time when Pilgrim's Pride circulated the new Pilgrim's Pride contracts beginning in December 2007. Indeed, the uncontested testimony from Pilgrim's Pride's Randy Stroud establishes that the Debtors did not anticipate that they would need to rely on the economic necessity language in the termination clause of the contracts when the contracts were circulated to the Growers.

16.     Moreover, the evidence is overwhelming that Debtors were incurring huge losses in 2008 that could best be stemmed by reducing their production of chicken. The evidence is that Debtors selected for closing plants that would eliminate the worst losses they were suffering. The plants selected were poor performed and/or required immediate, substantial investment, such as Siler City, North Carolina. Similarly, the evidence also demonstrates that Debtors selected Growers for contract termination that were below average performers and whose termination would bring supply to the remaining plants into line with the Debtors' requirements. Thus, Debtors' actions were reasonably necessary to Debtors' survival. Had Debtors not put a stop to their losses, it is likely that their business would either have failed entirely or would have had to be cut back even more at a future date. Consequently, the idling of plants and terminating/rejecting Growers' contracts based on the economic necessity language had off-setting beneficial effects for competition of the sort important to the *Pickett* and *Armour* Courts.

17.     Because the Growers failed to establish at least one or more of the essential elements of their section 192(a) claim or to defeat the evidence that Pilgrim's Pride had legitimate business reasons for circulating the new Pilgrim's Pride contract, the manner it circulated the contracts, and relying on the economic necessity language in the contracts to constrict production to avoid corporate extinction, the Court holds it may enter judgment for the Debtors under Federal Rule of Civil Procedure 52(c).

18.     Any finding of fact may be deemed to be a conclusion of law, and any conclusion of law may be deemed to be a finding of fact.

19.     Further, any finding of fact and conclusions of law in the Court's Memorandum Opinion signed on March 2, 2011 (Dkt. Entry No. 6509) are included and incorporated herein in their entirety.

V. **Order**

In accordance with the foregoing, it is therefore:

ORDERED that Debtor's Motion for Judgment on Partial Findings is GRANTED;

ORDERED that judgment be entered for the Debtors on the Growers' remaining section 192(a) PSA claims;

ORDERED that the Growers' section 192(a) PSA claims are dismissed with prejudice; and

ORDERED that this Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

# # # END OF ORDER # # #