

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

United States Bankruptcy Judge

**Signed August 25, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| *et al.*, | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## MEMORANDUM OPINION AND ORDER

Before the court is the *Debtors' One Hundred Thirty-Third Omnibus Objection to Claims of Deborah Wheatley* (the "Objection") filed by Debtors.[1] The court held a hearing on the Objection from April 18, 2011 through April 21, 2011 (the "Hearing"). During the Hearing, the court heard testimony from Deborah Wheatley ("Wheatley"); William Snyder, PPC's Chief Restructuring Officer; Steve Bolden ("Bolden"), Senior Vice President of Live Operations for

---

[1] Debtors are Pilgrim's Pride Corporation ("PPC"); PFS Distribution Company; PPC Transportation Company; To-Ricos, Ltd.; To-Ricos Distribution, Ltd.; Pilgrim's Pride Corporation of West Virginia, Inc.; and PPC Marketing, Ltd.

1

Eastern Operations for PPC; Kenneth Scott Black ("Black"), a former broiler manager for PPC; Shane Guy, Live Production Manager at PPC's Chattanooga, Tennessee plant; and James Hendricks ("Hendricks"), Wheatley's husband. The court also received into evidence at the Hearing exhibits identified as necessary below.[2] In addition to the Objection, the court has considered all applicable pretrial reports, briefs, and objections.

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B), except as otherwise noted herein. This memorandum opinion and order constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I.     BACKGROUND

Debtors are large chicken integrators with operations in the United States, Puerto Rico, and Mexico. Debtors each commenced a voluntary case in this court under chapter 11 of the Bankruptcy Code (the "Code")[3] on December 1, 2008. These cases are being jointly administered pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure as the above-captioned bankruptcy case (the "Case").

Wheatley is a former independent contract chicken grower for PPC, and formerly the owner of two chicken farms ("Faith Farms" and "Trinity Farms," and together, the "Farms"). The Farms are located in eastern Tennessee.

In the spring of 2005, Wheatley left the Farms and filed for divorce from her then-husband, Frank Wheatley ("Frank Wheatley"). Frank Wheatley subsequently signed two "broiler production agreements" (i.e., chicken growing contracts) covering the Farms with PPC

---

[2]      Wheatley's exhibits are identified by number and Debtors' exhibits are identified by letter.

[3]      11 U.S.C. §§ 101 *et seq.*

on June 14, 2006 (together, the "Frank Wheatley Contracts").[4] *See* Ex. G; Ex. N. Both of the Frank Wheatley Contracts were "flock-to-flock" – i.e., they provided that "[e]ither [Frank Wheatley] or [PPC] shall have the right to terminate [the contract] without any need for cause provided that written notice is given after a flock is settled and before a new flock is placed." *See* Ex. G, ¶ D; Ex. N, ¶ D. Each contract also gave PPC the option of terminating it at any time "for cause or economic necessity." *See id.*

Wheatley resumed possession of the Farms at some point after March 2007, and filed for protection under chapter 12 of the Code in April of that year (the "Chapter 12 Bankruptcy"). In July 2007, Wheatley and PPC entered into a boiler production agreement with respect to Trinity Farms (the "2007 TF Contract").[5] *See* Ex. O. Approximately one month later, PPC and Wheatley entered into a broiler production agreement with respect to Faith Farms (the "2007 FF Contract," and with the 2007 TF Contract, the "2007 Contracts"). *See* Ex. H. Like the Frank Wheatley Contracts, the 2007 Contracts were flock-to-flock and contained language permitting PPC to effect termination at any time for "cause or economic necessity." *See* Ex. H, ¶ D; Ex. O, ¶ D.

Pursuant to the 2007 Contracts, PPC provided Wheatley with chicks and feed, though PPC retained title to both throughout the growing process.[6] *See* Ex. H, ¶ F; Ex. O, ¶ F. The amount of Wheatley's compensation under the 2007 Contracts was determined using a formula

---

[4]     One of the Farms (it is not clear from the record which one) was named "Mountain View" at that time; the court cannot discern from the record the name of the other. The court understands Wheatley to have subsequently renamed the Farms "Faith Farms" and "Trinity Farms" after retaking possession of them sometime after March 2007.

[5]     It is not apparent from the record when the Frank Wheatley Contracts were terminated, though presumably termination occurred prior to execution of the 2007 Contracts.

[6]     Subsequent contracts between Wheatley and PPC (discussed below) also provided for this arrangement. *See, e.g.*, Ex. I, ¶ F. The court understands this arrangement to be typical of the relationships between chicken growers and integrators.

incorporating as variables the weight of chicken produced, the number of chicks placed, and the amount of feed used, among other things. *See* Ex. H (Broiler Production Payment Schedule); Ex. O (Broiler Production Payment Schedule); *see also* note 27, *infra* (discussing in detail a formula similar to that used to determine Wheatley's pay under the 2007 Contracts).

On January 1, 2008, Wheatley and PPC entered into two new broiler production agreements. *See* Ex. I; Ex. P. As before, one of these contracts covered Faith Farms (the "2008 FF Contract"), and one covered Trinity Farms (the "2008 TF Contract," and with the 2008 FF Contract, the "2008 Contracts").[7] *See, respectively,* Ex. I; Ex. P. The terms of the 2008 Contracts were substantially the same as those of the 2007 Contracts – e.g., the 2008 Contracts were flock-to-flock and contained "economic necessity" language. *See* Ex. I, ¶ D; Ex. P, ¶ D. The 2008 Contracts provided Wheatley with greater compensation than the 2007 Contracts, though the formula used to determine her pay remained essentially the same. *See* Ex. I (Broiler Production Payment Schedule); Ex. P (Broiler Production Payment Schedule).

As noted above, Debtors commenced the Case on December 1, 2008. On or about January 27, 2009**,** Wheatley filed two proofs of claim numbered 448 and 449 in the Case (respectively, "POC 448" and "POC 449"). Both POC 448 and POC 449 are blank as to the amount sought, the date the debt was incurred, and the nature of the debt.[8]

The Chapter 12 Bankruptcy was dismissed in March 2009 after Wheatley missed a plan payment. Approximately one month later, PPC provided Wheatley with notice that it intended to

---

[7]    The record is not entirely clear as to when the 2007 Contracts were terminated, though the court assumes it was no later than upon execution of the 2008 Contracts.

