U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed January 31, 2012**

_____


# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, | § | |
| ET AL., | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

## MEMORANDUM OPINION

Before the court is *Reorganized Debtors' Motion for Summary Judgment on Claims Asserted by Certain Live Oak, Florida Growers* (the "Motion") filed by Debtors by which Debtors ask that the claims of nine chicken growers (the "Growers")[1] be summarily disallowed. The court conducted a hearing on the Motion on November 28, 2011.

---

[1] The Growers are: 1) Adalberto Brito d/b/a AC Paradise, 2) Janet Brito d/b/a/ Brito Farm, 3) James Fountain, 4) Bruno Lazaro Garcia d/b/a Cullinane Farms, LLC, 5) David Hines, 6) Keith Hudson and Glenda Hudson, 7) Moises Rodriguez, 8) Abel E. Tellechea d/b/a Able T Farms, and 9) Roman Vasallo

The Growers had asserted claims for damages under a number of theories: 1) violation of the Packers and Stockyards Act, 2) violation of the Florida Deceptive and Unfair Trade Practices Act, 3) unconscionability, 4) reformation, 5) fraud, 6) breach of joint venture agreement, 7) promissory estoppel, and 8) breach of contract.

At the hearing, the court granted summary judgment as to all but the breach of contract claims. Following the hearing, at the court's suggestion, Debtors and the Growers filed additional briefs in supplement to the briefs and summary judgment evidence previously provided to the court.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion contains the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

I. Background

Debtors, and specifically the parent debtor, Pilgrim's Pride Corporation ("PPC"), are chicken integrators that process and sell chicken on the wholesale and retail markets. Debtors commenced these chapter 11 cases on December 1, 2008. Debtors' plan, which provides for payment in full with interest of all unsecured claims, was confirmed on December 10, 2009.

The Growers owned and operated chicken farms in the vicinity of Debtor's Live Oak, Florida, processing plant (the "Live Oak Plant"). Prior to commencement of these chapter 11 cases, the Growers had entered into contracts with PPC by which they grew chickens for processing at the Live Oak Plant. In December of 2008 and July of 2009,[2] Debtors filed motions

---

d/b/a/ R & C Farm. James Fountain and David Hines did not respond to the Motion and the court granted summary judgment as to both at the hearing on November 28, 2011.

[2] The motions filed in July of 2009 were contemplated at the time of the earlier filing. *See* Rejection Opinion (as defined below), 403 B.R. at 417-18.

2

under section 365(a) of the Bankruptcy Code (the "Code")[3] by which they sought to reject and ultimately were authorized to reject the contracts between PPC and various chicken growers serving the Live Oak Plant including the Growers. The relationship between chicken growers and Debtors and the events and court proceedings surrounding the rejection of the Growers' contracts are fully described in a prior opinion of this court. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413 (Bankr. N.D. Tex. 2009) (the "Rejection Opinion").

By the Motion and associated briefs, Debtors contend that the Growers are not entitled to assert damage claims by reason of rejection of their contracts. *See* Code § 502(g)(1). The Growers, on the other hand, insist that rejection of their contracts led to substantial damages for which they are entitled to make claims under a theory of breach of contract.[4] The Motion and this memorandum opinion deal only with Debtors' liability, if any, to the Growers arising from the rejection of their contracts.[5]

II.     Summary Judgment Standard

Rule 56(a) of the FEDERAL RULES OF CIVIL PROCEDURE, applicable to the Motion pursuant to FEDERAL RULES OF BANKRUPTCY PROCEDURE 7056 and 9014, provides that "[t]he

---

[3]     11 U.S.C. §§ 101 et seq.

[4]     The Growers have made claims in the amounts listed below: 1) Adalberto Brito d/b/a AC Paradise - $7,088,548.70, 2) Janet Brito d/b/a Brito Farm – $3,430,320.00, 3) Bruno Lazaro Garcia d/b/a Cullinane Farms, LLC - $9,659,859.50, 4) Keith Hudson and Glenda Hudson – $2,443,735.00, 5) Moises Rodriguez – $7,229,244.40, 6) Abel E. Tellechea d/b/a Able T Farms - $2,104,100.00, and 7) Roman Vasallo d/b/a R & C Farm – $4,173,757.44.

