

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

United States Bankruptcy Judge

**Signed August 08, 2012**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| PILGRIM'S PRIDE CORPORATION, *et. al.*, | § | |
| | § | CASE NO. 08-45664 (DML) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the court is the *Debtors' Objection to Claim No. 34 Filed by All R's Consulting, Inc. d/b/a WOW Wings and Fresh Pack, Inc.* (the "Objection"), filed by Pilgrim's Pride Corporation ("PPC"), PFS Distribution Company, PPC Transportation Company, To-Ricos, Ltd., To-Ricos Distribution, Ltd., Pilgrim's Pride Corporation of West Virginia, Inc., and PPC Marketing, Ltd. (collectively, "Debtors") objecting to proof of claim number 34 (the "Claim") filed by All R's Consulting, Inc. d/b/a WOW Wings and Fresh Pack Inc. ("WOW"), to which

1

WOW attached as the basis for the Claim its *Amended Complaint* (the "Amended Complaint").[1] Debtors filed a *Motion for Partial Summary Judgment Relating to the Claims of All R's Consulting, Inc. d/b/a WOW Wings and Fresh Pack Inc.* (the "MSJ"), respecting which the court heard oral argument on March 23, 2011, and which the court granted as to (1) the Ninth Cause of Action for palming off, and (2) as to the Second Cause of Action for breach of contract as to the Retail Agreement (as defined below), except to the extent that WOW could amend its pleadings and allege that Debtors were joint venturers with WOW.[2] In response to the MSJ, WOW also voluntarily withdrew its Seventh Cause of Action for trademark dilution. The court denied summary judgment as to all other causes of action. The causes of action remaining that are asserted in the Claim are as follows:

**First Cause of Action** - breach of contract (pending orders);

**Third Cause of Action** - breach of contract (failure to pay royalties on WOW Wings products);

**Fourth Cause of Action** - breach of contract (failure to pay royalties on WOW Rings products);

**Fifth Cause of Action** – trademark infringement (WOW Wings);

**Sixth Cause of Action** – trademark infringement (WOW Rings);

**Eighth Cause of Action** – unfair competition (misappropriation of slots);

---

[1]  The Amended Complaint was originally filed in a proceeding styled *All R's Consulting, Inc. d/b/a WOW Wings & Fresh Pack, Inc. v. Pilgrim's Pride Corp.*, Case No. 06CV3601 (RCC) (THK) (the "New York Proceeding"), in the United States District Court for the Southern District of New York (the "District Court").

[2]  WOW did not amend the Claim to plead the existence of a joint venture as to the Second Cause of Action and therefore the Second Cause of Action is not properly before the court. (WOW did, however, allege the existence of a joint venture in the "Summary of Claims and Defenses" of the parties in the *Joint Pretrial Order on Objection to Claim No. 34* (the "Joint Pretrial Order"), and did elicit evidence aimed at proving the existence of such a relationship at trial.) Regardless, WOW failed to prove by a preponderance of the evidence that such a relationship existed, and the court would, alternatively, deny the Second Cause of Action on those grounds.

**Tenth Cause of Action** – tortious interference with business relationship (wholesale customers);

**Eleventh Cause of Action** – tortious interference with business relationship (retail customers).

Hearings on the remaining causes of action asserted by the Claim were held on December 19, 20 and 21, 2011, and on January 23 and 24, 2012, at which time the court received evidence and heard testimony from Michael Murray ("Murray"), a former Senior Vice President of Sales, Marketing and Development at PPC, Richard Rofé ("Rofé"), President of WOW, Kevin Goodman, a friend, advisor and business partner of Rofé, and Jennifer Bishop, an accounting employee of PPC. The court heard testimony by video deposition from Michael Scaglione ("Scaglione"), a broker retained by PPC to promote and develop sales of WOW's products, and Robert Wright ("Wright"), a former Senior Vice President of Sales, Marketing and Development at PPC who succeeded Murray. The court accepted into evidence designated portions of the depositions of Thomas McDonald ("McDonald"), an employee of PPC assigned to work with WOW, and Jennifer Rofé, a principal of WOW. The court now considers the testimony and other evidence presented during the hearings, along with all of the motions, briefs, post-trial briefs, and stipulations of the parties.[3]

The Objection is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(B). This memorandum opinion and order constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

## I. Background

---

[3]    Of significance is the *Stipulation and Agreed Order Regarding Objection to Claim No. 34* (the "Attorney Fee Stipulation") discussed below.

Debtors are large chicken integrators with operations in the United States, Puerto Rico, and Mexico. Debtors each commenced a voluntary chapter 11 case in this court on December 1, 2008. The court consolidated these chapter 11 cases for joint administration pursuant to Rule 1015(b) of the FEDERAL RULES OF BANKRUPTCY PROCEDURE.