[8]    They also appear to be duplicates of one another.

reject the 2008 FF Contract pursuant to Code § 365(a), "due to economic necessity."[9] *See* Ex. K.[10] Wheatley then commenced a new bankruptcy case in May 2009 by filing another petition under chapter 12 of the Code (the "Second Chapter 12 Bankruptcy," and with the Chapter 12 Bankruptcy, the "Chapter 12 Bankruptcies").[11]

Meanwhile, PPC had decided to assume the 2008 TF Contract pursuant to Code § 365(a). Wheatley and PPC therefore entered into a boiler production agreement on June 15, 2009 (the "2009 TF Contract").[12] *See* Ex. Q. Like the 2007 Contracts and the 2008 Contracts, the 2009 TF Contract is flock-to-flock and may be terminated by PPC "for cause or economic necessity," though the payment terms differ somewhat from prior agreements. *See* Ex. Q, ¶ D & Broiler

---

[9] The "tournament" method utilized by PPC to determine which of its growers' contracts to reject is described in detail in a prior opinion of this court. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 419-20 (Bankr. N.D. Tex. 2009). It is appropriate to note here that PPC was not required to rely on the "economic necessity" language found in the 2008 FF Contract as an independent basis for rejecting that contract, as such rejection was effected pursuant to Code § 365(a). Whether rejection of the 2008 FF Contract was economically necessary is a relevant consideration, however, for purposes of determining whether Debtors used their independent business judgment in deciding to reject this contract.

[10] The court did not actually approve rejection of the 2008 FF Contract until April 2011. PPC initially filed a motion to reject the 2008 FF Contract pursuant to Code § 365(a) on July 10, 2009. *See Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the Debtors to Reject Certain Broiler Grower Agreements* (the "Fifth Rejection Motion"), Docket. No. 2591. On October 13, 2009, Wheatley filed an objection to the Fifth Rejection Motion. *See Objection to Motion Pursuant to 365(e) of the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the Debtors to Reject Certain Broiler Grower Agreements*, Docket No. 3754.

As a result of Wheatley's objection, as of the Hearing, the court had not granted the Fifth Rejection Motion with respect to the 2008 FF Contract. The court heard argument at the Hearing from Wheatley and from counsel for Debtors respecting the Fifth Rejection Motion. After considering their respective positions, the court granted the relief requested in the Fifth Rejection Motion and allowed Debtors to reject the 2008 FF Contract.

[11] The Second Chapter 12 Bankruptcy was dismissed on August 16, 2010. *See Order Granting Motion to Dismiss Case*, Dkt. No. 121, Case No. 1:09-bk-13057 (Bankr. E.D. Tenn.).

[12] PPC's representative did not execute the 2009 TF Contract until July 16, 2009, but the contract provided that it was effective from June 15, 2009.

Production Payment Schedule. PPC placed no chickens at Faith Farms under the 2009 TF Contract.[13]

On or about September 27, 2009, Wheatley filed two more proofs of claim numbered 6284 and 6289 in the Case (respectively, "POC 6284" and "POC 6289," and with POC 448 and POC 449, the "POCs"), each in the amount of $280,000. Wheatley lost Faith Farms to foreclosure approximately five months later, in February 2010. Debtors filed the Objection on June 28, 2010, controverting all four of the POCs. In August 2010, Wheatley lost Trinity Farms to foreclosure.

## II. DISCUSSION

As a preliminary matter, the court adopts as Wheatley's the claims listed in the *Joint Pretrial Report* (the "Report")[14] as Wheatley's claims against Debtors, except as otherwise stated in this memorandum opinion and order. The court has divided Wheatley's claims into four categories for purposes of discussion: (A) failed claims; (B) claims on which Wheatley has not met her burden of proof; (C) feed claims; and (D) Wheatley's claim respecting her grower ranking.

### A. Failed claims[15]

---

[13] Wheatley (somewhat confusingly) asserts that "[she] was promised chickens [to grow under the 2009 TF Contract] no later than June 4, 2010, but was not given chickens nor a date when to receive chickens." *See Response Opposed to Debtors' One Hundred Thirty-Third Omnibus Objection to Claims of Deborah Wheatley (No Liability, Duplicate Claims and Unsupported Claims)*, docket no. 5606, ¶ 14. Neither party disputes that Wheatley never received any chickens under the 2009 TF Contract.

[14] The Report was filed jointly by Wheatley and Debtors on April 11, 2011, at docket no. 6600. The court has made its best efforts to discern from the Report the exact claims Wheatley brings against Debtors, but the convoluted and confusing nature of Wheatley's statements therein made this an arduous task. The court is confident, however, that Wheatley has failed to carry her evidentiary burden with respect to any claim not addressed in this opinion, including any personal injury claims.

[15] The claims in this section fail for reasons other than that Wheatley failed to prove them by a preponderance of the evidence – e.g., the court may not have jurisdiction to consider a particular claim, or the court cannot identify under which statute Wheatley brings a claim. To the extent Wheatley properly brought any of the claims in this section, however, she failed to meet her burden of proof with respect to that cause of action.

Intentional Injury: It is not clear to the court what Wheatley means by "intentional injury," though she is plainly asserting some type of tort claim. To the extent Wheatley is asserting a personal injury claim, the court does not have jurisdiction to adjudicate this claim. *See* 28 U.S.C. § 157(b)(2)(B), (5).[16] To the extent this is a non-personal injury tort claim, Wheatley has provided the court with no evidence that she sustained injury as a result of tortious conduct engaged in by Debtors, and therefore has not proven this claim by a preponderance of the evidence.[17] *See Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000) (holding that the burden of proof is not altered from what it would be outside of bankruptcy).

Defamation: The court arguably cannot adjudicate defamation claims. *See* 28 U.S.C. § 157(b)(2)(B), (5); *Elkes Dev., LLC v. Arnold* (*In re Arnold*), 407 B.R. 849, 853 (Bankr. M.D.N.C. 2009) (concluding that "defamation claims constitute personal injury tort claims within the meaning of [s]ection 157(b)(5)"); *Control Ctr., L.L.C. v. Lauer*, 288 B.R. 269, 279 (M.D. Fla. 2002) (concluding that a defamation claim must be tried in U.S. District Court because it is a personal injury claim); *contra Massey Energy Co. v. W. Va. Consumers for Justice*, 351 B.R. 348, 351 (E.D. Va. 2006) (concluding that bankruptcy courts have jurisdiction to adjudicate a claim for defamation). The court will not exceed its jurisdiction and so concludes that Wheatley's claim for defamation must be tried, if at all, before the District Court. *See* 28 U.S.C. § 157(b)(5).