[5]     Numerous growers who served other plants owned by Debtors filed claims in these chapter 11 cases following termination or rejection of their contracts. These claims, however, were not based on damages for breach including claims allowable under section 502(g)(1) of the Code – the latter category of damages having been resolved as to growers other than the Growers through various settlements (*see, e.g., Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Authorizing and Approving Settlement Resolving Certain Grower Claims ("The Second Grower Settlement Agreement")* at docket number 3864). The remaining claims of other growers have been addressed elsewhere by the court. *See, inter alia, In re Pilgrim's Pride Corp.*, 2011 WL 3799835 (Bankr. N.D. Tex. Aug. 26, 2011); *In re Pilgrim's Pride Corp.*, 453 B.R. 691 (Bankr. N.D. Tex 2011); *In re Pilgrim's Pride Corp.*, 442 B.R. 522 (Bankr. N.D. Tex. 2010).

3

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056 and 9014. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it . . . ." FED. R. CIV. P. 56(e). Rule 56 thus "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

"[T]he [initial] burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has carried this initial burden, its opponent must establish that there exists a "genuine" issue of fact, something which requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party must rather come forward with "specific facts" showing that a genuine issue for trial exists. *Id.* at 587. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether the nonmoving party has properly shown that a genuine issue for trial

4

exists, the court should "construe all facts and inferences in the light most favorable to the nonmoving party . . . ." *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005).

In the case at bar most of the issues posed by the Motion require only that the court determine a legal question. At most, the court need but look to the contracts of the Growers to decide most of the issues. Where there is no factual finding required, summary judgment is appropriate. *See City of Alexandria v. Cleco Corp.*, 735 F.Supp.2d 465, 472 (W.D. La. 2010) (citing numerous cases in which courts have found it appropriate to grant motions for summary judgment because the issues were purely legal in nature). Moreover, though the Motion was filed by Debtors, under Rule 56(f)(1), the court may alternatively grant summary judgment in the Growers' favor.[6]

III. Discussion

Rejection of a contract by a trustee or debtor in possession pursuant to section 365(a) is treated as a breach of the contract. *See* Code § 365(g); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (noting that "[t]he Code states that, except in certain narrowly circumscribed instances, rejection of an executory contract or lease constitutes a material breach."); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 530, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (1984) (stating that the "Bankruptcy Code specifies that the rejection of an executory contract which had not been assumed constitutes a breach of the

---

[6] Though Rule 56(f) requires notice, the proceedings at the November 28th hearing and the effect of inviting further briefs provided sufficient notice that the court's ruling might dispose of part of this matter in favor of the Growers. *See Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 222- 23 (3d Cir. 2004) (holding that the notice requirement is satisfied if "'the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" (quoting *Levya v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999))).

contract…."). The counterparty to the contract is entitled to a claim for its damages calculated as if the breach occurred immediately prior to the commencement of the bankruptcy case.[7] *See id.*

In the case at bar, however, Debtors argue that rejection of the Growers' contracts could not give rise to a claim for damages because (1) Debtors could have terminated the contracts by reason of economic necessity as provided in the contracts and would then have had no liability to the Growers; (2) the contracts permitted termination by either party between flocks;[8] and (3) in any case, PPC was not required to provide any flocks ever to the Growers and so had no obligation to perform at all under the contracts except during the time when flocks were in fact placed. Alternatively, Debtors claim that the Growers have failed to mitigate damages when they had an opportunity to do so and, under the Growers' contracts, Debtors cannot be held liable for consequential damages.

A. Economic Necessity

Debtors argue that the contracts with the Growers, according to their terms, could have been terminated by reason of economic necessity. They note that the court, in the Rejection Opinion, concluded that the Live Oak Plant was losing about $1,000,000 per week and that rejection of the contracts with growers would reduce that loss by $800,000 per week. Thus, Debtors state, the economic necessity of terminating the Growers was proven and Debtors

---

[7] The Growers rendered performance to Debtors after commencement of these chapter 11 cases. Although Debtors compensated the Growers in accordance with their contracts, the general rule is that, consistent with Code § 503(b)(1), a counterparty is entitled to post petition payment (*i.e.*, administrative expense treatment for post petition performance) under a rejected contract only to the extent of value (benefit) to the estate. *See In re Templeton*, 154 B.R. 930, 932 (Bankr. W.D. Tex. 1993); *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159 (6th Cir. 1988); *but see In re Curry Printers, Inc.*, 135 B.R. 564 (Bankr. N.D. Ind. 1991). This is so because the trustee or debtor in possession's obligation to perform in accordance with a rejected contract is inapplicable post petition.

[8] See the Rejection Opinion, 403 B.R. at 418-20, for a description of the nature and placement of flocks.

consequently should owe the Growers no damages, just as would have been true if the contracts had been terminated, rather than rejected.[9]

But, in the first place, two of the contracts at issue do not even include a term allowing PPC to terminate on the basis of economic necessity.[10] Second, as for those contracts that do allow for termination based on economic necessity, that is not what Debtors chose to do.