WOW (or an affiliate) was the operator of a chain of chicken wing restaurants in Manhattan. WOW began developing its concept, name and client-base around 1990, primarily through the efforts of Rofé. WOW subsequently began distributing its chicken wings and related products at wholesale. As part of the development of its wholesale business, WOW ultimately entered into a relationship with PPC whereby PPC and WOW engaged jointly in the wholesale and retail sale of WOW-branded products. Rofé's primary contact at PPC was Murray, who managed the relationship and business with WOW on behalf of PPC.[4] The Claim relates to the termination of WOW's wholesale and retail relationships with PPC, the details of which are explored in greater depth below.

a.      **The Wholesale Business**

WOW marketed its "concept"—chicken wings, and later, chicken rings, sold with sauces modeled on flavors from around the world—to numerous restaurants and similar venues such as bars, schools, pizzerias and stadiums, as well as to the food-service distribution companies that supply such establishments. WOW used various companies such as PPC and "Tyson's"[5] (as identified in WOW's pleadings) to supply its wholesale products. However, in the late 1990's WOW, in part at PPC's instance, made PPC its exclusive supplier. Rofé testified that Murray

---

[4]      For routine, day-to-day matters, such as placing orders, WOW had contact with various PPC employees, including McDonald. After Murray left PPC, Wright oversaw the relationship between PPC and WOW, until such relationship was terminated.

[5]      WOW did not make clear whether it dealt with Tyson Foods, Inc., or a subsidiary thereof.

represented that PPC wanted to be WOW's sole supplier and wanted to partner with WOW in its wholesale business.[6]

Purchase orders were placed directly with WOW. To fill wholesale purchase orders, WOW purchased poultry products from PPC. PPC invoiced WOW and shipped the WOW-branded poultry products directly to customers in accordance with directions received from WOW. WOW was responsible for delivering the sauce component to customers. WOW profited by applying its mark-up to the price it paid PPC. WOW was paid directly by the wholesale customer.

Occasionally, a third party would place an order directly with PPC for wholesale products. When that happened PPC would pay a rebate to WOW for each such sale. Such orders were few.

WOW had no written agreement with PPC relating to the wholesale side of the business. Rofé testified (and Murray to some extent confirmed) that PPC made numerous oral representations to WOW that it would continue, and was obligated to continue, to supply WOW with product. Specifically, Rofé testified that, despite his requests that the PPC-WOW arrangement be reduced to writing, Murray repeatedly assured him that PPC would honor its word without the need of a formal contract.[7]

b.     **The Retail Business**

---

[6]     While Murray did not expressly corroborate Rofé's account, Murray did testify that in 1996 PPC made a commitment to meet all of WOW's supply needs at competitive national pricing.

[7]     An e-mail exchange between Murray and Rofé that took place in early July 1997 corroborates Rofé's account. In response to an e-mail sent by Rofé, in which Rofé asked PPC to sign a writing memorializing the relationship between PPC and WOW, Murray responded that: "I might lose my mind, but I don't lose my contracts etc. The formality of contracts are very counter to my values.....Let me know your risk concerns and I'll handle them to your satisfaction without a legal parasite." [*sic*] *See* exh. 197.

WOW began discussions with PPC in 1995 to expand its business into the retail market. Rofé testified that these discussions were initiated by PPC. The parties exchanged two letters (collectively, the "Retail Letters") setting forth the potential duties of each party. In a letter from Murray, dated April 11, 1996, PPC proposed to enter into a "joint venture agreement" with WOW, which agreement would have restricted either party from pursuing the venture separately for a certain period. *See* exh. 5. Apparently no agreement was reached at that point. A second letter sent by Rofé on behalf of WOW, dated April 1, 1997, proposed certain terms which would govern a potential agreement to be reached at a later date. *See* exh. 6. No agreement was reached then either.

Rofé testified that WOW reached an agreement with PPC (the "Retail Agreement") with respect to the retail side of its business sometime in 1998. Though the claimed Retail Agreement was never formally documented in a writing signed by either party, the Retail Letters overlapped substantially in their material terms, and both Rofé and Murray testified that the retail operation proceeded consistently with the Retail Letters. The parties also executed two license agreements with respect to the retail business, the "Wow Wings License Agreement," dated June 11, 1998, and the "Wow Rings License Agreement," dated April 22, 1999 (together, the "License Agreements"). Under the License Agreements, PPC was given a nonexclusive license to use WOW's trademarks in connection with the sale of poultry products. PPC agreed to pay WOW a specified royalty for each item sold.

The primary product sold at retail was an "at-home wing kit" consisting of a bag of frozen, fully-cooked wings, a sauce packet, and a "shake-and-serve" bag, sold in an outer bag branded with the WOW Wings trademark. Chicken rings were also sold as part of the retail side in a bag with a WOW Rings trademark. The retail product was sold in grocery stores. Orders

from grocery stores and food-service distributors were usually placed with Scaglione. PPC paid Scaglione's commissions on the sale of the retail products. PPC produced, packaged, and shipped the retail products to the purchaser. PPC invoiced and collected the purchase price from the retail customer. PPC would then pay the specified royalty to WOW.