---

[16] The U.S. Supreme Court recently suggested in dicta that this court might try a personal injury claim by consent, including implied consent of the claimant. *See Stern v. Marshall*, 131 S. Ct. 2594 (2011). However, under the order of reference to this court, personal injury claims are not referred and, thus, implied consent is not possible. *See* Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc, Miscellaneous Rule No. 33, U.S. Dist. Ct. N.D. Tex., *available at* http://www.txnb.uscourts.gov/general_orders/misc33.pdf (last visited August 25, 2011).

[17] Generally, tort claims must be proven by a preponderance of the evidence. *See, e.g.*, *Elchlepp v. Hatfield*, 294 S.W.3d 146, 150 (Tenn. Ct. App. 2008) (fraudulent misrepresentation); *Staggs v. Sells*, 86 S.W.3d 219, 224 (Tenn. Ct. App. 2001) (negligent misrepresentation).

<u>Discrimination</u>: The court arguably cannot dispose of discrimination claims. *See* 28 U.S.C. § 157(b)(2)(B), (5); *Goldschmidt v. Erickson (In re Erickson)*, 330 B.R. 346, 349 (Bankr. D. Conn. 2005) (concluding that bankruptcy courts lack jurisdiction to adjudicate discrimination claims); *contra In re Atron Inc. of Mich.*, 172 B.R. 541, 545 (Bankr. W.D. Mich. 1994) (concluding that bankruptcy courts have jurisdiction to adjudicate discrimination claims). The court will not exceed its jurisdiction and so concludes that Wheatley's claim for discrimination must be tried, if at all, before the District Court. 28 U.S.C. § 157(b)(5).

<u>Sexual Harassment</u>: The court arguably cannot dispose of claims for sexual harassment. *See* 28 U.S.C. § 157(b)(2)(B), (5); *Stranz v. Ice Cream Liquidation, Inc. (In re Ice Cream Liquidation, Inc.)*, 281 B.R. 154, 162-64 (Bankr. D. Conn. 2002) (describing "broad" and "narrow" interpretations by courts of the term "personal injury tort claim" and determining that a sexual harassment claim is such a claim under the broad definition, but declining to determine whether 28 U.S.C. § 157 entirely forecloses a bankruptcy court's jurisdiction over personal injury tort claims). The court will not exceed its jurisdiction and so concludes that Wheatley's claim for sexual harassment must be tried, if at all, before the District Court. 28 U.S.C. § 157(b)(5).

<u>Rude and Lascivious Behavior</u>: The court knows of no basis in law for assertion of a claim for rude or lascivious behavior. The court cannot allow a claim against Debtors that is unenforceable under applicable law. *See* Code § 502(b)(1). To the extent the alleged "lascivious behavior" may constitute sexual harassment, the court arguably cannot, in any case, hear the claim for the reasons discussed above.

Malice: The court knows of no basis in law for assertion of a claim for malice. The court cannot allow a claim against Debtors that is unenforceable under applicable law. *See* Code § 502(b)(1).

Bad Faith: Though a party's relative good faith is a relevant consideration in numerous instances throughout the law (e.g., whether a debtor's plan may be confirmed in bankruptcy, *see* 11 U.S.C. § 1129(a)(3)), the court is not aware of any cause of action for "bad faith."[18]

Corruption: Though conduct facilitating the exercise of what is colloquially referred to as "corruption" may be actionable in some circumstances,[19] Wheatley makes no factual allegations (and the record contains no evidence) whereby the court can determine the theory under which Wheatley brings this claim.

Collusion: The record does not contain factual allegations or evidence enabling the court to determine what cause of action Wheatley is asserting here. To the extent Wheatley is asserting a civil conspiracy claim, she has neither provided the court with evidence establishing the elements of this cause of action, nor pointed the court to the underlying tort upon which a civil conspiracy claim must be premised. *See, e.g.*, *Zurita v. Lombana*, 322 S.W.3d 463, 482 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (civil conspiracy is a derivative tort, and for a plaintiff to prevail under this theory, the defendant must also be liable for an underlying tort); *O'Dell v. O'Dell*, 303 S.W.3d 694, 697 (Tenn. Ct. App. 2008) (plaintiff bringing action for civil conspiracy must demonstrate the existence of concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose using unlawful means).

---

[18]    With the possible exception of the tort of bad faith committed by an insurer that denies or delays payment of a claim knowing that it has no reasonable basis for doing so. *See, e.g.*, *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 600 (Tex. 1993). That tort is plainly not at issue here.

[19]    Particularly with respect to criminal statutes. *See, e.g.*, 18 U.S.C. § 201 (providing criminal penalties for bribing public officials and witnesses).

Increase in Contract Price:  The 2008 Contracts provided for greater payments to Wheatley than she received under the 2007 Contracts.  *See* Boiler Production Payment Schedules in Exs. H, I, O, P.  Wheatley asserts that PPC increased its payments to her in order to increase its own liabilities so that it could file for bankruptcy protection.  Wheatley has put forth no evidence that this was PPC's intention when it entered into the 2008 Contracts, and at any rate, she would not have asserted a valid claim if she had.[20]  The court cannot allow a claim against Debtors that is unenforceable under applicable law.  *See* Code § 502(b)(1).

Animal Welfare Issues:  Wheatley cites no authority whatsoever for her animal welfare claim, and has neither pled sufficient facts nor provided sufficient evidence for the court to determine if a particular statute or common law cause of action applies here.

Federal Trade Commission Violation:  Wheatley does not have standing to file a claim for a Federal Trade Commission violation because a private cause of action does not exist for a violation of the Federal Trade Commission Act.  *See Fulton v. Hecht*, 580 F.2d 1243, 1251 n.2 (5th Cir. 1978); *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 988 (D.C. Cir. 1973); *Carlson v. Coca-Cola Co.*, 483 F.2d 279, 280 (9th Cir. 1973).