Under section 365(a), in order to be authorized to reject a contract, the trustee – or, as here, the debtor in possession – need only satisfy the business judgment test. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (stating that "[i]t is well established that 'the question whether a lease should be rejected … is one of business judgment.'" (quoting *Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943))); *Bildisco*, 465 U.S. at 524-25 (departing from the usual business judgment standard in considering the proper standard for rejection of a collective bargaining agreement under section 365(a)); *In re Food City, Inc.*, 94 B.R. 91, 93 (Bankr. N.D. Tex. 1988).

It was based on satisfaction of the business judgment rule, as interpreted by the court, that Debtors were authorized to reject the Growers' contracts. *See* Rejection Opinion, 403 B.R. at 428-35. Had Debtors come before the court under section 363(c)(1) of the Code[11] seeking

---

[9] In their post hearing brief Debtors seem to adopt the position that PPC's ability to have terminated based on economic necessity constitutes a defense to a claim for damages. While the court need not address that argument today, it has found no authority – nor have Debtors cited any – that would support the view that a termination clause in a contract that might have been, but was not, invoked can be used a defense against a claim of breach. Though Debtors argue in their brief that they did in fact elect to "'terminate,' through the mechanism of rejection," the court finds this argument unconvincing for the reasons explained in further detail below. *See Reorganized Debtors' Supplemental Brief in Support of Motion for Summary Judgment on Claims Asserted by Certain Live Oak, Florida Growers*, docket number 6891, p. 13.

[10] Those contacts are with Janet Brito and Glenda Hudson. An analysis of, the relevant parts of all the Growers' contracts is found in the appendix to this opinion (the "Appendix").

[11] Debtors correctly note that termination of a grower's contract may be in the ordinary course of business. While that would be true of termination for, *e.g.*, cause, it can hardly be said that the existence of economic

authority to terminate the Growers' contracts due to economic necessity, they would have been required to show not only that termination was consistent with their exercise of business judgment (so satisfying section 363(c)(1)) but also (at least if opposed) that economic necessity warranted termination of the contracts (so meeting the contractual requirement). Debtors did not make the additional showing that economic necessity warranted termination of the contracts, but only made the former showing that they met the business judgment test. A showing of economic necessity to terminate would require meeting a different and, perhaps, stricter test than the business judgment standard.

It also by no means is clear though that the losses at the Live Oak Plant, standing alone, would satisfy the standard of economic necessity. If PPC were, over all, healthy financially, it is unlikely that a court would find it economically *necessary* for the company to terminate contracts with growers serving an unprofitable processing plant. Even if a showing of the economic necessity for termination could have been made, in rejecting contracts with growers serving the Live Oak Plant the issue of whether economic necessity existed was not joined or resolved, and the Growers cannot now be held to have failed to controvert such an allegation.

B. Termination Between Flocks

Debtors next assert that, in any case, the Growers' contracts are flock-to-flock and each contract allows either party to freely terminate a Grower's contract between flocks. As it happens, though, only one of the Growers' contracts does not have a term stated in years but

---

necessity as a basis for termination is an element of the ordinary course of business. Thus, court authority would have been required to terminate the contracts on the basis of economic necessity as with any act a debtor or trustee proposes to take outside the ordinary course of business. *See* 3 COLLIER ON BANKRUPTCY ¶ 363.03[1], 16th ed. 2010; *In re Mickey Thompson Entm't Group, Inc.*, 292 B.R. 415, 421-22 (B.A.P. 9th Cir. 2003) (citing *In re Martin*, 91 F.3d 389 (3d Cir. 1996)) (applying broadly the principle that any transaction outside the ordinary course of business requires court approval pursuant to section 363).

8

rather has its term stated as flock-to-flock.[12] To the extent that a contract specifies a term of years, that provision must be given meaning. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (stating that "[w]e will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage." (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010))); *Hargrave v. Hargrave*, 728 So.2d 366, 367 (Fla. Dist. Ct. App. 1999) (stating that "[e]very provision in a contract should be given meaning and effect, and apparent inconsistencies reconciled if possible."). Allowing either party to freely terminate between flocks would strip the stated term of their contract of meaning.