In order to place the product in grocery stores, the parties obtained retail and warehouse slots for WOW products.[8] WOW asserts that it was able to negotiate slotting rights and to assist PPC in obtaining those rights by its actions and brand strength.[9] PPC paid any required slotting fees to retailers. With respect to the retail side of the business, consistent with the Retail Letters, PPC paid all of the marketing and promotional expenses, including advertising.

The WOW Wings License Agreement provided PPC with a license to use the WOW Wings trademark for a term of five years. By its terms, the WOW Wings License Agreement expired on June 22, 2003. The WOW Rings License Agreement provided PPC with a license to use the WOW Rings trademark for a term of three years. The WOW Rings License Agreement expired by its terms on May 6, 2002. Notwithstanding the expiration of the License Agreements, the parties' relationship continued as before. PPC continued to produce and sell WOW-branded products in response to purchase orders received from Scaglione, and PPC continued to pay a royalty to WOW in accordance with the terms of the License Agreements.

### c. Termination of the Parties' Relationship

Rofé testified that the parties' relationship began to change in late 2003 as a result of PPC's acquisition of the poultry business of ConAgra Foods, Inc., which included the Pierce division, 95% of whose sales were chicken wings. WOW claims that PPC became a direct

---

[8]     In this context, the term "slots" refers to the right to place merchandise for sale within a grocery store or to store merchandise at a grocery wholesaler.

[9]     Scaglione and Murray both testified, as did Rofé, that WOW had assisted PPC in obtaining slotting rights at no cost or reduced cost from one or more retailers.

competitor of WOW as a result of the acquisition. Debtors, on the other hand, claim that by the summer of 2004, PPC determined that it was losing money on the sale of WOW products and decided to terminate the relationship to stem those losses.[10]

On July 13, 2004, at a meeting and in a letter dated that same day (the "July Letter"), PPC presented WOW with two options. Under the first option ("Option A"), PPC would continue to supply WOW-branded products under a new pricing schedule, and PPC would no longer assume any responsibility or expense related to, *inter alia*, sales, marketing, customer billing or warehousing and distribution. Under the second option ("Option B"), PPC would cease doing business with WOW entirely, effective August 13, 2004.

On July 17, 2004, WOW presented a "counterproposal" to PPC. The counterproposal provided that the parties continue to operate on similar terms until June 30, 2005, while WOW attempted to find a new supplier. PPC rejected WOW's counterproposal. On August 13, 2004, PPC delivered by letter the formal notice of termination (the "August Letter"), by which PPC purported to terminate all agreements and relationships between the parties.

WOW asserted that, upon notice of termination, it made an immediate effort to find a replacement supplier for its wholesale business, but that it was unable to do so for several reasons. Rofé testified that the 30-day notice PPC gave was much too short a period in which to locate a supplier that could meet its demands. Rofé further testified that even if it could have located another supplier within the 30-day period, the unavoidable time delay in producing and packaging chicken products would have resulted in an inability to supply chicken products to its wholesale customers for a period of time that would have been unacceptable. The court finds that

---

[10]  In the Spring of 2004, PPC terminated Murray and replaced him with Wright, who instituted a review of certain of PPC's relationships including that with WOW. Wright testified that the review demonstrated PPC was losing substantial amounts through its dealings with WOW – though this determination was based on a "cost" figure for PPC based on the prices available to it in the market place.

the 30-day notice of termination was grossly inadequate and that PPC knew or should have known that the effect of 30 days notice would be to destroy WOW's business. [11]

Additionally, though PPC offered to sell WOW the remaining product under Option B, Rofé testified that WOW (which was not a distributor) did not have the cold storage facilities necessary to store the chicken products, and thus would have been unable to purchase the product.[12] As such, WOW's wholesale customers would have had to turn to other suppliers.

### i. Wholesale Side

At the time of the termination of the parties' relationship, WOW had an outstanding balance on its account with PPC in the sum of approximately $10,038.68. Additionally, prior to termination, PPC had received seven pending wholesale orders from WOW.[13] PPC demanded advance payment for the pending wholesale orders, which WOW did not provide.[14] The orders were never delivered, nor was WOW's balance of $10,038.68 ever paid despite efforts by PPC to collect it.

### ii. Retail Side

---

[11] The court takes notice of the findings it made in a prior opinion in this case: *In re* Pilgrim's Pride Corp., 403 B.R. 413, n.16 (Bankr. N.D. Tex. 2009) (the "Rejection Opinion"). In the Rejection Opinion, the court noted that it takes approximately 49 days to raise a chicken for slaughter. Rofé testified that the chickens raised for the production of the chicken wings were raised to specifications relating to size and taste, and that it would have been impossible to find a supplier able to meet those specifications with product on hand. Therefore it would have taken WOW more than 49 days to find a substitute supply of wings – even if WOW could have assumed the other functions of PPC such as storage.