United States Department of Agriculture Violation:  To determine whether a private cause of action may be inferred from a federal statute, the court must determine Congress's intent in enacting the statute.  *See Thompson v. Thompson*, 484 U.S. 174, 179 (1988).  It goes without saying, however, that the court must be able to identify the specific statute under which the plaintiff seeks to sue in order for the court to divine Congress's intent respecting that piece of legislation.  Nothing in the record points the court to the statute under which Wheatley is

---

[20]     Debtors could have filed for protection under chapter 11 of the Code regardless of the extent of their liabilities.  *See* Code § 109(d).

asserting this claim, and the court therefore cannot conduct the inquiry required by *Thompson* and similar precedents.

<u>Tennessee Department of Agriculture Violation</u>: Wheatley has not specified which rule or law enforceable by the Tennessee Department of Agriculture was violated by PPC, nor did she offer any evidence whereby the court could determine the applicable rule or law. The court therefore can neither determine the basis for this claim nor whether Wheatley has standing to bring it.

<u>Tennessee Code for Professional Responsibility[21] Violation</u>: The court cannot discern from the record who this claim is being asserted against, though the court assumes Wheatley is accusing counsel for PPC of professional misconduct. The court finds highly dubious the argument that Debtors could be held responsible under the Tennessee Rules of Professional Conduct for violations of those Rules committed by their attorneys. The court also doubts that Wheatley, as a private party, has standing to bring an action under the Tennessee Rules of Professional Conduct. Finally, to the court's knowledge, counsel for Debtors are not admitted to practice in Tennessee, and thus any actions undertaken by Debtors' counsel in connection with this case (which is, and always has been pending in federal court in Texas) would not be governed by the Tennessee Rules of Professional Conduct.

It is appropriate to note here that Debtors' counsel have displayed an admirable degree of professionalism and tolerance with respect to the case at bar. The court is aware of no conduct by Debtors' counsel that violates any rule governing the professional conduct of attorneys. On the contrary, Debtors' counsel competently and thoroughly represented their clients without obstructing Wheatley's ability to put on evidence respecting her claims. Indeed, counsel has

---

[21]    Wheatley asserts a claim under the "Tennessee Code for Professional Responsibility." The rules governing the professional conduct of attorneys admitted to the bar in Tennessee are actually titled the "Tennessee Rules of Professional Conduct."

made every effort, despite Wheatley's often antagonistic written and verbal statements, to ensure Wheatley had her day in court.[22] The court therefore cautions Wheatley to read carefully Rule 9011 of the Federal Rules of Bankruptcy Procedure before accusing opposing counsel of ethical violations in this or any other bankruptcy case.

        <u>State and Federal Weights and Measures Violations</u>:  Wheatley asserts claims pursuant to state and federal weights and measures laws.  There is no federal weights and measures law.[23] States (including Tennessee) enforce their own weights and measures laws.  *See* TENN. CODE ANN. §§ 47-26-901 to 47-26-926 (the "Tennessee Weights and Measures Statute").  The provisions of the Tennessee Weights and Measures Statute suggest its drafters did not intend for the statute to be enforced via a private right of action.  Rather, this statute expressly provides for enforcement by the state:  it gives the Tennessee Agriculture Commissioner the power to enforce its provisions through warnings and by applying to a court of competent jurisdiction for an injunction.  *See* TENN. CODE ANN. §§ 47-26-922, 47-26-923.  It also criminalizes (among other things) the use in commerce of any incorrect weight or measure.  *See* TENN. CODE ANN. §§ 47-26-921.  The statute contains no language suggesting that its drafters intended a private right of action to be available, and the court therefore concludes that Wheatley may not bring a claim

---

[22]    The court has been extremely patient with Wheatley, particularly given her consistent failure to comply with the standards for presenting evidence in federal court, and has attempted to give her every effort to put on her case.

[23]    The Weights and Measures Division of the National Institute of Standards and Technology (the "NIST") promotes uniformity in U.S. weights and measures laws.  *See Weights and Measures,* NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, http://www.nist.gov/pml/wmd/ (last visited June 23, 2011).  The NIST's standards are not legally binding *per se*, though states often incorporate them into their weights and measures laws.  *See, e.g.,* TENN. CODE ANN. 47-26-904(a) ("Weights and measures . . . approved as being satisfactory by [the NIST], shall be the state primary standards of weights and measures, and shall be maintained in such calibration as prescribed by the NIST.").

pursuant to it. At any rate, Wheatley has introduced no evidence suggesting that Debtors violated the Tennessee Weights and Measures Statute (or any other weights and measures law).

Environmental Protection Agency Warnings: As noted above, to determine whether a private cause of action may be inferred from a federal statute, the court must determine Congress's intent in enacting the statute. *See Thompson*, 484 U.S. at 179. The court must be able to identify the specific statute under which the plaintiff seeks to sue in order for the court to determine Congress's intent respecting that piece of legislation, however, and Wheatley has failed to point the court to any such statute. Even assuming the court could identify the relevant statute here, Wheatley has provided no evidence (other than her own statements) that the Environmental Protection Agency issued warnings to her or anyone else concerning Debtors' conduct. Nor can the court understand how Wheatley could have sustained injury as a result of these purported warnings, and therefore Wheatley would not have standing to bring this claim in any case. *See Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010).

Tennessee Fair Trade Act Violation: Wheatley asserts that PPC violated the "Tennessee Fair Trade Act." There is no "Tennessee Fair Trade Act." To the extent Wheatley is intending by this claim to accuse PPC of violating the Tennessee Consumer Protection Act of 1977[24] or a similar statute, Wheatley has provided no evidence of any such violation.

Grain Inspection, Packers and Stockyards Administration violation: Wheatley alleges that PPC violated standards promulgated by the Grain Inspection, Packers & Stockyards Administration ("GIPSA"). The court cannot discern from the Report or the record which

---

[24] Section 47-18-104 of the Tennessee Consumer Protection Act of 1977 prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," and provides a non-exclusive list of such acts and practices. Tenn. Code Ann. § 47-18-104(a)-(b). The statute provides for individual or private actions. *See* Tenn. Code Ann. § 47-18-109.

GIPSA standards PPC allegedly violated, and therefore cannot determine whether a private right of action exists to enforce those standards.