Furthermore, the court does not read the provision allowing termination between flocks as giving PPC the freedom to terminate it insists it had. Paragraph D of five of the contracts,[13] the provision on which Debtors rely, states:

> Either the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given after a flock is settled and before a new flock is placed. Written notice from the Independent Grower should be given to the Live Production Manager or Broiler Manager. Written notice shall be given from the Company to the Independent Grower. Termination during a flock shall be in accordance with the other terms of this Agreement. Should such termination occur, the Company agrees to pay the Independent Grower for all services performed until termination of this Agreement, and the Independent Grower agrees to perform all obligations until termination of this Agreement. Once notice has been given by either party to terminate, the Company will not deliver new chicks, nor will the Independent Grower accept new chicks. Except for cause or economic necessity, Company will not terminate this Agreement without first requiring Independent Grower to follow the "Cost Improvement Program" as described in Exhibit B.

---

[12] Only Janet Brito's contract states its term as flock-to-flock. For the terms of the other contracts (none of which had expired at the time of the Rejection Opinion), *see* the Appendix.

[13] The five contracts were those with 1) Adalberto Brito d/b/a AC Paradise, 2) Bruno Lazaro Garcia d/b/a Cullinane Farms, LLC, 3) Moises Rodriguez, 4) Abel E. Tellechea d/b/a Able T Farms, and 5) Roman Vasallo d/b/a R & C Farm.

Thus, PPC may terminate between flocks without cause and in the absence of economic necessity only after "requiring [the] Grower to follow the 'Cost Improvement Program.'" Though paragraph D is not free of ambiguity, the clear implication is that a grower that successfully completes the cost improvement program will not be subject to termination; at least that is a reasonable construction of paragraph D. As the contracts were drafted by Debtors, rather than dickered, whatever ambiguity there is in paragraph D must be resolved against Debtors. *See Nat'l Ropes, Inc. v. Nat'l Diving Serv., Inc.*, 513 F.2d 53, 59 (5th Cir. 1975) (construing an agreement against a bank because it had been the drafter of the agreement); *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 627 (Del. 2003) (citing RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (1981)) (stating that Delaware follows the well-accepted *contra proferentem* principle of construction); *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 942 (Fla. 1979) (stating that ambiguities are to be construed against the drafter of the contract). The court therefore concludes that PPC could not freely terminate between flocks under paragraph D.

The Growers that had contracts including a paragraph D were not required to participate in the Cost Improvement Program. They never had the opportunity to argue that under paragraph D completing the Cost Improvement Program allowed a Grower to avoid termination. As with termination due to economic necessity, Debtors did not end their relationship with the Growers pursuant to paragraph D. Rather, they breached the contracts by rejecting them under Code § 365(a).

As for the remaining two contracts – Janet Brito's and Glenda Hudson's – there is no provision allowing termination between flocks, though Janet Brito's contract states that its term

10

is "flock to flock years [sic]." While these two contracts may be "at will" contracts as to PPC, and accordingly limited, the court need not reach that issue today.

C. Requirement for PPC to Perform

Debtors next point to the provision of the Growers' contracts that specify that PPC shall "determine the number, frequency of placement . . . of birds" (paragraph F(3)).[14] Debtors construe this term as meaning that PPC had no obligation to place any flocks with any of the Growers. Because there was no obligation of PPC to place flocks, except while a flock was placed and in a grower's possession, PPC had no contractual obligations to the grower.

The court is not prepared to find in the language of paragraph F(3) manifestation of an intent of the parties that PPC be free not to place any flocks with a grower. Indeed, the court questions whether PPC would wish a finding from it that its intent was to be free of any obligation to perform. Such a finding would evidence an intentional lack of good faith and fairness on PPC's part in the formulation of the Growers' contracts. Rather, the intent of the parties may be implied to have been that PPC was obligated to give some flocks to the grower; for example, a given grower could expect to receive flocks of roughly the same size and at roughly the same frequency as would other similarly situated growers. Paragraph F(3) is best interpreted as intended to ensure that PPC could not be held accountable because of minor differences in the placement of flocks among different growers.

In both Florida and Delaware – the states the law of which is to be applied in interpreting the Growers' contracts[15]– case law supports implying in a contract a covenant of good faith and

---

[14] The contracts of Janet Brito and Glenda Hudson, unlike the other five contracts, do not have a provision like paragraph F(3).

[15] The Janet Brito and Glenda Hudson contracts are governed by Delaware law. The other contracts of the Growers provide for application of Florida law.