[12] As such, even if WOW had wanted to continue the relationship under Option A, WOW would have been unable to do so because it did not have, *inter alia*, the necessary cold storage facilities to take responsibility for warehousing and distribution of the product.

[13] WOW initially claimed there were twelve purchases orders, but Rofé admitted in his deposition, and in his testimony at the hearings, that five of the orders were submitted after termination of the parties' relationship on August 13, 2004. The seven purchase orders were introduced into evidence. *See* exhs. 20, 171.

[14] PPC changed the shipment terms in a series of e-mail exchanges with Rofé in July and early August. The change in terms was reiterated in the letter PPC sent to WOW on August 13, 2004, the date of termination, in which PPC directed WOW to remit payment in advance for all purchase orders that were pending as of that date. *See* exh. 19.

In its July Letter, PPC projected that there would be approximately 6,500 cases of WOW-branded retail products in inventory on August 13, 2004. In the August Letter, PPC informed WOW that it would "eliminate" the existing inventory.[15] Nonetheless, after August 13, 2004, the broker, Scaglione, began selling the remaining inventory. Scaglione testified that it took approximately six months to liquidate the inventory. The product was sold with Wow Wings trademarks on it, and PPC withheld payment of any royalty on the sales of the remaining inventory and gave no notice to WOW of the sales.

### d.    The New York Litigation

WOW initially filed a complaint against PPC in the District Court on May 11, 2006. PPC responded by filing a motion to dismiss which was denied in part and granted in part. WOW subsequently filed the Amended Complaint on May 31, 2008 asserting the causes of action subsumed by the Claim and presently before the court. PPC filed an answer to the complaint on June 26, 2008. Debtors subsequently filed their chapter 11 petitions in this court, and on January 12, 2009, WOW filed the Claim in Debtors' bankruptcy cases claiming damages of $10,141,085, attaching to it the Amended Complaint.

## II.    Discussion

It was the court's understanding that the parties agreed that as to matters governed by the Uniform Commercial Code (the "UCC"), the law of Texas would apply, and that as to unfair competition claims, the law of New York would apply. However, the post-trial briefing of the parties appears inconsistent with that agreement. Nevertheless, the court concludes that the laws of Texas and New York would lead to substantially similar outcomes in the instant litigation.

---

[15]    Specifically, PPC stated: "Pilgrim's Pride will begin to move forward with the elimination of all WOW labeled finished goods inventories, packaging, raw materials from our system, and conversion of retail and wholesale slots to Pilgrim's labeled products." *See* exh. 19.

10

For the sake of convenience, the court will apply the UCC as effective in Texas[16] as to those matters governed by it, and the law of New York as to the other causes of action.[17]

### a. Wholesale

#### i. Breach of Contract – Pending Purchase Orders (First Cause of Action).

WOW's First Cause of Action is a claim for breach of contract predicated on the seven[18] wholesale purchase orders submitted to PPC prior to termination of the parties' relationship.[19] WOW asserts that the electronically submitted purchase orders represent binding contracts

---

[16]     TEX. BUS. & COMM. CODE ANN. § 1.101 *et seq.* (hereinafter referred to as "TBCC").

[17]     Debtors raised an objection at trial under Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") to WOW's introduction of evidence relating to damages beyond the scope of damages asserted at the deposition of its Rule 30(b)(6) designee, Rofé. Debtors claim that such evidence should be excluded. The parties submitted briefs after trial on the issue.

Courts generally apply four discretionary factors when deciding whether to exclude evidence introduced at trial based on an objection raised under Rule 30(b)(6): 1) the party's explanation for the failure to comply with the discovery order; 2) the importance of the testimony of the precluded witness; 3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and 4) the possibility of a continuance. *See* Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 269 (2d. Cir. 1999).

To the extent Rofé exceeded the scope of the Rule 30(b)(6) deposition in his testimony at trial, the court finds that the discretionary factors, as applicable in the case at bar, disfavor exclusion of his testimony. Furthermore, in calculating damages below, the court has not relied on testimony given at trial that exceeded the scope of Rofé's Rule 30(b)(6) deposition.

[18]     *See supra* note 13.

[19]     In its trial brief, and at the hearings, WOW argued that, in addition to breach of contract damages for the pending purchase orders, it was entitled to consequential damages for breach of an agreement related to the wholesale side (the "Wholesale Agreement") under the First Cause of Action. The court rejects WOW's argument for two reasons.

First, the claim for damages alleged in the Amended Complaint made no mention of damages relating to breach of the Wholesale Agreement. It was limited by its terms to a claim for breach of pending purchase orders. WOW did not amend the Amended Complaint prior to the hearings (though WOW did make mention of such a claim in the "Summary of Claims and Defenses" in the Joint Pretrial Order.) Therefore, such a claim is not properly before the court.