Claims arising out of the Chapter 12 Bankruptcies: To the extent Wheatley has any claims against Debtors for actions taken with respect to the Chapter 12 Bankruptcies, the court (or courts) in which these bankruptcies were filed would be the proper forum to consider such claims. At any rate, Wheatley has not introduced any evidence with respect to any claim arising out of the Chapter 12 Bankruptcies.

B. Claims with respect to which Wheatley has not carried her burden of proof

Wheatley properly brought several claims on which she failed to carry her evidentiary burden. Wheatley had the burden to prove each of these claims by a preponderance of the evidence. *See Raleigh*, 530 U.S. at 20 (holding that the burden of proof is not altered from what it would be outside of bankruptcy).

Packers and Stockyards Act Violation:

Wheatley does not specify the subsection(s) of the Packers and Stockyards Act, 1921 (the "PSA") pursuant to which she brings this claim. *See* 7 U.S.C. § 192 (enumerating practices unlawful under the PSA). This court granted summary judgment in a prior contested matter with respect to certain claims brought by chicken growers (other than Wheatley) against Debtors pursuant to subsections (a), (b), and (e) of section 192 of the PSA. *See In re Pilgrim's Pride Corp.*, 448 B.R. 896 (Bankr. N.D. Tex. 2011). Though these growers alleged that PPC's decision to close several chicken processing plants and to terminate or reject their growing contracts violated the PSA, Debtors provided sufficient evidence that these actions served a valid business purpose and were more beneficial than detrimental to competition. *See id.* at 904-06. The court ultimately concluded that the growers could not prove that the complained-of conduct

14

had an anti-competitive effect, one of the requirements to recover under subsections (a), (b), and (e) of section 192. *See id.* at 902-05.

Though Wheatley does not so specify, the court assumes she brings this claim under one or more of subsections (a), (b), and (e) of section 192; section 192's other subsections do not appear to be relevant to her situation. Unlike the situation in the prior contested matter, however, Debtors need not provide evidence that PPC's actions toward Wheatley were in furtherance of a legitimate business purpose, as Wheatley has provided no evidence whatsoever that PPC's actions adversely affected competition.

Antitrust Business Practices: Wheatley does not specify under which statute she brings this claim, though a private right of action does exist under certain statutes targeting antitrust practices. *See, e.g.*, 15 U.S.C. § 15(a) (Clayton Act); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982). Wheatley failed, however, to prove by a preponderance of the evidence that PPC engaged in business practices that violated any antitrust statute or rule of common law. Nor did she provide any evidence of causation or that her business sustained damages as a result of PPC's alleged conduct, both necessary elements of any antitrust claim. *See, e.g.*, *Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir. 1973).

Negligence: It appears that Wheatley is alleging by this claim that PPC negligently operated its business. To recover under a negligence claim, a plaintiff must prove by a preponderance of the evidence that (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty by failing to comply with the standard of care applicable to that duty; (3) the plaintiff sustained injury as a result of the defendant's conduct; and (4) the defendant's conduct was both the cause-in-fact and the proximate cause of the plaintiff's injury. *See Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009); *see also Ortiz v. Glusman*, 334

S.W.3d 812, 817 (Tex. App.—El Paso 2011, pet. granted). Wheatley has provided no evidence with respect to any of these elements; the court highly doubts, for example, that PPC owed Wheatley a duty in its operation of its business. Wheatley therefore has not carried her burden of proof with respect to this claim. Furthermore, to the extent this is a personal injury claim, this court does not have jurisdiction to adjudicate it. *See* 28 U.S.C. § 157(b)(2)(B), (5).

<u>Misrepresentation</u>: It is not apparent from the Report and the remainder of the record whether Wheatley is asserting a claim for fraudulent misrepresentation, negligent misrepresentation, or both. To recover under a fraudulent misrepresentation theory, Wheatley must prove by a preponderance of the evidence that (1) PPC made a material false representation; (2) PPC knew the representation was false; (3) PPC intended Wheatley to rely on the representation; and (4) Wheatley relied on the representation to her detriment. *See, e.g.*, *Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 265 (Tex. App.—Corpus Christi 2008, no pet.); *accord Spectra Plastics, Inc. v. Nashoba Bank*, 15 S.W.3d 832, 840-41 (Tenn. Ct. App. 1999). Wheatley has failed to establish all of these elements by a preponderance of the evidence. Most notably, Wheatley has not pointed the court to the representation at issue here.

To recover under a negligent misrepresentation theory, Wheatley must prove by a preponderance of the evidence that (1) PPC made a representation in the course of its business, or with respect to a transaction in which PPC had a pecuniary interest; (2) PPC supplied false information for the guidance of Wheatley for use in her business; (3) PPC did not exercise reasonable care or competence in communicating or obtaining the information; and (4) Wheatley suffered pecuniary loss when she reasonably relied on the representation. *See Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn. Ct. App. 2004).

Wheatley has failed to establish all of these elements by a preponderance of the evidence. As with her potential fraudulent misrepresentation claim, Wheatley has not pointed the court to the representation at issue here.

Fraud in the Inducement: To recover under a fraudulent inducement theory,[25] Wheatley must prove by a preponderance of the evidence that she suffered injury when she reasonably relied on a promise of future action that PPC made knowingly and intentionally (or with utter disregard for the truth – that is, recklessly). *See Hood Land Trust v. Hastings*, No. M2009-02625-COA-R3-CV, 2010 WL 3928647, at *7 (Tenn. Ct. App. Oct. 5, 2010); *accord Taft v. Sherman*, 301 S.W.3d 452, 457 (Tex. App.—Amarillo 2009, no pet.). Wheatley has not proven this claim by a preponderance of the evidence. By way of example, Wheatley has not pointed the court to a promise of future action made by PPC, nor has she provided any evidence that such promise was made knowingly and intentionally or recklessly.

Interfering with a Sale of the Farms: Though the court is not entirely sure what claim Wheatley is asserting here, the court assumes Wheatley is alleging that PPC tortiously interfered with a contract to sell the Farms. Regardless of the actual claim asserted, Wheatley ultimately failed to provide any evidence that PPC interfered in any way with a sale of the Farms, both of which Wheatley lost to foreclosure in 2010.