11

fair dealing. *See Speedway SuperAmerica, L.L.C. v. Tropic Enters., Inc.,* 966 So.2d 1, 3 (Fla. Dist. Ct. App. 2007) (discussing the covenant of good faith and fair dealing implied in all contracts governed by Florida law); FLA. STAT. § 671.203 (imposing "obligation of good faith" under Florida's enactment of the Uniform Commercial Code); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 440-42 (Del. 2005) (stating that the "requirement that all parties to a contract act in 'good faith' toward one another spans at least three centuries of American legal thought."). In turn, this permits the court to imply an obligation of PPC to place flocks with each of the Growers. *See Gillenardo v. Connor Broad. Del. Co.*, 2002 WL 991110, at *7-8 (Del. Super. Ct. Aug. 30, 2002) (reading a duty of good faith into contractual provisions that otherwise appeared illusory, and implying contractual duties on that basis); *Pharmathene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at *11 (Del. Ch. Jan. 16, 2008) (stating that "Delaware courts try to avoid an interpretation that would render a provision illusory or meaningless."); *Great Am. Ins. Co. v. Sch. Bd. of Broward County, Fla.*, 2010 WL 4366865, at *17-18 (S.D. Fla. Jul. 31, 2010) (interpreting Florida law and declining to find a contract void for lack of mutuality of obligation and looking to other applicable law to imply a duty).

The court therefore concludes that PPC had some obligation to place flocks with the Growers under their contracts. Because the contracts are now in breach, as provided in Code § 365(g) the Growers are entitled to claims for damages to the extent PPC has failed to fulfill that obligation. Exactly what PPC's obligation was is an issue of fact, and the summary judgment evidence is inadequate for the court to resolve it.

D. Measure of Damages

Debtors argue further that the Growers' damages, if any, should be limited by (1) an obligation to mitigate; and (2) the exclusion of consequential, or non-compensatory damages.

The court will address these points first and then turn briefly to the measure of the Growers' actual damages.

1. Mitigation

Both Delaware and Florida law require a party to a contract harmed by another party's breach to mitigate its damages if possible. *See Norkei Ventures, L.L.C. v. Butler-Gordon, Inc.*, 2008 WL 4152775, at *2 (Del. Super. Ct. Aug. 28, 2008) (stating that in Delaware a "party has a general duty to mitigate damages if it is feasible to do so."); *Young v. Cobbs*, 110 So.2d 651, 653 (Fla. 1959) (applying Florida law to require a lessee to mitigate damages). It may well be that the Growers' damages should be reduced because of a failure to mitigate – for example if a Grower failed to take advantage of an opportunity to service another chicken integrator.

The summary judgment evidence, however, does not include proof of such an opportunity. Rather, Debtors point to their offer of new contracts to the Growers, arguing that the Growers should have reduced any damages they suffered by entering into such contracts. But to obtain a new contract with Debtors a grower was required to release any claims the grower might have against Debtors such as those now at issue before the court.[16] Such a requirement – that a contract party forfeit the very claim it is supposed to mitigate – taints the opportunity offered such that the court cannot fault the Growers for declining it. Mitigation of damages only requires an injured party to use ordinary and reasonable care to mitigate loss; it does not require forfeiture of property rights. *See Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So.3d 967, 982 (Fla. 2009) (stating that "the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and

---

[16] Debtors contend that new poultry growing contracts were offered to Roman Vasallo, Bruno Lazaro Garcia, Adalberto Brito, Moises Rodriguez and Abel Tellechea in exchange for release of their claims. *See* Appendix to the Motion, Ex. B, Gillis Decl. at ¶ 10. No evidence was presented as to whether Janet Brito and Glenda Hudson were offered similar contracts.

13

reasonable care,' without requiring undue effort or expense." (citing *Graphic Assocs. v. Riviana Rest. Corp.*, 461 So.2d 1011 (Fla. Dist. Ct. App. 1984) (stating that doctrine of mitigation of damages "prevents a party from recovering those damages inflicted by a wrongdoer which the injured party 'could have avoided without undue risk, burden, or humiliation.'"(quoting RESTATEMENT (SECOND) OF CONTRACTS § 305(1) (1979))))). Thus, while mitigation may ultimately enter into the calculation of the Growers' damages, the Growers' failure to mitigate has not been shown to be a proper subject for summary judgment.