Second, the District Court in the New York Proceeding dismissed WOW's claim for breach of the Wholesale Agreement, concluding that such an agreement, if proven, would have been barred because it would have been subject to the Statute of Frauds. The court concurs with the District Court that the Wholesale Agreement would have been subject to the Statute of Frauds and WOW's claim for breach of the Wholesale Agreement is thus barred.

between WOW and PPC. Debtors argue that the purchase orders are not contracts because they were mere offers which PPC did not accept, and that PPC had no obligation to supply the wholesale products to WOW.

In order to prove the existence of a binding contract a party must establish the following elements: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3D 231, 235-36 (Tex. App. – Houston [1st Dist.] 2007, no pet.).

Under the TBCC, a "contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TBCC § 2.204(a). As such, an implied in fact contract may arise from the parties course of dealing under the TBCC, provided that all of the contractual elements are met. *See Preston Farm & Supply Farm & Ranch Supply , Inc. v. Biozyme Enters.*, 625 S.W.2d 295, 298 (Tex. 1981).

The court is satisfied that the purchase orders tendered by WOW before termination of the parties' relationship were valid and binding contracts based on the parties' extensive course of dealing. PPC was bound by the purchase orders not because it had an obligation to supply product to WOW, but because *PPC had offered* to sell product on substantially the same terms for the past decade. WOW's tender of the purchase orders was not an offer to purchase product (as it would be, if WOW, for instance, had responded to an advertisement in a catalogue) but an acceptance of PPC's standing offer to sell to WOW. That such an offer existed is clear from the parties' course of dealing. The purchase orders were binding contracts.[20]

---

[20]  Rofé also testified that after PPC received orders from WOW, PPC would customarily send an acknowledgment of receipt before shipping. The communications between WOW and PPC concerning

A party suing for breach of contract must establish: (1) the existence of a valid contract, (2) performance, or tendered performance, by the plaintiff, (3) breach of the contract by the defendant, and (4) damages caused by the breach. *Williams*, 264 S.W.3d at 235-236 (citations omitted). The court concludes that the elements of breach have been proven in this case.

However, Debtors assert that PPC made a proper demand for adequate assurance when it demanded prepayment of the orders as a condition of shipment pursuant to its rights under TBCC section 2.609(a).[21] Debtors argue that WOW's failure to provide prepayment as adequate assurance served as a repudiation of the contracts. The court, however, must reject this argument.

PPC's demand for payment in advance was not a proper demand for adequate assurance. Though it is true that a party may ask for adequate assurance when there is doubt as to one party's ability to perform, Debtors put forth no evidence demonstrating that PPC sincerely doubted WOW's ability or willingness to perform. *See* TBCC § 2.609(b)("Between merchants the reasonableness of grounds for insecurity and the adequacy of any such assurance offered shall be determined according to commercial standards."). Rather, Debtors merely asserted that because PPC was terminating the relationship, and WOW had an outstanding balance (which was not yet due), PPC was entitled to adequate assurance.[22] Because Debtors provided no

---

shipment terms for the seven purchase orders (including in the August Letter) clearly demonstrate that PPC acknowledged receipt of such orders. Therefore, the court finds, in the alternative, that even if WOW's tender of orders were to be construed as an offer to PPC, such acknowledgment by PPC would have constituted an acceptance of WOW's offer given the parties' extensive course of dealing over ten years (notwithstanding PPC's later attempt to change the payment terms). The court notes that under either theory, the contracts formed for the pending purchase orders satisfy the TBCC's Statute of Frauds.

[21] TBCC § 2.609(a) provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other party may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."

[22] Moreover, that PPC's communications would have constituted a proper demand for adequate assurance if PPC had serious doubts about WOW's ability to perform is highly dubious. The language that Debtors

evidence that PPC doubted WOW's ability to perform, PPC had no "commercially reasonable" grounds to demand adequate assurance, and WOW had no obligation to provide such assurance. Moreover, a unilateral demand for prepayment does not equate to a written request for adequate assurance as provided for in TBCC section 2.609. *See, e.g., Nat'l Ropes, Inc. v. Nat'l Diving Serv., Inc.*, 513 F.2d 53, 61 (5th Cir. 1975) (holding that a request to accelerate payment did not represent a demand for adequate assurance under a Florida provision identical to TBCC section 2.609).

In an action for breach of contract, actual damages may be recovered when loss is the natural, probable and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). WOW's loss of profits from breach of the seven purchase order contracts was easily foreseeable and the court awards WOW damages for its lost profits. For clarity, WOW's damages for lost profits are calculated separately below.

### b. Retail

#### i. Trademark Infringement Claims (Fifth and Sixth Causes of Action)[23]

WOW's Fifth and Sixth Causes of Action allege that PPC infringed WOW's WOW Wings and WOW Rings trademarks by "selling their product in WOW branded packaging after August 13, 2004, without the authority or consent of WOW Wings to utilize its trademark or

---

assert constituted a proper demand was provided in the termination letter and reads: "If you will contact accounts receivable (Andrew Covey) and arrange for payment in advance of shipment we will be happy to ship the orders. If not, all orders currently in our system and requiring shipment after August 12th will be cancelled."