The evidence Wheatley did provide the court with respect to this claim is somewhat convoluted. During the Hearing (as well as in the Report), Wheatley claimed to have in her possession a contract of sale covering both of the Farms that had been executed by a buyer. *See* TR (Wheatley) April 21, 2011 at 591:10-17. The document Wheatley introduced at the Hearing is not a contract of sale, however, but rather a copy of a listing agreement with a real estate

---

[25] Although Wheatley does not use the term "fraud in the inducement" in the Report, her statements in the Report make clear that she is alleging this cause of action.

agent. *See* Ex. 60. Appended to this listing agreement, however, is a copy of a document titled

"Addendum," which by its terms modified a prior "Purchase and Sale Agreement" to extend the

closing date for that agreement. *See id.* Both Wheatley and the buyer – L & M Global

Marketing & Investments – executed this addendum. *See id.* Also appended to the listing

agreement are copies of a "disclaimer notice," which limits the duties owed by the brokers

involved in the sale transaction, and a document titled "Subsurface Sewage Disposal System

Permit Disclosure." *See id.* Both of these documents were executed by Wheatley but not by the

potential buyer. *See id.*

Based on the documents introduced as exhibit 60, it appears to the court that Wheatley

did indeed enter into a contract of sale with respect to at least one of the Farms.[26] Wheatley

never introduced that contract into evidence, and the court cannot discern the terms of that

agreement from the addendum or any of the other documents collectively introduced as exhibit

60. Even if Wheatley had introduced this contract of sale, however, she has provided no

evidence whatsoever that PPC interfered with it, and thus has not carried her burden with respect

to this claim.

Breach of contract: "The essential elements of a breach of contract claim . . . include (1)

the existence of an enforceable contract, (2) nonperformance amounting to a breach of the

contract, and (3) damages caused by the breach of the contract." *C & W Asset Acquisition, LLC*

*v. Oggs*, 230 S.W.3d 671, 676-77 (Tenn. Ct. App. 2007) (internal quotations and citations

omitted); *accord Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex.

---

[26] During the Hearing, counsel for Debtors cross-examined Wheatley respecting a petition Wheatley had filed in September 2009 in the Circuit Court of Bradley County, Tennessee, against her mortgagee, Farm Credit Services of Mid-America, FLCA ("Farm Credit"). *See* TR (Wheatley) April 21, 2011 at 627:10-21. In this petition, Wheatley stated that she received an offer for Faith Farms in the spring of 2009 in the amount of $1,700,000, but the potential buyer withdrew the offer when it learned of Farm Credit's impending foreclosure. *See* Ex. BBB at 0059.

App.—Houston [1st Dist.] 2007, no pet.). Except as detailed below in the section entitled "Feed Claims," Wheatley has not proven by a preponderance of the evidence that she sustained damages as a result of a breach by PPC of one or more of her growing contracts.

## C. Feed Claims

Feed spills: On several occasions, PPC employees spilled feed during the course of delivery. Wheatley entered pictures of these feed spills into evidence. *See* Ex. 44. Hendricks, who helped Wheatley run the Farms, credibly testified as to whether a credit was received for each spill, and, if not, the amount of feed lost in that particular incident. Hendricks testified that, with respect to Faith Farms, PPC employees spilled (and Wheatley did not receive credit for) 50 pounds of feed on August 21, 2008, 125 pounds of feed on February 11, 2009, and another 125 pounds of feed on February 12, 2009. *See* TR (Hendricks) April 20, 2011 at 467:14-19. Hendricks also testified that 50 pounds were spilled at Trinity Farms on January 30, 2008, for which Wheatley was not credited. *See id.* at 467:20-470:19.

The combined amount of feed spilled at the Farms for which Wheatley did not receive a credit therefore totaled 350 pounds. The court assumes, based on the testimony of Guy and Black, that each pound of spilled feed for which Wheatley did not receive a credit cost her 7.5 cents.[27] The court therefore awards Wheatley $26.25 on her claim for spilled feed.

---

[27]    Guy testified that PPC used the following formula to determine a grower's pay: PPC took the number of chicks placed on a farm during a week and the number of pounds of feed consumed on that farm during that week and multiplied those numbers by $0.18 and $0.07, respectively. PPC then combined the two dollar amounts and divided the total by the number of gross pounds of chicken sold by the farm during the week, arriving at a "formula cost" for the grower. Each grower's formula cost was compared to a weighted average calculated using the total amounts of chicks placed, feed consumed, and pounds of chicken sold for all competing growers during that week. If a grower's formula cost exceeded the weighted average for that week, the grower's pay was reduced in accordance with a point system; the greater the amount by which the formula cost exceeded the weighted average cost, the less pay that grower received. *See* TR (Guy) (April 19, 2011) 354:10-356:6. Thus, to the extent a grower was charged for feed that was either spilled or never received, that grower received a corresponding reduction in pay, since higher feed consumption increased a grower's formula cost. Black testified that a grower would have sustained roughly 7.5 cents in damages for each pound of incorrectly charged feed. *See* TR (Black) April 19, 2011 at 296:25-297:21.

Feed Overcharges: Wheatley asserts that PPC charged her for feed she never received. To determine the extent (if any) of Wheatley's damages with respect to this claim, the court compared Wheatley's feed records to those kept by PPC. Wheatley submitted spreadsheets created by Hendricks for each flock, each of which details the amount of feed received for a particular flock. *See, e.g.*, Ex. 25. For PPC's records, the court relied on the Grower Pay Advice and Grower Pay Summary for each flock. *See, e.g.*, Ex. OO. For sake of clarity, Faith Farms and Trinity Farms (and each flock placed thereon) are addressed separately.

i. Faith Farms

Flock 1:[28] Though Hendricks testified from a spreadsheet containing information for Faith Farms flock 1, that exhibit is not included in the record provided the court. The court admitted Hendricks's spreadsheets and assumes this particular one was misplaced. According to Hendricks's testimony, the spreadsheet showed receipt of 1,487,840 pounds of feed for Faith Farms flock 1. PPC's Grower Pay Advice and Grower Pay Summary show PPC charged Wheatley for 1,535,330 pounds of feed for this flock. *See* Ex. NN. Taking Hendricks's testimony as correct, Wheatley was overcharged by 47,490 pounds for Faith Farms flock 1.