2. Consequential and Non-compensatory Damages

On the other hand, Debtors are entitled to summary judgment that they are not liable by reason of breach of the Growers' contracts for consequential or non-compensatory damages. Each of the Growers' contracts contains a term by which the parties forego that category of damages.[17] Contractual provisions of this sort are enforceable under both Delaware and Florida law. *See Delmarva Power & Light Co. v. ABB Power T & D. Co.,* 2002 WL 840564, at *3-6 (Del. Super. Ct. Apr. 30, 2002) (finding binding a contract provision that limited consequential, special, indirect or incidental damages (citing DEL. CODE ANN. tit. 6, § 2-719, which states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable…")); *Orkin Exterminating Co. v. Montagano*, 359 So.2d 512 (Fla. Dist. Ct. App. 1978) (citing *Middleton v. Lomaskin*, 266 So.2d. 678 (Fla. Dist. Ct. App. 1972)) (stating that "[i]t is inescapable that Florida courts recognize and uphold, not only contracts with exculpatory clauses which limit liability, but also those which exempt liability altogether."). As a result, the Growers, to the extent they claim these sorts of damages by reason of breach of their contracts, are not entitled to recover and Debtors shall have summary judgment to such effect.

---

[17] *See* paragraph 4.3 of the Janet Brito and Glenda Hudson contracts and paragraph 14 of the remaining contracts.

3. Measure of Actual Damages

The parties have not briefed how to calculate damages to the Growers resulting from PPC's breach of their contracts. Indeed, the method of calculation may vary between the Janet Brito and Glenda Hudson contracts and the other Growers' contracts.

It appears to the court that there are a number of potential ways to calculate damages resulting from breach of the Growers' contracts.[18] Damages may run from a small sum or even zero to a very large amount depending on which method is applicable to the Growers' contracts and what evidence is presented at trial.

IV. Conclusion

It is a fundamental premise of the American legal system that a party may elect its remedy for resolving a legal problem and that the party is then bound by the consequences of the remedy selected. *See, e.g., State ex rel. Van Ingen v. Panama City*, 126 Fla. 776, 779 (Fla. 1937)

---

[18] It appears to the court that there may be at least three potential measures of damages applicable here. First, the court could follow the damages model followed by the district court in *Adams v. Pilgrim's Pride Corp.*, 2011 WL 5330301 (E.D. Tex. Sep. 30, 2011). In that case, the court calculated damages as the lost income for the length of the loan used to finance construction of the poultry houses (which was 15 years). *Id.* at *2, 7. The *Adams* court then adjusted that amount downward to reflect the fact that many of the poultry growers in that case were in various stages of repayment of the loans.

If the court were to determine that one or more of the Growers' contracts were "at will," the analysis would be different. Under Florida and Delaware law, an "at will" contract is terminable at will, provided that the terminating party give reasonable notice. *See Maytronics, Ltd. v. Aqua Vac Sys., Inc.*, 277 F.3d 1317, 1320-21 (concluding that Florida law requires reasonable notification prior to the termination of an "at will" contract); *Crawford v. David Shapiro & Co.*, 490 So.2d 993, 996-97 (Fla. Dist. Ct. App. 1986) (holding that special damages may be awarded for damages that would not have been incurred but for lack of reasonable notice in terminating an "at will" contract); *A.R. Dervaes Co. v. Houdaille Indus., Inc.*, 1981 WL 7625 (Del. Ch. Sep. 29, 1981) (holding that a contract silent as to termination was terminable at will by either party upon reasonable notice).

Alternatively, the opinion of the Court of Appeals in *In re Continental Airlines Corp.*, 901 F.2d 1259 (5th Cir. 1990), may provide a measure of damages for the present case. In *Continental,* the district court had rejected all of the appellants' claims for damages for breach of contract. The district court had based its holding upon a finding that but for unilateral changes to the contracts, the debtor would not have been able to continue its operations for want of necessary cash, and the appellants would not have recovered anything. The Court of Appeals reversed on the ground that the bankruptcy court had previously found that the debtor could have survived for approximately four more months without the changes to the contracts. The Court of Appeals reasoned that the appellants would have had a claim for damages, accruing until the debtor ceased operations after four months, if the contracts had not been rejected. Therefore, appellants were entitled to contract rejection damages for the same period.

15

(stating that the election of remedies "doctrine appears well settled that the election implies choice between alternative and inconsistent rights or remedies. The choice of one infers an election not to pursue the other. The person electing cannot enjoy both."). Debtors elected in the instant matter to utilize section 365(a) of the Code to eliminate their future obligations under the Growers' contracts. They thus chose to breach those contracts – rather than looking to the contracts and non-bankruptcy law for relief; now Debtors must accept the consequences of their breach.

The Motion will be

**GRANTED** as to consequential damages and otherwise **DENIED.**

Summary judgment will be **GRANTED** to the Growers to the extent that their claims are allowable in such amount as they might have been entitled to as damages had PPC breached their contracts immediately prior to commencement of these cases.

The parties are directed to obtain a setting for a status conference with the court to determine how to proceed in the future with disposition of the Growers' claims. Counsel may attend that status conference by telephone or in person.