[23] WOW's Third and Fourth Causes of Action are also addressed in this section.

trade name, and thus misrepresenting those products as WOW Wings products and causing customer confusion, to the detriment of WOW Wings."[24] Amended Complaint at ¶¶ 98, 103.

These causes of action are governed by the trademark and trademark licensing and infringement laws (the Lanham Act, 15 U.S.C. §§ 1051-1127, hereinafter the "Lanham Act"). The elements of a trademark infringement claim under the Lanham Act are: (1) any reproduction, counterfeit, copy or colorable imitation of a mark (2) without the registrant's consent (3) in commerce (4) in connection with the sale, offering for sale, distribution or advertising of any goods (5) where such use is likely to cause confusion, or to cause mistake or to deceive. *Service Merch. Co. v. Serv. Jewelry Stores, Inc.*, 737 F. Supp. 983, 991 (S.D. Tex. 1990); 15 U.S.C. § 1114(1)(a).

Debtors argue that PPC's sale of WOW-branded goods was not trademark infringement because PPC had an implied license to use WOW's trademark after the License Agreements expired, and that the implied license continued even after PPC terminated the relationship between the parties.[25]  The evidence directly contradicts Debtors' assertions.

McDonald stated in the July Letter that, effective immediately, "any and all previous agreements and/or contracts between Pilgrim's Pride and WOW are terminated."  Further, in the August Letter, McDonald was no less unequivocal:

> [E]ffective today August 13, 2004, Pilgrim's Pride will cease any and all business relationships and affiliations with WOW and its associated agencies (All R's Consulting, Fresh Pack, etc.).

---

[24]  WOW provided evidence that both marks were registered trademarks by the United States Patent and Trademark Office, which was not disputed by Debtors.  *See* exh. 181, 182.

[25]  WOW did not dispute that an implied license to use the trademarks continued until the relationship was terminated on August 13, 2004.

Nevertheless, Debtors take the untenable position that though PPC purported by the July Letter and August Letter to end its relationship with WOW *in toto*, the implied license (but no other implied contract with WOW) survived termination because WOW failed to expressly revoke it.

The July Letter and August Letter, by their terms, unambiguously terminated any implied license that existed after expiration of the License Agreements.   WOW was not required to explicitly terminate, again, that which had already been terminated by PPC.   Accordingly, the implied license ended on August 13, 2004, and all sales of products using WOW's trademarks after that date infringed WOW's trademarks.[26]   *See Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975) (stating that "once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement."); *See also Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983); *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 143 (3d. Cir. 1981).

The Lanham Act states that:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office…shall have been established…, the plaintiff shall be entitled… to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action…

15 U.S.C. § 1117.

Here, the court awards WOW profits from the infringing transactions – that is the gross proceeds from the sale of WOW-branded retail products sold after August 13, 2004.   After termination, PPC's only options were to destroy the product or sell it as labeled, as relabeling the products was not feasible.   Thus, absent infringing conduct, the products as labeled were

---

[26]   An internal PPC e-mail, dated February 10, 2005, was sent by an employee who had seen WOW-branded products in a grocery store.  *See* exh. 26.  Another e-mail sent from Scaglione on April 21, 2005, discussed sales of WOW branded products to a grocery store in March of 2005.  These e-mails unambiguously establish that PPC was infringing WOW's trademarks approximately 7-8 months after terminating its implied license.

essentially valueless to PPC.[27] PPC chose to sell the product as labeled and retain the profits entirely for itself, thereby infringing WOW's trademarks.[28] PPC paid no royalties to WOW for post-termination sales.[29] Accordingly, the entire gross proceeds of the sale of WOW-branded products were, in a sense, PPC's profits, because it would have otherwise received no money by reason of those products.[30] For clarity, WOW's damages relating to the infringement are calculated separately below.

The court also awards WOW "the costs of the action" as provided for in the Lanham Act. 15 U.S.C. § 1117. WOW's damages relating to the costs of the action will also be addressed below.

WOW's Third and Fourth Causes of Action for breach of the License Agreements are predicated on royalties owed from the post-termination sales of WOW Wings and WOW Rings products. Because the court awards WOW the entire proceeds from those sales, the court need not address the royalties claimed in the Third and Fourth Causes of Action. For practical purposes, any damages due by reason of the Third and Fourth Causes of Action are subsumed in the damages awarded on WOW's infringement claims.

### ii. The Unfair Competition Claim – Misappropriation of Slots (Eighth Cause of Action).

---

[27]     The court notes that PPC did offer to sell the remaining inventory to PPC at the price and on the terms indicated in the July and August Letters. However, as discussed above, WOW was unable to purchase the inventory because PPC refused to warehouse or distribute the inventory going forward, and WOW did not have the capability to do so. Thus, while PPC could have disposed of the remaining inventory by gradually selling it through WOW over time, and therefore have avoided infringing WOW's mark, its own actions in terminating its relationship with WOW precluded it from doing so.