Flock 2: The spreadsheet for Faith Farms flock 2 states that PCC delivered 1,461,480 pounds of feed for that flock.[29] *See* Ex. 25. PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,616,415 pounds of feed. *See* Ex. OO. This is an overcharge of 154,935 pounds of feed.

---

[28] PPC references the flocks by the date the flock was placed. Wheatley references the flocks by farm name (i.e., either "Faith Farms" or "Trinity Farms") and the number of the flock (e.g., "flock 1"). The court will state in a footnote the date each flock was placed. Faith Farms flock 1 was placed on September 6, 2007.

[29] Faith Farms flock 2 was placed on November 20, 2007.

Flock 3:  The spreadsheet for Faith Farms flock 3 shows receipt of 1,548,847 pounds of feed for that flock.[30]  *See* Ex. 26.  PPC's Grower Pay Advice and Grower Pay Summary show that PPC charged Wheatley for 1,561,697 pounds of feed.  *See* Ex. PP.  This is an overcharge of 12,850 pounds of feed.

Flock 4:  The spreadsheet for Faith Farms flock 4 shows receipt of 1,345,680 pounds of feed for that flock.[31]  *See* Ex. 27.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,489,675 pounds of feed.  *See* Ex. QQ.   This is an overcharge of 143,995 pounds.

Flock 5:  Both Hendricks's spreadsheet and PPC's Grower Pay Advice and Grower Pay Summary show delivery of 1,555,160 pounds of feed for Faith Farms flock 5.[32]  *See* Exs. 28, RR.

Flock 6:  The spreadsheet for Faith Farms flock 6 shows receipt of 1,299,365 pounds of feed.[33]  *See* Ex. 29.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,305,420 pounds of feed.  *See* Ex. SS.  This is an overcharge of 6,055 pounds.

Flock 7:  The spreadsheet for Faith Farms flock 6 shows receipt of 867,140 pounds of feed.[34]  *See* Ex. 30.  PPC's Grower Pay Advice and Grower Pay Summary show that PPC charged Wheatley for 1,139,002 pounds of feed for that flock.  *See* Ex. TT.  This is an overcharge of 271,862 pounds of feed.

Total overcharges for Faith Farms:  In sum, the overcharges for Faith Farms are 47,490 pounds for flock 1; 154,935 pounds for flock 2; 12,850 pounds for flock 3; 143,995 pounds for

---

[30]     Faith Farms flock 3 was placed on January 29, 2008.

[31]     Faith Farms flock 4 was placed on April 25, 2008.

[32]     Faith Farms flock 5 was placed on July 14, 2008.

[33]     Faith Farms flock 6 was placed on October 16, 2008.

[34]     Faith Farms flock 7 was placed on January 5, 2009.

flock 4; 6,055 pounds for flock 6; and 271,862 pounds for flock 7. The total amount of overcharges for Faith Farms is therefore 637,187 pounds of feed.

ii. Trinity Farms

Flock 1: The spreadsheet for Trinity Farms flock 1 shows receipt of 1,548,155 pounds of feed.[35] *See* Ex. 31. PPC has supplied no exhibits with respect to Trinity Farms flock 1. However, Wheatley has provided the court with the Grower Pay Advice and Grower Pay Summary for that flock. *See id.* Both of these documents state that PPC charged Wheatley for 1,555,340 pounds of feed. *See id.* This is an overcharge of 7,185 pounds of feed.

Flock 2: Wheatley did not provide the court with a spreadsheet for Trinity Farms flock 2,[36] and Hendricks thus did not testify regarding feed deliveries for this flock. The court therefore cannot determine whether PPC overcharged Wheatley for feed delivered for this flock.

Flock 3: The spreadsheet for Trinity Farms flock 3 shows receipt of 1,472,285 pounds of feed.[37] *See* Ex. 33. PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,530,011 pounds. *See* Ex. AA. This is a 57,726 pound overcharge.

Flock 4: The spreadsheet for Trinity Farms flock 4 shows receipt of 1,430,215 pounds of feed.[38] *See* Ex. 34. PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,532,878 pounds. *See* Ex. BB. This is a 102,663 pound overcharge.

Flock 5: The spreadsheet for Trinity Farms flock 5 shows receipt of 1,384,845 pounds of feed.[39] *See* Ex. 35. PPC's Grower Pay Advice and Grower Pay Summary state that PPC charged Wheatley for 1,376,543 pounds. *See* Ex. CC. This is an undercharge of 8,302 pounds.

---

[35]     Trinity Farms flock 1 was placed on August 3, 2007.

[36]     Trinity Farms flock 2 was placed on October 19, 2007.

[37]     Trinity Farms flock 3 was placed on January 3, 2008.

[38]     Trinity Farms flock 4 was placed on March 31, 2008.

22

Flock 6:  The spreadsheet for Trinity Farms flock 6 shows receipt of 1,441,515 pounds of feed.[40]  *See* Ex. 23.  The Grower Pay Advice and Grower Pay Summary show charges for 1,463,575 pounds.  *See* Ex. DD.  This is an overcharge of 22,060 pounds.

Flock 7:  The spreadsheet for Trinity Farms flock 7 shows receipt of 1,172,784 pounds of feed.[41]  *See* Ex. 37.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 1,220,904 pounds of feed.  *See* Ex. EE.  This is an overcharge of 48,120 pounds of feed.

Flock 8:  The spreadsheet for Trinity Farms flock 8 shows receipt of 828,060 pounds of feed.[42]  *See* Ex. 38.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 837,469 pounds.  *See* Ex. FF.  This is an overcharge of 9,409 pounds.

Flock 9:  The spreadsheet for Trinity Farms flock 9 shows receipt of 974,645 pounds of feed.[43]  *See* Ex. 40.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 930,426 pounds of feed.  *See* Ex. GG.  This is an undercharge of 44,219 pounds.

Flock 10:  The spreadsheet for Trinity Farms flock 10 shows receipt of 739,431 pounds of feed.[44]  *See* Ex. 39.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 835,161 pounds.  *See* Ex. HH.  This is an overcharge of 95,730 pounds.