It is so **ORDERED.**

## APPENDIX: GROWERS' CONTRACTS

| Contract | Choice of Law Clause | Term | Termination Clause(s) | Provision Limiting Damages |
|---|---|---|---|---|
| **Abel E. Tellechea d/b/a Able T Farms; Roman Vasallo d/b/a R & C Farm; Adalberto Brito d/b/a AC Paradise; Bruno Lazaro Garcia d/b/a Cullinane Farms LLC; Moises Rodriguez.** | Florida | **Paragraph C:** "The term of the previous contract commenced on ___ for an initial term ending on ___.* The fixed term of this Broiler Production Agreement will also continue until ___ unless otherwise terminated for cause or economic necessity under the provisions of the Agreement.** At the end of the fixed term, this Agreement will continue on a flock-to-flock basis, and shall terminate upon completion of the engagement(s) subject to the right of the Company to terminate this Agreement upon written notice to the Independent Grower in the event the Independent Grower does not timely perform its obligations hereunder as provided in this Agreement."<br><br>* The following contracts provided for terms as follows:<br>Abel E. Tellechea: Nov. 1, 2004 - Nov. 1, 2009;<br>Roman Vasallo: Aug. 3. 2006 - Aug. 3, 2011;<br>Adalberto Brito: Nov. 1, 2004 - Nov. 1, 2009;<br>Bruno Lazaro Garcia: Aug. 27, 2007 - Aug. 27, 2012;<br>Moises Rodriguez: Nov. 1, 2007 - Nov. 1, 2010.<br><br>** The following contracts provided that the fixed term would continue until the following dates:<br>Abel E. Tellechea: Nov. 1, 2009;<br>Roman Vasallo: Aug. 3, 20011;<br>Adalberto Brito: Nov. 1, 2009;<br>Bruno Lazaro Garcia: Aug. 27, 2012;<br>Moises Rodriguez: Nov. 1, 2010. | **Paragraph D:** "Either the Independent Grower or the Company shall have the right to terminate this Agreement and its Exhibits without any need for cause provided that written notice is given after a flock is settled and before a new flock is placed. Written notice from the Independent Grower should be given to the Live Production Manager or Broiler Manager. Written notice shall be given from the Company to the Independent Grower. Termination during a flock shall be in accordance with the other terms of this Agreement. Should such termination occur, the Company agrees to pay the Independent Grower for all services performed until termination of this Agreement, and the Independent Grower agrees to perform all obligations until termination of this Agreement. Once notice has been given by either party to terminate, the Company will not deliver new chicks, nor will the Independent Grower accept new chicks. Except for cause or economic necessity, Company will not terminate this Agreement without first requiring Independent Grower to follow the 'Cost Improvement Program' as described in Exhibit B." | **Paragraph 14:** "Exclusion of Incidental, Consequential, and Certain Other Damages. TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE COMPANY NOR INDEPENDENT GROWER SHALL BE LIABLE TO ONE ANOTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR NON-COMPENSATORY DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND/OR ITS EXHIBITS, AND/OR THE PERFORMANCE OF THE PARTIES UNDER THIS AGREEMENT AND/OR ITS EXHIBITS." |
| **Janet Brito d/b/a Brito Farm** | Delaware | **Paragraph 1.1:** "During a period of FLOCK TO FLOCK years from this date [Apr. 15, 2008], Pilgrim's Pride agrees to deliver to Producer groups of female and mal (sic) Pilgrim's Pride e (sic) Chickens of the appropriate age (each such flock being referred to as a "Flock"), as such Flocks are available for placement from time to time under prevailing market and production conditions and other relevant factors. Pilgrim's Pride shall deliver each Flock to | **Paragraph 4.4:** This Agreement shall become effective as of the date first above written and shall continue in full force and effect for the term set forth in section 1.1 above and with respect to the Flocks so delivered. If Producer fails to grow and care for any of said Flocks according to the standards set forth in Article II hereof, using reasonable and ordinary skill in so doing, or if Producer disposes of or attempts to dispose of any of the Flock(s), or if Producer encumbers, mortgages, or attempts to sell any of the Flock(s), or breaches any of the terms of this Agreement, then said Agreement may be terminated forthwith at the option of Gold Kist and, in the event of such termination, Pilgrim's Pride, its agents or employees shall be fully authorized to take possession of the Flocks and any unused feed or other supplies furnished Pilgrim's Pride (sic), as | **Paragraph 4.3:** "….Neither party shall be entitled to punitive, incidental, treble, special, or consequential damages with respect to any claims made with respect to this Agreement or any actions contemplated by this Agreement." |