[28]     Wright testified that he believed PPC had sold the remaining inventory through Scaglione at a distressed price on the secondary market.

[30]     The Lanham Act provides that in awarding profits, the court has significant discretion over how to calculate profits. 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."). The court concludes that the circumstances leading to and surrounding PPC's unauthorized sales of product bearing WOW's marks warrant the damages here awarded.

17

WOW's Eighth Cause of Action alleges that PPC misappropriated slots where WOW products were placed in grocery stores in violation of New York's unfair competition laws.

Under New York law, the tort of unfair competition requires "allegations of unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and talent." *Norbrook Labs., Ltd. v. G.C. Hanford Mfg. Co.*, 297 F.Supp.2d 463, 491 (N.D.N.Y. 2003) (internal quotations and citations omitted). Misappropriation has long been recognized as a form of unfair competition in New York. *Johnson & Johnson v. Am. Nat'l Red Cross*, 552 F.Supp.2d 434, 446 (S.D.N.Y. 2008). Misappropriation consists of taking advantage in bad-faith of "the results of the skill, expenditures and labors of a competitor." *Id.* (*citing ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 477 (2007)). No single element or act is required to establish unfair competition and the court may view the unfair competition from a totality of the circumstances. *See Electrolux Corp. v. Val-Worth Inc.*, 161 N.E.2d 197, 205 (N.Y. 1959).

PPC's conduct did not rise to the level required for unfair competition. To demonstrate that PPC's actions constituted a misappropriation of WOW's skills, expenditures and labors, WOW would have had to demonstrate, at a minimum, that PPC's actions were taken in bad faith. Put differently, for PPC's conduct to be actionable, the termination of its relationship with WOW would have had to have been at least partially motivated by the intent to misappropriate WOW-brand slots for its own products. WOW has failed to prove such bad faith intent for several reasons.

First, PPC set forth a valid business reason for terminating the relationship; it concluded it was losing a substantial amount of money on the sale of WOW products. As such, PPC

offered a plausible good faith explanation for its termination of the relationship.  WOW failed to offer evidence rebutting this explanation.[31]

Second, WOW failed to prove that when PPC terminated the relationship, it did so with the purpose of misappropriating the slots.  Rather, the evidence before the court would tend to suggest that any assumption by PPC of slots that had been procured for WOW-branded products was merely incidental to termination of the parties' relationship. That PPC may have, after the fact, decided to utilize slots that were previously dedicated to WOW's products, does not prove that PPC's motivation for ending the relationship was to do so. Viewed from a totality of the circumstances, PPC's conduct does not demonstrate the kind of culpable conduct necessary to find PPC liable for the tort of unfair competition.

The court sustains the Objection as to WOW's Eighth Cause of Action.

### iii.    The Tortious Interference Claims (Tenth and Eleventh Causes of Action).

WOW's Tenth Cause of Action is predicated on its relationships with its wholesale customers, and WOW's Eleventh Cause of Action is predicated on its relationships with its retail customers.[32]  WOW alleged that PPC:

> intentionally and without justification engaged in the use of wrongful and/or unlawful means to secure a competitive advantage over WOW Wings and to damage WOW Wings' relationship with its customers in that (a) [PPC] used Rofé and the WOW Wings name, brand, and executives to obtain wholesale customers for WOW branded products, (b) [PPC] produced and shipped WOW Wings

---

[31]    Though WOW disputed that PPC was losing money and further argued that the joint retail business, being in its early stage, was not fairly assessed by PPC in 2004, the record does not justify the conclusion that PPC was not principally motivated by its belief that the retail business was for it a losing proposition.

[32]    It is difficult to see how WOW could make out a cause of action for interference with *its* retail customers, since such customers were in fact customers of PPC; WOW's primary role in the retail business was as licensor of its mark.  Though WOW attempted to prove at trial that its relationship with PPC was more than merely that of licensor-licensee, and, as such, that inferentially the retail customers were also its customers, the court finds that it failed to do so by a preponderance of the evidence.

Additionally, to the extent that a licensor-licensee relationship could give rise to a relationship actionable under New York tort law, it was not so pleaded.  The court therefore sustains the Objection as to WOW's Eleventh Cause of Action.  As such, the rest of the discussion relates only to the Tenth Cause of Action.

branded products to those customers until WOW Wings established a loyal customer base, (c) [PPC] then ceased production of WOW branded products, effectively putting WOW Wings out of business, and (d) [PPC] then expropriated WOW Wings wholesale customers for it[s] own, and began selling and shipping to them competing [PPC] branded products.

Amended Complaint at ¶ 118.