Flock 11:  The spreadsheet for Trinity Farms flock 11 shows receipt of 989,994 pounds of feed.[45]  *See* Ex. 41.  PPC's Grower Pay Advice shows charges for 959,081 pounds.  *See* Ex. II. This would be an undercharge of 30,913 pounds, but the Grower Pay Summary shows that PPC

---

[39]     Trinity Farms flock 5 was placed on June 23, 2008.

[40]     Trinity Farms flock 6 was placed on September 18, 2008.

[41]     Trinity Farms flock 7 was placed on December 29, 2008.

[42]     Trinity Farms flock 8 was placed on June 15, 2009.

[43]     Trinity Farms flock 9 was placed on August 13, 2009.

[44]     Trinity Farms flock 10 was placed on October 14, 2009.

[45]     Trinity Farms flock 11 was placed on December 18, 2009.

picked up the excess 30,913 pounds from Wheatley.  *See id.*  PPC therefore charged Wheatley for the correct amount of feed.

Flock 12:  The spreadsheet for Trinity Farms flock 12 shows receipt of 874,600 pounds of feed.[46]  *See* Ex. 42.  The Grower Pay Advice shows charges for 840,444 pounds.  *See* Ex. JJ.  This would be an undercharge of 34,556 pounds, but the Grower Pay Summary shows that PPC picked up the excess 34,556 pounds from Wheatley.  *See id.*  PPC therefore charged Wheatley for the correct amount of feed for Trinity Farms flock 12.

Flock 13:  The spreadsheet for Trinity Farms flock 13 shows receipt of 857,595 pounds of feed.[47]  *See* Ex. 43.  PPC's Grower Pay Advice and Grower Pay Summary show charges for 833,275 pounds.  *See* Ex. KK.  This is an undercharge of 24,320 pounds.

Net Overcharges for Trinity Farms:  PPC overcharged Wheatley by 7,185 pounds for Flock 1, 57,726 for Flock 3, 102,663 pounds for Flock 4, 22,060 pounds for Flock 6, 48,120 pounds for Flock 7, 9,409 pounds for Flock 8, and 95,730 pounds for Flock 10.  PPC undercharged Wheatley by 8,302 pounds for Flock 5, 44,219 pounds for Flock 9, and 24,320 pounds for Flock 13.  The net amount by which PPC overcharged Wheatley for feed delivered to Trinity Farms is therefore 266,052 pounds.

iii.  Damages awarded for feed overcharges

The court finds that PPC overcharged Wheatley by 637,187 pounds for Faith Farms and 266,052 pounds for Trinity Farms.  Based on an award of damages of 7.5 cents per pound,[48] the court awards Wheatley $67,742.93 on her claim for feed overcharges.

---

[46]     Trinity Farms flock 12 was placed on February 12, 2010.

[47]     Trinity Farms flock 13 was placed on April 9, 2010.

[48]     *See* note 27, *supra.*

D.  Wheatley's Claim Respecting Her Grower Ranking

According to Wheatley, the overcharges and feed spills described above negatively affected her ranking in the tournament system vis-a-vis the other growers,[49] and ultimately caused PPC to terminate the 2008 Contracts.[50]  Based on the testimony of Bolden, the court doubts that PPC's miscalculations with respect to feed charges sufficiently affected Wheatley's grower ranking such that PPC's errors are the reason she finished at or near the bottom in the tournament system.[51]  *See* TR (Bolden) April 18, 2011 at 114:19-115:9, 120:9-122:3.[52]  Even assuming Wheatley is correct on this point, however, it would be inappropriate (and probably impossible) for the court to remedy this problem.  If PPC's recordkeeping practices were flawed with respect to Wheatley, then they likely affected other growers as well.  Recalculating the rankings of hundreds of growers would be a monumental task in itself, to say nothing of computing the damages.  Assuming Wheatley is correct that inaccurate feed charges had a substantial effect on her ranking (and assuming other growers kept records similar to

---

[49]  Though Wheatley asserts in the Report that PPC overcharged her for chicken feed, she waited until the Hearing to advance her claim respecting the effect these overcharges had on her grower ranking.  The gist of this argument is that, because growers are ranked based on their cost efficiency, a grower's rank will be artificially depressed if that grower was overcharged for feed, since total amount of feed used is one of the variables in the ranking formula.

[50]  As described above, PPC did not terminate or reject (or move to terminate or reject) the 2008 TF Contract, only the 2008 FF Contract.

[51]  There is also no evidence that these miscalculations were intentional; on the contrary, the fact that PPC undercharged Wheatley multiple times suggests that these errors were the result of mistakes in recordkeeping, not bad intent.

[52]  Bolden testified on direct examination that only an overcharge of "several tons of feed" would have been sufficiently large enough to drop Faith Farms's ranking from a "safe" spot to one in which the 2008 FF Contract would have been targeted for rejection.  *See* TR (Bolden) April 18, 2011 at 114:19-115:9.  Bolden further testified that spilling four tons of feed would have caused Faith Farms's ranking to move only "fractionally."  *See id.* at 120:9-122:3.  The court therefore cannot find that feed spills and overcharges sufficiently depressed Faith Farms's ranking such that PPC incorrectly terminated the 2008 FF Contract.  The court cannot, however, say for sure: it is at least possible that, if an 8,000-pound spill (or overcharge) would cause a grower's ranking to drop "fractionally," a 637,487-pound spill (in actuality, 687,137 pounds in overcharges plus 300 pounds in feed spills for Faith Farms) could more significantly depress the ranking.

Hendricks's), it is foreseeable that other growers whose contracts were terminated may be due compensation, and some whose contracts were not terminated obtained undeserved benefits. Untangling this mess would require Herculean labors; doing so would arguably be Wheatley's burden, which stands unmet. Nor would Wheatley be able to grow chickens for PPC in the event the court found termination of the 2008 FF Contract to be improper, since she owns neither Trinity Farms nor Faith Farms at present. The court therefore concludes that Wheatley's claims respecting damages she sustained as a result of PPC overcharging her for feed are best addressed by awarding her 7.5 cents per pound of overcharged or spilled feed, as detailed above.

## III. CONCLUSION

For the foregoing reasons, the Objection must be OVERRULED to the extent of $67,769.18 with respect to Wheatley's feed spill and overcharge claims and SUSTAINED with respect to all other claims.

It is so ORDERED.

### # # # END OF MEMORANDUM OPINION AND ORDER # # #