17

| | | | | |
|---|---|---|---|---|
| | | Producer at Producer's chicken houses at the above address. Pilgrim's Pride shall not be obligated to deliver any certain number of Flocks to producer or to deliver Flocks to Producer at any certain time. Pilgrim's Pride | aforesaid, and to dispose of same in such manner as and when Gold Kist may see fit....<br>**Paragraph 4.7:** The obligations to deliver and receive Flocks under this Agreement shall last from the above date until delivery of the last Flock to Pilgrim's Pride in accordance with this Agreement. This Agreement may be terminated by either party at any time by written notice to the other in the event of material default by the other. Any such termination shall not relieve the defaulting party of any liability to the other on account of any default hereunder occurring prior to termination.<br>**Paragraph 4.9:** The foregoing constitutes the entire agreement between the parties and no representation, warranty, or understanding not contained herein shall be binding on the parties. This Agreement may be amended only upon a written agreement executed by both parties hereto. However, the terms and conditions of this Agreement, including those on Exhibit A, may be changed by Pilgrim's Pride with respect to Flocks not yet delivered to Producer at the time written notice of such change is given to Producer, provided 1) that Producer may elect to terminate this Agreement with respect to any future Flocks by written notice to Pilgrim's Pride prior to the delivery of a new Flock if Producer does not consent to such change, and 2) that the same changes are made in the same manner in all other similar existing contracts of Producers servicing hatching egg Flocks for Pilgrim's Pride in the same Pilgrim's Pride division. | |
| **Keith Hudson and Glenda Hudson** | Delaware | **Paragraph 1.1:** "During a period of 3 YEARS (2011) from this date [Dec. 2, 2008], Pilgrim's Pride agrees to deliver to Producer groups of female and mal (sic) Pilgrim's Pride Chickens e (sic) of the appropriate age (each such flock being referred to as a "Flock"), as such Flocks are available for placement from time to time under prevailing market and production conditions and other relevant factors. Pilgrim's Pride shall deliver each Flock to Producer at Producer's chicken houses at the above address. Pilgrim's Pride shall not be obligated to deliver any certain number of Flocks to producer or to deliver Flocks to Producer at any certain time. | **Paragraph 4.4:** This Agreement shall become effective as of the date first above written and shall continue in full force and effect for the term set forth in section 1.1 above and with respect to the Flocks so delivered. If Producer fails to grow and care for any of said Flocks according to the standards set forth in Article II hereof, using reasonable and ordinary skill in so doing, or if Producer disposes of or attempts to dispose of any of the Flock(s), or if Producer encumbers, mortgages, or attempts to sell any of the Flock(s), or breaches any of the terms of this Agreement, then said Agreement may be terminated forthwith at the option of Pilgrim's Pride and, in the event of such termination, Pilgrim's Pride, its agents or employees shall be fully authorized to take possession of the Flocks and any unused feed or other supplies furnished by Pilgrim's Pride, as aforesaid, and to dispose of same in such manner as and when Pilgrim's Pride may see fit....<br>**Paragraph 4.7:** The obligations to deliver and receive Flocks under this Agreement shall last from the above date until delivery of the last Flock to Pilgrim's Pride in accordance with this Agreement. This Agreement may be terminated by either party at any time by written notice to the other in the event of material default by the other. Any such termination shall not relieve the defaulting party of any liability to the other on account of any default hereunder occurring prior to termination.<br>**Paragraph 4.9:** The foregoing constitutes the entire agreement between the parties and no representation, warranty, or understanding not contained herein shall be binding on the parties. This Agreement may be amended only upon a written agreement executed by both parties hereto. However, the terms and conditions of this Agreement, including those on Exhibit A, may be changed by Pilgrim's Pride with respect to Flocks not yet delivered to Producer at the time written notice of such change is given to Producer, provided 1) that Producer may elect to terminate this Agreement with respect to any future Flocks by written notice to Pilgrim's Pride prior to the delivery of a new Flock if Producer does not consent to such change, and | **Paragraph 4.3:** "….Neither party shall be entitled to punitive, incidental, treble, special, or consequential damages with respect to any claims made with respect to this Agreement or any actions contemplated by this Agreement." |

|  |  |  | 2) that the same changes are made in the same manner in all other similar existing contracts of Producers servicing Pullet Flocks for Pilgrim's Pride in the same Pilgrim's Pride division. |  |

# # # **END OF MEMORANDUM OPINION AND ORDER** # # #