To establish the tort of interference with prospective economic advantage a plaintiff must prove that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan* (*Carvel I*), 350 F.3d 6, 17 (2d Cir. 2003). However, the "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan (Carvel II)*, 3 N.Y.3d 182, 192 (N.Y. 2004). Though it is true that "economic pressure brought to bear by one contracting party on the other may, on rare occasions, be tortious (…), it cannot constitute the tort of interference with economic relations." *Id.* (citations omitted). In other words, at least some activity complained of must be directed against the third party with whose relationship the tortfeasor wishes to interfere. Thus WOW's tortious interference claim fails for several reasons.

First, WOW only alleged and offered evidence related to the economic pressure that PPC placed on it. It did not allege that PPC had directed any conduct towards its wholesale customers. Thus, to the extent PPC's conduct may have risen to the level of a tort, it could not, by definition, have been the tort of interference with a prospective business relation. Second, even assuming *arguendo* that the behavior complained of were cognizable as tortious interference in New York, the court finds that WOW failed to establish that PPC's actions in terminating its relationship with WOW were motivated by a desire to destroy WOW's business

relationships with its wholesale customers. The evidence before the court suggests that PPC's motivation in terminating its relationship with WOW was to stem its losses on the sale of WOW-branded products, not to sabotage WOW's relationships. WOW put forth no evidence demonstrating the sort of malicious or dishonest, unfair or improper conduct vis-à-vis PPC's transactions with WOW's wholesale customers that is required.

Though PPC's actions caused WOW to terminate its relationship with its wholesale customers, WOW failed to prove that PPC intentionally interfered with those relationships or that PPC did so solely out of malice or used dishonest, unfair or improper means to do so.

The Objection must be sustained as to the Tenth and Eleventh Causes of Action.

### iv.   Computation of Damages and Offset

As to the First Cause of Action, the court awards WOW's estimated profits from the seven pending wholesale orders, which based on All R's Consulting, Inc.'s gross margin[33] in the wholesale business from 2003 of 13%, are $6,433.72.[34]

As to the Fifth and Sixth Causes of Action, the court awards the net sales proceeds from post-license sales of WOW branded products, which Debtors showed to be in the amount of $229,173. *See* exh. 189. Debtors have alleged that they are entitled to a setoff of $10,038.68, which Wow Wings owed PPC as of termination. Testimony from witnesses of both parties confirmed that PPC was due this amount on its account receivable. The court therefore awards PPC the amount of $10,038.68 to offset WOW's damages.

### v.   Attorney's Fees

---

[33]   The court uses All R's Consulting, Inc.'s gross margin because the seven purchase orders were submitted by All R's Consulting, Inc. rather than Fresh Pack, Inc.

[34]   All R's Consulting, Inc.'s total income in 2003 was $807,519.27 and its gross profits were $105,414.49, yielding a gross margin of approximately 13%. *See* exh. 71. The seven purchase orders were for products totaling $49,490.18, of which WOW's profit would have been approximately $6,433.72. *See* exh. 171.

Counsel entered into the Attorney Fee Stipulation, which governs how attorney's fees may be awarded. Unless the parties can agree to what reasonable fees are allowable by law, the court will hear claims for fees pursuant to the Attorney Fee Stipulation upon request of the parties at a future date, but declines to award attorney's fees at this time. Court costs are assessed to Debtors, as discussed above.

### III. Conclusion

The court **OVERRULES IN PART** and **SUSTAINS IN PART** the Objection as to WOW's Breach of Contract claim for pending purchase orders, the First Cause of Action, and **ALLOWS** WOW's actual damages of $6,433.72.

The court **SUSTAINS** the Objection as to WOW's claim under the Second Cause of Action, the Breach of Contract claim for the Retail Agreement.

The court **OVERRULES** the Objection as to WOW's claims under the Third and Fourth Causes of Action, the Breach of Contract claims for the License Agreements, to the extent that such relief granted pursuant to the Fifth and Sixth Causes of Action also constitutes relief as to these claims.

The court **OVERRULES** the Objection as to WOW's claims under the Fifth and Sixth Causes of Action, the Trademark Infringement Claims. The court **ALLOWS** the Claim in the amount of $229,173, the proceeds from the post-termination, unlicensed sales of WOW-branded retail and wholesale inventory.

The court **GRANTS** PPC's setoff of $10,038.68 for WOW's unpaid accounts.

The court **DEFERS** final ruling on an award of the "costs of the action" under the Lanham Act, which costs are to be approved by the court in a later order.

The court **SUSTAINS** the Objection as to WOW's claim under the Eighth Cause of Action, the Unfair Competition Claim for the Misappropriation of Slots.

The court **SUSTAINS** the Objection as to WOW's claims under the Tenth and Eleventh Causes of Action, the Tortious Interference Claims.

The Claim is, therefore, **ALLOWED** in the amount of $225,568.04, subject to the court's determination of fees and costs at a later time, and otherwise **DISALLOWED**.

**IT IS SO ORDERED.**

**# # # # END OF MEMORANDUM OPINION AND ORDER # # # #**